08 CV 03324

 JUDGE SWEET

MARK K. SCHONFELD
REGIONAL DIRECTOR

Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, New York 10281
(212) 336-0077 (Gizzi)

RECEIVED
APR 03 2008
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,                :

                Plaintiff,                 :

      - against -                                  :

PENTAGON CAPITAL MANAGEMENT PLC and       :
LEWIS CHESTER,                                             :

              Defendants,                :        **COMPLAINT**

      - and -                                      :

PENTAGON SPECIAL PURPOSE FUND, LTD.,          :

           Relief Defendant.          :

-------------------------------------------------------------------x

The plaintiff Securities and Exchange Commission ("Commission") alleges the following

against defendants Pentagon Capital Management PLC ("PCM") and Lewis Chester ("Chester"

or, together with PCM, the "Defendants") and relief defendant Pentagon Special Fund, Ltd. (the

"Pentagon Fund" or "Relief Defendant") (PCM, Chester, and Pentagon Fund are sometimes

referred to collectively as "Pentagon"):

**SUMMARY**

1.     The Commission brings this enforcement action against United Kingdom-based hedge fund adviser PCM and its Chief Executive Officer, Chester. PCM and Chester orchestrated a scheme to defraud mutual funds in the United States ("U.S. mutual funds") and their shareholders through late trading and deceptive market timing.

2.     From approximately June 1999 through September 2003, PCM actively traded U.S. mutual funds through Pentagon Fund's accounts at numerous broker-dealers in the United States ("U.S. broker-dealers").

3.     PCM routinely engaged in late trading of U.S. mutual funds through Pentagon Fund's accounts at two U.S. broker-dealers. PCM placed orders on behalf of its client, the Pentagon Fund, to buy, redeem, or exchange mutual fund shares after the 4:00 p.m. Eastern Time ("ET") market close while still receiving the current day's mutual fund price, or net asset value ("NAV"). This illegal practice enabled Pentagon Fund to profit – at the expense of other shareholders in the U.S. mutual funds – from market events that occurred after 4:00 p.m. ET, but that were not reflected in the price that Pentagon Fund paid for the mutual fund shares.

4.     PCM also used deceptive techniques to market time U.S. mutual funds. Some U.S. mutual funds, for example, prohibited market timing and monitored trades above a certain dollar threshold. PCM therefore opened numerous accounts for the Pentagon Fund at various U.S. broker-dealers, and split Pentagon Fund trades among these multiple accounts to keep the size of the trades below the threshold and hide the extent of the Pentagon Fund's trading from the U.S. mutual funds.

5.     PCM also used multiple accounts so that when a U.S. mutual fund detected market timing and informed the Pentagon Fund to stop, PCM would simply transfer funds to a

new Pentagon Fund brokerage account that the U.S. mutual fund was unaware of, and Pentagon Fund would then resume market timing the same mutual fund.

6.        Chester provided instructions to, or otherwise communicated with, registered representatives ("RRs") at U.S. broker-dealers in order to direct Pentagon Fund's late trading and deceptive market timing.

7.        PCM, Chester, and Pentagon Fund benefited from this late trading and deceptive market timing at the expense of the U.S. mutual funds and their shareholders. Pentagon Fund earned illicit profits of approximately $62 million from its late trading and deceptive market timing of U.S. mutual funds. PCM and Chester obtained ill-gotten gains from the late trading and deceptive market timing scheme, through, among other things, their receipt of performance and management fees for managing the Pentagon Fund.

## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

8.        PCM and Chester, directly or indirectly, singly or in concert, engaged in transactions, acts, practices, or courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder. In the alternative, PCM and Chester engaged in acts, practices, or courses of business that aided and abetted violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9.        The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1). The Commission seeks a permanent injunction to restrain and enjoin

PCM and Chester from engaging in the transactions, acts, practices, and courses of business alleged herein. The Commission seeks a judgment ordering PCM, Chester, and the Pentagon Fund to disgorge their ill-gotten gains and to pay prejudgment interest thereon. The Commission also seeks the imposition of civil money penalties against PCM and Chester pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3). Finally, the Commission seeks all other just and appropriate relief.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act, 15 U.S.C. §77v(a), and Sections 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(e) and 78aa.

11. Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Certain of the transactions, acts, practices, and courses of business alleged herein occurred within the Southern District of New York. For instance, PCM opened accounts for Pentagon Fund at U.S. broker-dealers located in New York, New York. Chester also visited the offices of U.S. broker-dealers located in New York, New York in furtherance of Pentagon Fund's illegal trading of U.S. mutual funds.

12. PCM and Chester, directly or indirectly, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and/or the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

## DEFENDANTS

13.    **PCM** is an investment adviser and investment manager based in London, England. PCM has provided investment advisory services to Pentagon Fund and its various feeder funds since at least 1999. (A master-feeder structure involves a master fund that makes investments, and offers the master fund's securities to feeder funds. The feeder funds' securities are, in turn, offered to investors.)

