FRANK C. RAZZANO
IVAN B. KNAUER

Attorneys for Defendants, Lewis Chester,
Pentagon Capital Management, PLC and
Pentagon Special Purpose Fund, Ltd.

Pepper Hamilton LLP
Hamilton Square
600 Fourteenth Street, N.W.
Washington, DC  20005-20004
Phone:  202.220.1286

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE COMMISSION,        :
                                           :
     *Plaintiff*,                            :
                                           :
        v.                                 :
                                           :
PENTAGON CAPITAL MANAGEMENT PLC            :        08-CV-03324 (RWS)
and LEWIS CHESTER,                         :
                                           :
     *Defendants*,                           :
                                           :
     -and-                                  :
                                           :
PENTAGON SPECIAL PURPOSE FUND, LTD.,       :
                                           :
     *Relief Defendant*.                     :

---

## <u>DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 3

    A.  Rule 22c-1(a)................................................................................................... 3

    B.  Market Timing ................................................................................................. 4

ALLEGATIONS AGAINST THE DEFENDANTS ................................................................ 5

    A.  Late Trading..................................................................................................... 5

    B.  Market Timing ................................................................................................. 7

ARGUMENT .......................................................................................................................... 7

I.    THIS COURT SHOULD DISMISS ALL ALLEGATIONS OF LATE TRADING AS THE COMPLAINT ALLEGES NO MISREPRESENTATION BY THESE DEFENDANTS ....................................................................................... 7

II.   THIS COURT SHOULD DISMISS ALL ALLEGATIONS OF MARKET TIMING AS THE COMPLAINT DOES NOT ALLEGE A MISREPRESENTATION REGARDING MARKET TIMING ...................................................... 9

III.  THE COURT SHOULD DISMISS COUNT I BECAUSE THE DEFENDANTS DID NOT OWE A DUTY TO DISCLOSE ANY INFORMATION TO THE MUTUAL FUNDS ................................................................................................ 13

    A.  The Defendants Did Not Owe A Duty To The Mutual Funds To Disclose When They Executed Or Confirmed Trades. .................................................. 13

        1.  The Defendants were not subject to Rule 22c-1(a) under the Investment Company Act............................................................................................. 14

        2.  The law does not require parity of information. ...................................... 14

        3.  The SEC's tentative insider trading allegation fails because there are no facts to support an allegation that Defendants placed trades based on information obtained pursuant to a fiduciary duty. .................................. 15

    B.  The Defendants Did Not Owe A Duty To The Mutual Funds To Disclose Their Market Timing. ............................................................................................... 16

IV.   THIS COURT SHOULD DISMISS THE COMPLAINT IN ITS ENTIRETY BECAUSE
      ANY OMITTED INFORMATION WAS IMMATERIAL ........................................... 17

      A.   The Omitted Information Was Immaterial To The Mutual Funds............................... 18

      B.   Any Omitted Information Regarding Affiliation Was Immaterial As A Matter Of Law
           Because The Mutual Fund Companies Intended To Use The Information To Enforce
           An Illegal Condition. .................................................................................................. 19

V.    THE COURT SHOULD DISMISS COUNT II OF THE COMPLAINT BECAUSE THE
      DEFENDANTS DID NOT AID OR ABET A PRIMARY VIOLATION ..................... 20

      A.   The SEC Fails to Allege A Primary Violation............................................................. 21

           1.   No misrepresentation ................................................................................. 21

           2.   Lack of particularity .................................................................................. 21

VI.   EVEN IF THE SEC ALLEGES A PRIMARY VIOLATION, THE SEC FAILS TO
      ALLEGE THAT THE DEFENDANTS PROVIDED SUBSTANTIAL ASSISTANCE
      TO THE PRIMARY VIOLATORS ................................................................................ 22

      A.   The SEC Fails To Allege That The Defendants Had The Requisite Scienter. ............. 23

VII.  THE SEC'S ALLEGATIONS REGARDING LATE TRADING AND MARKET
      TIMING VIOLATE DUE PROCESS. .......................................................................... 26

VIII. THERE CAN BE NO LIABILITY FOR ALLEGED PENAL VIOLATIONS THAT
      TOOK PLACE BEFORE APRIL 3, 2003. .................................................................... 30

      A.   The Statute of Limitations Bars All Relief Sought by The SEC In This Case............. 30

           1.   Civil monetary penalties ............................................................................ 31

           2.   Injunctive relief ......................................................................................... 31

IX.   THE SEC IS NOT ENTITLED TO THE EQUITABLE REMEDY IT SEEKS.............. 33

      A.   The SEC Has Not Pled Any Facts That Would Entitle It To A Permanent Injunction
           With Respect To Any Claim. ...................................................................................... 33

      B.   The SEC Should Not Be Granted Leave to Amend..................................................... 34

CONCLUSION........................................................................................................................... 34

# TABLE OF AUTHORITIES

Page

CASES

3M Co. v. Browner,
   17 F.3d 1453 (D.C. Cir. 1994) ................................................................................ 30

Aaron v. SEC,
   446 U.S. 680 (1980).............................................................................................34

AIG Global Securities, Corp. v. Banc of America Securities, LLC,
   254 F. Supp. 2d 373 (S.D.N.Y. 2003)...............................................................16, 17

Armstrong v. McAltin,
   699 F.2d 79 (2d Cir. 1983)....................................................................................23

Backman v. Polaroid Corp.,
   910 F.2d 10 (1st Cir. 1990)...................................................................................13

Basic v. Levinson,
   485 U.S. 224 (1988).......................................................................................13, 18

Bloor v. Carro Spanbock Londlin, Rodman & Fass,
   754 F.2d 57 (2d Cir. 1985)....................................................................................23

Blount v. SEC,
   61 F.3d 938 (D.C. Cir. 1995)................................................................................27

Chiarella v. United States,
   445 U.S. 222 (1980)..................................................................................... passim

Frank G. v. Board of Educ. of Hyde Park,
   459 F.3d 356 (2d Cir. 2006)..................................................................................14

Glazer v. Formica Corp.,
   964 F.2d 149 (2d Cir. 1992)..................................................................................13

Graham v. SEC,
   222 F.3d 994 (D.C. Cir. 2000) ..............................................................................21

Greater Boston Television Corp. v. FCC,
   444 F.2d 841 (D.C. Cir. 1970)..............................................................................29

Greyhound Corp. v. ICC,
   551 F.2d 414 (D.C. Cir. 1977)..............................................................................29

*Howard v. SEC,*
   376 F.3d 1136 (D.C. Cir. 2004) ........................................................23

*IIT v. Cornfeld,*
   619 F.2d 909 (2d Cir. 1980)........................................................24

*In re Comverse Technology, Inc.,*
   2008 WL 2795927 (E.D.N.Y. July 18, 2008) ........................................26

*In re Telsey,*
   144 B.R. 563 (Bankr. S.D. Fla. 1992) ........................................ 32

*Johnson v. SEC,*
   87 F.3d 484 (D.C. Cir. 1996) ........................................................30, 31

*Luttangio v. Deloitte & Touche, LLP,*
   476 F.3d 147 (2d Cir. 2007)........................................................12

*Media Gen., Inc. v. Tomlin,*
   2001 WL 1230880 (D. D.C. Aug. 9, 2001) ........................................ 16

*National Black Media Coalition v. FCC,*
   775 F.2d 342 (D.C. Cir. 1985)........................................................29

*Novak v. Kasaks,*
   216 F.3d 300 (2d Cir. 2000)........................................................12

*O'Brien v. DiGragio,*
   544 F.2d 543 (1st Cir. 1976)........................................................7

*Pross v. Baird Patrick & Co,*
   585 F. Supp. 1456 (S.D.N.Y. 1984)........................................................16, 17

*Ross v. A. H. Robins Co., Inc.,*
   607 F.2d 545 (2d Cir. 1979)........................................................13, 21

*Ross v. Bolton,*
   904 F.2d 819 (2d Cir. 1990)........................................................21, 24, 25

*Santa Fe Indus., Inc. v. Green,*
   430 U.S. 462 (1977)........................................................8, 14

*Schatz v. Rosenberg,*
   943 F.2d 485 (4th Cir. 1991) ........................................................16

*SEC v. Coffey,*
   493 F.2d 1304 (6th Cir. 1974) ........................................................15

*SEC v. Commonwealth Chem. Sec., Inc.,*
    574 F.2d 90 (2d Cir. 1978)...................................................................33

*SEC v. DiBella,*
    409 F. Supp. 2d 122 (D. Conn. 2006)...........................................31, 32

*SEC v. Druffner,*
    353 F. Supp. 2d 141 (D. Mass. 2005) ...........................................10, 11

*SEC v. Durgarian,*
    477 F. Supp. 2d 342 (D. Mass. 2007) ...................................................8

*SEC v. Gann,*
    2006 WL 616005 (N.D. Tex. Mar. 13, 2006).......................................12

*SEC v. Jones,*
    476 F. Supp. 2d 374 (S.D.N.Y. 2007) ....................................30, 31, 32

*SEC v. Lorin,*
    869 F. Supp. 1117 (S.D.N.Y. 1994) ...................................................32

*SEC v. Militano,*
    1994 WL 285472 (S.D.N.Y June 23, 1994) ........................................33

*SEC v. Orr,*
    2006 WL 542986 (E.D. Mich. Mar. 6, 2006) ......................................34

*SEC v. Pimco Advisors Fund Management LLC,*
    341 F. Supp. 2d 454 (S.D.N.Y. 2004).................................................15

*Shaw's Supermarkets, Inc. v. NLRB,*
    884 F.2d 34 (1st Cir. 1989)..................................................................29

