UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

   - against -

PENTAGON CAPITAL MANAGEMENT PLC and
LEWIS CHESTER,

        Defendants,

   - and -

PENTAGON SPECIAL PURPOSE FUND, LTD.,

        Relief Defendant.

----------------------------------------X

08 Civ. 3324 (RWS)

OPINION

A P P E A R A N C E S:

       Attorneys for Plaintiff

       SECURITIES AND EXCHANGE COMMISSION
       New York Regional Office
       3 World Financial Center
       New York, New York  10281
       By: Paul G. Gizzi, Esq.
          Mark D. Salzberg, Esq.
          Christopher Dunnigan, Esq.

       Attorneys for Defendants

       PEPPER HAMILTON LLP
       Hamilton Square
       600 Fourteenth Street, N.W.
       Washington, D.C.  20005
       By: Frank C. Razzano, Esq.
          Ivan B. Knauer, Esq.
          Matthew D. Foster, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

**Sweet, D.J.,**

Defendants Pentagon Capital Management, PLC ("PCM"), Lewis Chester ("Chester," and with Pentagon, "Defendants"), and relief defendant Pentagon Special Purpose Fund, Ltd. (the "Relief Defendant" or the "Pentagon Fund") have moved pursuant to Rules 12(b)(6) and 9(b), Fed. R. Civ. P., to dismiss the Amended Complaint of the Securities and Exchange Commission ("Plaintiff" or the "SEC"). On the conclusions set forth below, the motion is denied.

## I. PROCEDURAL HISTORY

On April 3, 2008, the SEC filed its complaint against PCM, Chester and the Pentagon Fund, alleging that PCM and Chester had orchestrated a scheme to defraud mutual funds in the United States and their shareholders through late trading and deceptive market timing, in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder. In the alternative, the SEC asserts a claim of aiding and abetting violations of Section 10(b) and Rule 10b-5. The third claim asserts an unjust enrichment claim against the

1

Pentagon Fund.

On August 1, 2008, the Defendants and Relief Defendant moved to dismiss the complaint. On September 9, 2008, the SEC filed an amended complaint (the "FAC"), asserting the same claims for relief on the basis of additional factual allegations.

Defendants' motion to dismiss the FAC, filed October 8, 2008, was heard and marked fully briefed on December 3, 2008.

## II.  PLAINTIFF'S ALLEGATIONS

The following allegations, taken from the FAC, are accepted as true for the purpose of resolving the motion to dismiss.

### The Defendants

PCM is an investment adviser and investment manager based in London, England.  PCM has provided investment advisory services to the Pentagon Fund and its various feeder funds since

at least 1999.[1]

Chester is a resident of London, England. Chester joined PCM in 1998 and has served as PCM's Chief Executive Officer since 1999. During the relevant period, Chester served as one of the two portfolio managers for the Pentagon Fund, and directed PCM's market timing and late trading strategies. Chester is a graduate of the University of Oxford in England and the Harvard Business School. He is also a qualified Solicitor of the Supreme Court of England and Wales.

### Relief Defendant

The Pentagon Fund is an international business company incorporated by the British Virgin Islands. The Pentagon Fund served as the master fund in a master-feeder fund structure.

### Late Trading

The price of a U.S. mutual fund's shares is based on the value of the securities and other assets held by the mutual fund minus its liabilities. Each fund is required by the SEC's

---

[1] A master-feeder structure involves a master fund that makes investments and offers the master fund's securities to feeder funds. The feeder funds' securities are, in turn, offered to investors.

regulations to calculate the net asset value of the fund's holdings, or "NAV," each trading day. Typically, the U.S. mutual funds in which the Pentagon Fund traded calculated the prices of their shares as of the close of the New York Stock Exchange ("NYSE"), normally at 4:00 p.m. ET.

Rule 22c-1(a), 17 C.F.R. § 270.22c-1(a), adopted pursuant to Section 22(c) of the Investment Company Act of 1940 ("Investment Company Act"), 15 U.S.C. § 88a-22(c), requires registered investment companies issuing redeemable securities, principal underwriters and dealers, and any person designated in the fund's prospectus as authorized to consummate transactions in securities issued by the fund, to sell and redeem fund shares at a price based on the next computed NAV. U.S. mutual funds investing in equity securities virtually always determine the daily price of their shares as of 4:00 p.m. ET or the close of the NYSE, whichever is earlier. U.S. mutual funds' prospectuses typically state that orders received before 4:00 p.m. ET are executed at the price determined as of 4:00 p.m. ET that day, and that orders received after 4:00 p.m. ET are executed at the price determined as of 4:00 p.m. ET the next trading day.

"Late trading" refers to the practice of placing orders to buy, redeem, or exchange U.S. mutual fund shares after

4

the time as of which the funds calculate their NAV, but receiving the price based on the prior day's NAV. The late trader, by obtaining the previously determined NAV, is able to profit from market events that occur after 4:00 p.m. ET and not reflected in that day's price. Late trading harms innocent shareholders in mutual funds by diluting the value of their shares.

In order for U.S. broker-dealers to serve as dealers for a particular mutual fund company's funds, and thereby sell the company's mutual fund shares to their customers, U.S. broker-dealers and/or their respective clearing brokers typically enter into dealer agreements with the distributors, or principal underwriters, of various U.S. mutual funds. These agreements typically require the broker-dealers to sell the U.S. mutual funds in accordance with the federal securities laws and the terms of the mutual funds' prospectuses.

The mutual fund prospectuses typically state that the publicly available price, or NAV, for the funds' shares is calculated as of 4:00 p.m. ET, or as of the close of the NYSE. The prospectuses typically require U.S. broker-dealers to receive orders to purchase, redeem, or exchange shares of a fund no later than 4:00 p.m. ET for such orders to be executed at

5

that day's NAV.

Certain U.S. broker-dealers, known as "introducing brokers," enter into clearing agreements with other U.S. broker-dealers. For example, broker dealer "TW&Co.," a broker-dealer formerly registered with the SEC, cleared its mutual fund and other securities transactions through Banc of America Securities, LLC ("BofA"). The clearing agreement between BofA and TW&Co. stated that the "[a]greement, and all transactions and activities [thereunder, were] subject to the federal and state securities laws," including the Securities Act, the Exchange Act, and the Investment Company Act. The clearing agreement provided that TW&Co., and not BofA, was "solely and exclusively responsible for," among other things, ensuring that all TW&CO.'s customers' trades "comply in all respects with" the securities laws. BofA's trading instructions were contained in a manual given to the introducing broker-dealers, including TW&Co. These instructions specified that mutual fund orders should be received by 4:00 p.m. ET in order to receive the current day's NAV.

U.S. broker-dealers typically route mutual fund orders via the Fund/SERV platform, an automated system for processing purchase, redemption and exchange orders of U.S. mutual fund

6

shares.   Fund/SERV typically acts as a communication hub between
the U.S. broker-dealers and the primary transfer agent of the
U.S. mutual funds.

During the relevant time period, U.S. broker-dealers
often received customer orders prior to 4:00 p.m. ET but did not
submit the trades via the Fund/SERV platform until after 4:00
p.m. ET.   These trades were eligible for the current day's NAV
so long as the U.S. broker-dealer received the final order prior
to 4:00 p.m. ET.

The U.S. mutual funds were not able to determine from
the Fund/SERV platform the time at which U.S. broker-dealers
received orders from their customers.   The U.S. mutual funds
thus relied on the U.S. broker-dealers to comply with the
federal securities laws, the funds' prospectuses and dealer
agreements, and, if applicable, the U.S. broker-dealers'
clearing agreements.

PCM and Chester took advantage of this system by
searching for and locating registered representatives ("RRs") at
U.S. broker-dealers who were willing to accept Pentagon Fund
orders after 4:00 p.m. ET and submit them as if they had been
received before 4:00 p.m. ET, and in so doing deceived U.S.

7

mutual funds who believed that the trades had been received prior to 4:00 p.m. ET.

In the late 1990s, PCM and Chester caused the Pentagon Fund to open non-discretionary brokerage accounts at a number of U.S. broker-dealers, including those referred to in the FAC as TW&Co., CIBC, PRU, CONC, PW, BBH, CIC, SSB, and MS. Because the Pentagon Fund's brokerage accounts were "non-discretionary," only PCM - not the RRs at the U.S. broker-dealers - had discretion to submit trades on behalf of the fund.

