UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
                                      :

SECURITIES AND EXCHANGE COMMISSION,    :       08-CV-03324 (RWS)
                                        :

                   Plaintiff,            :

                                        :

             - against -           :       ECF CASE
                                        :

PENTAGON CAPITAL MANAGEMENT PLC and    :
LEWIS CHESTER,                          :
                                        :

                Defendants,        :

                                        :

             - and -              :

                                        :

PENTAGON SPECIAL PURPOSE FUND, LTD.,    :

                                        :

             Relief Defendant.    :

                                        :
------------------------------------------------------------------------x


**PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS**
**PURSUANT TO LOCAL CIVIL RULE 56.1**


Christopher Dunnigan (dunnigancj@sec.gov)
Paul G. Gizzi (gizzip@sec.gov)
John C. Lehmann, Jr. (lehmannj@sec.gov)

Attorneys for the Plaintiff

SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, NY  10281
(212) 336-1100

The Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this statement of material facts as to which there is no genuine issue to be tried pursuant to Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.  This Rule 56.1 statement is submitted in support of the Commission's motion for partial summary judgment against Defendants Pentagon Capital Management PLC ("PCM") and Lewis Chester, and Relief Defendant Pentagon Special Purpose Fund, Ltd. ("Pentagon Fund"), regarding PCM's late trading of U.S. mutual funds through former registered broker-dealer Trautman Wasserman & Company, Inc. ("TW&Co.").

## DEFENDANTS

1.      PCM is an investment adviser and investment manager based in London, England.  PCM has provided investment advisory services to Relief Defendant Pentagon Fund and others between 1999 and 2003.  (Defendants' Answer ¶ 13, attached as Exhibit 1 to the Declaration of Christopher J. Dunnigan dated March 16, 2011 ("Dunnigan Decl.").)[1]

2.      Chester, age 42, is a resident of London, England.  From 1999 – 2003, Chester served as PCM's Chief Executive Officer.  Chester is a graduate of the University of Oxford in England and the Harvard Business School.  He is also a qualified Solicitor of the Supreme Court of England and Wales, and formerly worked in the Los Angeles office of the U.S. law firm White & Case LLP.  (Defendant's Answer ¶ 14.)

---

[1]      The evidentiary record relied upon in compiling this Local Civil Rule 56.1 Statement of Undisputed Facts is comprised of admissions in Defendants' Answer, testimony, documents, and publicly available information.  The Dunnigan Decl. contains copies of the evidentiary record relied upon.

**RELIEF DEFENDANT**

3.     Pentagon Fund is an international business company incorporated in the British Virgin Islands.  In connection with trading U.S. mutual funds, PCM formed three Delaware limited liability companies (Pentagon Investment Partners, LLC, Pentagon Management Partners, LLC, and Pentagon Performance Partners, LLC), of which the Pentagon Fund was the sole member and manager.  From 1999 to 2003, PCM was Pentagon Fund's investment adviser responsible for making its trading decisions.  (Defendant's Answer ¶ 15.)

**Summary of Late Trading through TW&Co.**

4.     Between February 15, 2001, and September 3, 2003, PCM placed approximately 10,052 purchases of open-end U.S. mutual funds through TW&Co., formerly a U.S. registered broker-dealer, totaling over $3.1 billion.  (Expert Report of Professor Lawrence Harris dated October 15, 2010 ("Harris Rep.") Ex. 5, Dunnigan Decl. Ex. 2 and 2A.)  PCM had an average holding period of two days on the purchases.  (Harris Rep. Ex. 5.)  Defendants' trading records reflect that 97% of Defendants' trading through TW&Co. took place after April 5, 2001.  PCM realized profits of approximately $29.6 million from the U.S. mutual fund trades executed through TW&Co. (See Harris Rep. ¶ 29 and Ex. 5.)

5.     PCM's accounts were serviced primarily by two brokers at TW&Co., James Wilson ("Wilson") and Scott Christian ("Christian").  (Chester Dep. Sept. 23, 2010 Tr. 57, Dunnigan Decl. Ex. 3.)  Christian reported to Wilson.  (Id.)

**The Implementation of the Late Trading Scheme**

6.     On February 15, 2001, PCM began trading through TW&Co., a former broker-dealer located in New York, NY, which Chester characterized as "not a large broker-dealer." (Chester Dep. Sept. 23, 2010 Tr. 51, Dunnigan Decl. Ex. 3.)

7.      On April 5, 2001, seven weeks after commencing trading U.S. open-end mutual funds through TW&Co., PCM began late trading of U.S. mutual funds through TW&Co. (Chester Dep. Jan. 17, 2011 Tr. 169, Dunnigan Decl. Ex. 4.)

8.      At the time PCM began late trading through TW&Co., Chester and others at PCM knew that Wilson and Christian of TW&Co. placed false time stamps on PCM's trade sheets, which fraudulently disguised the fact that PCM was making its trading decisions *after* the close of the New York Stock Exchange at 4:00 PM ET.  (Dunnigan Decl. Ex. 9.)

9.      On April 5, 2001, Chester, the CEO of PCM, sent an email to Wilson and Christian at 7:31 AM GMT (i.e., 2:31 AM ET), with the subject header "After Hours Trading." (Dunnigan Decl. Ex. 8.)  The email states as follows:

### AFTER HOURS TRADING INSTRUCTIONS

I have spoken to my R&D people regarding a procedure for going IN, OUT or cancelling an IN or OUT on any given night, as per our telephone conversation last night.

Lets us know what the current cut-off time is (5:30 pm NY time?) and when you'll have the 6:30pm facility - I think you told me it will be available from Monday???

The procedure we are thinking of putting in place is as follows (subject to speaking this through to Trevor):

-   Trevor's team will give you a single figure on the S&P future (e.g. 1320), at or around the close
-   If the future exceeds (for an IN) or falls below (for an OUT) - see examples below after hours, then try to get hold of one of us by telephone
-   If you can't get hold of us, then do the corresponding trade
-   Send Trevor an e-mail letting him know what you've done

Example 1
Before the close, we go IN/stay IN on all/some baskets.
Trevor calls at 4pm and tells you that if the S&P future falls below 1420 before 6:30pm NY time, to call us.
The future falls to 1418.50.
You try to call us.
You can't get hold of anybody.

> You CANCEL all our trades, and send Trevor an e-mail telling him what you've done.
>
> Example 2
> Before the close, we go OUT/stay OUT on all/some baskets.
> Trevor calls at 4pm and tells you that if the S&P future rises above 1420 before 6:30pm NY time, to call us.
> The future rises to 1421.
> You try to call us.
> You can't get hold of anybody.
> You go IN on all baskets, and send Trevor an e-mail telling him what you've done.
> My R&D team is building an application for Trevor's team to spew out the requisite S&P future figure each night for you.  We should be able to be up and running on this within a day or two.

(emphasis in original.)

10.     At 10:25 AM GMT, approximately three hours after sending the email quoted in Paragraph 9 with the late trading instructions to TW&Co., Chester circulated an email to Jafar Omid, the other principal of PCM and PCM's Chief Operating Officer, and to PCM's Dealing and Research & Development Departments.  (Dunnigan Decl. Ex. 9.)  In this email, Chester explicitly acknowledged that TW&Co. had told him that, in order to effectuate late trading of U.S. mutual funds, TW&Co. would time stamp PCM's trade sheets *before* 4:00 p.m. ET.  The email states as follows:

> For this week only, TW can place or cancel any trades up to 5:00pm (10pm UK time).  From next week – TR [PCM employee Trevor Rose] to confirm - the time will be 6:30pm (11:30pm UK time).
> The significance of this is great.
> For instance, last night, the S&P future shot up at around 9:45pm.  Even though we hadn't placed any trades before 9pm, we STILL COULD HAVE PLACED THE TRADE after the bell, which we should have done given the marked rise in the future.
> I have been in Jimmy's office.  Every day, whether we do a trade or not, they time stamp our trade sheets before 4pm, and then sit on them until they leave the office, at which point they will process them or not.  Hence, the ability to place a buy order after the bell, even if we haven't done so before the bell.
> I spoke with Jimmy late last night - too late to trade I'm afraid!  We agreed that I would send him some parameters for switching In or Out of the market after the bell, in the event that he can't reach any of us.

> AP [PCM employee Anthony Profit]/CK [PCM employee Christian Koehl], can you
> come up with some simple parameters for this, without giving the game away to
> Jimmy re: our models.  Please bear in mind we trade D, E and F baskets with them
> currently, and that they
> might not be able to understand or obtain FV information.
> This facility is VERY VALUABLE and we should utilise it accordingly.
> We missed a big opportunity to trade last night because nobody was watching the
> S&P future – Trevor and I were at the game and I only got home at 10:45pm.
> Equally, I never received a text message saying that the S&P future had gone up
> considerably.
> Conclusion
> 1.  We fucked up last night.
> 2.  It doesn't matter whether we place trades or not before the bell, we can do so
> afterwards, up to Trautman's time limits
> 3.  TR - check with Jimmy when they are extending to 6:30pm.
> 4.  AP/CK - come up with parameters for Jimmy to trade on our behalf if he can't
> reach any of us.  I will then send him a fax with the instructions.

(emphasis in original, underline added.)

11.     The phrase "the bell" in the email quoted in Paragraph 10 refers to the closing bell

of the New York Stock Exchange, typically at 4 PM ET.  (Chester Dep. Jan. 17, 2011 Tr. 170-

71, Dunnigan Decl. Ex. 4.)

12.     The same day that Chester sent the emails quoted in Paragraphs 9 and 10, April 5,

2001, PCM began late trading U.S. mutual funds through TW&Co.  (Chester Dep. Jan. 17, 2011

Tr. 169, Dunnigan Decl. Ex. 4.)  Thus, at the time PCM began late trading U.S. mutual funds

through TW&Co., Chester fully understood that Wilson and Christian were creating trading

records for PCM's trades that falsely reflected that PCM made its trading decisions *before* 4:00

PM ET when in fact PCM made its trading decisions *after* 4:00 PM ET.

**Chester Failed to Explain Why TW&Co.**
**Time Stamped PCM's Trades Prior to 4:00 PM ET**

13.     During the investigation that preceded this enforcement action, Chester appeared

for an on the record interview with staff of the Commission and the U.K. Financial Services

Authority on June 21, 2006.  (Dunnigan Decl. Ex. 5.)  During the interview, Chester stated that

he was "surprised" when he read papers from the enforcement case against Scott Christian to learn that TW&Co. time stamped PCM's trade sheets prior to 4:00 PM ET.   (Chester June 21, 2006 Tr. 93-94, Dunnigan Decl. Ex. 5.)  Further, Chester said that at TW&Co., as with all PCM's brokers, "you would send in the trade sheets well earlier in the day, they would punch in the trades at some time during the day, and then you would call them in when you had your threshold and say, yea or nay." (Id.)