14.    **Chester,** age 38, is a resident of London, England. Chester joined PCM in 1998 and has served as PCM's Chief Executive Officer since 1999. During the relevant period, Chester served as one of the two portfolio managers for the Pentagon Fund, and he directed the market timing and late trading strategies. Chester is a graduate of the University of Oxford in England and the Harvard Business School. He is also a qualified Solicitor of the Supreme Court of England and Wales.

## RELIEF DEFENDANT

15.    **Pentagon Fund** is an international business company incorporated in the British Virgin Islands. Pentagon Fund served as the master fund in a master-feeder fund structure. The Pentagon Fund's feeder funds included Pentagon Global Opportunity Fund, Ltd., Pentagon Investment Capital International, Ltd., and Pentagon High Performance Fund, Ltd. In connection with trading U.S. mutual funds, PCM formed three Delaware limited liability companies (Pentagon Investment Partners, LLC, Pentagon Management Partners, LLC, and Pentagon Performance Partners, LLC), of which the Pentagon Fund was the sole member and manager.

## FACTS

### Background – Late Trading and Market Timing

16.     The price of a U.S. mutual fund's share is based on the value of the securities (and other assets) held by the mutual fund, and each fund is required by the Commission's regulations to calculate the value of the fund's holdings, or NAV, each trading day. Generally, the U.S. mutual funds in which the Pentagon Fund traded calculated the prices of their shares as of the close of the major United States securities exchanges and markets, normally 4:00 p.m. ET.

17.     Rule 22c-1(a), 17 C.F.R. § 270.22c-1, adopted pursuant to Section 22(c) of the Investment Company Act of 1940 ("Investment Company Act"), 15 U.S.C. § 88a-22(c), requires registered investment companies issuing redeemable securities, principal underwriters and dealers, and any person designated in the fund's prospectus as authorized to consummate transactions in securities issued by the fund to sell and redeem fund shares at a price based on the current NAV next computed after receipt of an order to buy or redeem. U.S mutual funds generally determine the daily price of their shares as of 4:00 p.m. ET. U.S. mutual funds' prospectuses generally state that orders received before 4:00 p.m. ET are executed at the price determined as of 4:00 p.m. ET that day, and that orders received after 4:00 p.m. ET are executed at the price determined as of 4:00 p.m. ET the next trading day.

18.     "Late trading" refers to the practice of placing orders to buy, redeem, or exchange U.S. mutual fund shares after the time as of which the funds calculate their NAV (usually as of the close of trading at 4:00 p.m. ET), but receiving the price based on the NAV already determined as of 4:00 p.m. ET. Late trading violates Rule 22c-1(a) under the Investment Company Act, enabling the trader to profit from market events that occur after 4:00 p.m. and are not reflected in that day's price. In particular, the late trader obtains an advantage – at the

expense of the other shareholders of the mutual fund – when he learns of market moving information and is able to trade mutual fund shares at prices set *before* the market moving information was released.  Late trading harms innocent shareholders in mutual funds by diluting the value of their shares.

19.    "Market timing" includes: (i) frequent buying and selling of shares of the same mutual fund or (ii) buying or selling mutual fund shares in order to exploit inefficiencies in mutual fund pricing.  Market timing can harm other mutual fund shareholders because it can dilute the value of their shares.  Market timing, while not illegal per se, can also disrupt the management of the mutual fund's investment portfolio and cause the targeted mutual fund to incur considerable extra costs associated with excessive trading and, as a result, cause damage to other shareholders in the funds.  Market timing is illegal, for example, if deception is used to induce a mutual fund to accept trades that it otherwise would not accept under its own market timing policies.

## Pentagon Begins Trading U.S. Mutual Funds

20.    PCM and its advisory clients engaged in market timing of United Kingdom and other European mutual funds during the 1990s.  In the late 1990s, Chester realized that the time lag between the close of trading in Europe and the United States created an arbitrage opportunity for market timing U.S. mutual funds that held international stocks.

21.    Shortly thereafter, Chester visited a number of broker-dealers in the United States. PCM then opened brokerage accounts at a number of U.S. broker-dealers, including:

(a)    Broker-Dealer "TW&Co." ("TW&Co."), a broker-dealer registered with the Commission with an office in New York, New York;

7

(b)    Broker-Dealer "CIBC" ("CIBC"), a broker-dealer registered with the Commission with an office in New York, New York;

(c)    "Broker-Dealer PRU," a broker-dealer registered with the Commission with an office in Boston, Massachusetts;

(d)    "Broker-Dealer CONC," a broker-dealer registered with the Commission with an office in Laurence Harbor, New Jersey;

(e)    "Broker-Dealer PW," a broker-dealer registered with the Commission with an office in New York, New York;

(f)    "Broker-Dealer BBH," a broker-dealer registered with the Commission with an office in Boston, Massachusetts;

(g)    "Broker-Dealer CIC," a broker-dealer registered with the Commission with an office in New York, New York;

(h)    "Broker-Dealer SSB," a broker-dealer registered with the Commission with an office in New York, New York; and

(i)    "Broker-Dealer MS," a broker-dealer registered with the Commission with an office in Baltimore, Maryland.