*Shemtob v. Shearson, Hammill & Co.,*
    448 F.2d 442 (2d Cir. 1971).........................................................16, 17

*Trussell v. United Underwriters, Ltd.,*
    228 F. Supp. 757 (D. Colo. 1964).......................................................16

*U.S. v. Brennan,*
    183 F.3d 139 (2d Cir. 1999)................................................................18

*U.S. v. Brown,*
    79 F.3d 1550 (11th Cir. 1996) ............................................................18

*U.S. v. Finnerty,*
    2008 WL 2778830 (2d Cir. July 18, 2008).........................8, 11, 12, 22

*U.S. v. O'Hagan*,
    521 U.S. 642 (1997)...........................................................................................16

*U.S. v. Oakford Corp.*,
    1999 WL 1201725 (S.D.N.Y. Dec. 13, 1999) ..................................................28, 29

*U.S. v. Rybicki*,
    287 F.3d 257 (2d Cir. 2002)..........................................................................16, 17

*U.S. v. Szur*,
    289 F.3d 200 (2d Cir. 2002)..........................................................................16, 17

*Upton v. SEC*,
    75 F.3d 92 (2d Cir. 1996) ......................................................................26, 27, 29

*Wright v. Ernst & Young, LLP*,
    152 F.3d 169 (2d Cir. 1998).................................................................................12

MISCELLANEOUS CASES

*In re Arnold*,
    64 SEC Docket 333, 1997 WL 126714 (Mar. 19, 1997)...................................... 32

*In the Matter of Scott G. Monson*,
    2008 SEC LEXIS 1503 (June 30, 2008).................................................................25

*In re First Nat. Monetary Corp.*,
    1985 CFTC LEXIS 289 (CFTC Aug. 7, 1985)........................................................28

STATUTES

11 U.S.C. § 523(a)(7)................................................................................................ 33

15 U.S.C. § 77t(b)....................................................................................................33

15 U.S.C. § 78u(d)....................................................................................................33

28 U.S.C. § 2462 .....................................................................................30, 31, 32, 33

15 U.S.C. §80A-22(e).........................................................................................19, 20

15 U.S.C. §80A-46(a)..............................................................................................20

OTHER AUTHORITIES

Thomas L. Hazen & David L. Ratner, *Broker-Dealer Regulation*, 618 (West 2003)...................19

Enforcement Actions http://www.sec.gov/news/testimony/ts060705lar-attach2.pdf...................27

Fed. R. Civ. P. 8 ................................................................................................................33

Federal Rule of Civil Procedure Rule 9(b) ........................................................... passim

Federal Rule of Civil Procedure Rule 12(b)(6) ......................................................................1

*Imperial Portfolios, Inc.*,
    SEC No Action Letter, 1988 SEC No Action Lexis 730 (June 10, 1988) ..............................19

Investment Company Act Release No. 3369 Fed. Sec. L. Rep. (CCH) ¶77 (December 27, 1968) ......................................................................................................................................4

Rule 10b-5 promulgated under 10(b) of the Exchange Act ................................... passim

Rule 15c3-3(e) ...............................................................................................................26, 27

Rule 22c-1 of the Investment Company Act ............................................................4, 28

Rule 22c-1(a) of the Investment Company Act .................................................... passim

SEC Release No. 1C-26288 68 Fed. Reg. 70,388, 70,389 (SEC Dec. 17, 2003) ...............................28

SEC Release No. 1C-26375A, 2004 SEC LEXIS 508 (March 5, 2004) .........................................28

Section 10(b) of the Exchange Act ...............................................................12, 16, 17

Section 17(a) of the Security Act .....................................................................17, 29

Section 20(b) of the Security Act .........................................................................33

Section 21 of the Exchange Act .............................................................................33

Randall Smith & Tom Lauricella, *U.S. Law Firms Advised Clients on Late Trading*, Wall St. J.....................................................................................................................................28

Pentagon Capital Management PLC ("PCM") and Lewis Chester ("Mr. Chester") (collectively "Defendants") and Pentagon Special Purpose Fund, Ltd. ("PSPF") ("Relief Defendant") submit this Memorandum in support of their motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") Rule 12(b)(6) and Rule 9(b).

## PRELIMINARY STATEMENT

PCM is an investment advisor based in the United Kingdom and Mr. Chester is its Chief Executive Officer.  PCM acted as both investment advisor and manager of PSPF, an unregulated Collective Investment Master Fund, which has a number of offshore feeder sub-funds.  The plaintiff, Securities and Exchange Commission ("SEC" or "Commission") alleges that Defendants orchestrated a scheme to defraud mutual funds through broker-dealers located in the United States, two of whom allegedly executed mutual fund orders after 4:00 p.m. for PCM, which, nevertheless, received the current day's net asset value ("NAV"), in violation of SEC Rule 22c-1(a), 17 C.F.R. § 270.22 c-1(a), promulgated by the SEC under the Investment Company Act of 1940 (the "Investment Company Act").  According to the complaint, Rule 22c-1(a) is alleged to apply to a mutual fund's principal underwriters, dealers and any person designated in the fund's prospectus.  Compl. ¶ 17.  The complaint does not allege that this Rule applied to the broker-dealers with whom PCM traded, nor that those broker-dealers were person's designated in the fund's prospectus.  On its face Rule 22c-1(a) does ***not*** apply to the Defendants.  Thus, the SEC has not and could not charge the Defendants with violating Rule 22c-1(a).

This is the complaint's Achilles' heel.  It fails to explain why these Defendants, who are not subject to Rule 22c-1(a), committed securities fraud by placing orders after 4:00 p.m. and receiving the same day's NAV.  In addition to the fact that the Defendants are not subject to Rule 22c-1(a), there is no allegation that the Defendants made any false or misleading

statement to anyone in connection with the alleged late trading, nor any allegation that Defendants assumed any fiduciary duty toward the mutual funds allegedly defrauded.

As we will show below, the SEC's second theory of fraud based upon illegal market timing is equally flawed. Market timing is a lawful strategy through which timers seek to profit from a mutual fund's mispricing of its shares by short term purchases or redemptions. Rather than cure this mispricing to deter market timers, according to the complaint, some unidentified mutual funds, who disliked this lawful strategy, sought to block market timing purchases by limiting the number of purchases, sales and redemptions during specified periods of time. Compl. ¶ 62. To circumvent the mutual funds blocking trades, the SEC alleges that Defendants used multiple investor accounts and their brokers used multiple broker identification numbers in connection with purchases and redemptions. Compl. ¶ 66. This the SEC claims is fraudulent because the use of multiple accounts and broker identification numbers prevents the mutual fund from obtaining sufficient information to block repeat purchasers. Therefore, according to the SEC, the use of multiple accounts and broker identification numbers is a misrepresentation or an omission.

These allegations fail for various reasons. First, the use of multiple account numbers and broker identification numbers are simply not misrepresentations. Second, there is no duty on the part of the Defendants to provide the mutual funds with any information in the absence of a request for that information. Third, any alleged misstatement or omission is immaterial as a matter of law. Fourth, to the extent that the mutual funds intended to use information about affiliation to reject purchases by market timers, the consequence of such action is that the mutual funds are placing a condition on the continuous offering of shares that

are otherwise available to the market at large. Such a condition is illegal, because it impermissibly restricts mutual fund shareholders of their statutory right to redeem shares.

## **STATEMENT OF FACTS**

In order to place the complaint's allegations in context, it is first necessary to understand what late trading and marketing timing are; what is permitted; what is prohibited; and to whom the rules apply.

### A.    Rule 22c-1(a)

The Defendants, customers of mutual funds, are not regulated by the SEC. On the other hand, U.S. mutual funds are regulated by the SEC pursuant to the Investment Company Act. Rule 22c-1(a) provides that the price assigned by mutual funds to their shares on any given day is the price "next computed" after the time an order is placed by an investor.[1]

Rule 22c-1(a) by its very term only applies to "investment companies," "underwriters," "dealers," or a "person designated in such issuer's prospectus as authorized to consummate transactions." It does not apply to or place obligations on broker-dealers, unless they are also "underwriters," "dealers," or "person designated in the prospectus," and on its face does <u>not</u> apply to customers such as Defendants, who purchase and sell shares in mutual funds. In the present case, there is no allegation that the two broker-dealers that allegedly executed late trades for Defendants were "underwriters," "dealers," or "persons designated in prospectuses."

---

[1] Rule 22c-1(a) provides:

No registered investment company issuing any redeemable security, no person designated in such issuer's prospectus as authorized to consummate transactions in any such security, and no principal underwriter of, or dealer in any such security shall sell, redeem, or repurchase any such security except at a price based on the current net asset value of such security which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security.

While the complaint describes late trading as "illegal," in fact, it is only illegal for the parties specified in the rule to sell, redeem or purchase shares at a price other than the net asset value "next computed."  Compl. ¶ 3

According to the complaint, U.S. mutual funds generally determine the price of their shares "as of" 4:00 p.m. eastern time.  Compl. ¶ 16.  However, the words "as of" do not appear in Rule 22c-1(a).  The rule on its face says nothing about 4:00 p.m. or "as of" 4:00 p.m., but simply provides that sales redemptions occur at the current net asset value "next computed" after the receipt of an order to purchase or sell the security.  Therefore, if a broker-dealer received an order after 4:00 p.m. and filled it at that day's NAV, the broker would not violate Rule 22c-1(a), if the fund next calculated the NAV at a later time.[2]  In fact, in December of 2003, the SEC proposed the adoption of a rule requiring a "hard close" for mutual funds, that would prevent the filing of any purchase or redemption request after 4:00 p.m.[3]  The proposed rule has yet to be adopted.