PCM utilized proprietary trading models to trade U.S. mutual funds in certain sectors, initially concentrating on funds investing in international equities.

After PCM began trading U.S. mutual funds, Chester knew that PCM had to submit U.S. mutual fund trades for Pentagon Fund by 4:00 p.m. ET for Pentagon Fund to receive that day's NAV. For example, after Pentagon Fund brokerage accounts were opened at PW with RRs James A. Wilson Jr. and Scott Christian, Chester sent an April 13, 2000 email to Wilson with an attached spreadsheet that indicated that PCM had to submit trades prior to 4:00 p.m. ET.

8

Chester, however, sought the ability to submit U.S.
mutual fund trades after 4:00 p.m. ET, but still receive the
current day's NAV. On May 5, 2000, Chester had a discussion
with Wilson and Christian about the latest time PCM could submit
trades. Chester memorialized the discussion in a memorandum
that indicated that they had "discussed the latest time for
trading on the [broker-dealer PW] accounts. [Wilson] stated
that currently we would be able to trade up to 4pm New York time
(9pm UK time). Within a period of weeks, he should be able to
accept trades up to 4.15pm New York time."

Christian then sent Chester an email on May 26, 2000,
that indicated that PCM had to enter its trades by 4:00 p.m. ET
because U.S. mutual funds were priced as of that time:

Regarding after hours trading, I have spoken to a
few sources and so far they have come back to me
with the idea that mutual funds trading will
still halt at 4 pm.    If portfolio managers are
still purchasing assets in the market after 4
then these will be reflected in the following
day's price. Therefore the pricing of the mutual
funds will not be affected by the after hours
market since the pricing will be based on
activity prior to 4 pm that day.    Anything after
4 will reflect in the price for the following
day's close.

Wilson and Christian were not able to arrange for late
trading through PW. Chester and other PCM personnel also spoke

9

with RRs from other U.S. broker-dealers, including CIC and PRU,

in an attempt to late trade through their respective U.S.

broker-dealers.  The Defendants were advised that they were

required to submit the current day's U.S. mutual fund trades

prior to 4:00 p.m. ET.

In late 2000, Wilson and Christian moved to broker-

dealer TW&Co. and advised Chester that PCM could submit late

trades in U.S. mutual funds.  PCM promptly caused the Pentagon

Fund to open non-discretionary brokerage accounts at TW&Co.

On April 5, 2001, Chester sent an email to Wilson and

Christian that contained the following:

AFTER HOURS TRADING INSTRUCTIONS

I  have  spoken  to  my  R&D  people  regarding  a
procedure for going IN, OUT or canceling an IN or
OUT  on  any  given  night,  as  per  our  telephone
conversation last night.

Lets [sic] us know what the current cut-off time
is (5:30 p.m. NY time?) and when you'll have the
6:30p.m.  facility  -  I  think  you  told  me  it  will
be available from Monday???

Chester's April 5, 2001 email also included a template for

taking advantage of after-hours information:

The procedure we are thinking of putting in place
is as follows (subject to speaking this through
to Trevor [another PCM employee]):
-    Trevor's team will give you a single figure
on the S&P future (e.g. 1320), at or around the

10

close
-      If the future exceeds (for an IN) or falls
below (for an OUT) - see examples below - after
hours, then try to get hold of one of us by
telephone
-      If you can't get hold of us, then do the
corresponding trade
-      Send Trevor an e-mail letting him know what
you've done
. . . .
My R&D team is building an application for
Trevor's team to spew out the requisite S&P
future figure each night for you.  We should be
able to be up and running on this within a day or
two.


On April 9, 2001, Chester sent an email to Wilson and

Christian asking whether they were ready to start late trading:

"Are you know [sic] able to do trades up to 6:30 pm NY time?"

Wilson responded in an email to Chester on April 10, 2001, as

follows:

[Christian] and i feel that if you are going to
use our late trading - "it" (you said) adds a
certain percentage of value - we would then like
some kind of system or proposal on how we can
make money on this . . . [because] if we are
going to trade later then we need parameters so
we can establish guidelines - im [sic] not
staying here everynight [sic] without cause - i
feel things are tight allover [sic] and there are
only so many places to do this . . so lets [sic]
be partners or such. . cheers


Chester responded in an April 11, 2001 email to Wilson

and Christian that contained the following:

11

Re: Late Trading

1.    We are partners.    I have always gone out of my way to support you. When you went to [PW], we gave you assets asap, and then when you went to [TW&Co.], you [sic] gave you assets asap. . . .

2.    Your facility for late trading is not the only one we have. In all the other cases, we pay 1% p.a. .

. . . .

5.    You currently earn 2% p.a. This is double what Pentagon earns as a management fee.    (Our performance    fee    reflects    the    strength    or otherwise of our modeling decisions, and hence is as variable as our decisions.) We work all the hours of the day to ensure we do our best for the client. To ask you or Scott, or someone else at [TW&Co.] to cover until 6:30pm each night, really is no big deal. And you know it. Remember, the more money we make, the more fees you earn - 2% of a larger figure. Hence, it's in everyone's interests to ensure we get the later trading times.

I really EXPECT you guys to go out of your way to make sure I get late trading - you're earning double what everyone else takes home on this business - although it's unlikely that we'll need 6:30pm trading every night.

. . . .

I really want to be your biggest client. I want to be the first to try your new products. And I want you to have the best facilities/trading. And that's why I am happy to pay you double what I pay any one else.


        On April 11, 2001, Wilson sent an email to Chester

including the following:

    **We are the only place to trade late past 530-** in
    the [U.S.] with any brokers.- fact. ;^)
    Thus you have to pay more ...

On May 9, 2001, a PCM employee sent an email to

Christian at TW&Co. attaching a document entitled "Notes on

Trading Domestic Technology Funds" that provided more detailed

instructions on how PCM wanted TW&Co. to execute late trades on

behalf of Pentagon Fund. Specifically, the document indicated

that PCM's trading model "outputs a couple of lines of text at

about 16:10 (New York time)." The document then provided the

following trading instructions for trading U.S. mutual funds

holding technology company securities:

> [T]he procedure for trading these funds is as
> follows (all times are New York):
>
> 1. At or around 16:10, the dealing team at
> Pentagon phone [TW&Co.] to tell them the output
> of the model.
> 2. At 17:30, if the condition on the futures is
> met and the futures are outside the "warning"
> band, [TW&Co.] execute the trades - no need to
> phone Pentagon.
> 3. At 17:30, if the condition on the futures is
> not met and the futures are outside the "warning"
> band, no trades executed - [TW&Co.] can go home!
> 4. At 17:30, the futures are in the warning
> band, [TW&Co.] phones Lewis [Chester] at
> Pentagon, or the list of phone numbers that
> Trevor will supply for further instructions,
> which might include waiting for another hour.

Having secured the ability to late trade, PCM also

took steps to increase Pentagon Fund's assets in brokerage

13

accounts at TW&Co. through financing from CIBC.

On May 1, 2001, Chester sent an email to Wilson and

Christian outlining his plan to submit late trades up to 6:30

p.m. ET:

> We're sending you some leverage money - hopefully
> [CIBC] and your lawyer will get off their
> backside and complete the bloody leverage
> documentation! - for domestic funds. Trevor will
> call you later to discuss.
>
> Hopefully this should stop your endless,
> pathetic, pittiful [sic] moaning that I've been
> subjected to for years.
>
> It does mean you might have to work a little
> harder ...pour souls, working past cookie and
> milk time ... for once in your lives, you can
> work like real men and do a proper day's work.
> (You really are a bunch of women of the first
> order).
>
> Trevor will run through the procedures of how the
> trading is going to work. In essence, most of it
> will be done by you within certain parameters
> that we will give you each day. In the majority
> of cases, your decision point will be 5:30 pm NY
> time. In a few cases, your decision point will
> be 6:30 pm - I know, slave labor... whatever will
> you do working that late!
>
> When there are close decision, you'll have a list
> of home / cell numbers for me, Trevor, Jafar
> [PCM's Chief Operating Officer] and Anthony
> [another PCM employee] (priority in that order) .
> . . and we'll make the call. If you can't get
> through to us, then on a close decision, you'll
> need to act like men and make the call. (Not too
> difficult really, as it's not your money!)