14.     During the same interview on June 21, 2006, Chester denied knowing that TW&Co. was time-stamping PCM's trade sheets to make it appear as if PCM submitted its trades prior to 4:00 PM ET:

> [Commission staff attorney Paul Gizzi]:  So did you have any understanding that any of the firms wanted the trades early so that they could stamp them and make them appear…
>
> CHESTER:         No.
>
> GIZZI:      As though the orders had been provided prior to four pm.
>
> CHESTER:         Absolutely not.

(Chester June 21, 2006 Tr. 130, Dunnigan Decl. Ex. 5.)

15.     Similarly, during his deposition on January 17, 2011, Chester testified as follows concerning time-stamping of PCM's trade sheets:

> Q:  Did James Wilson or Scott Christian or Sam Wasserman ever tell you that they needed to time-stamp your trades or your trade sheets or tickets, whatever, prior to 4 p.m.?
>
> A:  No.

(Chester Dep. Jan. 17, 2011 Tr. 144, Dunnigan Decl. Ex. 4.)

> Q:  Did you ever talk with any of your US broker-dealers about time-stamping your trades?
>
> A:  No.

(Chester Dep. Jan. 17, 2011 Tr. 146, Dunnigan Decl. Ex. 4.)

> Q.   Okay.  Just to be clear, prior to September 3, 2003, the date of the Canary Capital announcement, did Mr. Christian, Mr. Wilson or Mr. Wasserman, or anybody else at Trautman Wasserman, tell you that they were time-stamping forms, as alleged in paragraph 24 here [referring to the July 7, 2005 Complaint that the Commission filed as a settled enforcement against Scott Christian, available at http://www.sec.gov/litigation/complaints/comp19294.pdf], to make it appear as if the order -- as if Mr. Christian "had just received the orders from Trautman Wasserman['s] [customers]"?
>
> A.   No.
>
> MR. RAZZANO:  So the question is did someone tell him that?
>
> MR. DUNNIGAN:  Yes.

(Chester Dep. Jan. 17, 2011 Tr. 152-53, Dunnigan Decl. Ex. 4.)

> Q.   If I could turn your attention to the second page [referring to the transcript of Chester's June 21, 2006 sworn interview] -- I included the first page just for contextual reasons -- but do you see at the top of the page where Mr. Gizzi asked the question:  "So did you have any understanding that any of the firms wanted the trades early so that they could stamp them and make them appear..."
> And then you respond:  "No."
> And then Mr. Gizzi continues:  "As though the orders had been provided prior to four pm."
> And you replied:   "Absolutely not."
>
> A.  I see that, yes.
>
> Q.  Okay.  Is that correct?
>
> A.  I believe so.

(Chester Jan. 17, 2011 Tr., pg. 165, Dunnigan Decl. Ex. 4.)

16.     During his deposition on January 17, 2001, Chester testified that the April 5, 2001 email described in Paragraph 10, in which Chester described how TW&Co. would time stamp PCM's trade sheets prior to 4:00 PM ET and sit on them until PCM made its trading decisions, did not refresh his recollection about TW&Co. time-stamping PCM's trade sheets:

Q.  Have you seen this document [referring to Chester's April 5, 2001 email documenting that he had gone to TW&Co.'s office, and been told that TW&Co. would time stamp PCM's trades sheets prior to 4:00 PM ET, Dunnigan Decl. Ex. 9] before?

A.  No.

Q.  Do you see the sentence that says: "I have been in Jimmy's office"?

A.  Yes.

Q.  After that it says:  "Every day, whether we do a trade or not, they time stamp our trade sheets before 4pm, and then sit on them until they leave the office, at which point they will process them or not.  Hence, the ability to place a buy order after the bell, even if we haven't done so before the bell."

A.  Yes.

Q.  Do you recall going to the offices of Trautman Wasserman and being told by Mr. Wilson or Mr. Christian or anyone else at Trautman Wasserman that they would be time-stamping your trades before 4 p.m.?

MR. RAZZANO:  Objection.  That does not -- what you just said mischaracterizes what's written here.  But you can go ahead.

A:  This doesn't refresh my memory about the time-stamping.  I think -- well, that's it. It doesn't refresh my memory about it.

(Chester Dep. Jan. 17, 2011 Tr. 168, Dunnigan Decl. Ex. 4.)

17.     Chester did not dispute the authenticity of the April 5, 2001 email (Dunnigan Decl. Ex. 9.), and failed to proffer a plausible general explanation for why creating a time stamp prior to 4:00 PM ET benefitted PCM, or what about 4:00 PM ET was important:

Q.  Why did trade sheets have to be time-stamped prior to 4 p.m.?

A.  As I told you, I think time-stamping is done for the benefit of the customer so that if we placed a trade and the broker did not execute the order, then we would be able to sue the broker.  Equally, if the broker had time-stamped an order from us, he would be able to mitigate his risk that we would sue him for failing to do a trade.

(Chester Dep. Jan. 17, 2011 Tr. 169, Dunnigan Decl. Ex. 4.)

18.     Similarly, during his deposition on January 13, 2011, Jafar Omid testified that he was unaware of how PCM's U.S. broker-dealers processed PCM's trades:

> Q.  Did you ever ask Mr Christian whether Banc of America had given Trautman Wasserman any instructions concerning how it should trade US mutual funds?
>
> A.  I didn't ask them.  The brokers had their own internal requirements and we were not privy to any of their own internal requirements.

(Omid Dep. Jan. 13, 2011 Tr. 63, Dunnigan Decl. Ex. 6.)

### Chester Agreed to Pay PCM Extra for Late Trading

19. On April 9, 2001, Chester sent an email to Wilson and Christian stating:

> Guys,
>
> 1.  Did you find out that question re: BofA margin if we get kicked out of a fund?
> 2.  Are you know [sic] able to do trades up to 6:30 p.m. NY time?  Please confirm.

(Dunnigan Decl. Ex. 10.)

20.     Wilson responded in an email to Chester on April 10, 2001 that states, in part, as follows:

> Scott [Christian] and i feel that if you are going to use our late trading – "it" (you said) adds a certain percentage of value – we would then like some kind of system or proposal on how we can make money on this . . . [because] if we are going to trade later then we need parameters so we can establish guidelines – im (sic) not staying here everynight (sic) without cause – i feel things are tight allover (sic) and there are only so many places to do this . . so lets (sic) be partners or such. . . cheers

(Dunnigan Decl. Ex. 11.)

21.     On April 11, 2001, Chester replied via an email that states, in part, as follows:

> Re: Late Trading
>
> 1.  We are partners.  I have always gone out of my way to support you.  When you went to Paine Webber, we gave you assets asap, and then when you went to [TW&Co.], you (sic) gave you assets asap. . . .

2.  Your facility for late trading is not the only one we have.  In all the other cases, we pay 1% p.a. .

5.  You currently earn 2% [per annum].  This is double what Pentagon earns as a management fee.  (Our performance fee reflects the strength or otherwise of our modeling decisions, and hence is as variable as our decisions.)  We work all the hours of the day to ensure we do our best for the client. To ask you or Scott, or someone else at [TW&Co.] to cover until 6:30pm each night, really is no big deal.  And you know it.  Remember, the more money we make, the more fees you earn – 2% of a larger figure.  Hence, it's in everyone's interests to ensure we get the later trading times.

I really EXPECT you guys to go out of your way to make sure I get late trading – you're earning double what everyone else takes home on this business – although it's unlikely that we'll need 6:30pm trading every night.

I really want to be your biggest client.  I want to be first to try your new products.  And I want you to have the best facilities/trading.  And that's why I am happy to pay you double what I pay any one [sic] else.

(Dunnigan Decl. Ex. 11.)

22.     On April 11, 2001, Wilson replied to Chester via email indicating that the late

trading that TW&Co. offered to PCM was valuable.  The email states, in part, as follows:

[y]ou guys limit your funds choices and thus restrict the business.  You do one type of business . . .

**we are the only place to trade late past 530-** in the [U.S.] with any brokers.-fact.. ;^)
thus you have to pay more . . .

(Dunnigan Decl. Ex. 12, emphasis in original.)

23.     Chester described the April 11, 2001 email referenced in Paragraph 22 as a "very

familiar type of rant" from Wilson, and further testified that Wilson sent him rants often.

(Chester Jan. 17, 2011 testimony, pg. 181-82, Dunnigan Decl. Ex. 4)  Chester further testified

that Wilson's reference to PCM's limiting its fund choices was the fact that PCM only wanted to

trade mutual funds that held non-U.S. listed securities (i.e., "International Funds").  (Chester

Dep. Jan. 17, 2011 Tr. 182, Dunnigan Decl. Ex. 4.)

24.     On May 1, 2001, Chester sent an email to Wilson and Christian, stating as follows:

> We're sending you some leverage money – hopefully [CIBC] and your lawyer will get off their backside and complete the bloody leverage documentation! – for domestic funds.  Trevor will call you later to discuss.
>
> Hopefully this should stop your endless, pathetic, pittiful (sic) moaning that I've been subjected to for years.
>
> It does mean you might have to work a little harder …poor souls, working past cookie and milk time … for once in your lives, you can work like real men and do a proper day's work.  (You really are a bunch of women of the first order).
>
> Trevor will run through the procedures of how the trading is going to work. In essence, most of it will be done by you within certain parameters that we will give you each day.  In the majority of cases, your decision point will be 5:30 pm NY time.  In a few cases, your decision point will be 6:30 pm – I know, slave labor… whatever will you do working that late!
>
> When there are close decisions, you'll have a list of home / cell numbers for me, Trevor, Jafar [PCM's Chief Operating Officer] and Anthony [another PCM employee] (priority in that order) … and we'll make the call.  If you can't get through to us, then on a close decision, you'll need to act like men and make the call.  (Not too difficult really, as it's not your money!)

(Dunnigan Decl. Ex. 13.)

25.     On May 3, 2001, Chester sent an email to Wilson, Christian, and Trevor Rose, then the head of PCM's Trading & Dealing Desk, which stated in part as follows:

> I think Scott [Christian] will need to amend the fee letter to 2.25%, so that Anne [Harrington] at Olympia [Olympia Capital, PCM's administrator] can accrue properly for the fees.
> Can you arrange for this to happen.

(Dunnigan Decl. Ex. 14.)