22.    PCM utilized proprietary trading models to trade U.S. mutual funds in certain sectors, initially concentrating on funds investing in international equities.

**Pentagon Defrauded U.S. Mutual Funds by Engaging in Late Trading**

23.    After PCM began trading U.S. mutual funds, Chester knew that PCM had to submit U.S. mutual fund trades for Pentagon Fund by 4:00 p.m. ET for Pentagon Fund to receive that day's NAV.  For example, after Pentagon Fund opened brokerage accounts at Broker-Dealer PW with RRs James A. Wilson Jr. and Scott Christian, Chester sent an April 13, 2000 email to

Wilson with an attached spreadsheet that indicated that PCM had to submit trades prior to 4:00

p.m. ET.

24.    Chester, however, sought the ability to submit U.S. mutual fund trades after 4:00

p.m. ET, but still receive the current day's NAV.

25.    On May 5, 2000, Chester had a discussion with Wilson and Christian about the

latest time PCM could submit trades.  Chester memorialized the discussion in a memorandum

that indicated they had:

> discussed the latest time for trading on the [Broker-Dealer PW] accounts.
> [Wilson] stated that currently we would be able to trade up to 4pm New York
> time (9pm UK time).  Within a period of weeks, he should be able to accept trades
> up to 4.15pm New York time.

26.    Christian then sent Chester an email on May 16, 2000 that indicated that PCM

had to enter its trades by 4:00 p.m. ET because U.S. mutual funds were priced as of that time:

> Regarding after hours trading, I have spoken to a few sources and so far they have
> come back to me with the idea that mutual funds trading will still halt at 4 pm.  If
> portfolio managers are still purchasing assets in the market after 4 then these will
> be reflected in the following day's price.  Therefore the pricing of the mutual
> funds will not be affected by the after hours market since the pricing will be based
> on activity prior to 4 pm that day.  Anything after 4 will reflect in the price for the
> following day's close.

27.    Ultimately, Wilson and Christian were not able to arrange for late trading

through Broker-Dealer PW.

### Pentagon Engaged in Late Trading Through TW&Co.

28.    In late 2000, Wilson and Christian moved to a different broker-dealer, TW&Co.,

and advised Chester that PCM could submit late trades in U.S. mutual funds on behalf of the

Pentagon Fund.

29.    PCM then promptly opened accounts for Pentagon Fund at TW&Co.

30.    Chester immediately began to discuss with Wilson and Christian the mechanics of late trading U.S. mutual funds.  For example, on April 5, 2001, Chester sent an email to Wilson and Christian that contained the following:

AFTER HOURS TRADING INSTRUCTIONS

I have spoken to my R&D people regarding a procedure for going IN, OUT or cancelling an IN or OUT on any given night, as per our telephone conversation last night.

Lets (sic) us know what the current cut-off time is (5:30 p.m. NY time?) and when you'll have the 6:30p.m. facility – I think you told me it will be available from Monday???

31.    Chester's April 5, 2001 email also included a template for taking advantage of after-hours information:

The procedure we are thinking of putting in place is as follows (subject to speaking this through to Trevor [another PCM employee]):
-        Trevor's team will give you a single figure on the S&P future (e.g. 1320), at or around the close
-        If the future exceeds (for an IN) or falls below (for an OUT) – see examples below – after hours, then try to get hold of one of us by telephone
-        If you can't get hold of us, then do the corresponding trade
-        Send Trevor an e-mail letting him know what you've done
. . . .
My R&D team is building an application for Trevor's team to spew out the requisite S&P future figure each night for you.  We should be able to be up and running on this within a day or two.

32.    On April 9, 2001, Chester sent an email to Wilson and Christian asking whether they were ready to start late trading:

Are you know (sic) able to do trades up to 6:30 pm NY time?

33.    Wilson responded in an email to Chester on April 10, 2001 as follows:

[Christian] and i feel that if you are going to use our late trading – "it" (you said) adds a certain percentage of value – we would then like some kind of system or proposal on how we can make money on this . . . [because] if we are going to trade later then we need parameters so we can establish guidelines – im (sic) not staying here everynight (sic) without cause – i feel things are tight allover (sic)

and there are only so many places to do this . . so lets (sic) be partners or such. . cheers

34.    Chester responded in an April 11, 2001 email to Wilson and Christian that

contained the following:

Re: Late Trading
1. We are partners. I have always gone out of my way to support you. When you went to [Broker-Dealer PW], we gave you assets asap, and then when you went to [TW&Co.], you (sic) gave you assets asap. . . .

2. Your facility for late trading is not the only one we have. In all the other cases, we pay 1% p.a. .
. . . .
5. You currently earn 2% p.a. This is double what Pentagon earns as a management fee. (Our performance fee reflects the strength or otherwise of our modeling decisions, and hence is as variable as our decisions.) We work all the hours of the day to ensure we do our best for the client. To ask you or Scott, or someone else at [TW&Co.] to cover until 6:30pm each night, really is no big deal. And you know it. Remember, the more money we make, the more fees you earn – 2% of a larger figure. Hence, it's in everyone's interests to ensure we get the later trading times.