### B.    Market Timing

Market Timing is not and has never been illegal.  The term refers to strategic short-term purchases and redemptions of mutual funds in order to profit from inefficiencies in the way mutual funds price their shares.  Since a mutual fund's shares are priced only once a day, the price of the mutual fund may not reflect its true current NAV.  This is particularly so with regard to mutual funds that invest in international stocks that are traded on markets that

---

[2] SEC Commission Interpretive Positions Relating to Rule 22c-1, Investment Company Act Release No. 5569 (1967-69 transfer binder), Fed. Sec. L. Rep. (CCH) ¶77, 640 (December 27, 1968) ("The next computed price means the next price which goes into effect after receipt of the order").

[3] Amendments to Rules Governing Price of Mutual Fund Shares, Release No. IC-26288, File No. S7-27-03 (SEC December 11, 2003) (the proposed rule).  The proposed amendment noted that trading after 4:00 p.m. was not an isolated event but permitted by fund managers and intermediaries.

close well before the American markets close.  Consequently, if there are positive developments in the American markets that cause the price of a domestic stock to rise between the time the foreign markets close and the American markets close, there is a good chance that the international stocks will follow the American markets' lead and increase in price when the foreign markets begin trading the next day.  As a result, the price may not reflect the true NAV. Market timers seek to identify this mispricing and profit from it.

Although mutual fund companies have been aware of market timing for years, they have taken no action to prevent it by accurately pricing their funds.  Instead, they have attempted to impose restrictions on the number of times an investor can redeem shares by exchanging the shares of one mutual fund for the shares of another fund in the same fund family, or have attempted to block further transactions or prevent future purchases of a fund as a result of an investor attempting to redeem too quickly.  Rather than correct mispricing by fairly valuing the fund to reflect changes in the market after foreign markets have closed, these funds had opted to focus instead on the frequency of trading and the length of time an investor holds the shares before exercising the right to redeem the shares.

## ALLEGATIONS AGAINST THE DEFENDANTS

### A.    Late Trading

The complaint alleges that Defendants late traded through James A. Wilson Jr. ("Wilson") and Scott Christian ("Christian"), while they were associated with TW & Co. and on four occasions late traded through a broker dealer identified only as CONC.  According to the complaint, PCM initiated its relationship with Wilson and Christian when it opened a brokerage account with PW, a broker-dealer with whom no late trades were executed.  When the PW account was opened, Mr. Chester was advised by Wilson and Christian that PW's trading cut-off time was 4:00 p.m., but was also told that within a period of weeks, he should be able to trade up

to 4:15 p.m. New York time.  Compl. ¶ 25.  In late 2000, when Wilson and Christian moved from PW to TW & Co., the complaint alleges that Wilson and Christian sent a series of emails to defendant Mr. Chester in London indicating that it was possible to trade as late as 6:30 p.m. at TW & Co.  Compl. ¶¶ 30-41.  According to the complaint, PCM sent TW & Co. a fax early each afternoon – before 4:00 p.m. – containing tentative trades.  After 4:00 p.m. – generally between 4:00 p.m. and 5:30 p.m. – PCM personnel confirmed those instructions.  Compl. ¶ 43.

The complaint does not allege a single instance where PCM or Mr. Chester contacted any of the mutual funds directly.  There is no allegation that PCM made any representation to any mutual fund regarding the time orders were placed.  Nor is there any allegation that PCM was obligated to ensure that the price it paid for mutual fund shares was any particular NAV price.  All the complaint alleges is that tentative orders were placed by Defendants before 4:00 p.m. with TW & Co., which is not alleged to be an "underwriter," "dealer," or "person designated in a mutual fund prospectus;" that the orders were confirmed after 4:00 p.m.; and, that PCM received the current day's NAV.

While the complaint alleges that Mr. Chester knew that late trading was illegal, all of the allegations of the complaint in this regard are completely conclusory.  The only direct knowledge ascribed to Mr. Chester is contained in paragraph 57 where it is alleged that Mr. Chester called Wilson at TW & Co. and played a voicemail message from a registered representative from another U.S. broker claiming that "late trading was illegal".[4]  Nevertheless, according to the complaint, Wilson at TW & Co. disregarded the voicemail and, continued to execute trades confirmed after 4:00 p.m.  Compl. ¶ 57.

---

[4] As indicated above, late trading is barred by Rule 22c-1(a) with respect to certain categories of people.  It does not apply to customers, nor is there any allegation that it applied to TW & Co.

B.    **Market Timing**

The SEC alleges that the Defendants defrauded mutual fund companies by attempting to evade market timing restrictions put in place by various mutual funds.  Compl. ¶¶ 61-67.  Of course, we are never told who these mutual funds are or what restrictions were put in place.  We are left to guess or speculate in this regard.  Nevertheless, the complaint jumps to the conclusion that Defendants evaded these unknown restrictions put in place by unknown mutual funds by using multiple broker numbers; multiple accounts; splitting up large trades and using different broker dealers.  Compl. ¶¶ 68-92.  The SEC concludes that these practices constituted false statements to these unidentified mutual fund companies.

## ARGUMENT

### POINT I

I.    **THIS COURT SHOULD DISMISS ALL ALLEGATIONS OF LATE TRADING AS THE COMPLAINT ALLEGES NO MISREPRESENTATION BY THESE DEFENDANTS**

The SEC fails to allege that the Defendants, TW & Co. or CONC made any representations regarding PCM trades to any U.S. mutual funds.  According to the complaint, PCM placed trades before 4:00 p.m. and confirmed them after 4:00 p.m., but, Defendants, TW & Co. and CONC are not alleged to have hidden this from anyone.  Furthermore, it appears from the complaint that the broker-dealers with whom PCM dealt communicated the trades to the funds after 4:00 p.m. without disguising the fact that they had received confirmations from PCM after 4:00 p.m.  Therefore, there was no deception regarding the time the trades were placed.[5]

---

[5] *See O'Brien v. DiGragio*, 544 F.2d 543, 546 n.3 (1st Cir. 1976) ("[W]hen a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume those facts do not exist.")

Failure to allege conduct involving deception or manipulation is grounds for dismissal. Recently, the Second Circuit held in *United States v. Finnerty*[6] that while conduct can be deceptive, it must "entail some act that gives the victim a false impression." Therefore, under controlling Second Circuit precedent, a complaint does not allege fraud if it does not allege a deceptive statement or act. Yet, the Commission has made no allegation that Defendants communicated anything to the funds, let alone anything false.

Vague allegations of unfairness simply do not state a claim.[7] The plaintiff must allege that Defendants engaged in deception or manipulation. In *SEC v. Durgarian*,[8] the SEC alleged that several mutual fund employees agreed to cover up losses in a customer's account that were incurred when an employee failed to process a trade. The SEC alleged that the defendants agreed to do this by processing "as of" trades relating to other funds to recoup the unrealized gain. The court determined that the SEC failed to allege any misrepresentations or manipulation by several defendants, who, while knowing of the cover-up, took no specific action resulting in a misrepresentation or manipulative act.[9]

As in *Finnerty* and *Durgarian*, the Defendants in this case did not make any representation to the U.S. mutual funds or engage in any manipulative or deceptive conduct. The SEC only alleges that the Defendants "submitted trading decisions…at TW&Co." or "PCM placed trades after 4:00 p.m. … at Broker-Dealer CONC between March 2003 and August 2003." Compl. ¶¶ 42, 53. If true, these allegations only demonstrate that the Defendants

---

[6] *U.S. v. Finnerty*, 2008 WL 2778830, at *4 (2d Cir. July 18, 2008).

[7] *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977).

[8] *SEC v. Durgarian*, 477 F. Supp. 2d 342 (D. Mass. 2007).

[9] *Id*. at 354-55.

engaged in the perfectly lawful and normal act of placing orders with broker-dealers. The complaint does not allege that anyone, either Defendants or the broker-dealers, misrepresented to the U.S. mutual funds the time the trades were placed. Simply put, there was no deception or manipulation; and without deception or manipulation, there can be no fraud.

**POINT II**

**II.    THIS COURT SHOULD DISMISS ALL ALLEGATIONS OF MARKET TIMING AS THE COMPLAINT DOES NOT ALLEGE A MISREPRESENTATION REGARDING MARKET TIMING**

As with the allegations of late trading, the SEC's allegations regarding market timing fail because Defendants did not place any trades directly with the U.S. mutual funds. Instead, they placed trades with U.S. broker-dealers. Because of this, the Defendants did not make any representations to the mutual funds, let alone any misrepresentations.

While the complaint alleges that Defendants engaged in acts that "deceived" the mutual funds, Compl. ¶ 4, this allegation fails as well because the SEC does not identify a single act *by the Defendants* that deceived the funds. Instead, the SEC alleges a number of acts by the broker-dealers that are innocent on their face, and then attempts to suggest that they were done for a fraudulent purpose and that the Defendants somehow were involved. Specifically, the SEC alleges that the Defendants "utiliz[ed] multiple accounts, multiple RR [registered representative] numbers, and trad[ed] through multiple broker-dealers to help conceal Pentagon Fund's identity." Compl. ¶ 66. The complaint does not allege, because it can not, that the Defendants ever maintained any accounts that did not include Pentagon's name.