14

From approximately May 2001 to September 2003, PCM and Chester routinely submitted trading decisions after 4:00 p.m. ET for Pentagon Fund's brokerage accounts at TW&Co., and TW&Co. falsely represented that PCM's orders had been received prior to 4:00 p.m. ET, thereby ensuring that the Pentagon Fund would receive that day's NAVs for the trades. During this period, PCM placed thousands of trades through TW&Co., including hundreds of trades after April 3, 2003, many of which were late trades.

Typically, PCM sent TW&Co. tentative trading instructions early each afternoon. TW&Co. RRs Wilson and Christian would then time-stamp the order tickets prior to 4:00 p.m. ET. After 4:00 p.m. ET, PCM's model generated trading instructions, and PCM personnel conveyed the day's final trading instructions to TW&Co. between 4:00 p.m. ET and 5:30 p.m. ET or even later. TW&Co. would then relay the Pentagon Fund's orders through BofA, TW&Co.'s clearing broker, to U.S. mutual funds via Fund/SERV. The U.S. mutual funds, deceived into believing that the orders had been placed prior to 4:00 p.m., would assign that day's NAV to the orders.

In addition, if PCM learned of market moving

15

developments after it had provided the day's trading decisions
for Pentagon Fund accounts, PCM generally amended its trading
instructions for the day.

PCM sought and received from TW&Co. the current day's
NAV prior to PCM transmitting final trading decisions to TW&Co.
for the day - thereby gaining an extra measure of profit on the
trades.

PCM continued to late trade U.S. mutual funds in the
Pentagon Fund's accounts at TW&Co. until the public announcement
in early September 2003 that the New York Attorney General filed
settled fraud charges against hedge fund Canary Capital LLC for
engaging in late trading.

Pentagon also engaged in late trading through broker-
dealer CONC. In early 2003, a RR from CONC met with Chester in
New York and solicited Chester to open accounts at CONC. During
the meeting, Chester requested the ability to enter current day
orders on behalf of the Pentagon Fund after 4:00 p.m. ET.  The
RR agreed to allow PCM to place current day trades after 4:00
p.m. ET.

Subsequently, a PCM employee spoke with the RR about the need to make trading decisions after 4:00 p.m. ET. The PCM employee confirmed the discussion in an email to the RR at CONC:

I understand that on a daily basis I can call in the trade at 4.20 pm but need to call at 4.10 pm for indication. Though on an obvious evening I'd give the decision before then. However, on an evening when we know there will be after hours news I can call in my trade at 5.15pm. Its [sic] on these nights that I'd be likely to move fully my domestic positions to take advantage of the late trading privilege you guys are offering.

PCM placed trades after 4:00 p.m. ET on four occasions for the Pentagon Fund at CONC between March 2003 and August 2003 with the expectation that CONC RRs would falsely represent that these orders had been received prior to 4:00 p.m. ET, thereby ensuring that the Pentagon Fund would receive that day's NAVs for the trades.

In an April 10, 2003 email to an RR at CONC, a PCM employee noted that companies would soon be reporting earnings after the market close:

Starting from today and next week but excluding tomorrow I'll need someone to stay late at [CONC] as we'll be in reporting season. We've got Juniper [Networks] & Network Associates as the "big" ones tonight.

17

Chester had discussions with TW&Co. personnel concerning the legality of late trading. For example, during the fall of 2001, Chester called Wilson and played a voicemail message that a RR from another U.S. broker-dealer that PCM used, CIBC, had left for Chester. On the voicemail message, the CIBC RR told Chester to stop pushing CIBC RRs to accept late trades, and that late trading was illegal.[2]

On June 7, 2002, Christian sent an email to Chester with an article concerning the market timing of U.S. mutual funds with international holdings. The article noted that such funds calculated NAVs at 4:00 p.m.

On or about August 5, 2003, Chester received a paper entitled "Mutual Fund Market Timing Strategies," which included the following:

> In the United States, all mutual funds are traded electronically through the NSCC (National Securities Clearing Corporation) or through FundServ and are executed at the end of the market at 4:00 pm (Eastern Standard Daylight time).

[2] With their reply brief, Defendants have submitted a transcript of a phone call which they allege to be the "voicemail message" referred to in paragraph 79 of the FAC. Defendants assert that this transcript demonstrates the falsity of the allegation. At best, Defendants' submission raises a factual dispute not appropriately resolved on this motion to dismiss.

. . . .
Within the FundServ or NASD trading operation,
the trade execution of mutual funds is performed
at the transfer agent for each mutual fund group
at the close of the U.S. markets at 4:00 p.m. at
the same-day NAV for settlement T+1 (trade date
plus one).

Chester's notations on the paper indicated that it was "very
informative about US mutual fund market timing."

### Market Timing

"Market timing" includes: (i) frequent buying and
selling of shares of the same mutual fund or (ii) buying and
selling mutual fund shares in order to exploit inefficiencies in
mutual fund pricing.  Market timing can harm other mutual fund
shareholders by diluting the value of their shares.  Market
timing, while not illegal per se, can disrupt the management of
a mutual fund's investment portfolio and cause the targeted
mutual fund to incur considerable extra costs associated with
excessive trading and, as a result, cause damage to other
shareholders in the fund.

Many mutual fund prospectuses stated that the funds
prohibited or restricted market timing and reserved the right to
reject purchases and exchanges deemed excessive, and many U.S.

mutual funds attempted to track market timers in order to stop market timing trading within their funds.

When mutual funds identified a market timing trade, they frequently imposed restrictions on the shareholder and/or account that had traded. The mutual funds then notified the relevant U.S. broker-dealer that such trade had been rejected, and the relevant brokerage account restricted. The mutual funds would then permit the shareholder to exchange into the money market fund and/or redeem its shares, but the mutual funds would not permit the shareholder to purchase shares of another equity mutual fund within the fund company.

When a U.S. mutual fund rejected a market timing trade in a particular brokerage account, the fund typically intended that the restrictions that were imposed applied to all accounts owned or managed by the same shareholder. The mutual funds were often unable to enforce their restrictions, however, because market timers often continued trading within the same mutual fund companies using deceptive tactics such as continuing to trade through different brokerage accounts that the mutual fund had not yet identified or restricted.

The FAC alleges that because Chester and PCM knew that

20

U.S. mutual funds disliked and prohibited and/or restricted market timing, they needed to hide the Pentagon Fund's market timing trading from U.S. market funds. They split Pentagon Fund trades among multiple brokerage accounts at multiple U.S. broker-dealers in order to conceal the Pentagon Fund's trading from the mutual funds. After mutual funds blocked the Pentagon Fund's trades, PCM and Chester caused the Pentagon Fund to open additional brokerage accounts at various U.S. broker-dealers to deceive U.S. mutual fund companies into continuing to allow the Pentagon Fund to trade following rejections. RRs at various U.S. broker-dealers, with the knowledge and consent of PCM and Chester, furthered the scheme by employing additional deceptive tactics such as the use of multiple RR numbers in order to conceal the Pentagon Fund's identity from the mutual funds.

PCM and Chester caused the Pentagon Fund to open multiple accounts at TW&Co. In total, PCM and Chester caused the Pentagon Fund to open 68 brokerage accounts at TW&Co. Wilson and Christian established 17 different RR numbers to assist their market timing clients, including PCM and the Pentagon Fund. PCM and Chester used the multiple accounts and worked with Christian and Wilson to use the multiple RR numbers to evade mutual funds' efforts to block Pentagon Fund's market

timing trading.

For example, on September 21, 2001, a U.S. mutual fund company ("Mutual Fund Co. B") filed a prospectus with the SEC that noted that its funds had the right to limit exchanges to four times per year.

On November 28, 2001, Christian sent an email to PCM to advise it that Mutual Fund Co. B had rejected trades PCM had submitted in seven Pentagon Fund accounts. PCM continued to market time Mutual Fund Co. B's mutual funds for Pentagon Fund accounts. The next day, on November 29, 2001, Pentagon Fund purchased shares in Mutual Fund Co. B's mutual funds in a different account, and sold the position the following day. In total, after November 28, 2001, PCM placed 93 purchases and exchanges of Mutual Fund Co. B's mutual funds through 31 different Pentagon Fund accounts at TW&Co.