26.     On May 9, 2001, Dr. Anthony Profit, the person in charge of PCM's Research & Development Department, sent an email to Christian at TW&Co. attaching a document entitled "Notes on Trading Domestic Technology Funds" that provided more detailed instructions on

how PCM wanted TW&Co. to execute late trades on behalf of Pentagon Fund.  Specifically, the

document indicated that PCM's trading model "outputs a couple of lines of text at about 16:10

(New York time)."  The document then provided the following trading instructions for trading

U.S. mutual funds holding technology companies' securities:

> [T]he procedure for trading these funds is as follows (all times are New York):
>
> 1.  At or around 16:10 [4:10 PM ET], the dealing team at Pentagon phone
> [TW&Co.] to tell them the output of the model.
> 2.  At 17:30 [5:30 PM ET], if the condition on the futures is met and the
> futures are outside the "warning" band, [TW&Co.] execute the trades – no
> need to phone Pentagon.
> 3.  At 17:30, if the condition on the futures is not met and the futures are
> outside the "warning" band, no trades executed – [TW&Co.] can go home!
> 4.  At 17:30, the futures are in the warning band, [TW&Co.] phones Lewis
> [Chester] at Pentagon, or the list of phone numbers that Trevor will supply for
> further instructions, which might include waiting for another hour.

(Dunnigan Decl. Ex. 15.)

27.     On June 8, 2001, Trevor Rose sent an email to Christian attaching a "revised list

of instructions for TW."  The new instructions modified the prior "Notes on Trading Domestic

Technology Fund" as follows:

> If Pentagon is unreachable and the futures are in the warning band at 18:30 [6:30 p.m
> ET], then Trautman should take a half position.  So if we're going in to the market,
> put half the funds in.  If we're coming out, take half out.

(Dunnigan Decl. Ex. 16.)

28.     TW&Co. did not clear its own trades, as it did not have direct distribution

agreements with U.S. mutual funds to buy or sell their shares.  Instead, TWC functioned as an

"introducing broker", and used Banc of America Securities, Inc. ("BofA"), which did have such

distribution agreements with U.S. mutual funds, as "clearing broker."  (Chester Dep. Sept. 23,

2010 Tr. 229, Dunnigan Decl. Ex. 3.)

29.     As a clearing firm, BofA required that TW&Co. time stamp its order tickets to purchase, redeem, or switch U.S. mutual funds by 4:00 PM ET to have the orders receive that day's price, or net asset value ("NAV").  (Dunnigan Decl. Ex. 18 at pg. 2 and Ex. 19 at pg. 2.)

30.     Eventually, PCM abandoned its pretense of sending its orders prior to 4:00 PM ET, and conveyed its orders to TW&Co. orally or via email.  (Chester Dep. Jan. 17, 2010 Tr. 144-45, 177-78, Dunnigan Decl. Exs. 4 & 20.)  TWC continued to create trading records reflecting that PCM's trades were being made prior to 4:00 PM ET.  (Dunnigan Decl. Ex. 17.)

31.     The 2.25% fee paid by PCM for late trading through TWC was higher than any other fees paid by PCM to its U.S. broker-dealers.  (Chester Dep. Jan. 17, 2001 Tr. 195., Dunnigan Decl. Ex. 4.)  For example, on November 6, 2001, Chester emailed Eric Macy of Brown Brothers Harriman ("BBH") and stated that "US wrap fees are all 1% max."  (Dunnigan Decl. Ex. 21.)

32.     The 2.25% fee was specifically for late trading privileges.  When a dispute arose in May 2003 about fees on trading certain mutual funds that Chester stated did not benefit from TW&Co.'s "time window," and for which he wanted to pay only a 1% wrap fee, Scott Christian replied via email that if the time window that TW&Co. offered was not valuable, then "you obviously know what time we expect to be contacted each day to process these orders which should be somewhere between 3:45 and 3:55pm."  (Dunnigan Decl. Ex. 162)

**After April 5, 2001, PCM Regularly Submitted**
**Final Trading Instructions For Trades In U.S.**
**Mutual Funds Through TW&Co. After 4:00 PM ET**

33.     Once the TW&Co.'s late trading system was in place, from approximately April 5, 2001 to September 3, 2003, PCM submitted final trading instructions for trades in U.S. mutual funds after 4:00 PM ET.  (Chester Dep. Jan. 17, 2011 Tr. 169, Dunnigan Dec. Ex. 4.)  Typically,

PCM would give its anticipated final orders by 5:30 PM ET, with the caveat that Wilson and Christian were expected to stay at TW&Co.'s offices until 6:30 p.m. ET, and contact PCM if anything unusual happened in the intervening hour. (Dunnigan Decl. Exs. 13 & 16.) If Wilson or Christian were unable to contact PCM, they were to follow pre-established directions that PCM had given them in order to make trading decisions, based on market indices' movements between 5:30 – 6:30 PM. (Chester Dep. Jan. 17, 2011, Tr. 176, Dunnigan Decl. Ex. 4.) Thus, final decisions regarding PCM's trades were ultimately not made until 6:30 PM ET.

34.     TW&Co. in turn falsely represented to BofA that PCM's orders had been received prior to 4:00 p.m. ET, thereby allowing PCM to receive the NAVs calculated as of 4:00 PM ET on that day. (Dunnigan Decl. Exs. 17, 18, & 19.) See also In the Matter of Trautman Wasserman & Co., Inc., SEC Docket 1156, 2008 WL 149120, at *13 (Jan. 14, 2008) ("Virtually all of TWCO's mutual fund trades were late trades that included a false representation that TWCO had a firm order by 4:00 p.m.").

35.     On June 19, 2002, Matthew Ember, a member of PCM's Research & Development Department, memorialized a conversation he had with Quang Tran, a trader at PCM and a primary contact with TW&Co., about how late trading through TW&Co. worked. (Dunnigan Decl. Ex. 22.) The email, entitled "Notes on conversion [sic] with QT concerning evening models etc.," states, in part, as follows:

> TWC allow late switches until around 23:30 [6:30 PM ET], priced at the close – these domestic and international trades are useful for catching news releases just after the close. (Historically, we have found returns from these to be volatile.) The thresholds to go in are emailed to Scott & Jimmy (brokers at TWC) although JO/LC [referring to Jafar Omid and Lewis Chester] makes the final decision around 23:00 [6:00 PM ET].

**Other Broker-Dealers Declined to Allow PCM to Place**
**Trades After 4:00 PM ET and Receive that Day's NAVs**

36.     Several broker-dealers through which PCM traded U.S. mutual funds declined to

allow PCM to place trades after 4:00 PM ET but still receive the current day's NAVs as shown

below:

- In May 2000, Chester met with Wilson and Christian, who were then employed by PaineWebber, and was told that trades for U.S. mutual funds had to be received by 4:00 PM ET, but that within a period of weeks, they hoped to accept trades up until 4:15 PM ET for that day's NAV.  (Dunnigan Decl. Ex. 23.)  Three weeks later, however, Christian informed Chester that U.S. mutual fund orders had to be received before 4:00 PM ET to receive that day's NAV:

  > "Regarding after hours trading, I have spoken to a few sources and so far they have come back to me with the idea that mutual funds trading will still halt at 4 pm.  If portfolio managers are still purchasing assets in the market after 4 then these will be reflected in the following day's price. Therefore the pricing of the mutual funds will not be affected by the after hours market since the pricing will be based on activity prior to 4pm that day.  Anything after 4 will reflect in the price for the following day's close."  (Dunnigan Decl. Ex. 24.)

- In May 2000, PCM trader Trevor Rose confirmed via email (with copies to Chester and another trader at PCM, Andrew Chaplin) a telephone conversation with Martin Druffner, a senior broker at Prudential Securities, that PCM had to fax its trade sheets to Prudential 1-2 hours before and verbally confirm the trades no later than 4:00 PM ET: "Trading is done by way of trade sheets being faxed to you 1-2 hours prior to market close, we will then give you verbal confirmation of the trades no later than 4pm US time."  (Dunnigan Decl. Ex. 25.)

- In September 2000, after Wilson and Christian had been fired from PaineWebber, Chester met with Scott Shedden, Steven Feit, and Dino Coppolla, brokers at PaineWebber, and was told that PCM should submit its trades by 3:50 PM ET: "11.  There then followed a discussion regarding trading times.  LC [Lewis Chester] asked whether it was possible to trade right up to New York closing. Scott [Shedden] stated that he would prefer if Pentagon traded up to the time we were previously trading with Jimmy Wilson (3.50pmEST)."  (Dunnigan Decl. Ex. 26.)

- In 2001, Michael Sassano, a broker at CIBC, left a voicemail for Lewis Chester in which, according to the transcript of the voicemail that Defendants submitted in support of the motion to dismiss the Amended Complaint, Sassano stated that PCM's trading at TW&Co. was "crap" and he warned Chester to stop pressuring

his people and not to "do something stupid": "But uhm, trust me, this 8:30 trading crap that he's [James Wilson] got going on . . . He's, I'll explain the scenario later.  Just stand clear and don't try to pressure anybody to do something stupid, because pressuring us is the wrong move."  (Decl. of Jafar Omid dated Nov. 19, 2008, docket no. 27-3., Dunnigan Decl. Ex. 27.)

- A PricewaterhouseCoopers report that PCM commissioned regarding PCM's mutual fund trading ("PwC Report") confirms that PCM was required to place its trades with CIBC by 4:00 PM ET to receive the current day's NAV.  (Dunnigan Decl. Ex. 28, 28A, 28B (collectively, "Ex. 28"), App. 3.)

- In April 2001, PCM trader Trevor Rose informed PCM's Dealing Department that PCM had to submit its trades to Investex by 3:50 PM ET to receive that day's NAVs: "Trading time is 3.50 pm."  (Dunnigan Decl. Ex. 29.)  A July 23, 2001 entry in Chester's calendar states "Investex re: omnibus and late trading," (Dunnigan Decl. Ex. 30.) and Chester's handwritten notes of a conference call with Frank Magnani, a broker at Investex, contain the following: "4:00 p.m. . . . Late Trading – up to 5pm."  (Dunnigan Decl. Ex. 31.)

- The PwC Report confirms that PCM had to submit trades to Investex's by 4:00 PM ET to receive the current day's NAVs on the trades.  (Dunnigan Decl. Ex. 28, App. 3.)

- In November 2002, Quan Tran wrote an email to Chester stating that he "knew for a fact" that there was no late trading at Solomon Smith Barney ("SSB"). (Dunnigan Decl. Ex. 82.)  In December 2002, Joshua Matthews, an employee of SSB, informed Tran that PCM should submit its trades before the cut-off to ensure receiving the current day's NAVs: "We can execute close to the cut-off every day at NAV and with no sales charge (in or out).  We will charge a 1% annual fee and you should fax orders in and then confirm by phone. You will need to give us sometime [sic] to place the trades so try not to send the order too close to cutoff to avoid disappointment."  (Dunnigan Decl. Ex. 32.)  Tran forwarded the email to Emma Swords, an administrative assistant who maintained the files at PCM, and acknowledged that it reflected PCM's agreement with Salomon Smith Barney:  "Emma, I've forward this email to you, please print it and keep a copy of it as this is our agreement with them. Thanks, Qt."  (Id.)