I really EXPECT you guys to go out of your way to make sure I get late trading – you're earning double what everyone else takes home on this business – although it's unlikely that we'll need 6:30pm trading every night.
. . . .
I really want to be your biggest client. I want to be first to try your new products. And I want you to have the best facilities/trading. And that's why I am happy to pay you double what I pay any one else.

35.    On April 11, 2001, Wilson sent an email to Chester indicating that the late trading

that TW&Co. offered to PCM was valuable:

**we are the only place to trade late past 530-** in the [U.S.] with any brokers.-fact.. ;^)
thus you have to pay more … (Emphasis in original.)

36.    Chester fully understood that PCM was gaining an advantage by submitting trades

after 4:00 p.m. ET at TW&Co.

37.    On May 9, 2001, a PCM employee sent an email to Christian at TW&Co.

attaching a document entitled "Notes on Trading Domestic Technology Funds" that provided

more detailed instructions on how PCM wanted TW&Co. to execute late trades on behalf of

Pentagon Fund.

38.     Specifically, the document indicated that PCM's trading model "outputs a couple

of lines of text at about 16:10 (New York time)."  The document then provided the following

trading instructions for trading U.S. mutual funds holding technology companies securities:

[T]he procedure for trading these funds is as follows (all times are New York):

1.     At or around 16:10, the dealing team at Pentagon phone [TW&Co.] to tell
them the output of the model.
2.     At 17:30, if the condition on the futures is met and the futures are outside
the "warning" band, [TW&Co.] execute the trades – no need to phone Pentagon.
3.     At 17:30, if the condition on the futures is not met and the futures are
outside the "warning" band, no trades executed – [TW&Co.] can go home!
4.     At 17:30, the futures are in the warning band, [TW&Co.] phones Lewis
[Chester] at Pentagon, or the list of phone numbers that Trevor will supply for
further instructions, which might include waiting for another hour.

39.     As these instructions make clear, PCM's trading model for Pentagon Fund

utilized futures market data until 5:30 p.m. ET – or later – to determine whether or not to trade,

with the assurance that Pentagon Fund's trades would be executed at that day's NAV.

40.     Having secured the ability to late trade, PCM also took steps to increase Pentagon

Fund's assets in accounts at TW&Co. through financing from CIBC.

41.     On May 1, 2001, Chester sent an email to Wilson and Christian outlining his plan

to submit late trades up to 6:30 p.m. ET:

We're sending you some leverage money – hopefully [CIBC] and your lawyer
will get off their backside and complete the bloody leverage documentation! – for
domestic funds.  Trevor will call you later to discuss.

Hopefully this should stop your endless, pathetic, pittiful (sic) moaning that I've
been subjected to for years.

It does mean you might have to work a little harder …poor souls, working past
cookie and milk time … for once in your lives, you can work like real men and do
a proper day's work.  (You really are a bunch of women of the first order).

Trevor will run through the procedures of how the trading is going to work. In essence, most of it will be done by you within certain parameters that we will give you each day. In the majority of cases, your decision point will be 5:30 pm NY time. In a few cases, your decision point will be 6:30 pm – I know, slave labor... whatever will you do working that late!

When there are close decisions, you'll have a list of home / cell numbers for me, Trevor, Jafar [PCM's Chief Operating Officer] and Anthony [another PCM employee] (priority in that order) ... and we'll make the call. If you can't get through to us, then on a close decision, you'll need to act like men and make the call. (Not too difficult really, as it's not your money!)

42.     Once the late trading system was in place, from approximately May 2000 to September 2003, Chester and PCM routinely submitted trading decisions after 4:00 p.m. ET for Pentagon Fund's accounts at TW&Co., but Pentagon Fund received that day's NAVs for the trades.

43.     Typically, PCM sent TW&Co. a facsimile early each afternoon containing tentative trading instructions. After 4:00 p.m. ET, PCM's model generated trading instructions. Between 4:00 p.m. ET and 5:30 p.m. ET or even later, PCM personnel conveyed the instructions to TW&Co.

44.     PCM personnel often sent instructions conveying late trading by email to TW&Co. personnel in New York. For example, on May 15, 2002, a PCM employee sent an email to TW&Co. at 5:06 p.m. ET with the following instructions:

In, need SPM2 above 1091.50 AND NDM2 above 132.00
Warn Pentagon if SPM2 is within 1 pt AND NDM2 is within 2.5 pts

out, need SPM2 below 1091.60 OR NDM2 below 1319.00
Warn Pentagon if SPM2 is within 1 pt OR NDM2 is within 2.5 pts

45.     In addition, if PCM learned of market moving developments after it had provided the day's trading decisions for Pentagon Fund accounts, PCM generally amended its trading instructions for the day.

46.    Further, PCM sought and received from TW&Co. the current day's NAVs prior to PCM transmitting final trading decisions to TW&Co. for the day – thereby gaining an extra measure of profit on the trades.