Additionally, the SEC alleges that the Defendants continued to trade with certain unnamed mutual funds even after the unnamed mutual funds blocked specific accounts. Compl. ¶ 75. These allegations also fail to demonstrate that the Defendants made any misrepresentation to the U.S. mutual funds. There is nothing deceptive or manipulative about using more than one

broker-dealer or having multiple accounts. Indeed, the SEC does not allege **how** or **why** it is a misrepresentation to utilize multiple broker-dealers or to have multiple accounts. In fact, maintaining multiple accounts at multiple brokers is normal business practice for a variety of reasons, such as taking advantage of the SIPC indemnity limits.[10]

According to one recent case, using fictitious names to conceal the broker-dealer's identity and the identity of their clients could constitute a misrepresentation. In *SEC v. Druffner,*[11] the Court determined that the SEC's complaint met the particularity requirements for a misrepresentation where the SEC alleged that a broker-dealer used multiple registered representative numbers and opened "nearly 200 customer accounts **under fictitious names**."[12] The Court denied defendants' motions to dismiss because the complaint pled with particularity a misrepresentation by the broker-dealers, of their clients' names to the mutual funds, which allowed the broker-dealers to process trades for clients whom the mutual funds had previously blocked.[13] In addition, the Court determined that the SEC's allegations met the particularity standard of Rule 9(b) because the complaint alleged specific details regarding the clients' names, the various registered representatives' numbers, the customer account numbers, the date, dollar amount, and fund for each transaction.[14]

It is important to note that *Druffner* was a case against a broker-dealer, not its customer. In this case, the SEC fails to allege that the Defendants falsified any information on

---

[10] Another example is FDIC insurance. A person with $1 million may choose to deposit $100,000 with 10 different banks. This is prudent protection of capital, not fraud.

[11] *SEC v. Druffner*, 353 F. Supp. 2d 141, 148 (D. Mass. 2005).

[12] *Id*. at 146. (emphasis added).

[13] *Id*. at 148.

[14] *Id*.

any forms or documents submitted to anyone. In fact, there are no allegations that the Defendants took any affirmative steps to conceal PSPF's identity. Unlike *Druffner,* the SEC fails to allege that the Defendants made any misrepresentations. Because the Defendants did not make any representations to the mutual funds regarding their identity, they could not have made any misrepresentations subjecting them to liability under the U.S. securities laws.

The SEC also alleges PCM and TW & Co. opened new accounts after the mutual funds had blocked activity in certain specified accounts. Compl. ¶¶ 75-78. What it does not allege is that these mutual funds blocked any and all trades from the PSPF. It just blocked (or threatened to block) certain accounts. Unlike *Druffner*, where the court determined that the deceptive scheme to defraud the mutual funds included making trades for **customers** that the mutual funds previously blocked, the SEC's complaint in this case fails to plead with particularity that the PSPF or PCM were blocked by any specific mutual fund. Instead, the SEC alleges that certain **accounts** of the PSPF or PCM were blocked. For example, the SEC alleges that Mutual Fund Company B notified the Defendants' broker that the mutual fund was monitoring **one** of the PSPF's accounts and the mutual fund **could** block that particular account. Compl. ¶ 75. This allegation fails to rise to the allegations in *Druffner*. Here, the SEC fails to allege facts to support an inference that the U.S. mutual funds intended to block the PSPF or PCM, rather than a particular account from all future trading in the mutual funds. To the contrary, the mutual funds continued to accept trades from other accounts in Pentagon's name. Compl. ¶ 78.

The SEC will undoubtedly argue that the use of multiple accounts, etc., conveyed a misleading impression. But, as the Second Circuit[15] has now made clear, someone else's

---

[15] *U.S. v. Finnerty*, 2008 WL 2778830, at *6 (2d Cir. July 18, 2008).

misunderstanding does not create liability, unless it is based on the alleged violator's articulated false statements. The third party's understanding simply does not matter, unless it is based on the alleged violator's deceptive conduct or statements. An alleged violator cannot incur liability for an allegedly false statement neither made by nor attributed to him.[16]

The SEC's allegations of "deception" also fail to meet the particularly requirements of Rule 9(b). The SEC fails to identify "the U.S. mutual funds." Compl. ¶ 73. The SEC's allegations regarding letters by "unnamed mutual funds" fail to plead with particularity who made the statements contained in the letters.[17] More importantly, the SEC fails to establish each mutual fund's policies regarding market timing. The SEC does not include any prospectus language from the unnamed mutual funds; does not allege that Defendants ever saw, let alone agreed to, any limits on redemption; fails to allege how the use of multiple accounts amounts to fraud; and fails to allege that anyone created fictitious registered representative numbers. As the Supreme Court has stated, "Section 10(b) may be a catch-all provision, but what it catches must be fraud."[18] Absent allegations of falsity there is no fraudulent activity for 10(b) to catch.

---

[16] *Id.*; *accord Luttangio v. Deloitte & Touche, LLP*, 476 F.3d 147, 152-55 (2d Cir. 2007); *Wright v. Ernst & Young, LLP*, 152 F.3d 169 (2d Cir. 1998).

[17] *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000), *quoting Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

[18] *Chiarella v. United States*, 445 U.S. 222, 228 (1980). *SEC v. Gann*, a market timing case, is instructive. In *Gann*, the SEC alleged an aider and abettor violation against securities brokers for the primary violation of their hedge fund clients. The defendants moved to dismiss all claims. Although the court determined that the SEC sufficiently alleged that the brokers' direct actions might support a securities violation, the court granted defendants' motions to dismiss as to the aider and abettor claim for assisting the hedge fund clients. The court determined that the allegations failed to demonstrate a primary violation on behalf of the defendants' hedge fund clients. *SEC v. Gann*, 2006 WL 616005, at *7 (N.D. Tex. Mar. 13, 2006).

Because the SEC fails to plead with particularity that the Defendants made any misrepresentations, the complaint must be dismissed.[19]

## POINT III

### III.  THE COURT SHOULD DISMISS COUNT I BECAUSE THE DEFENDANTS DID NOT OWE A DUTY TO DISCLOSE ANY INFORMATION TO THE MUTUAL FUNDS

It is black letter law that "silence, absent a duty to disclose," does not give rise to liability for securities fraud.[20]  The securities laws impose a duty to disclose a material fact in three circumstances: (1) when required by statute; (2) when it is necessary to correct a prior statement; or (3) when trading on material non-public information obtained pursuant to a fiduciary duty to the source of the information.[21]  The SEC alleges that the Defendants committed securities fraud because "PCM and Chester … failed to disclose … material information to U.S. mutual fund companies."  Compl. ¶ 104.  However, the SEC fails to allege that the Defendants had a duty to disclose any information to the U.S. mutual funds.

### A.  The Defendants Did Not Owe A Duty To The Mutual Funds To Disclose When They Executed Or Confirmed Trades.

There are no allegations in the complaint that the Defendants had a fiduciary relationship with the U.S. mutual funds or their shareholders.  The complaint cannot allege that the Defendants failed to correct a prior statement because the Defendants did not make any previous statements to the U.S. mutual funds.  Therefore, the Defendants would only have a duty to disclose late trading to the U.S. mutual funds if a statute imposed such a duty.  While the SEC

---

[19] *Ross v. A. H. Robins Co., Inc.,* 607 F.2d 545, 557 (2d Cir. 1979).

[20] *See Chiarella*, 445 U.S. at 228; *Basic v. Levinson*, 485 U.S. 224, 239 n.17 (1988).

[21] *Backman v. Polaroid Corp.*, 910 F.2d 10, 12 (1st Cir. 1990); *recognized by Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992).

suggests that Rule 22c-1(a) of the Investment Company Act imposes such a duty, in fact, as a matter of law, the rule does not apply to the Defendants.

### 1. The Defendants were not subject to Rule 22c-1(a) under the Investment Company Act.

Rule 22c-1(a) under the Investment Company Act requires registered open-end investment companies (*i.e.*, mutual funds), persons designated in such issuers' prospectuses as authorized to consummate transactions in any such security, their principal underwriters, and dealers in the funds' securities, to sell and redeem fund shares at a price based on the current NAV next computed after receipt of an order to buy or redeem. Investment Company Act Rule 22c-1(a) does not apply to customers of broker-dealers who purchase the shares at arms-length.[22] Rule 22c-1(a) does not mention hedge funds in the list of those subject to the rule. Therefore, taking the allegations in the complaint as true for the purposes of this motion to dismiss, the complaint fails to allege a statutory duty that would require the Defendants to disclose the time that they placed or confirmed orders to the mutual funds in whose shares they traded.

### 2. The law does not require parity of information.

The SEC's complaint vaguely suggests that late trading is unfair to investors. Unfairness, however, without more, does not equate to fraud, nor does it translate to a duty to disclose.[23] In *Chiarella v. United States,* the Supreme Court stated, "a purchaser of stock who has no duty to a prospective seller because he is neither an insider nor a fiduciary has been held

---

[22] Under basic rules of statutory construction, if a statute is plain on its face, the analysis ends there. *Frank G. v. Board of Educ. of Hyde Park*, 459 F.3d 356, 370 (2d Cir. 2006) *citing U.S. v. City of New York*, 359 F.3d 83, 98 (2d Cir. 2004) (*"expressio unius est exclusio alterius"* – the express mention of certain things excludes others not mentioned).

[23] Breach of a fiduciary duty does not necessarily equate to fraud under the securities laws. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. at 462 (1977).

to have no obligation to reveal material facts."[24]   Thus, the Court held that a printer who determined the names of potential corporate takeover targets, purchased their stock prior to the takeover, and sold soon thereafter for a profit, did not violate the securities laws because he had no relationships that would impose a duty to disclose the information.[25]   Therefore, Defendants were not obligated to disclose to the U.S. mutual funds the times at which they entered trades. Indeed, the SEC does not allege that the Defendants had such a duty, most likely because under Rule 22c-1(a) no such duty exists.