On April 24, 2001, AIM filed a prospectus with the SEC containing the following language:

> You are limited to a maximum of 10 exchanges per calendar year, because excessive short-term trading or market-timing activity can hurt fund performance. If you exceed that limit, or if an AIM Fund or the distributor determines, in its

sole discretion, that your short-term trading is
excessive or that you are engaging in market-
timing activity, it may reject any additional
exchange orders.  An exchange is the movement out
of (redemption) one AIM Fund and into (purchase)
another AIM Fund.

On February 22, 2002, AIM sent a letter to BofA, TW&Co.'s

clearing firm, which BofA forwarded to TW&Co., concerning

several accounts at the broker-dealer including Pentagon Fund

account no. 797-70021.  The letter indicated that AIM had

"closely monitored the effects of market timing and short-term

trading within our family of funds" and had "determined that

these activities, if not properly addressed, may hinder our

ability to achieve the desirable long-term investment results

for our shareholders."  Further, AIM's letter indicated that,

pursuant to the prospectus, shareholders were restricted to ten

exchanges per year, and that AIM could reject purchase orders if

it determined that short term trading was excessive.  Finally,

the letter advised that the referenced accounts had already

exchanged eight times, and that following a tenth exchange "a

stop code will be placed on the accounts preventing further

exchanges and purchases in 2002."  TW&Co. informed PCM of this

restriction.

PCM and TW&Co. subsequently caused the Pentagon Fund

23

to open new brokerage accounts and continued to market time

AIM's mutual funds. Specifically, on approximately March 4,

2002, PCM directed TW&Co. to open three new brokerage accounts

for the Pentagon Fund. Then, beginning March 6, 2002, PCM

continued market timing AIM's mutual funds through these new

Pentagon Fund brokerage accounts.

On June 29, 2001, Putnam, a U.S. mutual fund company,

filed a prospectus with the SEC containing the following

language:

> The exchange privilege is not intended as a
> vehicle for short-term trading. Excessive
> exchange activity may interfere with portfolio
> management and have an adverse effect on all
> shareholders. In order to limit excessive
> exchange activity and otherwise to promote the
> best interests of the fund, the fund reserves the
> right to revise or terminate the exchange
> privilege, limit the amount or number of
> exchanges or reject any exchange. The fund into
> which you would like to exchange may also reject
> your exchange. These actions may apply to all
> shareholders or only to those shareholders whose
> exchanges Putnam Management determines are likely
> to have a negative effect on the fund or other
> Putnam funds.

On March 1, 2002, Putnam sent a letter to TW&Co. concerning

several accounts, including Pentagon Fund's account no. 797-

70090. Putnam's letter indicated that it had "identified

accounts . . . that have excessive exchanges," and that it was

24

"terminating your ability as broker of record to open new accounts at Putnam under your representative identification." Further, Putnam's letter stated that it would "not allow accounts for which you are broker of record and which are networked or trade within omnibus accounts to exchange into any other fund," other than a money market fund, and that it was taking this action because it had "found that excessive exchange activity of a small number of individuals was causing volatility in the funds' cash position" and that "this can have a detrimental effect on fund performance." TW&Co. informed PCM about this block.

PCM and Chester subsequently caused the Pentagon Fund to open new brokerage accounts and continued to market time Putnam mutual fund shares. On March 8, 2002, PCM caused the Pentagon Fund to open eight new brokerage accounts, and TW&Co. assigned new RR numbers to the new accounts not previously used in connection with Pentagon Fund accounts. Then, beginning March 14, 2002, PCM continued market timing Putnam mutual fund shares through the new Pentagon Fund brokerage accounts.

On October 30, 2002, ACM/Alliance, a U.S. mutual fund company, filed a prospectus with the SEC stating: "[a] Fund may

25

refuse any order to purchase shares. In particular, the Funds
reserve the right to restrict purchases of shares (including
through exchanges) when they appear to evidence a pattern of
frequent purchases and sales made in response to short-term
considerations."

From January 15, 2003, through February 13, 2003, AIM
blocked Pentagon Fund accounts at broker-dealer PRU. In
addition, from January 15, 2003, through February 11, 2003,
ACM/Alliance blocked Pentagon Fund accounts at PRU.

On January 16, 2003, a PRU RR, Justin Ficken, sent an
email to a PCM employee, stating:

I will need to redeem the following because they
were stopped:

AIM in Performance 12 and Management 12

[ACM/Alliance] Offshore in Performance 12,
Performance 5, Performance 4, Management 7,
Management 12, Management 8. (They all did five
exchanges in about two months. That would be
about 30 in a year - a bit much, no?)

On or about February 27, 2003, PCM caused the Pentagon
Fund to open four new brokerage accounts at PRU. PCM
subsequently utilized these additional accounts to continue

26

trading AIM mutual funds. In addition, PCM continued to use existing Pentagon Fund accounts at PRU that had not been blocked to trade AIM's mutual funds. In total, PCM used at least 26 accounts at PRU with 7 different RR numbers associated with them to market time U.S. mutual funds of at least 50 mutual fund companies.

On several occasions, after U.S. mutual funds blocked the Pentagon Fund's accounts at one U.S. broker-dealer because of market timing, PCM and the Pentagon Fund continued to trade within the same mutual fund companies through accounts at a different U.S. broker-dealer.

For example, on November 6, 2001, Putnam sent a letter to TW&Co. that referenced a Pentagon Fund brokerage account. The letter contained the following:

Putnam is terminating your ability as broker of record to open new accounts at Putnam under your representative identification.

Putnam will not allow accounts for which [TW&Co. is] broker of record and which are networked or trade within omnibus accounts to exchange into any other fund, other than the Putnam Money Market Fund. Once invested in the Putnam Money Market Fund, those accounts will not be allowed to exchange into any other Putnam fund.

To circumvent this restriction, PCM entered trades through

different U.S. broker-dealers.  Specifically, after November 6,

2001, Pentagon Fund brokerage accounts made the following

numbers of trades in Putnam mutual funds:  184 purchases and

exchanges through CIBC, 34 through CONC, 141 through PW.

After ACM/Alliance blocked six Pentagon Fund brokerage

accounts at PRU on January 15, 2003, PCM continued to place

trades in ACM/Alliance mutual funds through Pentagon Fund

brokerage accounts at TW&Co.  In total, PCM executed 22

additional purchases and exchanges of ACM/Alliance mutual funds

through Pentagon Fund brokerage accounts at TW&Co.  PCM also

executed an additional 25 purchases and exchanges of

ACM/Alliance mutual funds through broker-dealer CONC.

The FAC alleges that PCM was aware that the Pentagon

Fund needed to keep trades "under the radar" of certain U.S.

mutual funds.  In a May 3, 2002 email, a PCM employee wrote to

PRU RR Ficken:

> On [ACM/Alliance] are you getting a lot of
> kickouts?    I've  just  heard  on  the  street
> [ACM/Alliance] are now monitoring any trades over
> $200k.  May be we need to keep them below $200k
> for a longer stay.

PCM split up trades among Pentagon Fund accounts to

28

deceive the U.S. mutual funds about the extent of the Pentagon
Fund's market timing. For example, on July 25, 2001, PCM
utilized (a) 18 Pentagon Fund brokerage accounts at TW&Co. to
purchase shares of a fund within a U.S. mutual fund company
("Mutual Fund Co. C") and (b) 13 Pentagon Fund brokerage
accounts at TW&Co. to purchase shares of a fund within a U.S.
mutual fund company ("Mutual Fund Company D"), in each case
keeping all purchases under $176,000 per account.

In an email to a RR at broker-dealer MS, Chester
wrote: "Looking at my notes from our meeting, I note that we can
put our accounts through [MS's] trust company, to ensure
anonymity. Can you please do this for us on these new
accounts."

Chester's notes of a May 5, 2000 meeting with Wilson
and Christian in New York (while they still worked at PW)
reflect that "[Wilson] agreed to code the names of our accounts,
so that the Pentagon name does not appear on any of the
accounts."