- The PwC Report confirms that PCM had to submit trades to SSB by 4:00 PM ET to receive the current day's NAVs.  (Dunnigan Decl. Ex. 28, App. 3.)

- In August 2002, Quang Tran sent an email to Chester to relate a conversation he had with Christopher Glassman, a broker at Morgan Stanley, in which Glassman offered to introduce PCM to contacts at AG Edwards and indicated that PCM would have to call in its trades by 4:00 PM ET: "Chris Glassman has told me he wants to introduce us to some people he knows at AG Edwards.  He suggest (sic)

that we could do a full strings concept with them and call the trades in at 4pm.  I told him that's interesting and we'd think about it."  (Dunnigan Decl. Ex. 33.)

- The PwC Report indicates that PCM had to submit trades to Morgan Stanley by 4:00 PM ET to receive the current day's NAVs.  (Dunnigan Decl. Ex. 28, App. 3.)

- In January 2003, Tran sent an email to Chester and Matthew Ember of PCM's Research & Development Department indicating that PCM could trade MFS mutual funds through Wall Street Discount Corp. ("WSDC"), although PCM could not late trade through WSDC: "Unfortunately there is no late trading on these funds but they charge less than Jimmy [Wilson of TW&Co.]!"  (Dunnigan Decl. Ex. 34.)  In February 2003, Tran asked Christopher Ballerini, a broker at WSDC, if PCM could send trades in after 4:00 PM ET.  (Dunnigan Decl. Ex. 35.)

- The PwC Report indicates that PCM had to submit trades to WSDC by 4:00 PM ET to receive the current day's NAVs.  (Dunnigan Decl. Ex. 28, App. 3.)

- In August 2002, Matthew Heerwagen of Brown Brothers Harriman ("BBH") sent an email to PCM traders Tran and Chaplin that U.S. mutual funds had a cut-off time of 4:00 PM ET: "We have a trading deadline that is two hours before a fund company's cutoff time that we stand by.  For many of your US exchanges, we have received instructions 15 minutes before the cutoff time of the fund (generally 3.45)."  (Dunnigan Decl. Ex. 36.)  In August 2003, Tran sent an email to Chester indicating that BBH might be able to exploit their system to allow late trading: "BBH informed me that they may be able to exploit their system and let us do late trading i.e. they get a breathing space to settle trades internally before it's sent to the Fund Families."  (Dunnigan Decl. Ex. 38.)  In September 2003, Tran sent an email to Chester reflecting that PCM was seeking to late trade through BBH: "Late trading won't happen until the end of the month at the earliest (IT systems are being implemented) and we'd be able to invest into the Morgan Stanley Funds as soon the KBC paper work has been sorted.  Intend to use leverage money for this.  This is partly BBH's fault as their compliance people decided to get involved."  (Dunnigan Decl. Ex. 37.)

- The PwC Report confirms that PCM had to submit trades to BBH by 4:00 PM ET to receive the current day's NAVs.  (Dunnigan Decl. Ex. 28, App. 3.)

**PCM Received and Reviewed Multiple Academic Articles that
Made Clear that U.S. Mutual Funds Required Trades to be
<u>Submitted Prior to 4:00 PM ET to Receive the Current Day's NAVs</u>**

37.     On March 21, 2002, Chester sent an email to various PCM personnel, analyzing

an academic article entitled "The Wildcard Option in Transaction Mutual Fund Shares," Draft

00-03, published by the Wharton School at the University of Pennsylvania, by Professor Roger

M. Edelen of the Wharton School, Professor John M.R. Chalmers of the Lundquist College of

Business at the University of Oregon, and Professor Gregory B. Kedlec of the Pamplin College

of Business at the University of Virginia Tech (the "Wharton Article).  (Dunnigan Decl. Ex. 39.)

Although Chester's email made 14 distinct observations about the article, the email ignored the

fact that the article plainly stated:

> Specifically, most funds accept transactions in their shares at any time up to the 4:00
> p.m. Eastern close of trading on the NYSE.  The Transactions are executed at the
> NAV reported to the NASD by 5:50 P.M., which is almost universally set using
> closing prices of the underlying assets of the fund.  Closing prices are, in turn, almost
> always, the price of the last trade in the stock . . . With a telephone transfer, fund
> investors can feasibly make their trading decisions as late as, say, 3:55 p.m. . . . Thus,
> fund investors who defer their investment/redemption decision to the end of the day
> possess an option to trade at least some of the underlying assets of the fund at stale
> prices . . .The Option expires at 4:00 p.m. (or more realistically, 4:00 p.m. – delta,
> where delta is the time it takes to make a phone call), and it regenerates daily.

(underline added.)  The Wharton Article goes on to say:

> Funds employ a variety of tactics to limit short-term traders, including load fees,
> transaction fees, and outright restrictions on trade frequency.  For example, about half
> the funds in our sample employed a load fee, and approximately 22% of the no-load
> funds in our sample explicitly state in the fund prospectus a limit of 4-6 round-trip
> transactions per year.  While this leaves a substantial number of funds with no
> explicit transaction limit, we also note that virtually all funds retain the right to refuse
> short-term traders.  Therefore, a credible, sustained exercise campaign would have to
> be disguised.

38.     Chester's omission was not accidental.  At his September 23, 2010 deposition,

when questioned about academic articles reviewed by PCM, Chester testified as follows:

> Q: So an academic who is publishing a paper on the market timing of United States
>    mutual funds states that all trades have to be placed by 4 pm Eastern Time and
>    doesn't appear to know or even understand the concept of late trading, did that
>    raise any red flags to you?
> A: I understand the concept is not what . . .
> Q: OK.  Did point number five raise any red flags for you?
> A: No.
> Q: Why not?
> A: I wouldn't expect an academic to necessarily know every feature of a particular
>    marketplace.

> Q:  Would you expect an academic to know the structure of the marketplace?
> Mr. Razzano:         Objection.
> A:  I would expect an academic to be able to analyse statistical numbers and return streams and come up with a view as to the predictability of those return streams and whether they have alpha or not.

(Chester Dep. Sept. 23, 2010 Tr. 248-49, Ex. 3.)

When questioned about the article reflected in Para. 36 above, Chester testified similarly:

> Q:  Did you have an expectation that your research department would tell you if they saw academic articles that contradicted the practices of Pentagon?
> Mr. Razzano:         There is nothing in here that contradicts the practices of Pentagon.
> A:  As I answered before, my expectation would be that academics who specialize in crunching data and assessing the alpha characteristics of a particular trading strategy would opine and have expertise in relation to those issues rather than any other issues.

(Chester Dep. Sept. 23, 2010 Tr. 263., Dunnigan Decl. Ex. 3.)

39.    PCM also had a similar, earlier draft of the Wharton Article quoted in Paragraph 36 in its files.  This draft contains the following language:

> Most U.S. domiciled mutual funds offer an exchange of shares once per day, at 4:00 p.m. ET at a priced referred to as net asset value (NAV) . . . With a telephone or internet transfer, fund investors can feasibly make their trading decisions as late as, say 3:55 P.M.

(Dunnigan Decl. Ex. 40, at 1, 9.)

40.    On August 27, 2002, Dr. Christian Koehl, an employee in PCM's Research & Development Department, wrote an email analyzing an articled date July/August 2002 by four professors at the Stern School of Business at New York University entitled "Stale Prices and Strategies for Trading Mutual Funds" (the "Boudoukh Article").  (Dunnigan Decl. Ex. 41.)  The Boudoukh Article plainly states the following:

> The buying or selling of mutual funds in the United States occurs at the close of trade (i.e., 4:00 p.m.), but the reported prices of the underlying assets in the fund reflect the last traded priced.

(Dunnigan Decl. Ex. 41 at 55, underline added.)  The Boudoukh Article goes on to state:

> In general, three implementation methods are possible. First and foremost, an investor can trade directly through the mutual fund complex online (if available) or via automated telephone service. The speed of this transaction can be as quick as 30 seconds; thus, it can be implemented close to the 4:00 p.m. transaction deadline. <u>Second, an investor can put in a trade through a broker. Brokers can also trade close to the 4:00 p.m. deadline,</u> but this mechanism has the disadvantage of introducing an intermediary into the process. Third, a number of online trading firms (e.g., Charles Schwab & Company, E*TRADE Group, and Ameritrade) allow mutual fund trading. Transactions through these firms are relatively quick and allow trading across mutual fund families (i.e., the monies invested are through the online account); however, the transactions usually involve a fee (between $9.95 and $29.95) and execution times are sometimes limited.  For example, a number of online trading firms required notice by 3:00 p.m."

(<u>Id.</u> at 55, underline added.)  Koehl's August 27, 2002 email analyzing the Boudoukh Article made 9 points, including the following:

> (Tragically) Interesting paper, reads like what could be a blue print to what we are doing, coming from the public domain . . .

> 5)      <u>The authors state that all trading has to be done by 4pm US time latest.  I suppose it is a little consolation that they haven't heard about late trading . . . yet!</u>

(Dunnigan Decl. Ex. 41, exclamation point in original, underline added.)

41.      On April 30, 2002, an entry in Chester's personal calendar reflects an entry entitled "Zitzewitz Discussion."  (Dunnigan Decl. Ex. 42.)  "Zitzewitz" refers to Prof. Eric Zitzewitz, a professor at the Stanford Graduate School of Business, who wrote multiple articles between 1999-2004 regarding market timing of U.S. mutual funds.

42.      On May 10, 2002, Dr. Profit, the head of PCM's Research & Development Department, created a memorandum entitled "Mid-Cap models that specifically attempts to replicate the results from the Zitzewitz 2000 and 2002 Articles."  (Dunnigan Decl. Ex. 43.)  The references to Zitzewitz 2000 and 2002 Articles refer to articles entitled "Daily Mutual Fund New Asset Value Predictability and the Associated Trading Profit Opportunity" ("Zitzewitz, February

2000) and "Who Cares About Shareholders?  Arbitrage-Proofing Mutual Funds" (Zitzewitz,

March 2002).  (Dunnigan Decl. Exs. 44 & 45.)

> 43.     With respect to late trading, the March 2002 Zitzewitz Article plainly states:

> > Almost all U.S.-based mutual funds calculate daily net asset values (NAVs) using the
> > most recent price data as of 4 PM Eastern Time (ET) <u>and allow investors to make
> > trades at the current day's NAV up until 4 PM</u>.