47.    PCM continued to late trade U.S. mutual funds in Pentagon Fund's accounts at TW&Co. until the public announcement in early September 2003 that the New York Attorney General filed settled fraud charges against hedge fund Canary Capital LLC for engaging in late trading.

*Pentagon Engaged in Late Trading Through Broker-Dealer CONC*

48.    Pentagon also engaged in late trading through Broker-Dealer CONC.

49.    In early 2003, a RR met with Chester in New York, New York, and solicited Chester to open accounts at Broker-Dealer CONC.

50.    During the meeting, Chester requested the ability to enter orders on behalf of the Pentagon Fund after 4:00 p.m. ET.

51.    The RR agreed to allow PCM to place trades on behalf of Pentagon Fund after 4:00 p.m. ET.

52.    Subsequently, a PCM employee spoke with the RR about the need to make trading decisions after 4:00 p.m. (ET). The PCM employee confirmed the discussion in an email to the RR at Broker-Dealer CONC:

> I understand that on a daily basis I can call in the trade at 4.20 pm but need to call at 4.10 pm for indication. Though on an obvious evening I'd give the decision before then. However, on an evening when we know there will be after hours news I can call in my trade at 5.15pm. Its (sic) on these nights that I'd be likely to move fully my domestic positions to take advantage of the late trading privilege you guys are offering.

53.    PCM placed trades after 4:00 p.m. on at least four occasions for Pentagon Fund at Broker-Dealer CONC between March 2003 and August 2003.

54.     By entering late trades at Broker-Dealer CONC, PCM sought to take advantage of after-hours news. For example, in an April 10, 2003 email to a RR at Broker-Dealer CONC, a PCM employee noted that companies would soon be reporting earnings after the market close:

> Starting from today and next week but excluding tomorrow I'll need someone to stay late at [Broker-Dealer CONC] as we'll be in reporting season. We've got Juniper [Networks] & Network Associates as the "big" ones tonight.

### Chester Understood that Late Trading was Illegal

55.     Chester understood that PCM gained an improper, illegal trading advantage by being able to make trading decisions concerning which U.S. mutual fund shares to buy, redeem, or exchange after 4:00 p.m. ET, but still receive that day's NAVs.

56.     Chester had discussions with TW&Co. personnel concerning the legality of late trading.

57.     For example, during the fall of 2001, Chester called Wilson and played a voicemail message that an RR from another U.S. broker-dealer that PCM used, CIBC, had left for Chester. On the voicemail message, the CIBC RR told Chester to stop pushing CIBC RRs to accept late trades, and that late trading was illegal.

58.     On June 7, 2002, Christian sent an email to Chester with an article concerning the market timing of U.S. mutual funds with international holdings. The article noted that such funds calculated NAVs at 4:00 p.m.

59.     On or about August 5, 2003, Chester received a paper entitled "Mutual Fund Market Timing Strategies," which included the following:

> In the United States, all mutual funds are traded electronically through the NSCC (National Securities Clearing Corporation) or through FundServ and are executed at the end of the market at 4:00 pm (Eastern Standard Daylight time).
> . . . .
> Within the FundServ or NASD trading operation, the trade execution of mutual funds is performed at the transfer agent for each mutual fund group at the close of

the U.S. markets at 4:00 p.m. at the same-day NAV for settlement T+1 (trade date plus one).

60.     Chester's own notations on the paper indicated that it was "very informative about US mutual fund market timing."

**Pentagon Defrauded U.S. Mutual Funds by Engaging in Deceptive Market Timing**

61.     PCM opened multiple brokerage accounts on behalf of Pentagon Fund with at least nine U.S. broker-dealers for the purpose of market timing U.S. mutual funds.

62.     PCM and Chester knew that many U.S. mutual funds disliked and prohibited market timing, and that mutual funds blocked market timing trades because, among other reasons, the trading activity harmed the mutual funds' performance.

63.     RRs at broker-dealers routinely informed Chester and other PCM employees when U.S. mutual funds blocked Pentagon Fund trades.

64.     PCM and Chester therefore understood that they needed to hide the Pentagon Fund's market timing trading from U.S. mutual funds.

65.     U.S. mutual funds often tracked market timing by tax identification number, customer account number, RR number, and/or the code for a particular branch office of a broker-dealer.

66.     PCM and Chester accordingly employed a number of deceptive tactics, including utilizing multiple accounts, multiple RR numbers, and trading through multiple broker-dealers to help conceal Pentagon Fund's identity and thereby trick the U.S. mutual fund companies into accepting Pentagon Fund's trades.

67.     For example, when a U.S. mutual fund company identified a Pentagon Fund account as a market timer, PCM continued to trade the same mutual fund company through

different brokerage accounts that the mutual fund had not yet flagged as a market timing account. In an April 17, 2002 email to an RR at Broker-Dealer BBH, a PCM employee wrote:

> In this business when I mean 'kicked out' it applies only to the account that is conducting the trading activity not the broker. Thus after 10 round trips if we lose [a mutual fund company] in Account A[,] we'll have to stop trading it for that account, Account B & C can continue trading and eventually if we lose Account B & C the same applies.