### 3.    The SEC's tentative insider trading allegation fails because there are no facts to support an allegation that Defendants placed trades based on information obtained pursuant to a fiduciary duty.

The SEC also implies that PCM traded on non-public information.  Compl. ¶ 46. The complaint alleges that PCM "profit[ed] from market events that occur[ed] after 4:00 p.m." Compl. ¶ 18.  The complaint does not allege, however, that PCM obtained information that was otherwise unavailable to other mutual fund investors.  There is no duty to disclose publicly available information.[26]   As the complaint concedes, the Defendants traded based on a computer generated trading model that formulated its calculations upon publicly available information. There are no explicit allegations in the complaint that the Defendants possessed inside information that was unavailable to other investors.[27]   Indeed, as the complaint alleges, the Defendants' model was based on public information regarding the performance of international

---

[24] *Chiarella,* 445 U.S. at 228.

[25] *Id.*

[26] *See, e.g.*, *SEC v. Coffey*, 493 F.2d 1304, 1313 (6th Cir. 1974).

[27] *Compare*, *SEC v. Pimco Advisors Fund Management LLC*, 341 F. Supp. 2d 454, 469 (S.D.N.Y. 2004) (SEC alleged that defendants obtained nonpublic information that allowed defendants to anticipate the daily changes in the price of the funds that it market timed).

securities that was as available to everybody else as it was to them.  The SEC's tenuous insider trading theory fails with respect to this type of publicly available information.

The duty to disclose information or abstain from trading is premised on the existence of a duty between the individual possessing the information and the source of the information.[28]  The relationship between stock purchasers and sellers creates no such duty, even in the case of the shares of public companies that trade on exchanges.[29]  This is because, as the Supreme Court has held, there is no overall requirement of parity of information between purchasers and sellers in a free-market economy.[30]

> **B.    The Defendants Did Not Owe A Duty To The Mutual Funds To Disclose Their Market Timing.**

The mutual fund prospectus is a disclosure document for the benefit of the purchasers of the mutual fund shares, it does not create a contractual relationship, and the complaint does not allege otherwise.  Even if the prospectus could, theoretically, amount to an allegation that the Defendants breached some implied contractual relationship with the mutual funds, that breach of a contractual relationship would not give rise to claim for securities fraud.[31]

---

[28] *See Chiarella*, 445 U.S. at 228; *U.S. v. O'Hagan*, 521 U.S. 642 (1997); *Schatz v. Rosenberg*, 943 F.2d 485, 490 (4th Cir. 1991); *Media Gen., Inc. v. Tomlin*, 2001 WL 1230880, at *15 (D.D.C. Aug. 9, 2001) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").

[29] *See Trussell v. United Underwriters, Ltd.*, 228 F. Supp. 757, 763 (D. Colo. 1964).

[30] *See supra* fn. 20.

[31] *See, e.g.*, *U.S. v. Szur*, 289 F.3d 200, 209 n.5 (2d Cir. 2002); *U.S. v. Rybicki*, 287 F.3d 257, 264 (2d Cir. 2002) ("we are bound by this court's precedents upholding convictions under § 1345 that involved schemes ... in which the defendant breached or induced the breach of duty owed by an employee or agent to his employer or principal that was enforceable by an action at tort."); *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442, 445 (2d Cir. 1971) (mere breach of contract or of a stock exchange rule does not constitute securities fraud); *Pross v. Baird Patrick & Co*, 585 F. Supp. 1456, 1460 (S.D.N.Y. 1984) (without deception, trades executed in violation of brokerage agreement can not be converted into fraud under section 10(b)); *AIG Global Securities, Corp. v. Banc of America Securities, LLC*, 254 F. Supp. 2d 373, 385 (S.D.N.Y. 2003) (failure to abide by a contractual commitment is insufficient to ratify Rule 9(b)'s requirement that plaintiff allege why the misrepresentation is fraudulent).

These were arms-length transactions, not fiduciary transactions, and neither of the Defendants had a fiduciary duty to the U.S. mutual funds or their shareholders.

Moreover, there are no allegations that the Defendants had any knowledge that any mutual fund's prospectus stated that each customer is limited to only one account. The sole example of any language from a mutual fund's prospectus comes from a letter sent to a broker-dealer's clearing firm from an unnamed mutual fund. The letter referenced in the complaint states "that pursuant to the prospectus, shareholders were restricted to ten exchanges per year and that Mutual Fund Company B **could** reject purchase orders **if** the fund determined that short term trading was excessive." Compl. ¶ 73 (emphasis added). This letter demonstrates that even the cribbed language of the prospectus enabled the mutual funds to utilize their discretion to prevent or allow trades. It does not, however, establish a fiduciary duty between the Defendants and the U.S. mutual funds or their shareholders. Even in cases where the mutual funds did not waive the trading frequency limitations or otherwise acquiesce in frequent trading, this constitutes no more than a possible breach of contract between sophisticated business parties, **not** fraud. Only breaches of duty actionable in tort are fraudulent; breaches of contract are not.[32]

## POINT IV

### IV.   THIS COURT SHOULD DISMISS THE COMPLAINT IN ITS ENTIRETY BECAUSE ANY OMITTED INFORMATION WAS IMMATERIAL

Even if this Court were to find that Defendants omitted to state certain information that they were duty bound to disclose, to state a claim for a violation of Section 17(a) of the Securities Act and, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, the SEC must allege a material misrepresentation or omission. A material

---

[32] *Id.*

misrepresentation or omission is defined as one which has "substantial likelihood that the disclosure of the omitted fact would have been reviewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[33]    In *Basic*, the Supreme Court held "[i]t is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."[34]

### A. The Omitted Information Was Immaterial To The Mutual Funds.

In the SEC's complaint, the Commission alleges that Defendants omitted to state that they had confirmed orders after 4:00 p.m., and failed to disclose the affiliation of accounts and registered representative numbers.  The Commission's underlying premise is that if these facts had been disclosed, mutual funds would have refused to accept PCM's trades.  But, a "scheme to defraud" simply does not exist where a representation or omitted representation is about something which should or could be easily confirmed if the recipient wished to do so from readily available external sources.[35]    In the present case, if the mutual funds deemed the exact time that trades were finalized to be important, or if affiliation information was important to their decisions to transact business with individuals buying and selling their mutual funds, they could have simply asked for the time at which the trade was finalized and/or asked for the identity of the individual or entity executing the trade.  They did not.  Consequently, it is obvious that such information was immaterial.

---

[33] *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988) (*citing TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

[34] *Id.* at 238.

[35] *See, e.g., U.S. v. Brown*, 79 F.3d 1550, 1559 (11th Cir. 1996) (when entering into an arms-length transaction, there is no general affirmative obligation to disclose sales price disparities between homes offered by a seller and a competitor's home); *accord U.S. v. Brennan*, 183 F.3d 139, 150 (2d Cir. 1999) (there is no fraud where sophisticated parties deal in an arms-length transaction).

**B.    Any Omitted Information Regarding Affiliation Was Immaterial As A Matter Of Law Because The Mutual Fund Companies Intended To Use The Information To Enforce An Illegal Condition.**

Mutual funds offer shares on a continuous basis, at a price related to current net asset value, and stand ready to redeem shares at any time at the shareholder's request.[36]  Section 22(e) of the Investment Company, 15 U.S.C. §80A-22(e) prohibits mutual funds from suspending the right of redemption subject to only three exceptions, not applicable here.[37]  Consequently, mutual funds are statutorily prohibited from reserving the right to suspend redemptions in their offering materials.  Thus, a mutual fund cannot condition an investor's acceptance of an offer to buy mutual funds on his or her agreement to suspend the right of a redemption for a specified period of time.[38]

---

[36] Thomas L. Hazen & David L. Ratner, *Broker-Dealer Regulation*, 618 (West 2003).

[37]    No registered investment company shall suspend the right of redemption, or postpone the date of payment or satisfaction upon redemption, of any redeemable security in accordance with its terms for more than seven days after the tender of such security to the company or its agents designed for the purpose of redemption except –

(1) for any period (A) during which the New York Stock Exchange is closed other than customary week-end and holiday closings or (B) during which trading on the New York Stock Exchange is restricted;

(2) for any period during which an emergency exists as a result of which (A) disposal by the company of securities owned by it is not reasonably practicable or (B) it is not reasonably practicable for such company fairly to determine the value of its net assets; or

(3) for such other periods as the Commission may by order permit for the protection of security holders of the company.

The Commission shall by rules and regulation determine the conditions under which (i) trading may be deemed to the restricted and (ii) an emergency shall be deemed to exist within the meaning of this subsection.

[38] *See Imperial Portfolios, Inc*., SEC No Action Letter, 1988 SEC No Action Lexis 730 (June 10, 1988) (a mutual funds' intention to include in its Articles of Incorporation a requirement that investors provide it with thirty days' notice of intended redemption was not permissible because it was not a reasonable restriction on redemption rights).

In its complaint, the SEC suggests that mutual funds have a right to refuse to honor an investor's acceptance of its offer to sell securities based on the investor's affiliation with another account that has previously redeemed shares too quickly in the mutual fund's estimation.  In other words, a mutual fund, according to the SEC, has the right to place a condition on its continuous offering of securities and only allow those investors who agree voluntarily to suspend their right of redemption for undisclosed and unspecified periods of time to invest in the fund.  Such a condition is illegal and violates Section 22(e).  In essence, it allows a mutual fund's continuous offering obligation to extend only to those purchasers who acquiesce in the suspension of their statutory right of redemption in the unfettered discretion of the mutual fund, and postpones the date of redemption for that investor indefinitely.