In an July 30, 2002 email to a broker-dealer that
provided financing for the Pentagon Fund's market timing,

29

Chester wrote:

Chaps,

I NEVER want to see the words "Market Timing" on any correspondence, e-mail, telephone call, etc.

If you want to label what we do with something, call it "dynamic asset allocation", but never market timing!

During the period from approximately 1999 through September 2003, the Pentagon Fund earned approximately $62 million in profits from fraudulent late trading and deceptive market timing of U.S. mutual funds. PCM profited through advisory fees, including fixed management fees and performance allocations that it was entitled to as the adviser to the Pentagon Fund. Chester profited both through his position as PCM's Chief Executive Officer and as an investor, via a feeder fund, in the Pentagon Fund. At the same time, U.S. mutual funds and their shareholders were harmed. Pentagon Fund's trading diluted the value of U.S. mutual funds it traded and increased transaction costs associated with the funds' management.

The SEC did not become aware that the Defendants may have engaged in late trading and/or deceptive market timing until in or about September 2003.

## III. STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule
12(b)(6), Fed. R. Civ. P., the Court construes the complaint
liberally, "accepting all factual allegations in the complaint
as true, and drawing all reasonable inferences in the
plaintiff's favor." Chambers v. Time Warner, 282 F.3d 147, 152
(2d Cir. 2002) (citing Gregory v. Daly, 243 F.3d 687, 691 (2d
Cir. 2001)). However, mere "conclusions of law or unwarranted
deductions" need not be accepted. First Nationwide Bank v. Gelt
Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994) (quotation marks
and citation omitted). "The issue is not whether a plaintiff
will ultimately prevail but whether the claimant is entitled to
offer evidence to support the claims." Villager Pond, Inc. v.
Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer
v. Rhodes, 416 U.S. 232, 236 (1974)). In other words, "'the
office of a motion to dismiss is merely to assess the legal
feasibility of the complaint, not to assay the weight of the
evidence which might be offered in support thereof.'" Eternity
Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375
F.3d 168, 176 (2d Cir. 2004) (quoting Geisler v. Petrocelli, 616
F.2d 636, 639 (2d Cir. 1980)). However, "[t]o survive
dismissal, the plaintiff must provide the grounds upon which his

31

claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)).

Because an action alleging violation of section 10(b) or 17(a)(1) sounds in fraud, the FAC "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). However, "[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally." Id. In order to satisfy Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000) (quotation omitted).

## IV. DISCUSSION

### A. The Allegations of Count I State a Claim

The SEC's first claim for relief alleges violations of

32

Section 17(a) of the Securities Act, Section 10(b) of the

Exchange Act, and Rule 10b-5. Section 17(a) of the Securities

Act makes it unlawful for any seller of securities, using the

mails or an instrumentality of interstate commerce, directly or

indirectly

(1) to employ any device, scheme or artifice to
defraud, or

(2) to obtain money or property by means of any
untrue statement of a material fact or any
omission to state a material fact necessary in
order to make the statements made, in the light
of the circumstances under which they were made,
not misleading, or

(3) to engage in any transaction, practice, or
course of business which operates or would
operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). Section 10(b) of the Exchange Act prohibits

both sellers and buyers of securities, using the mails or any

instrumentality of interstate commerce or the facility of a

national securities exchange, from employing "any manipulative

or deceptive device or contrivance in contravention of [SEC]

rules and regulations." 15 U.S.C. § 78j(b). Rule 10b-5,

promulgated under § 10(b), makes it unlawful

(a) To employ any device, scheme, or artifice to
defraud,

(b) To make any untrue statement of a material
fact or to omit to state a material fact
necessary in order to make the statements made,
in light of the circumstances under which they

33

were made, not misleading, or

(c) To engage in any act, practice, or course of
business which operates or would operate as a
fraud or deceit upon any person,

in connection with the purchase or sale of any
security.

17 C.F.R. § 240.10b-5.

To state a violation of section 10(b) or Rule 10b-5,
the SEC must allege that a defendant "(1) made a material
misrepresentation or a material omission as to which he had a
duty to speak, or used a fraudulent device; (2) with scienter;
(3) in connection with the purchase or sale of securities."
S.E.C. v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir.
1999). "Essentially the same elements are required under
Section 17(a)(1)-(3) in connection with the offer or sale of a
security, though no showing of scienter is required for the SEC
to obtain an injunction under subsections (a)(2) or (a)(3)."
Id. However, where a scheme of unlawful market manipulation is
alleged, the complaint need only set forth "to the extent
possible, 'what manipulative acts were performed, which
defendants performed them, when the manipulative acts were
performed, and what effect the scheme had on the market for the
securities at issue.'" ATSI Commc'ns, Inc. v. Shaar Fund,

Ltd., 493 F.3d 87, 102 (2d Cir. 2007) (quoting Baxter v. A.R.
Baron & Co., No. 94 Civ. 3913 (JGK), 1995 WL 600720, at *6
(S.D.N.Y. Oct. 12, 1995)).

## 1.    The Allegations Related to Late Trading
Are Sufficient to Subject Defendants
to Primary Liability

The Defendants first argue that the FAC's allegations
of a scheme to defraud mutual funds through late trading are
insufficient to subject them to primary liability under the
securities laws.  The same argument was made to the Honorable
John G. Koeltl in S.E.C. v. Simpson Capital Mgmt., Inc., No. 07
Civ. 6072 (JGK), 2008 WL 4093046 (S.D.N.Y. Sept. 3, 2008)
("Simpson").  In Simpson, the SEC asserted one claim of
securities fraud, based on a violation of Section 10(b) and Rule
10b-5, alleging that defendants knew or were reckless in not
knowing that late trading was illegal, but nevertheless sought
out broker-dealers that would allow them to place trades after
4:00 p.m. ET, and devised a method that would falsely represent
to mutual funds that the trades had been received prior to 4:00
p.m. ET in order to receive that day's NAV.  Id. at *2.  The
Simpson defendants argued that any liability should be solely
that of the brokers who violated Rule 22c-1 and that they were

not "primary violators." Id. at *8. The SEC countered that
defendants should be held liable as primary violators because
they were alleged to be the "architects" or "conductors" of a
fraudulent scheme. Noting that there is some conflict in the
Court of Appeals' cases as to the scope of primary liability, as
opposed to aiding and abetting liability, in actions brought by
the SEC, compare S.E.C. v. First Jersey Sec., Inc., 101 F.3d
1450, 1471 (2d Cir. 1996) ("Primary liability may be imposed
'not only on persons who made fraudulent misrepresentation but
also on those who had knowledge of the fraud and assisted in its
perpetration.'" (quoting Azrielli v. Cohen Law Offices, 21 F.3d
512, 517 (2d Cir. 1994)), S.E.C. v. U.S. Envtl., Inc., 155 F.3d
107, 111 (2d Cir. 1998) (citing First Jersey for the proposition
that "a primary violator is one who 'participated in the
fraudulent scheme' or other activity proscribed by the
securities laws") with Wright v. Ernst & Young LLP, 152 F.3d
169, 176 (2d Cir. 1998) (rejecting "substantial participation"
test and characterizing First Jersey as case involving only
"controlling person" liability), Judge Koeltl held that the
complaint nevertheless sufficiently pled a claim for primary
liability:

> The SEC is correct that the Complaint alleges
> that the defendants devised the scheme to defraud
> and that they proceeded to deal only with brokers

who agreed to continue to join with them in the scheme to defraud the mutual funds. The defendants dealt only with brokers who agreed to place the late trades as though they had been placed before 4:00 p.m., and ceased to do business with brokers when the brokers would not continue to treat such trades in a deceptive way. The Complaint provides further details of how the defendants orchestrated late trading schemes with each of the five brokers.

These allegations are sufficient to allege with particularity the primary liability of the defendants.

Id. at *11.

Defendants do not challenge Simpson's application of Second Circuit law, but rather attempt to distinguish the instant case on its facts. Defendants argue that the FAC includes only conclusory allegations that they were the "architects of a scheme to defraud," and fails to allege that PCM and Chester sought out broker-dealers to engage in late trading, or that PCM and Chester would only use broker-dealers that would engage in late trading. Instead, according to Defendants, the allegations demonstrate that the RRs sought out Chester and advised him that late trading was available.