(Dunnigan Decl. Ex. 45 at 1, underline added.)  Similarly, the February 2000 Zitzewitz Article

plainly states:

> > A trading strategy designed to take advantage of the predictability of fund returns
> > would involve buying when expected future returns are high and selling when they
> > are low.  In practice this would involve checking the market at 3:55 PM each day and
> > switching between the fund and case depending on whether expected next-day returns
> > are high or low. (fn. 18)

> > fn.18  Almost all fund families allow transactions up to 4:00 P.M.; a few even allow
> > one to cancel transactions after 4:00 P.M. but before NAVs are reported.

(Dunnigan Decl. Ex. 44 at 12.)  Profit's May 10, 2002 memorandum analyzing the two Zitzewitz

articles contains no mention of the plainly stated 4:00 PM ET cut-off time that U.S. mutual funds

established for investors seeking to trade at the current day's NAVs.

> 44.     On April 10, 2002, Chester received an email from Prof. Andre Perold at Harvard

Business School, attaching an academic article by three professors at the Yale School of

Management, William Goetzmann, Zoran Ivkovich, and K. Geert Rouwenhorst, entitled "Day

Trading International Mutual Funds:  Evidence and Policy Solutions."  (Dunnigan Dec. Ex. 46.)

Chester wrote an eight point, two page email analyzing this article and forwarded it to Profit.

The article states, in part, as follows:

> > Consider a U.S. mutual fund that wants to invest in Japanese equities, most of which
> > are not cross-listed in the U.S.  Suppose the fund wants to determine the NAV in
> > dollars (U.S.D.) of its shares as of 4 PM Eastern Standard Time (EST) to sell the buy
> > and sell orders it receives during the day. [FN1]

FN1.  Among other reasons, 4 PM EST is desirable because it allows fund companies to transfer investor wealth among its funds on the same day.

Which prices should the fund use to compute the value of its Japanese holdings?  One option is to take the Yen closing prices from the Tokyo Stock Exchange (TSE) and use the Yen/U.S.D. exchange rate that prevails at 4 PM EST to compute the dollar value of the portfolio.  The TSE closes at 1 AM EST, about nine hours before the opening New York Stock Exchange (NYSE).  <u>Therefore, this pricing rule effectively allows U.S. investors to purchase or sell shares in the fund during NYSE trading hours at prices determined at least fifteen hours earlier.</u>

(Dunnigan Decl. Ex. 46 at pg. 3, underline added.)  Chester's analysis of this article does not address the fact that the article states that investors can purchase or sell shares during NYSE trading hours.

**PCM and Chester Received Marketing Materials from
Two Competitor Hedge Funds, to Which Chester Directed
Investments, that Plainly Stated Orders for U.S. Mutual Funds
<u>Had to be Placed by 4:00 PM ET to Receive the Current Day's NAVs</u>**

45.     Chester's calendar contains a March 11, 2002 entry with the following: "Gigi re: getting Haidar's Prospectuses."  (Dunnigan Decl. Ex. 47.)  Chester's calendar contains an April 2, 2002 entry with the following: "Haidar Conference Call."  (Dunnigan Decl. Ex. 48.)  Haidar refers to Said N. Haidar, the principal of two investment adviser entities, Haidar Capital Management, LLC and Haidar Capital Advisors, LLC (collectively, "Haidar").  Haidar is the investment adviser to a New York-based hedge fund that engaged in market timing of U.S. mutual funds.  The Commission instituted settled enforcement proceeding against Haidar for engaging in deceptive market timing.  See <u>In the Matter of Haidar Capital Management, LLC</u>, Admin. Proc. File No. 3-12678 (July 6, 2007) (available at

http://www.sec.gov/litigation/admin/2007/33-8820.pdf).

46.     A PowerPoint presentation sent by Haidar to PCM provided examples of Haidar's

trading strategy, including the fact that trades in U.S. mutual funds must be made by 4:00 PM ET

to receive that day's NAV:

> Example Trade:
> Buy International Funds
> - Fed unexpectedly cuts rates at 1:30 PM.  US equity market soars higher.
> - Europe and Asia already closed.
> - Buy international Equity fund before 4PM
>   - o    Priced based on last traded price of the fund's holdings, does not reflect Fed rate cut
>   - o    Fund 1% cheap to fair value
>   - o    Momentum worth additional 0.5%

(Dunnigan Decl. Ex. 49, at 7.)  The PowerPoint presentation likewise plainly explained that sell

orders in U.S. mutual funds must be placed by 4:00 PM ET to receive that day's NAV:

> Example Trade
> Sell International Equity
> - Market continues to rise for 3 more days
> - US market reacts negatively to earnings downgrade
> - US market deteriorates further in afternoon after European equities have closed
> - Sell fund by 4PM go into cash
>   - o    0.6% rich relative to fair value
>   - o    Momentum effect is additional 0.5% drag

(Id. at 8.)

47.     Chester and other PCM employees, acting through a fund-of-funds investment

vehicle named "Talisman," directed investments into three Haidar hedge funds, including the

Haidar Jupiter Shorty Equity Fund.  (Dunnigan Decl. Ex. 50.)  The prospectus for the Haidar

Jupiter Short Equity Fund contained in Defendants' files contains the following concerning late

trading:

> Mis-Pricings arise for a variety of reasons.  For example, open-ended mutual funds, which allow purchase by 4PM Eastern Time for same-day Net Asset Value, value their portfolios at the last traded price on a major stock exchange.

(Dunnigan Decl. Ex. 51.)

48.     PCM, via Talisman, invested in another hedge fund, NetFund Offshore Fund,

managed by NetFund, Inc., which, while engaged in market timing, stated in its offering

memorandum contained in Defendants' files that trades in U.S. mutual funds had to be made by

4:00 PM ET to receive that day's NAV.  The offering memorandum for NetFund Offshore Fund

states, in relevant part:

> NetFund, Inc. is a market-timing hedge fund doing international arbitrage.  The
> prospectus states:  "As the daily closing prices of shares of international investment
> funds that are registered in the U.S. are based on the value of their holdings are the
> time the international markets close for the day (which occurs 5-12 hours prior to the
> close of the U.S. markets) <u>and as it is possible to purchase or sell these funds up until
> the close of the U.S. markets</u>, these funds can be purchased or sold with the benefit of
> the knowledge about the latest movements in the U.S. markets.

(Dunnigan Decl. Ex. 52, Second Addendum dated January 7, 2000, underline added.)

49.     On July 12, 2002, Omid sent an email to Chester forwarding the NetFund

Offering Memorandum.  (Dunnigan Decl. Ex. 52.)  On July 31, 2002, Chester sent an email

directing placement of $250,000 in NetFund Offshore Fund and attaching the relevant

prospectus.  (Dunnigan Decl. Ex. 53.)

**PCM Received Prospectuses for at Least Three U.S.**
**Mutual Funds that Plainly Stated that Orders Had to be**
**<u>Submitted by 4:00 PM ET to Receive that Day's NAV</u>**

50.     On September 12, 2002, Christopher Glassman, a broker at Morgan Stanley,

emailed to Quang Tran a copy of the prospectus for the Nations Funds, U.S. mutual funds

managed by an investment adviser subsidiary of BofA.  The prospectus plainly states the

following:

> Orders to buy, sell or exchange shares are processed on business days."  <u>Orders
> received by Stephens, PFPC or their agents before the end of a business day (usually
> 4:00 p.m. Eastern time, unless the NYSE closes early) will receive that day's net asset
> value per share</u>.  Orders received after the end of a business day will receive the next
> business day's net asset value per share.

(Dunnigan Decl. Ex. 54, 54A, 54B, and 54C, at 51, underline added.)  PCM engaged in late

trading of the Nations Funds through TWC, including after September 12, 2002.

51.     PCM also received the prospectus for GAMNA Funds, which plainly stated the

following:

> All purchases and redemption will be processed at the NAV next calculated after your
> request is received and approved by the Fund (or its designated agent).  The Fund's
> NAV is calculated at the close of the regular trading session of the New York Stock
> Exchange (the 'NYSE') which is normally 4:00 p.m. New York time each date that
> the NYSE is open (a 'Business Day').

(Dunnigan Decl. Ex. 55, at 10.)

52.     PCM also received the prospectus for the Rydex Funds, which contained the

following:

> To receive the current NAV, the transfer agent must receive your purchase order
> before the cut-off times specified in the "Exchanges" section for each method of
> investing.

(Dunnigan Decl. Ex. 56 and 56A, at 25.)  The Exchanges section of the prospectus for online

transactions, in turn, provided that trades may be made up to 3:55p.m. ET.  (Id. at 28.)

53.     Moreover, the prospectuses for all of the U.S. mutual funds that PCM traded were

publicly available on the Commission's website at www.sec.gov.  The prospectuses typically

state that the NAVs for the funds' shares are calculated as of 4:00 PM ET, or as of the close of

the NYSE (in the event that the NYSE closes earlier than 4:00 PM ET).  For example, 79

prospectuses, covering 114 of the mutual funds PCM late traded through TW&Co., not only state

that the mutual funds use 4:00 p.m. prices to calculate their daily NAVs, but specifically state

that purchasers of shares in their fund must place their orders prior to 4:00 p.m. ET or the close

of the NYSE in order to receive that day's NAV.  (Dunnigan Decl. Exs. 83-161).

**Chester and Tran Wrote in Emails Acknowledging
That U.S. Mutual Fund Trades had to be
Submitted by 4:00 PM ET to Receive that Day's NAVs**

54.     On October 3, 2002, approximately 19 months after PCM began late trading

through TW&Co., Tran sent an email to a broker at an Australian broker-dealer. (Dunnigan

Decl. Ex. 57.)  In the email, Tran stated the following:

> Thank you for your email, I'm getting my R&D team to look at the fund list.  In the
> mean time can you confirm the cut off time for the funds on the platform and do I get
> the same day NAV or the next day NAV.  Typically with a UK Fund Platform we
> invest at 12 GMT, with European platforms this varies throughout the day and the US
> we have to place orders just before the US Close at 4pm EST.  On all platforms we
> receive same day NAV.  I assume for Australia we have to place orders before
> Market Close.

(underline added.)

55.     Similarly, on May 14, 2003, Chester sent an email to Ron Basu, a broker at

broker-dealer Lehmann Brothers.  (Dunnigan Decl. Ex. 58.)  In discussing non-U.S. mutual

funds, Chester wrote the following:

> Ron, these work just like the US funds, except dealing time is 3pm London time.  If
> we were able to convince them to allow us to trade at 9pm London time, they would
> be exactly the same as any US mutual fund.