*Pentagon Used Deceptive Tactics at TW&Co.*

68.     PCM opened multiple accounts for Pentagon Fund at TW&Co. in order to market time U.S. mutual funds. In total, PCM opened 68 brokerage accounts at TW&Co. In addition, Wilson and Christian established 16 different RR identification numbers to assist their market timing clients, including PCM and the Pentagon Fund, to deceive mutual funds that prohibited market timing.

69.     PCM and Chester used the multiple accounts and RR identification numbers to evade mutual fund companies' efforts to block Pentagon Fund's market timing trading. Below are a number of illustrative examples.

70.     On November 28, 2001, Christian sent an email to PCM to advise it that a U.S. mutual fund company ("Mutual Fund Company A"), which limited shareholders to four exchanges per year, had rejected trades PCM had submitted in seven Pentagon Fund accounts (nos. 797-70023, 797-70040, 797-70043, 797-70046, 797-70090, 797-70091, and 797-70097).

71.     Nonetheless, PCM continued to market time Mutual Fund Company A's mutual funds for Pentagon Fund accounts. The next day, on November 29, 2001, Pentagon Fund purchased shares in Mutual Fund Company A's mutual funds in a different account (no. 797-70084). Pentagon Fund then sold the position the following day.

17

72.     In total, after November 28, 2001, PCM placed 93 purchases and exchanges of Mutual Fund Company A's mutual funds through 31 different Pentagon Fund accounts at TW&Co.

73.     On February 22, 2002, a U.S. mutual fund company ("Mutual Fund Company B") sent a letter to TW&Co.'s clearing firm, which the clearing firm promptly forwarded to TW&Co., concerning several accounts at the broker-dealer, including Pentagon Fund account no. 797-70021. The letter indicated that Mutual Fund Company B had "closely monitored the effects of market timing and short-term trading within our family of funds" and had "determined that these activities, if not properly addressed, may hinder our ability to achieve desirable long-term investment results for our shareholders." Further, Mutual Fund Company B's letter indicated that, pursuant to the prospectus, shareholders were restricted to ten exchanges per year, and that Mutual Fund Company B could reject purchase orders if it determined that short term trading was excessive. Finally, the letter advised that the referenced accounts had already exchanged eight times, and that following the tenth exchange "a stop code will be placed on the accounts preventing further exchanges and purchases in 2002."

74.     TW&Co. informed PCM about this block.

75.     PCM and TW&Co. responded by opening new Pentagon Fund accounts and continuing to market time Mutual Fund Company B's mutual funds. Specifically, on approximately March 4, 2002, PCM directed TW&Co. to create three new accounts for Pentagon Fund (including nos. 797-70089 and 797-70110). Then, beginning on March 6, 2002, PCM continued market timing Mutual Fund Company B's mutual funds through these new Pentagon Fund accounts.

76.    On March 1, 2002, a U.S. mutual fund company ("Mutual Fund Company C")
sent a letter to TW&Co. concerning several accounts, including Pentagon Fund's account no.
797-70090. Mutual Fund Company C's letter indicated that it had "identified accounts . . . that
have excessive exchanges," and that it was "terminating your ability as broker of record to open
new accounts at [Mutual Fund Company C] under your representative identification." Further,
Mutual Fund Company C's letter indicated that it would "not allow accounts for which you are
broker of record and which are networked or trade within omnibus accounts to exchange into any
other fund," other than a money market fund. Finally, Mutual Fund Company C's letter
indicated that it was taking this action because it had "found that excessive exchange activity of a
small number of individuals was causing volatility in the funds' cash position" and that "this can
have a detrimental effect on fund performance."

77.    TW&Co. informed PCM about this block.

78.    PCM responded by opening new Pentagon Fund accounts, with different RR
numbers, and continuing to market time Mutual Fund Company C mutual fund shares.
Specifically, on March 8, 2002, PCM opened eight new accounts for Pentagon Fund, each with a
different RR number assigned. Then, beginning on March 14, 2002, PCM continued market
timing Mutual Fund Company C mutual fund shares through the new Pentagon Fund accounts.

*Pentagon Used Deceptive Tactics at Broker-Dealer PRU*

79.    PCM similarly engaged in deceptive market timing for the Pentagon Fund
through Broker-Dealer PRU. For example, from January 15, 2003 through February 13, 2003,
Mutual Fund Company B blocked Pentagon Fund accounts. In addition, from January 15, 2003
through February 11, 2003, a different U.S. mutual fund company ("Mutual Fund Company D")
blocked Pentagon Fund accounts at Broker-Dealer PRU.

80.     On January 16, 2003, a Broker-Dealer PRU RR, Justin Ficken, sent an email to a

PCM employee stating:

> I will need to redeem the following because they were stopped:
>
> [Mutual Fund Company B] in Performance 12 and Management 12
>
> [Mutual Fund Company D] Offshore in Performance 12, Performance 5,
> Performance 4, Management 7, Management 12, Management 8.  (They all did
> five exchanges in about two months.  That would be about 30 in a year – a bit
> much, no?)