Under Section 47(a) of the Investment Company Act, 15 U.S.C. §80A-46(a), a condition that requires waiver of compliance with the Act is void.[39]  Therefore, mutual funds cannot legally prevent the acceptance of their continuous offerings by affiliated investors based on a condition that violates Section 22(e).  Accordingly, all of the market timing allegations of the complaint must be dismissed.

### POINT V

**V.    THE COURT SHOULD DISMISS COUNT II OF THE COMPLAINT BECAUSE THE DEFENDANTS DID NOT AID OR ABET A PRIMARY VIOLATION**

To show that a defendant willfully aided and abetted the violation of another, the SEC must establish that (1) another party has committed a primary violation; (2) the alleged

---

[39] "[A]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this title or with any rule, regulation, or order thereunder shall be void."

aider and abettor provided substantial assistance to the primary violator; and (3) scienter on the part of the alleged aider and abettor.[40]

### A. The SEC Fails to Allege A Primary Violation.

#### 1. No misrepresentation

The complaint fails to allege a primary violation because, as we noted in Points I through IV above, there is no allegation of any misrepresentation either with respect to late trading or market timing; Defendants owed no duty to disclose; and the omitted information is immaterial.

#### 2. Lack of particularity

Assuming without conceding that misrepresentations or omissions were made, the allegations of the complaint fail to allege with particularity a primary violation of fraud by the broker-dealers and registered representatives.  For example, there are no allegations in the complaint that specify when each individual mutual fund calculated its NAV.  Allegations that the U.S. mutual funds "generally" calculate their NAV at 4:00 p.m. fail to meet the particularity requirement of Rule 9(b).[41]  The complaint also fails to allege (1) the name of the mutual funds with whom trades were executed, (2) the exact time that a broker-dealer placed a specific trade with the unidentified mutual fund, (3) that this trade was placed after the NAV was calculated and (4) that the PSPF received the NAV previously calculated.  Absent these specific allegations, the complaint fails to allege fraud with particularity.

The complaint also fails to allege a primary violation because the brokers alleged in the complaint are not identified as one of the parties regulated by Rule 22c-1(a), which applies

---

[40] *See Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000), *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990).

[41] *See Ross v. A. H. Robins Co., Inc.,* 607 F.2d 545, 557 (2d Cir. 1979).

only to "investment companies," "underwriters," "dealers," or "persons designated in the prospectus as authorized to consummate transactions."

The complaint also fails to allege a primary violation regarding market timing because it again fails to allege with particularity ***how*** it is deceptive to have multiple accounts. There are no factual allegations in the complaint to support the conclusion that by opening multiple accounts the broker-dealers intended to conceal the PSPF's identify.  The complaint does not allege that the broker-dealers provided false information to the U.S. mutual funds when the accounts were opened.  The complaint does not allege that the registered representatives used fictitious names to gain additional registered representative numbers.  Nor does the complaint allege that the registered representatives used different addresses to establish the additional numbers.  Thus, the complaint fails to establish a primary violation by the broker-dealers because the SEC fails to allege with particularity that the broker-dealers employed "deceptive" practices.[42]

## POINT VI

## VI.    EVEN IF THE SEC ALLEGES A PRIMARY VIOLATION, THE SEC FAILS TO ALLEGE THAT THE DEFENDANTS PROVIDED SUBSTANTIAL ASSISTANCE TO THE PRIMARY VIOLATORS

Assistance is "substantial" only if it proximately caused the resulting securities law violation.  "In alleging the requisite 'substantial assistance' by the aider and abettor, the complaint must allege that the acts of the aider and abettor proximately caused the harm to the corporation on which the primary liability is predicated… allegations of a 'but for' causal

---

[42] *U.S. v. Finnerty*, 2008 WL 2778830, at *6 (2d Cir. July 18, 2008).

relationship are insufficient."[43]  Defendants did not take any affirmative action in processing the trades or opening additional accounts that could be considered substantial assistance.

Although the SEC alleges that "PCM and Chester substantially assisted the fraudulent conduct described above," Compl. ¶ 110, nowhere does it allege how Defendants' actions caused, or were a substantial factor in causing, the broker-dealers' violations of the securities laws.  Merely placing orders with the broker-dealers does not substantially assist a violation of the securities laws.  Otherwise, every customer of a brokerage house that subsequently violated the securities laws would be an aider and abettor.

The SEC's allegations that the Defendants assisted the broker-dealers' alleged violations of the U.S. securities laws stretches aiding and abetting beyond its limits.  Essentially, the SEC alleges "but for" the Defendants' placing orders, the broker-dealers would not have violated the securities laws.  It is this type of "but for" analysis that fails to allege substantial assistance.[44]  The Defendants merely placed trades with the broker-dealers.  There are no allegations that the Defendants assisted the broker-dealers in processing the orders with the U.S. mutual funds.  Therefore, the complaint lacks sufficient allegations that the Defendants provided "substantial assistance" to the broker-dealers and registered representatives.

A.    **The SEC Fails To Allege That The Defendants Had The Requisite Scienter.**

Assuming that the SEC has alleged a primary violation, the SEC fails to allege that the Defendants knew they were a part of an improper or illegal scheme.[45]  Absent a

---

[43] *Bloor v. Carro Spanbock Londlin, Rodman & Fass*, 754 F.2d 57, 62-63 (2d Cir. 1985).  *Accord*, *Armstrong v. McAltin*, 699 F.2d 79, 92 (2d Cir. 1983) (aider and abettor not liable "unless his financial advice was a proximate cause of the … resultant losses … moreover, a 'but-for' concept of proximate cause will not satisfy this requirement.").

[44] *Armstrong v. McAltin*, 699 F.2d 79, 92 (2d Cir. 1983).

[45] *Howard v. SEC*, 376 F.3d 1136 (D.C. Cir. 2004).

fiduciary duty or duty of disclosure, an alleged aider-abettor can be found liable only if the SEC can establish scienter of the high conscious intent.[46]   The SEC does not allege that the Defendants owed a fiduciary duty or a duty to disclose to the U.S. mutual funds; therefore, under established Second Circuit precedent, the SEC must allege facts that demonstrate that the Defendants acted with ***actual intent***, not just recklessness.[47]

The SEC fails to allege that the Defendants had actual knowledge that the broker-dealers were subject to Rule 22c-1(a) and that they were committing a primary violation. Instead, the SEC makes conclusory allegations that the Defendants ***knew*** that broker-dealers accepted trades after 4:00 p.m., but that the broker-dealers "execute[ed] the trades as though they were received before 4:00 p.m."   Compl. ¶ 110.   Additionally, the SEC alleges that the Defendants "knew that various U.S. broker-dealers, including TW & Co. and Broker-Dealer PRU, employed deceptive practices to conceal the PSPF's identity and trading strategies from U.S. mutual fund companies."  Compl. ¶ 110.

First, the SEC must allege facts that show the Defendants had actual knowledge that a violation of the law had occurred, not that the Defendants were reckless in not knowing.[48] The complaint lacks any facts that support the SEC's conclusory allegations that the Defendants knew that the broker-dealers processed the trades with the U.S. mutual funds as if they were received before 4:00 p.m.  Second, without first establishing when each mutual fund calculated its NAV, it is pure speculation to allege that the Defendants knew that placing trades after 4:00 p.m. constituted illegal late trading.  There are no allegations in the complaint to suggest that the

---

[46] *IIT v. Cornfeld,* 619 F.2d 909, 925 (2d Cir. 1980) (emphasis added).

[47] *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990).

[48] *Id*.

broker-dealers falsified the trade times to the mutual funds and that the Defendants knew that this was done. The SEC only alleges that the Defendants "knew," but fails to allege *how* they knew. This conclusory allegation does not meet the strict pleading requirements of Rule 9(b).

The complaint also fails to allege that the Defendants knew the broker-dealers employed "deceptive" practices while submitting trades on behalf of the Defendants. The SEC alleges that the Defendants "knew that many U.S. mutual funds disliked and prohibited market timing." Compl. ¶ 62. Thus, the SEC alleges that the Defendants knew they needed to "hide the Pentagon Fund's market timing trading from U.S. mutual funds." Compl. ¶ 64. However, the SEC fails to allege how the Defendants knew the mechanics by which the brokers were conducting their trading, or how the Defendants knew that the actions taken by the brokers were calculated to deceive the mutual funds. The conclusory allegations of the Defendants' knowledge do not rise to the particularized pleadings required under Rule 9(b). The SEC does not allege facts showing that Defendants knew of the illegality of the underlying conduct and of their own role in furthering the violation.[49] At most, the SEC alleges that an unidentified person left a voicemail message claiming that late trading was illegal, which Mr. Chester played for James Wilson, his registered representative at TW & Co, who continued to trade after 4:00 p.m. after hearing the tape. While the SEC might argue that Defendants should have done more, that is not actual knowledge. Indeed, in *In the Matter of Scott G. Monson*,[50] the Commission itself

---

[49] *Id.*

[50] *In the Matter of Scott G. Monson*, 2008 SEC LEXIS 1503 (June 30, 2008) (the SEC alleged that a mutual funds in-house counsel violated Section 9 of the Investment Company Act by aiding and abetting a violation of Rule 22c-1(a) by drafting a trading agreement between a mutual fund and a client that allowed for late trading. The SEC failed to establish a claim against the attorney because there was no evidence that he had any knowledge of Rule 22c-1(a) and he was allowed to rely upon those with superior knowledge of the securities laws.) In this case, the complaint fails to allege that Defendants had actual knowledge of Rule 22c-1(a) and the Defendants relied upon the superior expertise of their broker-dealers who continued to trade after hearing the voice mail regarding the legality of late trading.