However, the FAC goes well beyond conclusory allegations that Chester and PCM were the architects of a

fraudulent scheme. The FAC alleges that Chester unsuccessfully

sought the ability to late trade with RRs Christian and Wilson

at broker-dealer PW, and with RRs at broker-dealers CIC and PRU.

When Wilson and Christian moved to broker-dealer TW&Co., they

advised Chester that PCM could submit late trades with them.

PCM then began late trading with TW&Co., and Chester and other

PCM personnel provided detailed instructions concerning how the

late trading would be carried out. The accounts were set up

such that all trades required authorization from the client,

i.e. PCM or Chester. The FAC includes numerous emails from

Chester and other PCM personnel to Wilson and Christian that,

drawing all reasonable inferences in favor of the SEC, indicate

that Chester and PCM instigated, designed and directed the late

trading scheme. The FAC also alleges that Chester sought and

received the ability to late trade through an RR at broker-

dealer CONC. In combination with the alleged market timing

scheme, this late trading scheme is alleged to have reaped

approximately $62 million in profits for the Pentagon Fund, from

which PCM profited in the form of advisory and management fees,

and Chester profited through his position as PCM's CEO and as an

investor. Taken together, these allegations of the Defendants'

role in the alleged fraudulent scheme as its creators,

directors, and chief beneficiaries, are sufficient to allege

with particularity the primary liability of the Defendants. See Simpson, 2008 WL 4093046, at *10-11; In re Mutual Funds Inv. Litig., 384 F. Supp. 2d 845, 858 (D. Md. 2005) (holding that defendants alleged to have been involved in fraudulent scheme from the outset, to have been at least one of its architects, and to have received the profits that were siphoned off of mutual funds as a result of late trades and market timed transactions were subject to liability as primary participants); see also In re Global Crossing, Ltd. Sec. Litig., 322 F.Supp.2d 319, 336 (S.D.N.Y. 2004) ("[Plaintiff's] allegedly central role in these schemes, as their chief architect and executor, leaves no doubt as to its potential liability as a primary violator under section 10(b)."); In re Blech Sec. Litig., 961 F. Supp. 569, 585-86 (S.D.N.Y. 1997) (holding that claim for liability as primary violator under section 10(b) was sufficiently stated where plaintiff alleged that defendant "directed," "contrived" and participated in the initiation and clearing stages of certain alleged fraudulent transactions).[3]

---

[3] It should be noted that the allegations that Defendants here were the architects of the alleged scheme are sufficient, but not necessary, to plead liability as primary violators of the securities laws. In Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994), the Supreme Court held that

> [a]ny person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller

Defendants also argue that, with respect to late

trading, the FAC fails to sufficiently allege that Defendants

engaged in deceptive conduct. Defendants assert that the RRs

submitting late trades to mutual funds at TW&Co. were under no

duty to inform the mutual funds of the time they received the

orders from Defendants, because Rule 22c-1(a) does not apply to

TW&Co or Defendants. Defendants also argue that even if TW&Co.

misrepresented the time it received trades to the mutual fund,

PCM and Chester cannot be held responsible, because all they did

was place trades with a broker.

"'Conduct itself can be deceptive,' and so liability

under § 10(b) or Rule 10b-5 does not require 'a specific oral or

written statement.' Broad as the concept of 'deception' may be,

---

of securities relies may be liable as a primary violator
under 10b-5, assuming all of the requirements for primary
liability under Rule 10b-5 are met.

Id. at 191 (emphasis omitted); see also U.S. Envtl., 155 F.3d at 108 (holding
stock broker primarily liable under § 10(b) "for following a stock promoter's
directions to execute stock trades that [the stock broker] knew, or was
reckless in not knowing, were manipulative, even if [the stock broker] did
not share the promoter's specific overall purpose to manipulate the market
for that stock"); In re Able Labs. Sec. Litig., No. 05 Civ. 2681 (JAG), 2008
WL 1967509, at *21 (D.N.J. Mar. 24, 2008) ("[W]hile the Central Bank holding
prohibits extending § 10(b) liability to aiders and abetters, it does not
limit liability solely to architects or masterminds of a scheme to
defraud."); In re Enron Corp. Sec., 529 F. Supp. 2d 644, 707 (S.D.Tex. 2006)
(holding that any person who directly or indirectly engages in a manipulative
or deceptive act as part of a scheme to defraud can be held liable as a
primary violator).

it irreducibly entails some act that gives the victim a false impression." United States v. Finnerty, 533 F.3d 143, 148 (2d Cir. 2008) (quoting Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 128 S. Ct. 761, 769 (2008)).

The FAC alleges that Chester and PCM initiated, directed, and implemented a scheme to deceive mutual funds as to the timing of trading decisions and the submission of trades. The FAC does not assert a claim that Defendants violated Rule 22c-1(a), but rather describes Rule 22c-1(a) because it governs pricing of open-end mutual funds in the United States and provides the context to explain Defendants' alleged deceptive scheme to make trades appear to have been conducted earlier than 4:00 p.m. when they were in fact transacted at a later time. Thus, as in Simpson, "the 'false impression' communicated by the defendants' acts was that the trades were submitted before 4 p.m., when they actually were submitted with the benefit of market moving information after 4 p.m. The mutual funds were misled into thinking that the trades were made before 4 p.m." Simpson, 2008 WL 4093046, at *7. As alleged, this false impression was the direct and intended result of a scheme designed and implemented by Defendants. The fact that the trades were actually entered by broker-dealers under Defendants'

direction cannot shield Defendants from liability. The allegations of Defendants' deceptive conduct state a claim for securities fraud. See id.; In re Mut. Funds Inv. Litig., 384 F. Supp. 2d 845, 856 (D. Md. 2005) ("Late trading is itself illegal, and therefore as alleged by plaintiffs, a scheme, practice, or course of business effectuating late trading is inherently fraudulent." (footnote omitted)).

## 2. The Allegations of Market Timing State a Claim

Defendants make a number of arguments that the allegations of market timing are insufficient to establish that Defendant engaged in deceptive or manipulative conduct.

As noted above, the first element of a securities fraud violation is that defendants made "a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device." Monarch Funding Corp., 192 F.3d at 308. Defendants argue that they owed no duty to the mutual funds, and even if they did, it was a contractual duty, the breach of which cannot constitute fraud. Faced with the same argument, the Honorable Laura Taylor Swain has noted that a duty to disclose under section 10(b) or 17(a) can arise

"where a previous disclosure is or becomes inaccurate,

incomplete or misleading." S.E.C. v. O'Meally, No. 06 Civ. 6483

(LTS), 2008 WL 4090461, at *2 (S.D.N.Y. Sept. 3, 2008) (quoting

Burekovitch v. Hertz, No. 01 Civ. 1277 (ILG), 2001 WL 984942, at

*10 (E.D.N.Y. July 24, 2001). O'Meally held that the SEC had

sufficiently pled the existence of a duty to disclose because

> it is at least plausible that, after the mutual
> funds explicitly notified Defendants that the
> mutual funds no longer wanted Defendants to trade
> shares in their respective funds and actively
> sought to block Defendants' trading activities,
> there was a duty on the part of Defendants to
> disclose their identities should they choose to
> use different account names or FA numbers in the
> future.

Id. It bears note that Defendants are accused of a scheme to

conceal not only their identities, but the fact that they were

engaged in market timing. Cf. S.E.C. v. Druffner, 517 F. Supp.

2d 502, 508 (D. Mass. 2007) ("The record also indicates that the

accounts that the mutual funds blocked were replaced by new

accounts many of which were registered under [defendant's] name.

In view of such convincing evidence, the Court concludes the

defendant clearly misrepresented the nature of his and [co-

defendant's] transactions to the mutual funds."). The

systematic use of multiple accounts and broker-dealers to

conceal market timing trades from mutual funds may be better

described as the use of a fraudulent device. Under either

43

theory, however, the SEC's allegations are sufficient. See
S.E.C. v. Gann, No. Civ. A. 305CV0063L, 2006 WL 616005, at *5
(N.D. Tex. Mar. 13, 2006) (holding that allegations that
defendants participated in deceptive activities designed to
circumvent trading restrictions on market timing imposed by
mutual funds through use of multiple accounts and registered
registration numbers and dividing trades into smaller dollar
amounts stated a claim under section 10(b) and Rule 10b-5); In
re Mut. Funds Inv. Litig., 384 F. Supp. 2d at 856 ("Although
market timing may be lawful, it nevertheless is prohibited by
Rule 10b-5 if it is engaged in by favored market insiders at the
expense of long-term mutual fund investors from whom it is
concealed and who have a right to rely upon its prevention by
fund advisers' and managers' good faith performance of their
fiduciary obligations.").