(underline added)  9:00 PM London time is 4:00 PM ET.

**PCM's Internal Emails Reflect the Understanding
That U.S. Mutual Funds Required Orders to be
Submitted by 4:00 PM ET to Receive the Current Day's NAVs**

56. On March 30, 1999, Chester emailed three PCM employees as follows:

On the assumption that we will be investing an initial $2m with Morgan Stanley for
onward investment in Templeton, the following dealing arrangements have been agreed:-

> You will need to contact Graves Kieley by phone (follow up fax) 5 mins before
> Templeton's dealing cutoff time (which I believe is 9pm). Graves will then place the
> deal.

> Best thing to do is contact Graves directly and talk through the exact procedure with him to ensure no cock-ups. Graves number is 212 903 7673. Make sure you have 2 other people to contact and 2 fax numbers, and discuss with Graves worse case scenario - i.e. can't get hold of anyone...what do you do?

(Dunnigan Decl. Ex. 59, underline added.)  9:00 PM London time is 4:00 PM ET.

57.     On February 12, 2001, approximately seven weeks *before* PCM began late trading through TW&Co., Chester emailed Jack Governale, Esq., of Wolf, Block, Schorr, & Solis-Cohen LLP, PCM's U.S. counsel.  (Dunnigan Decl. Ex. 60.)  The subject of the email concerned PCM's attempt to sell shares of three Federated mutual funds through WSDC, a U.S. broker-dealer with whom PCM dealt.  The email contains the following:

> WALL STREET DISCOUNT CORP. - C CLASS ACCOUNT - FEDERATED
>
> Please note that I have instructed Wolf Block Schorr Solis-Cohen to liase with Justin Morcom at Wall Street Discount Corp. in respect of positions we have with Federated mutual funds.
>
> In brief, we put in a redemption request to withdraw our funds from Federated on Tuesday afternoon <u>before the fund's cut-off dealing point</u>. The sums involved are listed below. Wall Street Discount have informed us that Federated ignored our redemption request and kept us invested in the funds, without giving good reason.
>
> On Wednesday afternoon, <u>before the fund's cut-off dealing point</u>, another redemption request was placed by Wall Discount Discount Corp. Once again, this was ignored by Federated and they kept us invested in the funds, without giving good reason.
>
> The total loss to-date incurred as a result of their refusal to accept are redemption requests are listed below.
>
> I have asked Justin Morcom to put Federated on notice of our intention to take legal action against them, and to elicit ** address/person to write to in respect of this matter. I have also asked Justin to write a statement for Wolf Block outlining the facts of this matter. I have also instructed them to continue placing redemption requests with Federated so as to mitigate our losses.
>
> Jack Governale, on behalf of Wolf Block, will project manage the proceedings.
>
> Regards,
> Lewis

FEDERATED POSITIONS

FTITX[2] - current value US$494,594.60 (value on redemption request date was US$498,280)

ISCAX[3] - current value US$499,225.63 (value on redemption request date was US$504,330)

EURAX[4] - current value US$387,843.55 (value on redemption request date was US$393,410)

(underline added)

58.     The Prospectuses for the three Federated mutual funds in effect on February 12, 2001, and publicly available on the Commission's website, provide as follows:

> You can purchase, redeem or exchange Shares any day the New York Stock Exchange (NYSE) is open.  When the Fund received your transaction request in proper form (as described in this prospectus) it is processed at the next calculated net asset value (NAV) plus any applicable front end sales charge (public offering price).

The Prospectuses also state:

> NAV is determined at the end of regular trading (normally 4:00 p.m. Eastern time) each day the NYSE is open.

The Prospectuses further state:

> **How to Purchase Shares**
>
> You may purchase Shares through an investment professional, directly from the Fund, or through an exchange from another Federated Fund.  The Fund reserves the right to reject any request to purchase or exchange Shares.
>
> Where the Fund offers more than one share class and you do not specify the class choice on your New Account Form or form of payment (e.g. Federal Reserve wire or check) you automatically will receive Class A shares.
>
> **THROUGH AN INVESTMENT PROFESSIONAL**
>
> • Establish an account with the investment professional; and

---

[2]     FTITX refers to the Federated International Equity Fund.

[3]     ISCAX refers to the Federated International Small Company Fund.

[4]     EURAX refers to the Federated European Growth Fund.

- <u>Submit your purchase order to the investment professional before the end of regular trading on the NYSE (normally 4:00 p.m. Eastern time).</u>  You will receive the next calculated NAV if the investment professional forwards the order to the Fund on the same day and the Fund receives payment within three business days. You will become the owner of Shares and receive dividends when the Fund receives your payment.

(Dunnigan Decl. Exs. 61, 62, & 63, underline added.)

59.     Chester testified that that he did not recall anything about the February 12, 2001 email referenced in Paragraph 56.  (Chester Dep. Sept. Sept. 23, 2010 Tr. 237, Dunnigan Decl. Ex. 3.)

60.     Likewise, Mr. Governale, PCM's U.S. counsel, testified that that he did not recall this February 12, 2001 email or the circumstances surrounding it.  (Governale Dep. Tr. 75-77, Dunnigan Decl. Ex. 79.)  When asked what the phrase "fund's cut-off dealing point" referred to, however, Mr. Governale testified as follows:  "The trading deadline for mutual funds generally is the close of the trading day 4 o'clock."  (<u>Id.</u> at 76.)

61.     Beginning April 17, 2001, Defendant' trading records reflect PCM placed 9 orders to purchase Federated U.S. mutual funds, totaling approximately $1.37 million, and 13 orders to sell Federated mutual funds, through TW&Co.  PCM made the final trading decisions for all of these trades *after* 4:00 PM ET.

62.     On August 7, 2002, Chester sent an email to PCM employees Profit, Koehl, Bristow, Omid, Ember, and Rose memorializing a conversation with Casey Cline of the Huntrise Funds, which contained the following:

1. I called Casey in order to ascertain why Huntrise was performing so well and whether his capacity had changed (i.e. morning trades, etc.).
2. <u>Casey told me that they only trade the US International funds, as well as some offshore International funds at US close (i.e. the same trade).</u>
3. The good returns are really to do with the fact that the evening US trade has been good for them recently.  On top of this, the offshore fund only has $1.3m in it, so kick-outs are a non-issue.

30

4. The firm as a whole has seen assets fall from $120m to currently $80m.  This was due to a restructuring that took place at the beginning of the year, when they set up funds, rather than managed accounts, and raised the fee structure accordingly. At that time, clients left because:

   a)    Fee structure radically changed

   b)    Performance not as good as now

   c)    Clients didn't want the custodial risk of hedge fund structure

   d)    Many of the clients aren't rich and couldn't be described as "qualified" for the purposes of the funds' prospectuses.

5. Capacity generally is tight and difficult.  He thinks they might be able to grow to $120m of assets.

(Dunnigan Decl. Ex. 64, underline added.)

**Chester Cautioned PCM Employee Quang
Tran to be Careful When Making Inquiries about
Late Trading and to Keep Such Inquires "Discreet"**

63. On August 22, 2002, Chester instructed Tran via email as follows:

Do you want to phone around First Union and see if you can - discreetly - find out who's dealing with Najjy's account there.  Then see if you can set up with them too. They might have late trading?

(Dunnigan Decl. Ex. 65.)  "Najjy" refers the Najy N. Nasser, the head of another U.K.-based

hedge fund known as Headstart Advisers Ltd. ("Headstart"), which engaged in late trading and

deceptive market timing of U.S. mutual funds.  The Commission filed an enforcement action

against Nasser and Headstart on April 10, 2008, shortly after filing this action.  See SEC v.

Headstart Advisers Limited, 08 CV 3484 (S.D.N.Y.) (available at

http://www.sec.gov/litigation/complaints/2008/comp20524.pdf).  On June 29, 2009, the

Commission announced the settlement of that matter.  See "Commission Settles with Najy N.

Nasser, Headstart Advisers Limited and Heastart Fund Ltd. in Connection with Deceptive

Market Timing and Late Trading Scheme," SEC Lit. Rel. No. 21108, 2009 WL 1856532 (June

29, 2009) (available at http://www.sec.gov/litigation/litreleases/2009/lr21108.htm).

64. Tran responded to Chester's August 22, 2002 email the same day as follows:

I've been in touch with First Union aka Wachovia, I spoke to a mutual funds broker there, it seems they are an outfit like pru [Prudential], solly [Salomon Smith Barney] where you have more than 1 broker at that place.

However this guy does have other timers (I didn't use that word with him) and he is keen on wanted to further discuss.  He is on holiday and will get back next week to continue this discussion.

(Dunnigan Decl. Ex. 66.)

65.      On August 23, 2002, Chester responded as follows:

good . . . see if you can find out who Headstart are using.  <u>Obviously late trading is key . . .don't know how you find out about this without actually saying it</u>.

(Dunnigan Decl. Ex. 66, underline added.)

**PCM Was Informed About and Obtained**
**A Commission Staff No-Action Letter Regarding Late Trading**

66.      On April 17, 2002, Chester and Profit participated in a conference call with

personnel from The RAM Group, including a former broker from WSDC who had started a

market timing fund.  PCM's notes of the conference call include the following:

After-hours trading
- There is an SEC letter that "legally allows us to trade until the time that the NAV is actually calculated"
- They've come to direct agreements with fund families to secure late trading.
- Using after-hours trading moves his proportion of profitable trades from 55% to 68%.
- They pulled 3 trades in Jan 2002, saving in the region of 6%.

(Dunnigan Decl. Ex. 67.)

67. Chester's testified about this subject matter as follows:

Q:  Did you ever look for an SEC "no action" letter or other SEC publication regarding late trading?
A:  No.

********

Q:  Did Pentagon ever seek a legal opinion regarding the legality of late trading?
A:  No.

Q: Did Pentagon ever make any attempts to find an SEC "no action" letter - - -
A: No.
Q: - regarding late trading?
A: No, but we – I relayed the information to Jimmy Wilson, because I was in the habit of giving Jimmy information that I learnt in the marketplace and what Eddy [Stern] was doing seemed very much akin to what Jimmy was doing, which was acting as an introducing broker or someone who was inputting trades through a banking system, so I thought it was relevant information for Jimmy.  I wasn't necessarily relevant information for Pentagon, because we weren't carry out what Eddy Stern purported to tell he was doing.
Q: What did Jimmy Wilson say when you told him what Eddy Stern had told you?
A: Umm . . . I don't recall if he said anything in particular but I do recall that Scott Christian called me shortly thereafter and had said that a friend of his had found the legal opinion and thanking me for bringing it to his attention.  Sorry, not the legal opinion, the SEC "no action" letter.
Q: Did he send you the SEC "no action" letter?
A: No.