81.     On or about February 27, 2003, PCM opened four new Pentagon Fund accounts at

Broker-Dealer PRU.   PCM subsequently utilized these additional accounts to continue trading

Mutual Fund Company B mutual funds.

82.     In addition, PCM continued to use existing Pentagon Fund accounts at Broker-

Dealer PRU that had not been blocked to trade Mutual Fund Company B's mutual funds.

83.     In total, PCM used at least 26 accounts and 7 RR numbers at Broker-Dealer PRU

to market time mutual funds of at least 50 mutual fund companies.

*Pentagon Exploited Its Relationships with Multiple*
*Broker-Dealers to Engage in Deceptive Market Timing*

84.     On several occasions, after mutual fund companies blocked Pentagon Fund's

accounts at one broker-dealer because of market timing, PCM and Pentagon Fund continued to

trade the same mutual funds through accounts at a different broker-dealer.

85.     For example, on November 6, 2001, Mutual Fund Company C sent a letter to

TW&Co. that referenced a Pentagon Fund account (no. 797-70014).  The letter contained the

following:

> [Mutual Fund Company C] is terminating your ability as broker of record to open
> new accounts at [Mutual Fund Company C] under your representative
> identification.

[Mutual Fund Company C] will not allow accounts for which [TW&Co. is] broker of record and which are networked or trade within omnibus accounts to exchange into any other fund, other than the [Mutual Fund Company C] Money Market Fund. Once invested in the [Mutual Fund Company C] Money Market Fund, those accounts will not be allowed to exchange into any other [Mutual Fund Company C] fund.

86.    To circumvent this restriction, PCM simply entered trades through different broker-dealers.  Specifically, after November 6, 2001, Pentagon Fund accounts made the following numbers of trades in Mutual Fund Company C mutual funds:

- 184 purchases and exchanges through CIBC;

- 34 purchases and exchanges through Broker-Dealer CONC; and

- 143 purchases and exchanges through Broker-Dealer PW.

87.    Additionally, after Mutual Fund Company D blocked six Pentagon Fund accounts at Broker-Dealer PRU on January 15, 2003, PCM continued to place trades in Mutual Fund Company D mutual funds through Pentagon Fund accounts at TW&Co.

88.    In total, PCM executed 22 additional purchases and exchanges of Mutual Fund Company D mutual funds through Pentagon Fund accounts at TW&Co.

89.    In addition, Pentagon continued trading Mutual Fund Company D mutual funds through accounts at Broker-Dealer CONC.  In total, PCM executed an additional 25 purchases and exchanges of Mutual Fund Company D mutual funds through Broker-Dealer CONC.

*Pentagon Split Up Trades Among Accounts at Various Broker-Dealers*

90.    PCM was well aware that the Pentagon Fund needed to keep trades "under the radar" of certain U.S. mutual funds. For example, in a May 3, 2002 email, a PCM employee suggested to Broker-Dealer PRU RR Ficken how to avoid being kicked out of a mutual fund for excessive market timing:

21

On [Mutual Fund Company D] are you getting a lot of kickouts? I've just heard on the street [Mutual Fund Company D] are now monitoring any trades over $200k. May be we need to keep them below $200k for a longer stay.

91.    PCM therefore split up trades among Pentagon Fund accounts to deceive the U.S. mutual funds about the extent of the Pentagon Fund's market timing.

92.    For example, on July 25, 2001, PCM utilized (a) 18 Pentagon Fund accounts at TW&Co. to purchase shares of a fund within a U.S. mutual fund company ("Mutual Fund Company E") and (b) 13 Pentagon Fund accounts at TW&Co. to purchase shares of a fund within a U.S. mutual fund company ("Mutual Fund Company F"), in each case keeping all purchases under $175,000 per account.

### Chester Understood that Pentagon Deceived Mutual Funds

93.    As described above, Chester and PCM understood that U.S. mutual funds sought to curtail the Pentagon Fund's market timing and therefore Chester and PCM used deceptive means to continue market timing.

94.    Additionally, Chester's notes of a May 5, 2000 meeting with Wilson and Christian in New York (while they still worked at Broker-Dealer PW), reflect that "[Wilson] agreed to code the names of our accounts, so that the Pentagon name does not appear on any of the accounts."

95.    In addition, in a July 30, 2002 email to a broker-dealer that provided financing for Pentagon Fund's market timing, Chester wrote the following:

Chaps,

I NEVER want to see the words "Market Timing" on any correspondence, e-mail, telephone call, etc.

If you want to label what we do with something, call it "dynamic asset allocation", but never market timing! (Emphasis in original.)

**Pentagon Profited from Illegal Late Trading and Deceptive
Market Timing While U.S. Mutual Funds Suffered Harm**

96.     During the period from approximately 1999 through September 2003, PCM,

Chester, and the Pentagon Fund earned ill-gotten gains through their fraudulent late trading and

market timing of U.S. mutual funds.

97.     In particular, the Pentagon Fund earned approximately $62 million in profits from

its late trading and deceptive market timing of U.S. mutual funds.