refused to find that a lawyer who drafted an agreement providing for late trading was negligent in doing so, in the absence of actual knowledge of Rule 22c-1(a).[51]  Therefore, the complaint fails to state a cause of action for aiding and abetting

### POINT VII

**VII.  THE SEC'S ALLEGATIONS REGARDING LATE TRADING AND MARKET TIMING VIOLATE DUE PROCESS**

The SEC's novel interpretation of market timing and late trading set forth in this complaint violates due process, because the Defendants did not have fair notice that their conduct would constitute regulatory violations.  In *Upton v. SEC*, the Second Circuit held that an SEC enforcement action was improper because Upton had no prior notice that his conduct was in violation of the securities laws.[52]  Upton was the Chief Financial Officer of FCSC, a brokerage firm.  Every week, acting pursuant to SEC Rule 15c3-3(e), Upton computed the amount of funds FCSC had to deposit into a special reserve bank account for the benefit of its customers, which amount depended upon whether loans were secured or unsecured.  Each week, just before computing the amount of a required deposit,  FCSC would pay down the value of the secured loans and replace them with unsecured loans, thus reducing the amount of the deposit by as much as $40 million per week.  Shortly after making the required deposit, FCSC would reverse this process.  FCSC, along with many other brokerage firms, routinely engaged in this conduct.  Subsequently, the New York Stock Exchange ("NYSE") released an interpretation memo advising for the first time that this activity violates Rule 15c3-3(e).  Two

---

[51] In the case of *In re Comverse Technology, Inc.*, 2008 WL 2795927 (E.D.N.Y. July 18, 2008) (The court refused to infer that the General Counsel of Comverse deliberately engaged in an accounting manipulation because he had admitted in a guilty plea his involvement in a backdating scheme.  It simply did not necessarily follow that because he backdated documents that he was involved in accounting manipulation.)

[52] *Upton v. SEC*, 75 F.3d 92 (2d Cir. 1996).

years later the SEC brought an enforcement action against Upton. The Second Circuit held that the SEC's enforcement action was improper because, despite the fact that Upton's conduct was clearly manipulative, Upton had no prior knowledge that his conduct violated Rule 15c3-3(e).[53]

A regulated party has fair notice of the Commission's position only if the public statements issued by the agency allow a party to determine with "ascertainable certainty" the standards to which the agency expects the party to conform.[54] Yet, prior to September 2003, the SEC did not provide any notice of its current positions, and the general anti-fraud provisions do not even mention "late trading" or "market timing," much less provide the requisite "ascertainable certainty" that they proscribe late trading or market timing. If such notice was not even available to regulated individuals like registered representatives and broker-dealers, then surely the information was not available to the broker-dealers' foreign customers like the Defendants. In 2000-2003, it was the understanding among the industry that late day trading[55] and market timing[56] were legal strategies that investors had employed for decades.

---

[53] The Second Circuit reasoned:

> Due process requires that 'laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.' Although the Commission's construction of its own regulation is entitled to 'substantial deference' we cannot defer to the Commission's interpretation of its rules if doing so would penalize an individual who has not received fair notice of its regulatory violation.... [T]he Commission took no steps to advise the public that it believed the practice was questionable until August 23, 1989, after Upton had already stopped the practice. The Commission may not sanction Upton pursuant to a substantial change in its enforcement policy that was not reasonably communicated to the public.

*Id.* at 98 (citations omitted).

[54] *Blount v. SEC*, 61 F.3d 938, 948-949 (D.C. Cir. 1995).

[55] The court may take judicial notice of the numerous settled actions that have been brought against broker-dealers, registered representatives, and mutual funds for late trading inferring that this was a prevalent practice. The following link summarizes some but not all of the enforcement actions taken by the SEC during 2003-2005 against broker-dealers, registered representatives and mutual fund companies for late trading. (*Available at* http://www.sec.gov/news/testimony/ts060705lar-attach2.pdf). If this case proceeds to trial then we will present a vast body of material to show that this activity was prevalent. According to the Wall Street Journal, Akin Gump Strauss Hauer & Feld, LLP and Piper Rudnick, LLP gave legal advice that trading was permissible after 4:00 p.m.

(continued...)

Indeed, the fact that the SEC proposed rules as late as March 5, 2004 to curb market timing, and recently proposed rules specifically to address late trading, demonstrates that the law was (and still may be) ambiguous at best.[57]  It is certainly far from clear that the antifraud provisions banned these practices all along.

Judge Rakoff reiterated this point in *U.S. v. Oakford Corp.*[58]  In that case, floor brokers executed trades for accounts over which they had discretionary trading authority, and split profits from such trading with the customers.  Rule ll-l-l(a) prohibited a floor broker from engaging in trades for any account in which the floor broker had discretion.  However, the enforcement arm of the SEC took the position that a floor broker could lawfully evade this ban by notifying the customer prior to making the trade, even if the parties had previously

_____

(continued...)

based on their interpretation of Rule 22c-1.  Randall Smith and Tom Lauricella, *U.S. Law Firms Advised Clients on Late Trading*, Wall St. J. (Europe) (Dec. 3, 2003).  After September of 2003, the SEC did a survey of broker-dealers.  It found that 25% reported that customers placed or confirmed mutual fund orders after 4:00 p.m. and received the 4:00 p.m. NAV; 10% of fund groups surveyed "indicated there may have been late trading"; and, 80% of fund groups surveyed reported that they allowed late processing of share orders.  Stephen M. Cutler, Director of the Division of Enforcement, Testimony Concerning Recent Commission Activity to Combat Misconduct Relating to Mutual Funds by of the Securities and Exchange Commission Before the Senate Subcommittee on Financial Management, the Budget, and International Security, Committee of Governmental Affairs (November 3, 2003) *available at* http://www.404.gov/news/testimony/ts110303smcoral.htm.

[56] The S.E.C. survey also concluded that the market timing policy of the typical fund groups were discretionary and 50% of responding fund groups had one or more arrangements that allowed market timing by providing customers with marketing timing capacity.  *Id.*  The Janus Funds, in the wake of the late trading and marketing timing probes, publically stated that, although it had policies and procedures in place to deter marketing timing, its "employees believed that limited, controlled marketing timing was permitted by the prospectus language and was not harmful to the funds." Janus Capital Group Inc., Current Report (Form 8-K), Ex-99.1 (Sept. 30, 2003).

[57] *See* Mandatory Redemption Fees for Redeemable Fund Securities, Release No. 1C-26375A, 2004 SEC LEXIS 508, at *41 (March 5, 2004) (proposing rules "to curb harmful market timing transactions"); Amendments to Rules Governing Pricing of Mutual Fund Shares, Release No. 1C-26288, 68 Fed. Reg. 70,388, 70,389 (SEC Dec. 17, 2003) (proposing rules "to eliminate late trading through fund intermediaries"); *In re First Nat. Monetary Corp.*, CFTC Dkt. No. 79-56,1985 CFTC  LEXIS 289, at *3-*6 (CFTC Aug. 7, 1985) ("recognizing the potential unfairness in subjecting respondent to liability for [conduct] which [the agency] had already decided to examine prospectively via rulemaking.").

[58] *U.S. v. Oakford Corp.*, 199 WL 1201725 (S.D.N.Y. Dec. 13, 1999).

agreed that the floor broker would exercise discretion, and regardless of whether the notification was perfunctory. Under those circumstances, the court held that it could not conclude that the defendants were given fair notice that their arrangements constituted unlawful discretionary trading, except in instances where there was no prior contact between the customers and Oakford. The failure of the SEC to enforce the rule deprived the defendants of fair notice.

The SEC's current positions with respect to market timing and late trading violate due process because its retrospective interpretation of the law under Section 17(a) and Rule 10b-5 is now different from what is was in 2000 - 2003, the period in which the Defendants are alleged to have known that conduct by others was illegal. Moreover, the SEC's current stance effectively creates new duties under Rule 22c-l(a) that the SEC is attempting to impose on the Defendants without providing any reasoned and studied analysis for such a change as required by law.[59] "An inadequately explained departure solely for purposes of a particular case, or the creation of conflicting lines of precedent governing the identical situation, is not to be tolerated."[60]

Like the defendants in *Upton* and *Oakford*, neither Mr. Chester nor PCM had fair notice in 2000 - 2003 of the SEC's post-September 2003 interpretation of the law.

---

[59] *See, e.g., Greyhound Corp. v. ICC*, 551 F.2d 414, 416 (D.C. Cir. 1977); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970); *National Black Media Coalition v. FCC*, 775 F.2d 342, 355 (D.C. Cir. 1985).

[60] *Shaw's Supermarkets, Inc. v. NLRB*, 884 F.2d 34, 36-37 (1st Cir. 1989).

**POINT VIII**

## VIII.   THERE CAN BE NO LIABILITY FOR ALLEGED PENAL VIOLATIONS THAT TOOK PLACE BEFORE APRIL 3, 2003

The SEC's claims are barred due to the expiration of time under the general statute of limitations imposed by 28 U.S.C. § 2462.[61]  The general statute of limitations is applicable to the entire federal government in all civil penalty cases, unless Congress specifically provides otherwise.[62]  Courts have applied the statute to SEC enforcement actions.[63]

Here, the SEC alleges violations of the securities laws based on transactions that occurred in 2000 through 2003.  The SEC, however, did not file the complaint until April 3, 2008.  Therefore, any claims for civil penalties based on transactions or conduct that occurred prior to April 3, 2003 are barred.[64]

### A.   The Statute of Limitations Bars All Relief Sought by The SEC In This Case.

The statute of limitations under 28 U.S.C. § 2462 bars all relief the SEC seeks in this case because the relief is penal in nature.  The five-year limitation applies to penalties, but

---

[61] The statute provides:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued . . . .

28 U.S.C. § 2462.

[62] *3M Co. v. Browner,* 17 F.3d 1453, 1461 (D.C. Cir. 1994).

[63] *See Johnson v. SEC,* 87 F.3d 484 (D.C. Cir. 1996); *SEC v. Jones,* 476 F. Supp. 2d 374, 381 (S.D.N.Y. 2007).

[64] *Id.* (dismissing aiding and abetting claims that allegedly occurred in the summer of 1999 because "a 'discovery of violation' rule does not apply to cases governed by § 2462 - *i.e.*, that the Commission's claim accrued when the factual and legal prerequisites for filing suit were in place, not when the Commission discovered those prerequisites").

not remedial measures.[65]  A penalty, as used in 28 U.S.C. § 2462, is "a form of punishment imposed by the government for unlawful or proscribed conduct, which goes beyond remedying the damage caused to the harmed parties by the defendant's action."[66]  Here, the Commission seeks civil monetary penalties, injunctive relief, and disgorgement that is penal in nature, and thus the statute of limitations must apply.

### 1.    Civil monetary penalties

The language of 28 U.S.C. § 2462 unambiguously and unquestionably applies to civil monetary penalties.[67]  Therefore, the SEC's request for "civil monetary penalties" is barred by the five-year statute of limitations in 28 U.S.C. § 2462.

### 2.    Injunctive relief

The five-year statute of limitations in 28 U.S.C. § 2462 applies to injunctions that are penal in nature.[68]  An injunction is a penalty when there is little likelihood of recurrence or the injunction would have harsh collateral consequences.  Without such a showing, an injunction is "likely aimed at punishing Defendants."[69]

In *SEC* v. *Jones,* the SEC's request for a permanent injunction enjoining defendants from committing future violations of the Investment Advisers Act was barred by 28 U.S.C. § 2462 because there was no proof that there was a danger of recurrent violations, and the Commission relied exclusively on the defendants' past conduct to demonstrate the need

---

[65] *Id.*

[66] *Johnson,* 87 F.3d at 488.

[67] *SEC v. DiBella,* 409 F. Supp. 2d 122, 127-28 & n.3 (D. Conn. 2006) (stating that § 2462 applies to SEC's civil money penalty claims).

[68] *Id.*; *Jones,* 476 F. Supp. 2d at 381.

[69] *Id.*

for an injunction.[70]  Furthermore, the court recognized the serious collateral consequences of a permanent injunction: "[t]he practical effect of such an injunction [] would be to stigmatize Defendants in the investment community and significantly impair their ability to pursue a career.  In fact, a permanent injunction would provide authority for the Commission to seek to permanently bar defendants from the investment advisor industry."[71]

       The SEC's request to enjoin Defendants from violating or aiding and abetting violations of the securities laws constitutes a request for penalties.  As in *Jones,* the Commission seeks an injunction based entirely on the Defendants' past conduct, and does not even allege a danger of a recurrent violation.  Indeed, many years have passed without incident since Defendants' alleged misconduct, a fact that undercuts the SEC's conclusory assertion that Defendants pose a continuing risk to the public.  The SEC obviously does not believe Defendants pose a serious risk to the public, as it waited almost five years to bring this action.  Moreover, the Defendants are not alleged to have conducted any business in the U.S. mutual funds market since 2003.  Thus, the SEC's claims for injunctive relief must be subject to the five-year statute of limitations in 28 U.S.C. § 2462, and therefore should be denied.[72]

---

[70] *Id.*

[71] *Id.* at 385.

[72] The SEC's request for disgorgement, with prejudgment interest, constitutes a penalty, and is therefore barred by the five-year statute of limitations under 28 U.S.C. § 2462.  *Jones supra*, *DiBella supra* and *SEC v. Lorin*, 869 F. Supp. 1117 (S.D.N.Y. 1994) have held that disgorgement is not a penalty.  However, the SEC itself has argued that disgorgement is a penalty.  *See In re Telsey,* 144 B.R. 563, 565 (Bankr. S.D. Fla. 1992) (finding that the deterrence purpose of disgorgement is sufficiently penal to be characterized as a "fine, penalty, or forfeiture" within the meaning of the bankruptcy code, 11 U.S.C. § 523(a)(7)); *see also In re Arnold,* 64 SEC Docket 333, 1997 WL 126714, at * 15 (Mar. 19, 1997) (holding that proceeding must be dismissed pursuant to § 2462 because "a cease and desist order or disgorgement order would constitute penalties.").  Because the SEC has conceded that disgorgement is a penalty, § 2462 applies and bars all claims for disgorgement before April 3, 2003.  While we understand that this Court may chose to follow the opinion of Judge Baer in *Lorin*, reconciling the SEC disingenuous contrary position, we raise this issue to preserve it for appeal, if necessary.

## POINT X

**IX.    THE SEC IS NOT ENTITLED TO THE EQUITABLE REMEDY IT SEEKS**

The SEC's complaint fails to allege facts that would support the requested relief. Instead, the SEC merely concludes that it is entitled to an injunction. However, Fed. R. Civ. P. 8 requires a minimum of factual support to establish entitlement to the relief requested.

### A.    The SEC Has Not Pled Any Facts That Would Entitle It To A Permanent Injunction With Respect To Any Claim.

The SEC has failed to adequately plead the necessary facts to support injunctive relief. Section 20(b) of the Securities Act and Section 21 of the Exchange Act authorize the SEC to seek, and direct the courts to enter, permanent restraining orders upon a "proper showing" that the defendant "is engaged or is about to engage" in violations of the federal securities laws.[73] The SEC has the burden of satisfying the Court that there is "a reasonable and substantial likelihood that [a defendant], if not enjoined, would violate the securities laws in the future."[74] The following factors are relevant in determining the likelihood of future violations: 1) the egregiousness of the violations; 2) the isolated or repeated nature of the violations; 3) the degree of scienter involved; 4) the sincerity of the defendant's assurances, if any, against future violations; 5) the defendant's recognition of the wrongful nature of his conduct; 6) the likelihood that the defendant's occupation will present opportunities (or lack thereof) for future violations; and 7) the defendant's age and health.[75]

---

[73] *See* 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d).

[74] *SEC v. Commonwealth Chem. Sec., Inc.,* 574 F.2d 90, 99 (2d Cir. 1978).

[75] *SEC v. Militano*, 1994 WL 285472, at *9 (S.D.N.Y June 23, 1994), *citing SEC v. Youmans,* 729 F.2d 413, 415 (6th Cir. 1984).

The SEC has not alleged *any* facts that suggest, based on these factors, that there is a likelihood of future violations by the Defendants. Taking the complaint's allegations as true suggests only that any wrongdoing (which there was none) occurred during 2000-2003. Indeed, the SEC fails to allege that the Defendants are currently conducting market timing or late trading. It is an impermissible leap to assume that wrongdoing would occur elsewhere.[76] In fact, the Defendants are not alleged to have conducted any trades in violation of U.S. law since 2003 and there is no evidence that the Defendants will do so in the future.

**B.    The SEC Should Not Be Granted Leave to Amend.**

The SEC has had almost five years of unfettered access to the underlying facts and has brought numerous actions against various broker-dealers and others for the same allegations. Indeed, the SEC even conducted interviews with Mr. Chester and one other PCM employee in London in June of 2006. As such, this is certainly not a circumstance where an opportunity to amend the complaint would cure the pleading deficiencies. "[A] 9(b) [securities] claimant must know what his claim is when he files."[77] Under these circumstances, leave to amend should not be granted.

**CONCLUSION**

For the foregoing reasons, PCM and Mr. Chester respectfully request that this Court enter an order dismissing the complaint for the reasons set forth above without leave to replead.

---

[76] At the very least, when scienter is an element of the substantive violation sought to be enjoined, it must be proven before an injunction may issue. *Aaron v. SEC*, 446 U.S. 680, 699-700 (1980). Since, as discussed in detail above, the SEC has failed to plead facts showing scienter, it has per se failed to plead facts showing that it is entitled to an injunction of violations of § 17(a), § 10(b) or Rule 10b-5.

[77] *SEC v. Orr*, 2006 WL 542986, at *8 (E.D. Mich. Mar. 6, 2006).

Pentagon Capital Management, PLC, Pentagon
Special Purpose Fund, LTD and Lewis Chester

By counsel,


_____/s/  Frank C. Razzano_
Frank C. Razzano, Esq.
(Admitted in NY & SDNY, FCR 8820)
Ivan B. Knauer, Esq.
(Admitted in NY & SDNY, IK 2963)
Pepper Hamilton LLP
Hamilton Square
600 Fourteenth Street, N.W.
Washington, DC  20005-20004
Phone:  202.220.1286
Fax:     202.220.1665
razzanof@pepperlaw.com
knaueri@pepperlaw.com

***Counsel for Defendants, Lewis Chester,
Pentagon Capital Management, PLC and
Pentagon Special Purpose Fund, Ltd.***

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2008, a true and correct copy of this Memorandum of Law in Support of Defendants' Motion to Dismiss was served electronically via the Court's Electronic Case Filing system on the following:

Mark K. Schonfeld, Esq.
Paul G. Gizzi, Esq.
Securities and Exchange Commission
Northeast Regional Office
3 World Financial Center, Room 4300
New York, NY  10281-1022
(212) 336-0077 (Paul Gizzi)
gizzip@sec.gov
Attorney for Plaintiff


_____/s/  Frank C. Razzano_
Frank C. Razzano