Defendants also argue that the FAC fails to allege any
act by the Defendants that deceived the funds. Defendants
submit that the SEC alleges only acts by PCM's brokers that are
innocent on their face and merely suggests that those acts had a
fraudulent purpose and that the Defendants somehow were
involved.

44

The FAC alleges that PCM and Chester caused Pentagon Fund to open multiple accounts with at least nine broker-dealers for the purpose of market timing U.S. mutual funds. PCM split Pentagon Fund trades among these accounts to keep the trades below the funds' thresholds in order to conceal Pentagon Fund's trading from the mutual funds. For example, PCM and Chester caused Pentagon Fund to open 68 brokerage accounts at TW&Co. Wilson and Christian established 17 different RR numbers to assist their market timing clients, including Defendants. PCM also used at least 26 accounts, which had 7 different RR numbers associated with them, at broker-dealer PRU to market time U.S. mutual funds of at least 50 mutual fund companies. After mutual funds blocked Pentagon Fund's trades from certain accounts or otherwise informed Defendants, through their brokers, that market timing their funds was not permitted, PCM and Chester caused Pentagon Fund to open additional accounts to deceive mutual fund companies into continuing to allow Pentagon Fund to market time their funds. When a mutual fund company informed one of Defendants' brokers that the broker would be blocked from future trading in their funds, Defendants opened accounts at another broker-dealer and continued to market time the company's mutual funds. The FAC's allegations, including emails from Chester and another PCM employee, sufficiently plead that

Defendants not only actively participated in, but orchestrated
the scheme to defraud the mutual funds.

Defendants propose that it is normal business practice
to maintain multiple accounts at multiple brokers, which, *inter
alia*, allows the customer to take advantage of the SIPC
indemnity limits. While this may be true, it is a factual issue
not appropriate for resolution on a motion to dismiss.
Furthermore, the alleged fraudulent scheme is not the mere use
of multiple accounts at multiple brokers. As such, even if
Defendants factual assertion were true, it would not refute the
SEC's allegations.

Defendants also argue that the allegation that mutual
funds blocked certain accounts from trading is insufficient, and
that to state a claim, the FAC would have to allege that the
mutual funds blocked any and all trades from the Pentagon Fund.
Defendants cite no authority for this proposition. The SEC has
alleged facts sufficient to show that Defendants were on notice
that the mutual funds sought to prevent them from engaging in
market timing, and that the fraudulent scheme was intended, and
had the effect, of deceiving mutual funds into allowing
Defendants to engage in market timing trades that the mutual

funds would have blocked had they not been so deceived.  This is all that is required.  See In re Mut. Funds Inv. Litig., 384 F. Supp. 2d at 856-57.

Defendants also argue that U.S. mutual funds are prohibited from stating in their prospectuses that they reserve the right to suspend redemptions by Section 22(e) of the Investment Company Act.  According to Defendants, "[t]he SEC necessarily alleges that a mutual fund has a right to place a condition on its continuous offering of securities and only allow those investors who agree to suspend their right of redemption for undisclosed and unspecified periods of time to invest in the fund."  Def. Mem. 19.  This argument was rejected by O'Meally, discussed above.  See 2008 WL 4090461, at *2.  As in O'Meally, the SEC has not alleged here that any mutual fund suspended or delayed Defendants' ability to redeem shares already held.

### 3.    The Allegations of Scienter Satisfy Rule 9(b)

Defendants next argue that the SEC has failed to sufficiently allege scienter with respect to the first claim. To satisfy Rule 9(b)'s requirement for pleading scienter in the

47

Second Circuit, the complaint is required to allege facts giving rise to a "strong inference" of fraudulent intent. See Ross v. A.H. Robins Co., 607 F.2d 545, 558 (2d Cir. 1979). To do so, "a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." Rothman v. Gregor, 220 F.3d 81, 89 (2d Cir. 2000).

Although they recite the Second Circuit standard, Defendants argue that the Court should apply the heightened standard imposed by section 21D(b)(2) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). This area of the law has become somewhat muddled, due largely to the fact that the PSLRA uses the Second Circuit's "strong inference" language but requires a different showing. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) (holding that the PSLRA's "strong inference" standard is satisfied "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged"). By the terms of the PSLRA, its heightened pleading standard does not apply to actions brought by the SEC. See 15 U.S.C. § 78u-4(b) ("The provisions of this subsection

48

shall apply in each private action arising under this title that
is brought as a plaintiff class action . . . ."). Defendants
nevertheless argue that the PSLRA standard should be applied to
this action, relying on S.E.C. v. Collins & Aikman Corp., 524 F.
Supp. 2d 477 (S.D.N.Y. 2007). However, Collins & Aikman does
not speak to the issue. See id. at 488 ("It is unclear whether
district courts must now find that the inference of scienter
raised in actions not governed by the PSLRA, but governed by
Rule 9(b), be at least as compelling as any other inference. I
need not reach this thorny (albeit interesting) issue . . . .").
However, S.E.C. v. Dunn, 07 Civ. 2058 (LAP), 2008 WL 4449379
(S.D.N.Y. Sept. 30, 2008), explored the issue at length, and
held that the pre-Tellabs standard still applies:

> Any argument that Congress intended to apply the
> provisions of the PSLRA to SEC enforcement
> actions ignores the statute's plain language.
> Indeed, as the Supreme Court explained, Congress
> designed the PSLRA specifically to address the
> perceived abuses of *private* securities
> litigation. Extending its 'heightened standard'
> to SEC enforcement actions, a context not found
> by Congress to harbor such abuses, does violence
> to that intent . . . .

Id. at *10 (emphasis in original, citation omitted)); see also
S.E.C. v. Berry, 580 F. Supp. 2d 911, 920-21 (N.D. Cal. 2008)
(rejecting argument that SEC must satisfy the PSLRA "strong
inference" standard and applying pre-Tellabs Ninth Circuit

standard for pleading scienter). The Court therefore applies
the Second Circuit's "strong inference" standard under Rule
9(b).

The facts alleged, particularly the emails discussed
in detail above, constitute strong circumstantial evidence that
Chester and PCM conceived and directed the late trading scheme,
despite their knowledge that late trading was illegal.
Similarly, the facts alleged with regard to market timing
support a strong inference that Chester and PCM directed the
scheme and actively engaged in the effort to conceal their
market timing activities from the mutual funds. The allegations
are also sufficient to demonstrate that Chester and PCM had both
motive and opportunity to commit the fraud alleged, from which
both Defendants are alleged to have profited substantially.

According to Defendants, Chester and PCM had no
affirmative duty to be familiar with U.S. securities laws, the
broker-dealers who were late trading on their behalf never told
them it was illegal, and they were entitled to rely on that fact
for the proposition that late trading was legal. Defendants
rely on S.E.C. v. Steadman, 967 F.2d 636, 639 (D.C. Cir. 1992),
for the proposition that Chester and PCM were entitled to rely

on the expertise of their broker-dealers. The Steadman court
did not hold, as a matter of law, that defendants have a right
to rely on a lawyer's inaccurate advice, but rather that a
finding of willful fraud cannot be "based solely on the evidence
that [the lawyer] . . . is a graduate of the Harvard Law School
and that he and the directors of the [defendants] had extensive
experience in the securities industry." Id. at 642. This kind
of factual determination is obviously not appropriate at this
stage of the proceedings. The SEC has pled facts that, if true,
constitute strong circumstantial evidence that Defendants were
aware that late trading was illegal, including an email from a
U.S. broker-dealer to Chester that directly informed him of the
fact. As discussed above, the allegations of scienter are
sufficient.