(Chester Dep. Sept. 23, 2010 Tr. 211-13, Dunnigan Decl. Ex. 4.)

68.    As of the time of the conference call with RAM, there existed on the

Commission's website, and on other electronic databases such as Westlaw, the Commission

staff's publicly available July 7, 1997 response to a letter from Charles Schwab & Co., Inc.

concerning Rule 22c-1, 17 C.F.R. § 270.22c-1, adopted pursuant to Section 22(c) of the

Investment Company Act of 1940, 15 U.S.C. § 88a-22(c).  See Charles Schwab & Co., SEC No-

Action Letter, 1997 WL 447915, Ref. No. 97-146-CC, File No. 132-3 (July 7, 1997).  The

Commission's staff's response, in the course of explaining Rule 22c-1, provides in part as

follows:

> The primary purpose of [Rule 22c-1] is to prevent "backward pricing" (the purchase or sale of fund shares at a price based upon a previously determined NAV). [FN5]
>
> > FN5. Investment Company Act Rel. No. 5519 (Oct. 16, 1968). In adopting Rule 22c-1, the Commission expressed the view that backward pricing could permit a speculator to take advantage of fluctuations in the prices of the fund's portfolio securities that occurred after the fund had last calculated its NAV.

In an interpretive release published shortly after the adoption of Rule 22c-1, the staff took the position that when a customer transmits an order to a retail dealer, the time of receipt of the order by the retail dealer, rather than the time of receipt by the fund or its underwriter, is controlling for purposes of determining the price to be received by the customer under Rule 22c-1. This position recognized that a customer would have no opportunity to take advantage of recent changes in the prices of a fund's portfolio securities if the customer receives a price for fund shares that is calculated after the customer placed the order. Moreover, the staff has indicated on several occasions that receipt of an order by a person designated by the fund, whether or not a dealer, would be "receipt of a tender" for purposes of Rule 22c-1. (footnotes omitted.)

69.     PCM also had in its files the Commission staff's No-Action Letter publicly issued

on July 15, 2002 in response to a request from ReFlow Fund, LLC. (Dunnigan Decl. Ex. 68)[5]

The ReFlow Fund No-Action Letter was also publicly available on electronic databases such as

Westlaw. See ReFlow Fund, LLC, SEC No-Action Letter, 2002 WL 1493234, Ref. No.

2001619943 (July 15, 2002).) This Commission staff No-Action Letter provides in part as

follows:

> The primary purpose of Rule 22c-1 is to eliminate or reduce any dilution of the value of outstanding redeemable securities of registered open-end investment companies that may occur through the practice of "backward pricing." The rule is intended to prevent speculative traders from engaging in short-term trades based on the knowledge that the value of an investment company's portfolio securities is not yet reflected in the fund's NAV.

Id. at *4 (footnote omitted). Significantly, the ReFlow Fund No-Action Letter specifically refers

to the July 7, 1997, Charles Schwab & Co. No-Action Letter discussed in Paragraph 68.

**There Were Numerous Other Publicly**
**Available Commission Documents Regarding the**
**Pricing Of U.S. Mutual Funds and Trade Cut-Off Times**

70.     On October 16, 1968, the Commission publicly announced the adoption of Rule

22c-1 under the Investment Company Act by issuing a release entitled "Adoption of Rule 22c-1

---

[5] In Dunnigan Decl. Ex. 68, two handwritten circles appear around footnotes 11 and 12. These two circles are not part of the original document produced by Defendants, but were placed there by Defendant Lewis Chester during his January 17, 2003 deposition.

Under the Investment Company Act of 1940 Prescribing the Time of Pricing Redeemable

Securities for Distribution, Redemption, and Repurchase, and Amendment of Rule 17a-3(a)(7)

Under the Securities Exchange Act of 1934 Requiring Dealers to Time-Stamp Orders" (the

"Adopting Release").  See Release No. 5519, 1968 WL 87057 (Oct. 16, 1968).  The Adopting

Release provides in part as follows concerning the purposes of Rule 22c-1:

> One purpose of Rule 22c–1 is to eliminate or reduce so far as reasonably practicable
> any dilution of the value of outstanding redeemable securities of registered
> investment companies through (i) the sale of such securities at a price below their net
> asset value or (ii) the redemption or repurchase of such securities at a price above
> their net asset value. Dilution through the sale of redeemable securities at a price
> below their net asset value may occur, for example, through the practice of selling
> securities for a certain period of time at a price based upon a previously established
> net asset value. This practice permits a potential investor to take advantage of an
> upswing in the market and an accompanying increase in the net asset value of
> investment company shares by purchasing such shares at a price which does not
> reflect the increase.
>
> Another purpose of Rule 22c–1 is to eliminate or reduce so far as reasonably
> practicable other results, aside from dilution, which arise from the sale, redemption,
> or repurchase of securities of registered investment companies and which are unfair to
> the holders of such outstanding securities. The Commission believes that the practice
> of selling securities for a certain period of time, at a price based upon a previously
> established net asset value, encourages speculative trading practices which so
> compromise registered investment companies as to be unfair to the holders of their
> outstanding securities. This pricing practice allows speculators to buy large blocks of
> such securities under circumstances where the net asset value of the securities has
> increased but where the increase in value is not reflected in the price. The speculators
> hold such securities until the next net asset value is determined and then redeem them
> at large profits. These speculative trading practices can seriously interfere with the
> management of registered investment companies to the extent that (i) management
> may hesitate to invest what it believes to be speculators' money and (ii) management
> may have to effect untimely liquidations when speculators redeem their securities. . . .

(Id. at *1-2.)

71.     In addition to announcing the adoption of Rule 22c-1, the Adopting Release also

announced that, as a companion measure, the Commission was amending 17a-3(a), 17 C.F.R. §

240.17a-3(a), under the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., which sets

forth the types of records that broker-dealers must make and keep, to require all broker-dealers, such as TW&Co., to maintain records of orders from customers, such as PCM, showing, <u>inter alia</u>, the *time* the orders are received.  Specifically, the Adopting Release provides as follows:

> In order to implement Rule 22c–1 under the Investment Company Act, the Commission, as a companion measure, has determined to adopt an amendment of Rule 17a–3(a)(7) under the Securities Exchange Act to require dealers, when selling securities to, or buying securities from, a customer, other than a broker or dealer, <u>to stamp on the memorandum of order the time of receipt</u>. Brokers are already subject to such requirement under subparagraph (a)(6) of Rule 17a–3.

(<u>Id.</u> at *3, underline added.)

72.     On December 27, 1968, and again on January 9, 1969, the SEC staff issued a Staff Interpretive Position (the latter updating the former) regarding the adoption of Rule 22c-1 and the Commission's October 16, 1968 Release referenced in Para. 69 above.  <u>See</u> <u>Staff Interpretive Positions Relating to Rule 22c-1</u>, Release No. 5569, 1968 WL 87104 (Dec. 27, 1968); <u>Staff Interpretive Positions Relating to Rule 22c-1</u>, Release No. 5569, 1969 WL 96373 (Jan. 9, 1969).  At the time, it was common for mutual funds to price their securities twice per day.  Further, the New York Stock Exchange closed at 3:30 PM ET.  Both versions of the Staff Interpretive Position contain, verbatim, a hypothetical that leaves no doubt that orders to trade U.S. mutual funds at the current day's NAVs have to be received before the funds' pricing times.

73.     For example, the January 9, 1969 Interpretive Position provides as follows:

> The following examples are intended to illustrate how the pricing provisions apply: The fund prices at 1:00 p.m. and 3:30 p.m.
> (a) A dealer receives a customer's order before 1:00 p.m. The 1:00 p.m. price would be applicable and the dealer should assure that the order is received by the underwriter prior to 3:30 p.m.
> (b) A dealer receives a customer's order after 1:00 p.m. but before 3:30 p.m. The 3:30 p.m. price would be applicable and the dealer should assure that the order is received by the underwriter prior to the close of the underwriter's business day.
> (c) A dealer receives a customer's order at 4:00 p.m. The 1:00 p.m. price on the next business day would be applicable and the dealer should assure that the underwriter

receives the order prior to 3:30 p.m. on such next day. (See also the answer to question 4(b).)

Release No. 5569, 1969 WL 96373, at *2.

**PCM's Trading Strategies Depended on
"Mispriced Securities" That Did Not Reflect
<u>Post 4:00 PM ET Market Moving Information</u>**

74.     On August 20, 2002, Chester sent an email to Profit and Omid, which stated as

follows:

> For our strategy, the following can be said:
> 1.  Without the capacity we have nothing.
> 2.  Hence, to try our best to keep our capacity is clearly the most important.
> 3.  <u>Our return and our models are NOT based on us taking market views; they are based on us taking advantage of mispriced securities (in our case, mutual funds). To pretend any different is stupid.  Even Jafar [Omid] has admitted that the value of us trying to predict positive momentum is a lot less valuable than capturing our edge.</u>
> 4.  We can't have it both ways.  We can't expect to do really well in a bear, whipsaw environment by adopting one strategy and then do really well in an upward drifting bull market.

(Dunnigan Decl. Ex. 69, underline added.)

75.     On July 18, 2002, TW&Co. broker Scott Christian sent an email at 4:27 PM ET to

Quang Tran listing companies that were coming out with earnings announcements that night.

(Dunnigan Decl. Ex. 70.)

76.     PCM knew that NAV's were published on Bloomberg between 5:15 p.m. and

6:00 p.m.  (Dunnigan Decl. Ex. 163)

**PCM Attempted to Cover Up Its Late Trading
After the Mutual Fund Market Timing and
<u>Late Trading Scandal Broke in September 2003</u>**

77.     On September 3, 2003, the New York Attorney General ("NYAG") announced a

settled enforcement action against hedge fund Canary Capital Partners, LLC for violations of the

New York State Martin Act through, among other things, late trading of U.S. mutual funds.

State Investigation Reveals Mutual Fund Fraud (Sept. 3, 2003) (available at

http://www.ag.ny.gov/media_center/2003/sep/sep03a_03.html).  In the weeks thereafter, the

NYAG and the Commission announced numerous additional enforcement actions involving

abusive mutual fund trading practices. See generally Appendix B to the Commission's

Opposition to Defendants' and Relief Defendant's Motion to Compel (collecting Commission

enforcement actions) (docket no. 75-2).

     78.    Chester and other PCM employees were aware of the Canary Capital settlement

the day it was announced.  (Dunnigan Decl. Ex. 71.)