98.     PCM profited through advisory fees, including fixed management fees and

performance allocations that it was entitled to as the adviser to the Pentagon Fund.

99.     Chester profited both through his position as PCM's Chief Executive Officer and

as an investor, via a feeder fund, in the Pentagon Fund.

100.    At the same time, U.S. mutual funds and their shareholders were harmed.  For

example, Pentagon Fund's trading diluted the value of U.S. mutual funds it traded and increased

transaction costs associated with the funds' management.

## FIRST CLAIM FOR RELIEF

**Violations of Section 17(a) of the Securities Act,
Section 10(b) of the Exchange Act, and Rule 10b-5**

101.    The Commission repeats and realleges paragraphs 1 through 100 above.

102.    PCM and Chester, directly or indirectly, singly or in concert, by use of the means

or instrumentalities of interstate commerce, or of the mails, or of the facility of a national

securities exchange, in the offer and sale, and in connection with the purchase or sale, of

securities, knowingly or recklessly:  (a) employed devices, schemes and artifices to defraud; (b)

obtained money or property by means of, or otherwise made, untrue statements of material fact,

23

or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

103.    As part of and in furtherance of the fraudulent scheme, PCM and Chester engaged in late trading and deceptive market timing of U.S. mutual funds. PCM and Chester regularly placed mutual fund trades on behalf of the Pentagon Fund after 4:00 p.m. ET, and understood that those trades would improperly receive that day's NAV instead of the following day's NAV. Additionally, PCM and Chester utilized multiple deceptive practices to conceal the Pentagon Fund's identity and trading strategies from U.S. mutual fund companies, to enable the Pentagon Fund to market time mutual funds that had previously prohibited the Pentagon Fund from further trading.

104.    PCM and Chester misrepresented, and failed to disclose, and caused others to misrepresent and fail to disclose, material information to U.S. mutual fund companies to induce them to accept Pentagon Fund's trades.

105.    Chester knowingly or recklessly engaged in the fraudulent conduct alleged above. Because Chester is the Chief Executive Officer of PCM, Chester's scienter is imputed to PCM.

106.    By reason of the foregoing, PCM and Chester, directly or indirectly, violated, and unless enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

### In the Alternative, PCM and Chester Aided and Abetted
### Violations of Sections 10(b) Exchange Act and Rule 10b-5

107.    The Commission repeats and realleges paragraphs 1 through 100 above.

108.    PCM's U.S. broker-dealers and their respective RRs, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale, of securities, knowingly or recklessly:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

109.    For example, as part of the fraudulent scheme, numerous broker-dealers, including TW&Co., Broker-Dealer CONC, and Broker-Dealer PRU, engaged in late trading and/or deceptive market timing of U.S. mutual funds and committed primary violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

110.    PCM and Chester substantially assisted the fraudulent conduct described above. For example, PCM and Chester directed the trading of Pentagon Fund's accounts on a daily basis, and knew that TW&Co. and Broker-Dealer CONC were accepting the Pentagon Fund's trades submitted after 4:00 p.m. ET, but executing the trades as though they had been received before 4:00 p.m. ET.  Additionally, PCM and Chester knew that various U.S. broker-dealers, including TW&Co. and Broker-Dealer PRU, employed deceptive practices to conceal the Pentagon Fund's identity and trading strategies from U.S. mutual fund companies, to enable

Pentagon Fund to market time mutual funds that had previously prohibited the Pentagon Fund from further trading.

111.    PCM and Chester knew that the U.S. broker-dealers engaged in the fraudulent conduct alleged above.

112.    Pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), and by reason of the foregoing, PCM and Chester, singly or in concert, directly or indirectly, aided and abetted violations of, and unless enjoined will again aid and abet violations of, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

### THIRD CLAIM FOR RELIEF

#### Against Relief Defendant Pentagon Fund

113.    The Commission repeats and realleges paragraphs 1 through 112 above.

114.    The Pentagon Fund obtained substantial illicit profits as a result of the fraudulent late trading and deceptive market timing of U.S. mutual funds.

115.    The Pentagon Fund was the recipient of such ill gotten gains under circumstances in which it is not just, equitable or conscionable for it to retain the illegal proceeds. Consequently, the Pentagon Fund has been named as a Relief Defendant for the amount of such proceeds by which it has been unjustly enriched as a result of the fraudulent scheme described in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining PCM and Chester, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

### II.

Ordering PCM, Chester, and the Pentagon Fund to disgorge the ill-gotten gains received from the violative conduct alleged in this Complaint, and to pay prejudgment interest thereon.

### III.

Ordering PCM and Chester to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## IV.

Granting such other and further relief as the Court may deem just and proper.

Dated: New York, NY
    April 3, 2008

Mark K. Schonfeld

Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, New York 10279
(212) 336-0077 (Gizzi)
Email: gizzip@sec.gov; salzbergm@sec.gov

Of Counsel:

Kay L. Lackey (not admitted in New York)
Paul G. Gizzi
Mark D. Salzberg