Defendants also suggest that the mutual funds were not
deceived because they had access to tax identification numbers
by which they could have identified all of Pentagon Fund's
accounts, and could have sent broker-dealers a letter blocking
all future trades in all of those accounts. Defendants cite
United States v. Brown, 79 F.3d 1550, 1559 (11th Cir. 1996) and
United States v. Brennan, 183 F.3d 139, 150 (2d Cir. 1999) for
the proposition that there is no fraud when "the representation

is about something which the customer should, and could easily confirm . . . from readily available external sources." Brown, 79 F.3d 1559. Brown has been expressly rejected by the Second Circuit, see United States v. Amico, 486 F.3d 764, 780 (2d Cir. 2007), and was recently overruled by the Eleventh Circuit in United States v. Svete, 2009 WL 225254 (11th Cir. 2009). Brennan relied on Brown in dicta, and in view of Amico and Taylor, discussed below, is not compelling authority.

Both Brown and Brennan involved criminal prosecutions for mail fraud. In Brown, defendants, former executives of a housing developer, were tried and convicted for making affirmative misrepresentations to sellers about the investment value of the developer's properties. The Brown court held that mail fraud requires the government to prove that the defendant "intended to create a scheme 'reasonably calculated to deceive persons of ordinary prudence and comprehension.'" Brown, 79 F.3d at 1557 (quoting Pelletier v. Zweifel, 921 F.2d 1465, 1498-99 (11th Cir. 1991). Brown relied on this principle to formulate its "unreasonable victim" standard relied on by Defendants. Svete overruled Brown as inconsistent with the language of the mail fraud statute and Supreme Court precedent, noting that "[t]hose circuits who have considered the issue

52

after Brown have rejected our position." Id. at *10.

In United States v. Thomas, 377 F.3d 232 (2d Cir. 2004), the Second Circuit rejected the Eleventh Circuit's "unreasonable victim" standard in the context of a prosecution for violation of 18 U.S.C. § 2314, which prohibits inducement of travel in interstate commerce for a fraudulent purpose:

> The 'unreasonable victim' argument misapprehends the function of the ordinary prudence standard. To establish a violation of the federal fraud statutes, the government must prove a scheme to defraud.    Critical to this showing is evidence that the defendant possessed a fraudulent intent. The   role   of   the   ordinary   prudence   and comprehension standard is to assure that the defendant's conduct was calculated to deceive, not to grant permission to take advantage of the stupid or careless.

Id. at 242 (citations and quotation omitted); see also Amico, 486 F.3d at 780 (affirming district court's holding that the "reasonable victim" defense does not apply to allegations of mail fraud); United States v. Biesiadecki, 933 F.2d 539, 544 (7th Cir. 1991) ("Those who are gullible, as well as those who are skeptical, are entitled to the protection of the mail fraud statute."); United States v. Maxwell, 920 F.2d 1028, 1036 (D.C. Cir. 1990) (disagreeing with Pelletier and holding that mail fraud can lie even where only the "most gullible" would be deceived); United States v. Brien, 617 F.2d 299, 311 (1st Cir.

1980) ("a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright."); Lemon v. United States, 278 F.2d 369, 374 (9th Cir. 1960) ("It is immaterial whether only the most gullible would have been deceived by this technique.").

The Thomas court went on to discuss Silverman v. United States, 213 F.2d 405 (5th Cir. 1954), the case that originated the "ordinary prudence" language:

> In Silverman, the defendant's scheme to defraud, though misleading, did not involve any patently false representations. Rejecting defendant's argument that he could not be convicted under the mail fraud statute absent a misrepresentation, the Fifth Circuit held that:
>
>> [I]f a scheme is devised with the intent to defraud, and the mails are used in executing the scheme, the fact that there is no misrepresentation of a single existing fact makes no difference. It is only necessary to prove that it is a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension . . . .
>
> Thus, in a case with no evidence of any false representation, the Fifth Circuit used the ordinary prudence standard as a way to determine whether the defendant acted with fraudulent intent.

Thomas, 377 F.3d at 242-43. Thus, the "ordinary prudence" standard focuses on the defendant — it is a way for the jury to

54

determine whether, despite a defendant's assertions "that he was merely joking, that the statements were mere puffery, or that the statements were merely sharp business dealing" were actually intended to deceive. Id. at 243. As such, the "ordinary prudence" standard, properly understood, has no bearing on this motion to dismiss. As discussed above, the allegations of Defendants' fraudulent intent are sufficient.

## B. The Allegations of Count II State a Claim

Defendants next argue that the FAC fails to adequately allege "substantial assistance" or the requisite scienter for aiding and abetting liability. To state a claim that defendants aided and abetted violations of the Exchange Act, the SEC must allege "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." IIT v. Cornfeld, 619 F.2d 909, 922 (2d Cir. 1980); see also S.E.C. v. Espuelas, 579 F. Supp. 2d 461, 471 (S.D.N.Y. 2008). "The aider and abettor's substantial assistance must be a proximate cause of the primary violation." S.E.C. v. Treadway, 430 F. Supp. 2d

293, 339 (S.D.N.Y. 2006).

The Court has already determined that the allegations
of Defendants' active involvement in the late trading and market
timing schemes are sufficient to subject them to primary
liability. For the same reasons, the pleadings are sufficient
to subject Defendants to liability as aiders and abettors.
Likewise, as discussed above, the allegations of scienter are
sufficient.

## C.    The SEC's Allegations Do Not Violate Due Process

Defendants argue that the SEC's interpretation of
market timing and late trading set forth in the FAC violates due
process because Defendants did not have fair notice that their
conduct would constitute regulatory violations, relying on Upton
v. S.E.C., 75 F.3d 92 (2d Cir. 1996). "Due process requires
however, only that 'laws give the person of ordinary
intelligence a reasonable opportunity to know what is
prohibited.'" Valicenti Advisory Services, Inc. v. S.E.C., 198
F.3d 62, 66 (2d Cir. 1999) (quoting Upton, 75 F.3d at 98).
Neither Chester, a sophisticated investor and solicitor with
degrees from Oxford and the Harvard Business School, nor the

56

company that he headed, "can credibly claim lack of fair notice
of the proscription against defrauding investors." Id. The SEC
"seeks with its action to enforce provisions of the securities
laws that have been in existence for over half a century. Since
their inception, it has been unlawful to offer or sell []
securities using a false or misleading statement. The Due
Process Clause of the Constitution requires nothing more by way
of notice." S.E.C. v. Tambone, 550 F.3d 106, 148 (1st Cir.
2008); see also Druffner, 517 F. Supp. 2d at 151.

## D.   The Statute of Limitations Is Not a Bar to Liability

Defendants argue that the SEC's claims are barred by
the five-year statute of limitations imposed by 28 U.S.C. §
2462.   Defendants also argue that the SEC's claims for
injunctive relief and disgorgement are penal in nature and thus
barred under section 2462.

"Disgorgement is an equitable remedy to which Section
2642 does not apply." S.E.C. v. Power, 525 F. Supp. 2d 415,
426-27 (S.D.N.Y. 2007); see also S.E.C. v. Lorin, 869 F. Supp.
1117, 1122 (S.D.N.Y. 1994). In addition, to the extent that the
SEC is seeking injunctive relief, the allegations of Defendants'

scheme to defraud are sufficient to establish the likelihood of future misconduct, and the claims are therefore not subject to the statute of limitations. Power, 525 F. Supp. 2d at 426-27; S.E.C. v. Alexander, 248 F.R.D. 108, 115 (E.D.N.Y. 2007); S.E.C. v. Alexander, 160 F. Supp. 2d 642, 655 (S.D.N.Y. 2001).

As to other relief, there are factual questions precluding a determination as to when the statute of limitations began to run. See FAC ¶ 134 ("The Commission did not become aware that the Defendants may have engaged in late trading and/or deceptive market timing until in or about September 2003."); Alexander, 248 F.R.D. at 119. There also remain issues of fact concerning application of the continuing violation doctrine. See S.E.C. v. Schiffer, No. 97 Civ. 5853, 1998 WL 226101, at *3 (S.D.N.Y. May 5, 1998). It would therefore be premature to rule on the statute of limitations defense.

## V.   CONCLUSION

For the above reasons, the motion to dismiss is denied.

It is so ordered.

New York, NY
February 9 , 2009

ROBERT W. SWEET
U.S.D.J.