     79.    On September 4, 2003, PCM Research & Development Department employee

Matthew Ember sent an email to Omid, the rest of PCM's Research & Development Department,

and PCM's capacity team memorializing a conversation he had with a competitor called "East

Rock."  (Dunnigan Decl. Ex. 72.)  The email stated in part as follows:

> They [East Rock] couldn't believe such a large player as [Edward] Stern [of Canary
> Capital] would engage in such blatant illegal practices.  When they were at Haidar
> "some shady guy would occasionally call up" and make them dodgy offers of
> capacity or late trading in return for inducements, but they always said no (of course!)
> as it was clearly illegal.  They knew someone must have been willing to do those
> sorts of deals but were surprised it was such a prominent player.

     80.    On September 18, 2003, Doron Cohen from Gems Investment Research sent an

email to Chester, which stated as follows:

> Our investor committee asked me to request from you a letter stating what we
> discussed the other day.  That Pentagon was not engaged in late trading or any other
> illegal activity.  Likewise, that you are not under investigation by the FSA or any
> other regulatory body.

(Dunnigan Decl. Ex. 73.)  Chester responded to the email as follows: "not a problem."  (Id.)

     81.    Later the same day, Chester sent Cohen a "comfort letter."  (Dunnigan Decl. Ex.

74)

82.     The "comfort letter" was a form letter that PCM used in the wake of the NYAG's

announcement of the Canary Capital late trading settlement and subsequent announcements of

additional enforcement actions involving late trading and market timing of mutual funds that

stated as follows:

> To Whom it May Concern
>
> PENTAGON CAPITAL MANAGEMENT
>
> We are writing to you in order to make certain representations and warranties that you
> have requested and that we are happy to affirm.
>
> We confirm the following:
>
> 1. Pentagon Capital Management PLC (PCM), the investment advisor to Pentagon
> Special Purpose Fund Ltd. and its wholly-owned subsidiaries (PSPF), is a regulated
> investment advisor in the UK.  We are regulated by the Financial Services
> Authority (FSA), and our regulatory membership number is 189239, category:  B3.
>
> 2. As a regulated entity, we do not engage in any practices which are illegal or
> contrary to the rules and regulations of our regulator, the FSA.
>
> 3. To the best of our knowledge, all arrangements that PCM have entered into on
> behalf of PSPF are with other regulated asset management firms, investment
> advisors, brokers or similar regulated investment firms.  To the best of our
> knowledge, all such arrangements are in accordance with the relevant rules,
> regulations, investment prospectuses, and/or any other such relevant documentation
> relating to the investment(s) concerned.
>
> 4. To the best of our knowledge, PSPF has not entered into any arrangements with
> any
> other regulated asset management firms, investment advisors, brokers or similar
> regulated investment firms which are exclusive or are offered on special terms
> (given the size and nature of the relevant transaction(s)) to Pentagon, or are outside
> of any relevant legal prospectus or otherwise.
>
> 5. We confirm that we currently have no exposure to US Mutual Funds.  In recent
> months, we had a small proportion of our Fund's assets (in the region of 5%) in the
> US Mutual Fund market.  We have no, nor have we ever had, any direct dealings or
> agreements with any US onshore Mutual Fund.  Further, we have never entered into
> arrangements with any US onshore Mutual Fund in order to trade post-4:00pm EST
> for same-day NAV.  All our activities have been placed through reputable,
> regulated broker-dealers or investment advisors in the US under their normal terms

and conditions.

6. We confirm that, as at today's date, we have not been advised of our investment activities being investigated by any regulatory body, whether in the US or elsewhere.

Yours sincerely

Lewis Chester      Jafar Omid

Chief Executive Officer     Director & Compliance Officer
Direct Line:  +44(0)20 7222    Direct Line:  +44(0)20 7299 9933

For and on behalf of
PENTAGON CAPITAL MANAGEMENT PLC

(Dunnigan Decl. Ex. 75, underline added.)

83.      On November 21, 2003, John Rosenheim, an attorney at the U.K. law firm

Denton Wilde Sapte who represents PCM, sent a facsimile to The Sunday Times  about an article

written about PCM and The Sunday Times' plan to publish a further article.  (Dunnigan Decl.

Ex. 76)  The facsimile stated in part as follows:

As far as our client is concerned, it has had no complaint from its own Regulator, the FSA, let alone the SEC.  Moreover, our client has had no notification whatsoever of any investigation or probe from the SEC.  Indeed, over five weeks ago it provided the FSA with a detailed report by PriceWaterhouseCoopers, following a full investigation into its trading operations, in order to ascertain whether there was any breach of FSA Rules or Regulations.  That report confirmed that Pentagon complied with all relevant Rules and Regulations.

Any suggestion by you implying that it has been in breach of any regulations or acted in any way unlawfully, as would be suggested by reference to an SEC investigation, would of course be extremely damaging to it.  As we made clear to you in our letter of 19 September, untrue allegations of this kind could give rise to very substantial financial losses.

In these circumstances, if any defamatory article is published about our client, it reserves its right to take any action necessary to recover such losses from you.

**James Wilson of TW&Co. Accused Chester of Feeling**
**Paranoia, Pressure, and Guilt Regarding Late Trading**

84.     On March 14, 2003, James Wilson sent an email to Chester, which stated in part

as follows:

> Lastly, there are huge changes in this business as well as serious concerns.  Read the
> papers! . . .
>
> We have made more money for you than you would have been able to make for
> yourself.  It is times like these where I question the choices made with your accounts
> when others tell me I am being undervalued and underpaid.  It has made me draw
> lines and make choices that I would nonetheless make again.  In the end you have
> made more money and that is how IT should be.  <u>You have created paranoia, pressure
> and guilt in your head that is associated with me and makes me sad and not happy.</u>  I
> am very careful – who I call friend these days and loyalty is worth more than money .
> . . . Until we speak again . . . .

(Dunnigan Decl. Ex. 77, underline added.)

85.     Chester testified that this email was a result of the "constant love/hate relationship

going on, normally to do with fees principally or him wanting me to do something and I'm not

wanting to do it, and him sort of bringing personal loyalty-type issues or so forth."  (Chester

Dep. Jan. 17, 2011 Tr. 38, Dunnigan Decl. Ex. 4.)

**Defendants' Own Expert Witness Testified**
**That It Is Not Reasonable to Rely Upon a Broker**
**Who Is Falsifying Trading Records and Agreed**
**With Many Allegations in the Amended Complaint**

86.     Defendants have proffered Professor Jonathan Macey of Yale Law School as an

expert witness regarding trading in mutual fund.  In response to questioning from defense

counsel, Professor Macey testified that, "generally speaking," customers of broker-dealers had "a

right to rely on what the broker tells them as to how orders should be executed."  (Macey Dep.

Tr. 208, Dunnigan Decl. Ex. 78.)  Professor Macey further testified, however, that there were

exceptions to this – in particular, if the customer knows that the broker is acting in bad faith, or

that the information provided by the broker is erroneous, the customer is *not* entitled to rely upon the broker or broker-dealer.  (Macey Dep. Tr. 208-09.)

87.     Professor Macey agreed with the statement found in paragraph 16 of the Amended Complaint: "Typically, the U.S. mutual funds in which the Pentagon Fund traded calculated the prices of their shares as of the close of the New York Stock Exchange ("NYSE"), normally 4:00 p.m. ET."  (Macey Dep. Tr. 92, Dunnigan Decl. Ex. 78.)

88.     Professor Macey agreed with the statement found in paragraph 19 of the Amended Complaint: "In order for U.S. broker-dealers to serve as dealers for a particular mutual fund company's funds, and thereby sell the company's mutual fund shares to their customers, U.S. broker-dealers – and/or their respective clearing broker(s) – typically enter into dealer agreements with the distributors, or principal underwriters, of various U.S. mutual funds." (Macey Dep. Tr. 93, Dunnigan Decl. Ex. 78.)

89.     Professor Macey agreed with the statement found in paragraph 20 of the Amended Complaint: "Dealer agreements typically required the broker-dealers to sell the U.S. mutual funds in accordance with the federal securities laws and the terms of the mutual funds' prospectuses."  (Macey Dep. Tr. 94, Dunnigan Decl. Ex. 78.)

90.     Professor Macey agreed with the statement found in paragraph 21 of the Amended Complaint:  "U.S. mutual fund prospectuses state the terms on which the particular U.S. mutual fund offers securities to its investors."  (Macey Dep. Tr. 94, Dunnigan Decl. Ex. 78.)

**PCM Never Sought Legal Advice Regarding Late Trading**
**Even Though PCM Had U.S. Counsel That PCM Dealt With Regularly**

91.     PCM retained U.S. lawyer Jack P. Governale, Esq., initially of Wolf, Block, Schorr and Solis-Cohen LLP and later of KMZ Rosenman LLP, to establish Pentagon Fund and the Delaware LLCs through which PCM traded U.S. mutual funds.  (Governale Dep. Tr. 18,

Dunnigan Decl. Ex. 79.)  Mr. Governale is an expert in aspects of the U.S. securities laws.  (<u>Id</u>. at 78.)

92.     Mr. Governale estimated that from 1999 through the Fall of 2003, PCM paid his firms' legal bills of between $2-3 million.  (Governale Dep. Tr. 29, Dunnigan Decl. Ex. 79.) Governale performed both corporate work, such as assisting the formation of new funds managed by PCM, as well as advising PCM and Pentagon Fund.  (<u>Id</u>. at 18.)  Additionally, when PCM had a dispute with a U.S. mutual fund, PCM turned to Governale for legal advice. (Dunnigan Decl. Ex. 60.)

93.     PCM never asked its U.S. counsel for a legal opinion regarding late trading or market timing.  (Chester Sept. 23, 2010 Tr. Pg. 213.)  Mr. Governale testified that "the trading deadlines for mutual funds generally is the close of the trading day 4 o'clock."  (Governale Dep. Tr. 76., Dunnigan Decl. Ex. 79.)

94.     PCM never saw a legal opinion from any law firm regarding late trading. (Chester Dep. Sept. 23, 2010 Tr. 215., Dunnigan Decl. Ex. 3.)

95.    The law firms that Defendants identified as having provided legal opinions concerning trading of U.S. mutual funds never had PCM as a client.  (Dunnigan Decl. Exs. 80 & 81.)

Dated: New York, NY
March 16, 2011

                          _____/s/_____
                          Christopher Dunnigan (dunnigancj@sec.gov)
                          Paul G. Gizzi (gizzip@sec.gov)
                          John C. Lehmann, Jr. (lehmannj@sec.gov)

                          Attorneys for the Plaintiff

                          SECURITIES AND EXCHANGE COMMISSION
                          New York Regional Office
                          3 World Financial Center, Suite 400
                          New York, NY  10281
                          (212) 336-1100