UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X

SECURITIES AND EXCHANGE COMMISSION,

               Plaintiff,                   08 Civ. 3324

  -against-                              OPINION

PENTAGON CAPITAL MANAGEMENT PLC and
LEWIS CHESTER,

               Defendants,

  -and-

PENTAGON SPECIAL PURPOSE FUND, LTD.,

               Relief Defendant.

------------------------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiff

        SECURITIES AND EXCHANGE COMMISSION
        New York Regional Office
        3 World Financial Center, Suite 400
        New York, NY 10281
        By:  Paul G. Gizzi, Esq.
             Christopher J. Dunnigan, Esq.
             John C. Lehmann Jr., Esq.

        Attorneys for Defendants

        PEPPER HAMILTON LLP
        Hamilton Square
        600 Fourteenth Street, N.W.
        Washington, DC 20005-20004
        By:  Frank C. Razzano, Esq.
             Ivan B. Knauer, Esq.
             Matthew D. Foster, Esq.

TABLE OF CONTENTS

I. Prior Proceedings...........................................2

II. Findings of Fact..........................................3
     A. The Parties ..........................................3
          1. The Plaintiff....................................3
          2. The Defendants...................................4
          3. The Relief Defendant.............................6
     B. The Operation of Mutual Funds ........................6
     C. Market Timing .......................................10
     D. Late Trading ........................................18
     E. Market Regulation ...................................20
     F. Market Timing by PCM ................................27
     G. Late Trading by PCM .................................45

III. Conclusions of Law......................................76
     A. The Applicable Standard .............................76
     B. The SEC Has Not Established Liability for Defendants'
        Market Timing ........................................81
     C. Defendants Engaged in Fraudulent Late Trading .......98
     D. Aiding and Abetting Liability .......................112

IV. Damages and Injunctive Relief............................113
     A. The Claims for Relief are Not Time Barred ..........113
     B. Injunctive Relief ..................................114
     C. Defendants and Relief Defendant are Jointly and
        Severally Liable ....................................116
     D. Disgorgement .......................................118
          1. The Standard for Disgorgement..................118
          2. Disgorgement of $38,416,500 is Ordered.........119
     E. Civil Penalties of $38,416,500 are Imposed .........124

V. Conclusion...............................................126

**Sweet, D.J.**

On April 3, 2008, the Securities and Exchange Commission ("Plaintiff" or "SEC") commenced the instant enforcement action against defendants Pentagon Capital Management PLC ("PCM" or "Pentagon"), Lewis Chester ("Chester") and relief defendant Pentagon Special Purpose Fund, Ltd. ("PSPF") (collectively, the "Defendants"), alleging that PCM and Chester had orchestrated a scheme to defraud mutual funds in the United States through late trading and deceptive market timing in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder. In the alternative, the SEC asserted a claim of aiding and abetting violations of Section 10(b) and Rule 10b-5. The following findings of fact and conclusions of law result from the evidence presented at the bench trial and all the prior proceedings. Based on the findings and conclusions, the Court grants in part and denies in part the relief sought by the SEC and will enter judgment providing injunctive relief, disgorgement of $38,416,500 and civil penalties of $38,416,500.

1

PCM, a British hedge fund, traded the shares of mutual funds from 1999 through September 2003 on the New York Stock Exchange.  This trading included two practices challenged by the SEC in this action as securities violations, namely, market timing and late trading.  The issues surrounding these practices are complicated and controversial as evidenced by the eighteen witnesses and the many hundreds of exhibits presented by the able and skilled counsel.  The entire record establishes that the Defendants did not violate the securities law by pursuing a strategy of market timing, but did violate the securities laws by engaging in late trading, thereby entitling the SEC to judgment.

## I.  PRIOR PROCEEDINGS

This case was initiated by the SEC on April 3, 2008. (Dkt. No. 1.)  On August 1, 2008, Defendants filed a motion to dismiss.  (Dkt. No. 11.)  On September 9, 2008, the SEC filed an amended complaint (Dkt. No. 15), and on October 8, 2008, Defendants again moved to dismiss (Dkt. No. 23).  That motion was heard on December 3, 2008, and by an opinion of February 9, 2009 it was denied.  SEC v. Pentagon Capital Management PLC, 612 F. Supp. 2d 241 (S.D.N.Y. 2009).

On March 16, 2011, the SEC moved for partial summary judgment.  (Dkt. No. 92.)  That motion was heard on April 5, 2011 and denied in open court and then by memo endorsement on April 22, 2011 (Dkt. No. 141).

Beginning on April 12, 2011, the bench trial was conducted over seventeen days, ending May 4, 2011.  The eighteen witnesses included: Professor Lawrence Harris, Samuel Engelson, Scott Christian, Lewis Chester, Carl Heppenstall, Seth Gersch, Thomas Feretic, Philip Hetzel, Said Haidar, Matthew Perrone, Justin Ficken, Dino Coppola, Gregory Trautman, Professor Jonathan Macey, Dr. Anthony Profit, Edward Stern, Conrad Ciccotello, and Jafar Omid.

Final argument was heard on September 27, 2011.

## II.  FINDINGS OF FACT

### A. The Parties

#### 1.   The Plaintiff

3

The SEC is the federal agency, established following the stock market crash of 1929, that is charged with enforcing federal securities laws and regulating the national securities markets.

2.   The Defendants

In the 1980's Jafar Omid ("Omid") and David Chester, defendant Chester's father ("Chester, Sr."), were partners in an accounting firm in the United Kingdom and formed a wealth management advisory firm, Booth Anderson Investment Services, which traded European mutual funds using a dynamic asset allocation strategy.   The term "dynamic asset allocation" is a British or European term for what Americans called "market timing."

The strategy sought to generate profits based on buying and selling mutual funds as markets moved up or down. Chester, Sr. believed that as markets were moving up, investors should be invested in equity mutual funds, and when markets were moving down, they should be invested in cash.  To assist in this determination, Chester, Sr. developed a basic statistical analysis.

4

In 1998, Chester joined the firm and Chester, Sr. retired for health reasons.  Until 2003, Chester served as PCM's Chief Executive Officer.  Chester is a graduate of the University of Oxford in England, the College of Law in London, and the Harvard Business School.  He is also qualified as a solicitor in England and Wales and, prior to joining PCM, Chester summered at the law firm White & Case in the United States and worked for three years as an international corporate attorney at the London law firm Linklaters & Paines.

Following Chester Sr.'s departure, the business continued under the name Pentagon Capital Management.  Chester and Omid soon thereafter hired a team of mathematicians to computerize Chester, Sr.'s original methodology.  Using these computer models, PCM traded unitized collective investment trusts, i.e., European mutual funds, in the European markets.

The models were developed by performing a regression analysis which compared European mutual funds to various indices such as the Nikkei and FTSE 100.  When the model found that a fund tracked an index or indices, the fund would become a candidate for trading, since a correlationship between the

5

performance of the fund and the performance of an index provided a predictive value as to the fund's future price movement.

As each fund was analyzed and found to track a particular index or indices, it would be added to a basket of similar funds. At the end of each day, the computer model would provide a signal indicating whether the funds in each basket should be bought, sold or held depending on how it tracked against the correlated index or indices. That signal - buy, sell or hold - was then communicated to PCM's brokers.

### 3.   The Relief Defendant

PSPF is an international business company incorporated in the British Virgin Islands. In connection with trading U.S. mutual funds, PCM formed three Delaware limited liability companies (Pentagon Investment Partners, LLC, Pentagon Management Partners, LLC, and Pentagon Performance Partners, LLC), of which the PSPF was the sole member and manager. From 1999 to 2003, PCM was PSPF's investment advisor responsible for making its trading decisions.

## B. The Operation of Mutual Funds

6

Mutual funds consist of a basket of underlying equity holdings, and, as such, their value fluctuates as a function of the change in the value of the underlying shares.  Professor Lawrence Harris, an SEC expert ("Professor Harris"), accurately described mutual funds and their operation.  Portions of his report (SEC Ex. 420) follow:

> Mutual funds are investment companies whose sole purpose is to invest in securities on behalf of their shareholders.  The directors of investment companies hire investment managers, who are paid out of the assets of the fund, to manage the company.  The investment managers choose the securities held by the mutual fund.  The securities typically are publicly traded stocks or bonds issued by corporations or governmental agencies.  The shareholders of a mutual fund are its investors.  Mutual funds are called pooled investments because mutual fund investors pool their money together for management by a professional manager.
>
> 　　　　　　　* * *
>
> When investors want to buy fund shares, the fund issues new shares in exchange for cash deposited by the investors.  When existing investors want to sell their shares, the fund redeems (repurchases) those shares by paying the investors cash in exchange for their shares.  The directors of open-end mutual funds hire distribution agents to help arrange and settle their trades.  The distribution agent is generally a company affiliated with the investment manager.
>
> The managers of an open-end fund, or agents hired by the fund, set the prices at which the deposit and redemption transactions occur.
>
> 　　　　　　　* * *

The managers (or their agents) generally set the deposit and redemption price at their best estimate of the value of a share in the mutual fund, which is called the fund's net asset value (NAV).  The aggregate net asset value of the fund is the total value of the fund's assets, less any liabilities that the fund may have.  Funds compute their NAV by dividing the aggregate net asset value by the total number of mutual fund shares outstanding.

For example, suppose that Mutual Fund ABC owns 100 shares of Stock A and 200 shares of Stock B.  If Stocks A and B were respectively valued at $20 and $40 per share, the total net asset value of the fund would be 100 x $10 + 200 x $40 = $10,000.  If the mutual fund had 400 shares outstanding, the NAV of the fund would be $10,000 ÷ 400 = $25 per share.

Suppose a new investor buys 200 shares of Fund ABC at $25 per share.  After the transaction, the total net asset value of the Fund will increase by $5,000 to $15,000 and the total shares outstanding will increase to 600 shares.  However, the NAV of the fund will remain at $25 = $15,000 ÷ 600 dollars per share.  The NAV of a fund following a deposit or redemption transaction does not change if the transaction price takes place at the NAV.

\* \* \*

Deposit (investor purchase) and redemption (investor sale) transactions in open-end mutual funds are always executed after the normal closing time of the stock and bond markets.  In general, traders must place their orders before 4:00 PM Eastern Time.

The fund's NAV is generally computed from last trade prices recorded as of 4:00 PM Eastern Time.  If the fund managers believe that the last observed price of a security held by the fund does not fairly represent its current value, the managers may specify a different price.  This process is called fair valuation.

\* \* \*

8

Managers who fair value their portfolios risk choosing the wrong prices for their securities. For example, although the best estimate of the 4:00 PM value of Stock B in the example above, made on the basis of movement of similar stocks, may be $40.40, Stock B might actually be worth $40 because some negative news specific to Stock B counteracted the market-wide price rise. If so, the use of a $40.40 estimate of the value of Stock B would cause the NAV of the fund be too high. Any purchasers of the fund would receive too few shares and any sellers would receive too much cash.

When computing NAVs, managers rarely specify prices different from last observed prices for their portfolio securities because they are afraid of the mistakes, and thus the associated liability, that may result from fair valuation. They prefer to use last observed prices because the computation of NAVs based on such prices does not require any judgment. Although the failure to fair value a portfolio commonly creates NAVs that inaccurately value their funds, managers generally have not been concerned about the liability associated which such mistakes because the principle of valuation based on last observed prices is objective and well accepted.

* * *

Fund managers must set the price at which they allow investors to transact at their best estimate of the NAV to ensure that they treat all shareholders fairly. These shareholders include purchasers, sellers, and the vast majority of shareholders who on any given day merely retain their shares. If purchasers could buy shares for less than they are worth, the purchasers would profit and the retaining shareholders would lose. The purchasers would profit and the retaining shareholders would lose because the proportionate increase in the number of shares in the mutual fund would be greater than the proportionate increase in the total value of the fund's assets. The retaining shareholders suffer dilution because the purchasing shareholders contribute less to the fund than their proportionate share of ownership.

9

* * *

As noted, when setting NAVs, fund managers also must be mindful of sellers as well as purchasers and retaining shareholders.   If investors could sell shares for more than their worth, they would gain at the expense of the retaining shareholders.   The selling investors would gain by avoiding a loss, because the shares that they tendered would be less valuable than the cash that they would receive in exchange.   The retaining shareholders would lose because the proportionate decrease in the number of shares in the mutual fund would be less than the proportionate decrease in the aggregate value of the fund's assets.   The retaining shareholders would suffer dilution because the selling shareholders would have taken out more than their proportionate share of the value of the fund.

## C. Market Timing

As the Second Circuit has described:

"Market timing" refers, _inter alia_, to buying and selling mutual fund shares in a manner designed to exploit short-term pricing inefficiencies. A mutual fund sells and redeems its shares based on the fund's net asset value ("NAV") for that day, which is usually calculated at the close of the U.S. markets at 4:00 P.M. Eastern Time. Prior to 4:00 P.M., market timers either buy or redeem a fund's shares if they believe that the fund's last NAV is "stale," _i.e._, that it lags behind the current value of a fund's portfolio of securities as priced earlier in the day. The market timers can then reverse the transaction at the start of the next day and make a quick profit with relatively little risk.

Mutual funds . . . that invest in overseas securities are especially vulnerable to a kind of market timing known as "time zone arbitrage," whereby market timers take advantage of the fact that the foreign markets on

which such funds' portfolios of securities trade have
already closed (thereby setting the closing prices for
the underlying securities) before the close of U.S.
markets.   Market timers profit from purchasing or
redeeming fund shares based on events occurring after
foreign market closing prices are established, but
before the events have been reflected in the fund's
NAV. In order to turn a quick profit, market timers
then reverse their positions by either redeeming or
purchasing the fund's shares the next day when the
events are reflected in the NAV.

SEC v. Gabelli, 653 F.3d 49, 53 (2d Cir. 2011) (citations

omitted).


        Professor Harris accurately described the practice of

market timing.   Portions of his report follow:


    Market Timing Strategies

    Some traders can occasionally estimate a fund's NAV
    more accurately than can the fund managers.   When such
    traders expect that a fund's computed NAV likely will
    be less than its actual NAV, they will buy the fund.
    If they are correct, they will profit when the NAV of
    the fund eventually rises to its correct value. This
    strategy is called market timing, and such traders are
    called market timers.   The market timing strategy can
    also work in reverse.   If market timers own fund
    shares that they believe will be overvalued by the
    fund, they will sell their shares to avoid losses that
    they would otherwise incur when the NAV eventually
    drops to its correct value.

    Market timing causes the retaining shareholders to
    experience dilution.   The profits that market timers
    earn when buying, and the losses they avoid when
    selling, reduce the returns that the other
    shareholders obtain from their fund investments.

                            11

Market times generally are short-term traders. They usually sell their positions within a week of acquiring them, though some market timers may wait longer for an opportunity to profitably exit the fund. While invested in a fund, market timers may hedge their positions in the futures markets to reduce the risks of fund ownership. For example, a market timer may sell S&P 500 Index futures contracts while invested in a large cap equity index fund. If prices fall, the profits on the short futures contract position will offset losses from the mutual fund investment. If prices rise, the profits from the mutual fund investment will offset the losses from the short futures contract position.

To protect their shareholders from market timers, many funds have adopted various policies designed to prevent market timing. These policies may restrict the number of trades that investors may make in a fund, or they may impose minimum holding periods for investors. These policies do not harm long term investors that the funds seek to serve, but they discourage or prevent short-term trading by market-timers.

* * *

Identifying Market Timing

Mutual funds most often misvalue their portfolios when prices are changing rapidly. The uncertainty associated with large price changes makes their valuation problems difficult.

For example, mutual funds that hold portfolios of international stocks must value these portfolios as of 4:00 PM Eastern Time. At that time, the home markets in which these stocks trade generally have been closed for 5 to 16 hours, depending on their locations. Accordingly, the prices last observed in these market often are quite stale. If significant events occur after these markets close, the last closing prices in these home markets will not reflect the effects of these events on security values until the markets next open. Many such events also affect U.S. securities

12

markets.      Market    timers    therefore    often    buy
international    mutual    funds    (U.S.-domiciled    mutual
funds that invest in international securities) when
the U.S. markets rise substantially more than the
foreign markets that closed earlier.   Market timers
may also buy when the U.S. markets rise in response to
news that was disseminated after the foreign markets
closed.   Although international mutual funds sometimes
fair value-adjust their NAVs to avoid this problem,
the    adjustments    often    are    not    large    enough.
Accordingly,   market   timers   often   buy   international
funds   on   days   when   their   NAVs   rise   with   the
expectation that NAV will rise again on the next day.

The international mutual funds generally correct these
misvaluations   on   the   next   day,   after   they   have
observed    new    prices    in    the    foreign    markets.
Accordingly,   market   timing   trades   in   such   funds   often
show profits by the next trading day.

These    comments    suggest    that    three    characteristics
identify market timing:

a.    High frequency, short-term trading;

b.    Purchases   on   days   when   market   indices   and
      reported NAVs rise and sales on days when market
      indices and reported NAVs fall;

c.    Extraordinary    profits    on    purchases    and
      extraordinary avoided-losses on sales that, on
      average, accrue the next day but which cease to
      accrue after that day.

Any of these characteristics is indicative of market
timing.   When all are found together, they strongly
indicate market timing.

(SEC Ex. 420.)

As Professor Harris accurately described at trial, market timing harms long-term fund investors by diluting the value of their shares:

Q.  Can market timing and late trading have an effect on the value of other investors' shares of the mutual funds in which such trading takes place?

A.  Yes.  This is called dilution . . . . [S]uppose that the mutual fund has decided that its shares are worth $10 a share, and it is willing to allow investors to buy those shares for $10 a share.  But for whatever reason suppose in fact that those shares are actually worth . . . $11 a share.  So anybody who can buy those shares at $10 is receiving $11 in value.  So if no transactions take place . . . the existing shareholders will eventually get the full value of their shares, which is to say that tomorrow prices will rise to $11 if the information becomes revealed and the existing shareholders will profit to the full extent of that rise.  If, however, the fund allows new shareholders to buy . . . at $10 a share, those new shares will participate in the increase in the value of the fund . . . [which] means that the existing shareholders will have to share their gains with the new shareholders.  That process is called dilution because there are now more shares that will share in the gain to the fund as the funds' value rises from 10 to 11.  Note though that the new shareholders, they will be buying at $10 a share, something that is worth 11.  So they will make a profit from this transaction.  The profit comes from the other shareholders, and . . . . their profit is exactly equal to the losses from the existing shareholders . . . . So that is dilution on a purchase.

On the sale, let's set up that situation as a similar circumstance.  So once again, let's assume that the fund believes its shares are worth $10 a share but in fact . . . the actual value of the fund is now $9.  So anybody who can sell their shares on that information will be able to make a dollar a share of losses

14

avoided. So they will avoid losing a dollar when the
fund drops from $10 to, presumably, $9 the next day.
So if nobody sells their shares, then those losses
will be distributed evenly over all the existing
shareholders. But if some of the shareholders are
able to sell, they will receive $10 of something that
is actually only worth $9, which it means that all of
the other shareholders will have to share the losses -
- they will share the total amount of the losses, but
now there are fewer of them and so their loss per
share will be greater than it otherwise would be. The
losses that the exiting shareholders avoid will be
losses that the remaining shareholders will incur and
that, again, is called dilution although in this case
it seems to work backwards. But, again, it is a loss
to the existing shareholders. So the ability to do a
market timing strategy . . . in which you can buy
shares at a price less than their actual value or sell
shares at a price above their actual value, that
process causes dilution and losses to the other
shareholders . . . .

(Tr. 99-102.)


In addition, as the Court of Appeals has recognized:


[M]arket timing can harm long-term investors in the
fund by raising transaction costs for a fund,
disrupting the fund's stated portfolio management
strategy, requiring a fund to maintain an elevated
cash position to satisfy redemption requests, . . .
resulting in lost opportunity costs and forced
liquidations . . . unwanted taxable capital gains for
fund shareholders and a reduction of the fund's long
term performance.


Gabelli, 653 F.3d at 53 (citations and internal quotations and

15

alterations omitted); see also Janus Capital Group, Inc. v.
First Derivative Traders, -- U.S. --, 131 S. Ct. 2296 (2011)
(finding that market timing "harms other investors in the mutual
fund."); SEC v. PIMCO Advisors Fund Mgmt. LLC, 341 F. Supp. 2d
454, 458 (S.D.N.Y. 2004) ("[M]arket timing . . . can also harm
investors . . . by increasing trading and brokerage costs, as
well as tax liabilities, incurred by a fund and spread across
all fund investors . . . [and] market timing may also hinder the
ability of mutual fund managers to act in the best interest of
fund investors who seek to maximize their long-term investment
gains."); First Lincoln Holdings, Inc. v. Equitable Life
Assurance Soc'y, 164 F. Supp. 2d 383, 390-94 (S.D.N.Y. 2001)
(discussing the detrimental effects of market timing on long-
term mutual fund investors).

As testified by Professor Jonathan Macey ("Professor
Macey"), one of the Defendants' experts, market timing was
ubiquitous during the 1999 through 2003 time period. (Tr.
1466.) Professor Conrad Ciccotello ("Professor Ciccotello"),
one of the Defendants' experts, testified that mutual fund
complexes knew of market timing, and that 40 of the 80 largest
mutual fund families had at some point entered into capacity
agreements, whereby they permitted market timing by certain

16

investors. (Tr. 1869-72.) See also PIMCO Advisors Fund Mgmt., 341 F. Supp. 2d at 460-61 ("According to the SEC investigations, press reports, allegations in complaints, and expert commentary, many mutual fund companies engaged in huge volumes of undisclosed transactions with Canary and other market timers during the period at issue.")

Mutual funds sought to uncover and reject trades by market timers. The industry termed this effort "kick outs." Three mutual fund witnesses testified at trial and four by deposition about the steps taken to restrict market timers and to bar their trading. (Carl Happenstall (American Century) Tr. 874-91; Philip Hetzel (Federated) Tr. 1036-42; Matthew Perrone (Dryfus) Tr. 1166-71; Barbara Sleiman (Evergreen) Dep. Tr. 30-33, 60-64; Ellen Bradley (MFS) Dep. Tr. 6-7, 10, 40-60, 78, 91-92, 190-91, 196-8, 213-17; John Mari (Janus) Dep. Tr. 122-23; Henry Brennan (Alliance Capital) Dep. Tr. 27-8, 33-35, 63-4, 73, 95, 115-9, 124.)

The prospectuses of many of the funds traded by the Defendants contained provisions granting the funds the right to reject trades considered by the funds to be market timing trades. (SEC Ex. 420A-499.)

17

## D. Late Trading

Professor Harris accurately described the practice of late trading. Portions of his report follow:

The Late Trading Strategy

Traders must submit orders to trade open-end mutual funds before 4:00 PM if they want the orders filled on that day. Orders submitted after 4:00 PM are late orders. Brokers are supposed to hold late orders for execution on the next trading day. Late trading results when brokers allow late orders to execute on the same day instead of the next day.

* * *

Late trading is an extreme form of market timing. It can be very profitable when traders know that their late orders will be executed on the same day. Funds compute the NAVs that they use to price deposit and redemption orders from security prices last observed as of 4:00 PM. If values subsequently change, these NAVs would no longer reflect the actual value of the funds. Late traders who submit buy orders when values rise after 4:00 PM tend to profit from buying undervalued funds because the NAVs of those funds tend to rise on the next day. Those who submit sell orders when values fall after 4:00 PM tend to avoid losses from holding overvalued funds because the NAVs of those funds tend to fall on the next day. In both cases, their profits and losses-avoided result in dilution to the other shareholders, for the same reasons described above in the discussion of market timing.

Events that convey material information about security values often occur after 4:00 PM. For example, many corporations and governmental agencies deliberately

18

wait until after the 4:00 PM close of the normal trading session to release significant news. Traders who observe these announcements sometimes can infer that prices will change substantially on the next day. Late traders thus pay close attention to these news events to determine whether, and how, they will affect values.

Trading in equity index futures contracts and in some securities continues after the 4:00 PM close of the regular trading sessions at US equity markets. The futures markets continue to trade until 4:15 PM. Many equity index futures contracts resume trading at 4:30 PM and continue to trade throughout the night. Many equity markets have extended trading sessions in which traders can continue to trade stocks in electronic trading sessions from 4:00 PM until 5:30 PM or later.

Trading after 4:00 PM in these contracts and securities can be quite active when traders respond to significant news first released after 4:00 PM. Late traders thus do not need to interpret news events to trade successfully. They simply follow price changes in these after-hours markets. When those prices rise, the value of mutual funds that hold similar assets will also rise. Late traders thus tend to buy mutual funds when the prices of securities and contracts have risen significantly after 4:00 PM. They tend to sell funds when prices have fallen significantly after 4:00 PM.

(SEC Ex. 420.)


     Almost all mutual funds require that trades be placed by 4:00 p.m. ET in order to receive that day's NAV. The SEC submitted 82 mutual fund prospectuses from the relevant time period, covering 116 mutual funds late traded by Defendants, which required that trades be placed by 4:00 p.m. ET in order to

receive that day's NAV.   (SEC Exs. 419A, 420A, 421-499.)

Additionally, three witnesses from mutual funds testified at

trial that 4:00 p.m. ET was the order deadline (Carl Heppenstall

(American Century) Tr. 870, 873, 892-893; Philip Hetzel

(Federated) Tr. 1046-7, 1050-3; Matthew Perrone (Dryfus) Tr.

1173-6, 1203), as did five witnesses by deposition submitted at

trial.   (Barbara Sleiman (Evergreen) Dep. Tr. 84-85; Ellen

Bradley (MFS) Dep. Tr. 24-29, 209-10, 218-9; John Mari (Janus)

Dep. Tr. 35-36, 69-70; Henry Brennan (Alliance Capital) Dep. Tr.

70, 119, 120; Ira Cohen (AIM) Dep. Tr. 89-90; Stephen Adamsky

(Ivy) Dep. Tr. 94-99.)


## E. Market Regulation


On October 16, 1968, the SEC announced the adoption of

Rule 22c-1 under the Investment Company Act, 17 C.F.R. §

270.22c-1.   Rule 22c-1 provides that "[n]o registered investment

company issuing any redeemable security . . . shall sell,

redeem, or repurchase any such security except at a price based

on the current net asset value of such security which is next

computed after receipt of a tender of such security for

redemption or of an order to purchase or sell such security."

17 C.F.R. § 270.22c-1.   "The rule is commonly referred to as the

20

'forward pricing rule' because the price assigned to mutual fund shares is not assigned until after the time an order is placed by an investor.   The rule creates a requirement that the price of mutual fund shares be set at the NAV 'next computed' by the mutual fund company after the receipt of the order to buy or sell the shares in question."   SEC v. Simpson Capital Mgmt., Inc., 586 F. Supp. 2d 196, 202 (S.D.N.Y. 2008).

At the same time it adopted Rule 22c-1, the SEC issued a release entitled "Adoption of Rule 22c-1 Under the Investment Company Act of 1940 Prescribing the Time of Pricing Redeemable Securities for Distribution, Redemption, and Repurchase, and Amendment of Rule 17a-3(a)(7) Under the Securities Exchange Act of 1934 Requiring Dealers to Time-Stamp Orders" (the "Adopting Release").   See Release No. 5519, 1968 WL 87057 (Oct. 16, 1968). (SEC Ex. 72.)   The Adopting Release provides in part as follows:

> One purpose of Rule 22c-1 is to eliminate or reduce so far as reasonably practicable any dilution of the value of outstanding redeemable securities of registered investment companies through (i) the sale of such securities at a price below their net asset value or (ii) the redemption or repurchase of such securities at a price above their net asset value. Dilution through the sale of redeemable securities at a price below their net asset value may occur, for example, through the practice of selling securities for a certain period of time at a price based upon a previously established net asset value. This practice

21

permits a potential investor to take advantage of an
upswing in the market and an accompanying increase in
the net asset value of investment company shares by
purchasing such shares at a price which does not
reflect the increase. . . .

Another purpose of Rule 22c-1 is to eliminate or
reduce so far as reasonably practicable other results,
aside from dilution, which arise from the sale,
redemption, or repurchase of securities of registered
investment companies and which are unfair to the
holders of such outstanding securities. The
Commission believes that the practice of selling
securities for a certain period of time, at a price
based upon a previously established net asset value,
encourages speculative trading practices which so
compromise registered investment companies as to be
unfair to the holders of their outstanding securities.
This pricing practice allows speculators to buy large
blocks of such securities under circumstances where
the net asset value of the securities has increased
but where the increase in value is not reflected in
the price. The speculators hold such securities until
the next net asset value is determined and then redeem
them at large profits. These speculative trading
practices can seriously interfere with the management
of registered investment companies to the extent that
(i) management may hesitate to invest what it believes
to be speculators' money and (ii) management may have
to effect untimely liquidations when speculators
redeem their securities. . . .

1968 WL 87057, at *1-*2.


In addition to announcing the adoption of Rule 22c-1,

the Adopting Release also announced that, as a companion

measure, the SEC was amending Rule 17a-3(a) under the Securities

Exchange Act of 1934, 15 U.S.C. § 78a et seq., which sets forth

the types of records that broker-dealers must make and keep, to

require all broker-dealers to maintain records of orders from customers showing, _inter alia_, the time the orders are received. 17 C.F.R. § 240.17a-3(a).   The Adopting Release provided as follows:

> In order to implement Rule 22c-1 under the Investment Company Act, the Commission, as a companion measure, has determined to adopt an amendment of Rule 17a-3(a)(7) under the Securities Exchange Act to require dealers, when selling securities to, or buying securities from, a customer, other than a broker or dealer, to stamp on the memorandum of order the time of receipt. Brokers are already subject to such requirement under subparagraph (a)(6) of Rule 17a-3.

1968 WL 87057, at *3.


On December 27, 1968, and again on January 9, 1969, the SEC staff issued a Staff Interpretive Position (the latter updating the former) regarding the adoption of Rule 22c-1 and the Commission's October 16, 1968 Release discussed above.  See Staff Interpretive Positions Relating to Rule 22c-1, Release No. 5569, 1968 WL 87104 (Dec. 27, 1968) (SEC Ex. 73); Staff Interpretive Positions Relating to Rule 22c-1, Release No. 5569, 1969 WL 96373 (Jan. 9, 1969) (SEC Ex. 74).  Both versions of the Staff Interpretive Position contain a hypothetical to the effect that orders to trade U.S. mutual funds at the current day's NAVs have to be received before the funds' pricing times.

23

The January 9, 1969 Interpretive Position, issued at a time when the New York Stock Exchange closed at 3:30 p.m. ET, provided as follows:

> The following examples are intended to illustrate how the pricing provisions apply:
>
> The fund prices at 1:00 p.m. and 3:30 p.m.
>
> > (a) A dealer receives a customer's order before 1:00 p.m. The 1:00 p.m. price would be applicable and the dealer should assure that the order is received by the underwriter prior to 3:30 p.m.
> >
> > (b) A dealer receives a customer's order after 1:00 p.m. but before 3:30 p.m. The 3:30 p.m. price would be applicable and the dealer should assure that the order is received by the underwriter prior to the close of the underwriter's business day.
> >
> > (c) A dealer receives a customer's order at 4:00 p.m. ET. The 1:00 p.m. price on the next business day would be applicable and the dealer should assure that the underwriter receives the order prior to 3:30 p.m. on such next day.

1969 WL 96373, at *2 (SEC Ex. 74).

In an April 2001 letter, the SEC's Associate Director and Chief Counsel of Investment Management, Douglas Scheidt, noted the prevalence of market timing strategies designed to capitalize on mispricing. See Letter from Douglas Scheidt, Assoc. Dir. and Chief Counsel, Div. of Inv. Mgmt., U.S. Sec. and

24

Exch. Comm'n, to Craig S. Tyle, Gen. Counsel, Inv. Co. Inst., 2001 SEC No-Act. LEXIS 543 (Apr. 30, 2001) available at http://www.sec.gov/divisions/investment/guidance/tyle043001.htm. The letter emphasized that mutual funds have a fiduciary duty to protect investors from any loss of value due to these strategies and evidenced that the Commission knew of these timing strategies.  The letter gave no indication that the SEC intended to prohibit such strategies and proposed no regulatory action to prevent or deter market timing.

On September 3, 2003, the New York Attorney General ("NYAG") announced a settled enforcement action against hedge fund Canary Capital Partners, LLC ("Canary Capital") for violations of the New York State Martin Act through, among other things, late trading of U.S. mutual funds.  Chester and other PCM employees were aware of the Canary Capital settlement the day it was announced. (SEC Exs. 61, 62, 103; see also, SEC Ex. 522 (August 21, 2003 email from Matthew Embler, PCM employee, to Frank Bristow, head of trading at PCM, Omid, Anthony Profit ("Profit"), head of research and development for PCM, and PCM's Capacity Team, saying "Talked about Spitzer, and Stern giving up capacity following the subpoena.  Sounds like a main focus of the investigation is the unfair advantage from late-trading

(maybe Scott at TWC was being straight with us after all?).
Stern's plight is letting [competitor Goodwin Trading] pick up a
lot of capacity, because for obvious reasons (Goodwin is an ex-
Stern guy) they're already well connected with the same broker
networks!").)

Stephen M. Cutler, then director of the SEC's Division
of Enforcement, testified in 2003 before the Senate Subcommittee
on Financial Management that a written examination of 88 of the
largest mutual fund complexes in the country revealed that more
than 50% of the mutual fund groups had "one or more arrangements
with certain shareholders that allow[ed] these shareholders to
engage in market timing." Mutual Funds: Trading Practices and
Abuses that Harm Investors: Hearing Before S. Subcomm. on Fin.
Mgmt., the Budget and Int'l Sec., Comm. on Gov't'l Affairs,
108th Cong. 11-12 (Nov. 20, 2003) (statement of Stephen M.
Cutler, Dir., Div. of Enforcement, U.S. Sec. and Exch. Comm'n)
("Cutler Testimony").

Prior to 2003, the SEC had never commenced an
enforcement proceeding against any mutual fund, market timer, or
securities firm for market timing.

26

In April of 2004, following the announcement of the Canary enforcement action, the SEC adopted a market timing rule that requires mutual funds to describe in their prospectuses the risks, if any, that frequent purchases and redemptions may present to other shareholders; to state whether or not the fund's board has adopted policies and procedures with respect to frequent purchases and redemptions, and, if not, to provide a statement of the specific basis for the view of the board that it is appropriate not to have such policies and procedures. See Final Market Timing Rule, 69 Fed.Reg. at 22,300. In addition, under the 2004 rule, U.S. mutual funds must describe their market timing policies with particularity as a requirement of registration.         See    SEC    Form    N-1A,    available    at http://www.sec.gov/about/forms/formn-1a.pdf.

## F. Market Timing by PCM

In 1999 Chester was introduced to an American at Chronos Asset Management, from whom he learned that market-timing techniques were employed in the United States. (Tr. 479-80.) After this conversation, Chester began trading in mutual funds, using market timing techniques as described above, through CIBC, a U.S. broker-dealer. The broker utilized by PCM

27

at CIBC was Michael Sassano ("Sassano").   Sassano had an assistant, James Wilson ("Wilson").   (Tr. 483-84.)

In 2000, Wilson left CIBC and obtained employment at Paine Webber.  At Paine Webber, he acquired an assistant named Scott Christian ("Christian").  (Tr. 490.)

At Paine Webber, Wilson and Christian facilitated their customers' market timing strategies in a number of ways, including making a series of purchases with small ticket amounts, such as $150,000 or $300,000, with the intention of not drawing too much attention to the size of the overall purchase. (Tr. 212-13.)  Wilson and Christian also kept PCM's names off its accounts.  (SEC Ex. 15 (memorandum written by Chester following a May 5, 2000 meeting between Chester, Wilson and Christian stating that Wilson "agreed to code the names of our accounts, so that the Pentagon name does not appear on any of the accounts"); Tr. 495).  Additionally, Wilson and Christian facilitated their customers' market timing strategies by using multiple accounts.  If Wilson and Christian were purchasing a small position and a customer was sending them millions of dollars, there were only so many mutual funds that could be purchased.  Purchasing the same mutual funds by way of multiple

28

accounts enabled them to break down their ticket amounts such as
to avoid detection but nonetheless in aggregate make large
purchases. (Tr. 214.)

While at Pane Webber, Pentagon's accounts were
restricted from trading. In response, Pentagon continued to
trade the same fund families that had restricted their trading
by journaling money to other accounts to be purchased into the
same fund family. Pentagon was aware that Wilson and Christian
were trading the same group of mutual funds among different
accounts. (Tr. 215-16.)

Wilson and Christian were terminated from Paine Webber
in August or September of 2000. (Tr. 224.) Wilson was accused
by a Paine Webber back office employee of attempting to bribe
her in exchange for information about what other brokers at
Paine Webber with market timing clients were doing. (Id.)
Chester testified that he had a different understanding as to
why Wilson and Christian were terminated and that he believed
that Wilson, "in a drunken stupor," made inappropriate comments
to a female employee at Paine Webber. (Tr. 502-03.)

29

On September 25, 2000, Chester sent an email to Michael Sapourn ("Sapourn"), a U.S. trader, saying: "Just wanted to know how the various managers coped with last week. I assume some/all got caught on one day at least. Also, I'm sure you saw the article in WSJ on timers. Interested to hear your views as to whether there might be some repercussions as a result of this." (SEC. Ex. 223.) Sapourn responded that he had noticed that "many" U.S. international fund families (i.e., U.S.-based funds holding international securities) were "trying to stamp out timer activity" and that he was being coached by his brokers "as to when to 'suspend' our activity in order to stay off the radar screens of many of our Fund families. The strong will survive..." (Id. (ellipsis in original)).

After Wilson and Christian were terminated, a different broker, Scott Shedden ("Shedden"), and his assistant, Dino Coppola ("Coppola") took over PCM's accounts at Paine Webber. (SEC Ex. 18.)

In November or December of 2000, Wilson and Christian obtained employment with Trautman Wasserman & Co., Inc., a small New York broker-dealer ("TW&Co."). (Tr. 225.) Christian testified that in searching for a position following his

30

termination from Paine Webber, he and Wilson were "looking for another company to facilitate market timing" and that they found that in TW&Co.  (Id.)

On February 15, 2001, PCM began trading through TW&Co. (SEC Ex. 126.)

Defendants' market timing involved the utilization of multiple broker-dealers, the use of multiple accounts at broker-dealers, keeping trades in small amounts that would avoid detection by mutual funds, and the use of multiple registered representative numbers by PCM's brokers.  This practice was referred to in the marketplace and in this litigation as "under the radar" trading.  As described by Justin Ficken, PCM's broker at Prudential, "'under the radar' is a term that we used as market timers, the phrase was to facilitate trades, to execute trades, to place trades with mutual funds without generating a block or a kick-out by the fund family."  (Tr. 1209.)  Under the radar trading was designed to elude detection by "market timing police," internal employees of investment advisers to mutual funds whose job it was to detect market timers and enforce the policies that the funds had in place.  (Tr. 1211.)

31

On PCM's account opening documents at TW&Co., in response to the question "[d]oes customer object to disclosing his/her name, address and security position to requesting companies in which he/she is a shareholder," a box is checked "yes." (SEC Ex. 235.)

In an email on February 27, 2002, Quang Tran ("Tran"), a principal trader on the PCM trading desk, wrote to Matthew Heerwagen, a broker at Brown Brothers Harriman, as follows:

> When you do enquire with the Fund Families please do not mention our name. Anonymity is very important in Market Timing, the Fund Families should never know who is the underlying client. . . . With regards to the execution I need to be able to place trades as late as possible or close to the cut off point as possible. I'm looking to invest into a few funds in Europe to begin with, not just one fund family. In case they decide to terminate the agreement we wouldn't be reliant on one fund family.

(Ex. 133; Quang Tran Dep. Tr. 127-128.)

In an undated email from Lewis Chester to Christopher Glassman, a broker at Morgan Stanley, Chester stated "[l]ooking at my notes from our meeting, I note that we can put our accounts through Morgan Stanley's trust company, to ensure anonymity. Can you please do this for us on these new accounts." (SEC Ex. 208.)

Wilson and Christian used multiple registered representative numbers, or broker numbers, at TW&Co. YKA was Wilson's registered representative number, and YKB was Christian's registered representative number. Wilson and Christian also used registered representative numbers YKC, YKD, YKF, YKG, YKN, YKO, YLR, YLS, YLT, YLU, YLV, YLW, YLX, YL1, YL2, and YL3 to trade mutual funds at TW&Co. Christian prepared account opening forms for PCM to trade mutual funds using the registered representative numbers. (Tr. 275-80; SEC Ex. 901, 235.) Wilson and Christian used different registered representative numbers on accounts to shield the unitary nature of the accounts. Mutual funds would only see the name "Bank of America"[1] on PCM's accounts at TW&Co., and not Pentagon's name. (Tr. 284-285; SEC Ex. 235, 237.)

PCM opened accounts at U.S. broker-dealers in order to facilitate market timing as follows:

- Brown Brothers Harriman - 2 accounts

- Charles Schwab - 2 accounts

---

[1]    Various Bank of America entities are referred to by the parties, including but not limited to Banc of America Securities LLC. For ease, all are denoted as "Bank of America" here.

- Concord – 39 accounts

- Investex – 13 accounts

- JP Morgan – 4 accounts

- Morgan Stanley – 16 accounts

- Murjen – 2 accounts

- CIBC/Oppenheimer – 11 accounts

- Paine Webber – 21 accounts

- Prudential – 30 accounts

- Solomon Smith Barney – 10 accounts

- Trautman Wasserman – 67 accounts

- Wall Street Discount – 12 accounts.

(SEC Dem. Ex. 1.)


Chester was aware that mutual funds blocked PCM's
trading.  On one occasion at TW&Co., PCM wanted to purchase a
significant amount of international equity mutual funds.  The
following morning a good portion of the positions did not get
invested because of the market timing police.  Christian spoke
directly with Chester about this because it was a significant
portion of Pentagon's portfolio, and instead of being invested,
they had to sell out of the fund families.  Chester was

34

disappointed because the market was up on that particular day.
(Tr. 216-17.)

TW&Co. negotiated timing capacity primarily with the Janus mutual fund complex. Gregory Trautman ("Trautman"), President and CEO of TW&Co., knew Warren Lammert, one of the earliest portfolio managers at Janus. (Tr. 272-73.) As Christian testified when asked to describe the negotiated capacity:

> Well, it was -- we didn't have to deal with the market timing police. We were not dealing with kick-outs. The fund was allowing us to trade their funds. They acknowledged who we were and they were allowing us to trade within certain parameters, meaning we couldn't just trade every day but our traders weren't typically doing that anyway, so they were openly allowing us to trade, to mark time their funds, despite what a prospectus might state.

(Tr. 273.)

In a May 3, 2001 email Chester also inquired about using annuities because several other brokers were using annuities and were having success trading mutual funds through annuities because they were not being kicked out of the funds. (SEC Ex. 868; Tr. 298.)

35

On August 30, 2001, Chester sent an email to Trevor Rose ("Rose"), the head of PCM's Trading & Dealing Desk, and Omid, the Chief Operating Officer of PCM, suggesting that "we start swapping stuff around as we get chucked from funds." (SEC Ex. 207.)

On November 6, 2001 and March 1, 2002, Putnam Investments sent kick out letters to Christian that referenced accounts at TW&Co. that held Putnam mutual funds. (Tr. 285-288; SEC Ex. 243, 236.)

On November 28, 2001, Christian sent an email to PCM to advise that the First American mutual fund complex had "hard rejected" trades in seven PCM accounts, meaning that the trades were blocked and the accounts frozen from any further exchanges. (SEC Ex. 233; Tr. 298-301.) Christian sent a similar email on October 26, 2001 concerning different mutual fund complexes, including AIM and Sun America. (Defs. Ex. 159.)

Barbara Donegan ("Donegan") worked at Olympia Capital, the fund administrator for PSPF. Donegan opened accounts for PCM at U.S. broker-dealers only when directed to do so. Donegan took instructions from personnel at PCM to open accounts, not

36

from U.S. broker-dealers.   Donegan testified that she was in daily contact with individuals at PCM.   Documents that Donegan sent to U.S. broker-dealers indicated that the various LLCs that were on the names of PCM's accounts were composed of a single member, PSPF.   (Barbara Donegan Dep. Tr. 13-14, 19-22, 24-29, 32-111, 131-33; SEC Ex. 680-718.)

Christian sent Chester an email on July 1, 2002 indicating that PCM should not trade mutual funds on July 3 or July 5 because the those are low volume days and "on low volume days, it is easier for the funds to track us." (SEC Ex. 249; Tr. 288-90.)

In May 2002, Chester proposed using PSPF share classes C and D interchangeably to trade Janus midcap fund pursuant to TW&Co.'s capacity agreement.   (Tr. 291-94; SEC Ex. 686.)

On June 7, 2002, Christian sent Chester an email with the subject line "thought you might be interested."   Christian copied a story from a website, entitled "Market Timing Costs Funds $4 billion a Year," into the body of the email.   The story indicated that "the NAVs that international funds (mutual funds holding international equities) calculate at 4:00 p.m. EST are

37

based on securities prices that are half a day old," and that "[t]imers take advantage of that because they can predict whether the funds' underlying securities will rise or fall the following day. International markets usually perform the same way U.S. markets did the day before." (SEC Ex. 624.)

On July 30, 2002, Chester sent instructions to at least one broker that "I NEVER want to see the words 'Market Timing' on any correspondence, e-mail, telephone call etc. If you want to label what we do with something, call it 'dynamic asset allocation', but never market timing!" (SEC Ex. 231.)

In one email dated July 30, 2002, Chester wrote that "[w]e can assume a certain level of kickouts, but nevertheless tough to be close to exact." (SEC Ex. 226.)  Similarly, Dr. Profit, head of PCM's Research and Development Department, ran a trading analysis assuming that PCM suffered from a 25-50% kick out rate.  (SEC Ex. 407; Tr. 1708-10.)  While Profit testified that he did not conduct a study to reach this rate, his assumption, as PCM's head of Research and Development, was an educated and knowledgeable estimate.

38

In August 2002 Christian sent fifteen Bank of America account agreements to Donegan for her to open five new accounts for each of PSPF's classes A, B and C.

On August 20, 2002, Chester sent an email to Profit, CC'ing Omid, that states:

> For our strategy, the following can be said: . . . Our return and our models are NOT based on us taking market views, they are based on us taking advantage of mispriced securities (in our case, mutual funds).  To pretend any different is stupid.  Even Jafar has admitted that the value of us trying to predict positive momentum is a lot less valuable than capturing our edge.

(SEC Ex. 59.)

On October 4, 2002, Chester had an email exchange with Christian in which Christian indicated that Invesco had "captured," or frozen, all of Pentagon's accounts that were trading the Invesco technology fund. (Defs. Ex. 59; Tr. 301-303.)

On October 31, 2002, Chester wrote an email about a hedge fund known as "Spire/Tower."  Chester stated that "[h]is ticket sizes have decreased and therefore his number of trades have also increased substantially in recent years - as we would

39

expect for someone trading under the radar screen. And he uses
various sub-entities to place the deals – i.e., like our LLCs."
(SEC Ex. 209.)

On December 27, 2002 Chester sent Christian an email
inquiring whether a mutual fund complex had kicked Pentagon out,
which Christian understood to be asking whether "we were no
longer allowed to trade the fund because we got kicked out by
the mutual fund timing police." (SEC Ex. 250, Tr. 290-91.)

On January 15, 2003, Rose asked Donegan to complete a
document for CIBC World Markets that provided that all
transactions pursuant to the agreement shall be subject to the
regulations of all applicable federal, state and self-regulatory
agencies, including but not limited to the SEC.  (SEC Ex. 698.)

On March 19, 2003, Tran sent an email to Donegan
asking that when she received paperwork to open Pentagon
accounts at Prudential Securities in New York, she "play around
with the name" on the accounts "so instead of Pentagon
Management Partners can you call it Management Partners and on
the second line write C/o PSP I've found out by change the

40

format this confuses the Fund Company and they're unable to detect who we are for a good few months." (SEC Ex. 703.)

Tran also wrote in a March 19, 2003 email that he had forwarded to Donegan account opening forms to open five accounts with Wall Street Discount, and that Donegan should "mark the first line c/o Olympia, and then the second line as normal." (SEC Ex. 703.)

Two PCM internal emails refer to under the radar trading as "Stealth Trading" in the context of PCM's research into the practices of other market timers.

On July 9, 2003, Matthew Ember ("Ember"), a trader at PCM, sent an email to Chester, Anthony Profit ("Profit"), head of the PCM Research and Development Department, and Omid describing a conversation he had with a hedge fund known as "Axiom." Under the heading "Stealth/distribution," Ember wrote:

> Use many small tickets (a couple of hundred k)
> Understand 'hot spots' for fund companies, often by
> explicitly asking them(!) - result is low kickout rate
> of 2-3% (same as before)
> Have about 12 clearers/platforms - same as before –
> nothing has tightened / no problems in this area.

(SEC Ex. 210.)

On July 31, 2003, Ember sent an email to Directors and Research & Development entitled "Quick summary:  US 'bottom feeders' doing pure long-only International under the radar," which described a hedge fund known as "Blackpoint," to which Chester directed investments on behalf of the fund-of-funds, Talisman.  (SEC Ex. 217.)  Under the heading "Stealth," Ember described Blackpoint's trading as "[j]ust small ticket sizes, trial and error, etc. (didn't mention anything original that we've heard elsewhere, like phoning up the fund companies and asking them)."  (Id.)  The same day, Chester replied to Embler's email, saying "obviously, after each of these, put them on the file."  (Id.)

On August 5, 2003, Chester received a memorandum discussing market timing hedge funds from a European banker. Chester's response was "[n]ote: no mention of Pentagon anywhere. This means either one of two things: i) we really are well below the radar screen, which is good news (!) or ii) he's not as knowledgeable about the sector as he professes (!!)."  (SEC Ex. 203).

On August 22, 2003, Ember sent an email to Chester, Omid, and Research & Development describing a conversation with the hedge fund NettFund. Ember wrote "Entirely international, small tickets, under the radar (average $250k tickets, means about 250 trades on a full go in day), lots of different entities, etc." (SEC Ex. 199.)

The Defendants were aware that their trades had been rejected or that they were kicked out of the Oppenheimer Funds, Ivy Funds, Goldman Sachs Funds, Sentinel Funds, Federated Funds, Van Kampen Funds, First American Funds, Pilgrim Funds, ING Funds, Putnam Asia Pacific Growth Funds, Putnam Europe Equity Funds, Evergreen Funds, Seligman Funds and Defendants continued trading in these funds after these "kick outs." (SEC Ex. 256, SEC Dem. Ex. 11 (Oppenheimer); SEC Exs. 642-46, Tr. 1252, SEC Dem. Ex. 28 (Ivy); SEC Exs. 858 & 867, SEC Dem. Ex. 30 (Goldman); SEC Ex. 282, SEC Dem. Ex. 15 (Sentinel); SEC Ex. 373, SEC Dem Ex. 26 & 27 (Federated); SEC 233, SEC Dem. Ex. 9 (First American); SEC Ex. 108, SEC Dem. Ex. 5 (Pilgrim); SEC 748, SEC Dem. Ex. 18 (ING); SEC Ex. 291, SEC Dem. Ex. 20 (Putnam); SEC Ex. 343 & 748, SEC Dem. Ex. 22 (Evergreen); SEC Ex. 345, SEC Dem. Ex. 23 (Seligman).) Defendants were further aware that

43

they were kicked out of the AIM funds for market timing. (SEC Ex. 234, 677, 678, 679, 839, 840, 841, 842.)

SEC witness Samuel Engelson ("Engelson") reviewed TW&Co.'s files and assembled various documents demonstrating both PCM's cloning of accounts to continue trading U.S. mutual funds following kick outs. (Tr. 181-205, 1136-1156, 1755-1760; SEC Ex. 839, 840, 841, 842, 858, 859, 860, 861, 863, 864, 865, 866, 867.)

Between 1999 and 2003, PCM placed a total of 44,488 mutual fund transactions through thirteen U.S. broker-dealers. (SEC Ex. 420, App.3.) These transactions totaled over $14 billion. (Id., Ex. 4.) PCM had an average holding period of three days, and a median holding period of two days. (Id. Ex. 5). Of these transactions, 22,448 were buys totaling over $7,128,391,744 (over $7.1 billion) and 22,038 were sells/redemption totaling $7,178,636,179 (nearly $7.2 billion). (Id., Ex.4).

The Defendants participated in market timing under the radar with knowledge that certain of the mutual funds sought to eliminate the practice.

44

## G. Late Trading By PCM

On March 30, 1999, Chester emailed three PCM employees as follows:

> On the assumption that we will be investing an initial $2m with Morgan Stanley for onward investment in Templeton, the following dealing arrangements have been agreed:-
>
> You will need to contact Graves Kieley by phone (follow up fax) 5 mins before Templeton's dealing cutoff time (which I believe is 9pm[2]). Graves will then place the deal.
>
> Best thing to do is contact Graves directly and talk through the exact procedure with him to ensure no cock-ups. . . . Make sure you have 2 other people to contact and 2 fax numbers, and discuss with Graves worse case scenario - i.e. can't get hold of anyone . . . what do you do?

(SEC Ex. 52).

As found above, in early 2001 PCM began trading through TW&Co. after Wilson and Christian joined the firm.

Wilson and Trautman, the president and CEO of TW&Co., met with Chester to greet him shortly after Wilson joined TW&Co.

---

[2]     This is equivalent to 4 p.m. ET.

There was reference at that meeting to legal advice relating to mutual fund trading. Trautman credibly testified that during that meeting Chester and Wilson discussed that the mutual fund trading business that they were engaged in had been vetted through some sort of legal review. (Tr. 1397-1404.)

PCM first started late trading through TW&Co. on February 15, 2001. Initially, PCM sent its orders to TW&Co. before 4:00 p.m. ET, but was allowed to cancel trades after 4:00 p.m. ET. (Tr. 225-28, 461.) Wilson and Christian sent PCM's late trades to Bank of America via the Mutual Fund Order Entry Processing system ("MFRS"), which was created by the software company Automatic Data Processing ("ADP") to process mutual fund trades (Tr. 225-30). This system was open until 5:15 or 5:30 p.m. ET. (SEC Ex. 10, 11; Tr. 225-26.) TW&Co. soon switched to a system called RJE, which shut down at 6:30 p.m. ET. (Tr. 230; SEC Ex. 6.)

On February 15, 2001, the day PCM began trading through TW&CO., Chester emailed Jack Governale, Esq., ("Governale") of Wolf, Block, Schorr, & Solis-Cohen LLP, PCM's U.S. counsel. The subject of the email concerned PCM's attempt to sell shares of three Federated mutual funds through Wall St.

46

Discount Corp. ("WSDC"), an effort which was frustrated by WSDC's failure to honor a redemption request.    The email contains the following:

> Please note that I have instructed Wolf Block Schorr Solis-Cohen to liase with Justin Morcom at Wall Street Discount Corp. in respect of positions we have with Federated mutual funds.
>
> In brief, we put in a redemption request to withdraw our funds from Federated on Tuesday afternoon <u>before the fund's cutoff dealing point</u>. . . . Wall Street Discount have informed us that Federated ignored our redemption request and kept us invested in the funds, without giving good reason.
>
> On Wednesday afternoon, <u>before the fund's cutoff dealing point</u>, another redemption request was placed by Wall Discount Corp. Once again, this was ignored by Federated and they kept us invested in the funds, without giving good reason. . . .
>
> I have asked Justin Morcom to put Federated on notice of our intention to take legal action against them, and to elicit ** address/person to write to in respect of this matter. I have also asked Justin to write a statement for Wolf Block outlining the facts of this matter.   I have also instructed them to continue placing redemption requests with Federated so as to mitigate our losses.
>
> Jack Governale, on behalf of Wolf Block, will project manage the proceedings.
>
> Regards,
> Lewis

(Defs. Ex. 92 (emphasis added).)

Chester testified that that he did not recall anything about the February 15, 2001 email, sending this document, or the circumstances surrounding the dispute between PCM and the Federated Funds. (Tr. 485-7; Chester Dep. Tr. 237.)

Likewise, Governale testified that that he did not recall this February 15, 2001 email or the circumstances surrounding it. (Governale Dep. Tr. 75-7.) When asked what the phrase "fund's cutoff dealing point" referred to, however, Governale testified as follows: "The trading deadline for mutual funds generally is the close of the trading day 4 o'clock." (Id. at 76.)

Wilson and Christian had Excel spreadsheets on their computer that captured all the positions that PCM owned. The spreadsheets were set up with a "from" symbol, indicating the mutual fund, the account number, and a "to" column with the symbol that they were trading into with the share amount or quantity listed. Wilson and Christian printed the spreadsheets every day on behalf of PCM to be prepared for their orders. (Tr. 230.)

48

On April 5, 2001, Chester sent an email to Wilson and Christian at 7:31 a.m. GMT (i.e., 2:31 a.m. ET), with the subject header "After Hours Trading." It states as follows:

**AFTER HOURS TRADING INSTRUCTIONS**

I have spoken to my R&D people regarding a procedure for going IN, OUT or cancelling an IN or OUT on any given night, as per our telephone conversation last night.

Lets [sic] us know what the current cutoff time is (5:30pm NY time?) and when you'll have the 6:30pm facility - I think you told me it will be available from Monday???

The procedure we are thinking of putting in place is as follows (subject to speaking this through to Trevor):

- Trevor's team will give you a single figure on the S&P future (e.g. 1320), at or around the close

- If the future exceeds (for an IN) or falls below (for an OUT) - see examples below - after hours, then try to get hold of one of us by telephone

- If you can't get hold of us, then do the corresponding trade

- Send Trevor an e-mail letting him know what you've done

Example 1

Before the close, we go IN/stay IN on all/some baskets.
Trevor calls at 4pm and tells you that if the S&P future falls below 1420 before 6:30pm NY time, to call us.
The future falls to 1418.50.
You try to call us.

49

You can't get hold of anybody.
You CANCEL all our trades, and send Trevor an e-mail
telling him what you've done.

Example 2

Before the close, we go OUT/stay OUT on all/some
baskets.
Trevor calls at 4pm and tells you that if the S&P
future rises above 1420 before 6:30pm NY time, to call
us.
The future rises to 1421.
You try to call us.
You can't get hold of anybody.
You go IN on all baskets, and send Trevor an e-mail
telling him what you've done.

My R&D team is building an application for Trevor's
team to spew out the requisite S&P future figure each
night for you. We should be able to be up and running
on this within a day or two.

(SEC Ex. 1.)


        At 10:25 a.m. GMT, approximately three hours after

sending SEC Ex. 1 with the late trading instructions to TW&Co.,

Chester circulated an email to Omid, the other principal of PCM

and PCM's Chief Operating Officer, as well as to PCM's Trading &

Dealing and Research & Development Departments.   The SEC has

characterized this email as the "smoking gun" email, which

states as follows:


For this week only, TW can place or cancel any trades
up to 5:00pm (10pm UK time). From next week – TR [PCM

50

employee Trevor Rose] to confirm - the time will be
6:30pm (11:30pm UK time).

The significance of this is great.

For instance, last night, the S&P future shot up at
around 9:45pm [4:45 p.m. ET]. Even though we hadn't
placed any trades before 9pm [4 p.m. ET], we STILL
COULD HAVE PLACED THE TRADE after the bell, which we
should have done given the marked rise in the future.

I have been in Jimmy's office. Every day, whether we
do a trade or not, they time-stamp our trade sheets
before 4pm, and then sit on them until they leave the
office, at which point they will process them or not.
Hence, the ability to place a buy order after the
bell, even if we haven't done so before the bell.

I spoke with Jimmy late last night - too late to trade
I'm afraid! We agreed that I would send him some
parameters for switching In or Out of the market after
the bell, in the event that he can't reach any of us.

AP  [PCM employee Anthony Profit]/CK  [PCM employee
Christian Koehl], can you come up with some simple
parameters for this, without giving the game away to
Jimmy re: our models. Please bear in mind we trade D,
E and F baskets with them currently, and that they
might not be able to understand or obtain FV
information.

This facility is VERY VALUABLE and we should utilize
it accordingly.

We missed a big opportunity to trade last night
because nobody was watching the S&P future – Trevor
and I were at the game and I only got home at 10:45pm
[5:45 p.m. ET]. Equally, I never received a text
message saying that the S&P future had gone up
considerably.

Conclusion
1. We fucked up last night.
2. It doesn't matter whether we place trades or not
before the bell, we can do so afterwards, up to
Trautman's time limits

51

3. TR - check with Jimmy when they are extending to 6:30pm[ ET].
4. AP/CK - come up with parameters for Jimmy to trade on our behalf if he can't reach any of us. I will then send him a fax with the instructions.

(SEC Ex. 2.)

Chester testified that "the bell" in the email quoted above referred to the closing bell of the New York Stock Exchange at 4 p.m. ET.   (Tr. 521.)

On April 9, 2001, Chester sent an email to Wilson and Christian stating:

Guys,
1. Did you find out that question re: BofA margin if we get kicked out of a fund?

2. Are you know [sic] able to do trades up to 6:30 p.m. NY time? Please confirm.

(SEC Ex. 3.)

Wilson responded in an email to Chester on April 10, 2001 that states, in part, as follows:

scott [Christian] and i feel that if you are going to use our late trading - "it" (you said) adds a certain

52

percentage of value – we would then like some kind of
system or proposal on how we can make money on this .
. . [because] if we are going to trade later then we
need parameters so we can establish guidelines – im
not staying here everynight without cause – i feel
things are tight allover and there are only so many
places to do this . . so lets be partners or such. . .
cheers

(SEC Ex. 4.)


On April 11, 2001, Chester replied via an email that
states, in part, as follows:


Re: Late Trading

1. We are partners. I have always gone out of my way
to support you. When you went to Paine Webber, we gave
you assets asap, and then when you went to [TW&Co.],
you [sic] gave you assets asap. (When you left PW, you
left me in the shit . . . but I accepted it and got on
with it.)

2. Your facility for late trading is not the only one
we have. In all the other cases, we pay 1% [per
annum].

3.  We pay 2% [per annum] to you and Mike, because
that's what you both wanted and we went along with it,
even though it's double what we pay elsewhere. . . .

4.  All our other brokers are suffering a bit at the
moment.  A number of timers have been having a bad
time of it, and have been forced to withdraw money
from brokers accounts to cover redemptions in their
funds.  Hence, I am getting calls daily from other
brokers asking me "to fill the void" left by other
clients taking money out.  In other words, I have been
giving you money ahead of other brokers who have been
asking for it.  And that's because I want to be your

biggest client, as we had talked about when you left PW.

5. You currently earn 2% [per annum]. This is double what Pentagon earns as a management fee. (Our performance fee reflects the strength or otherwise of our modeling decisions, and hence is as variable as our decisions.) We work all the hours of the day to ensure we do our best for the client. To ask you or Scott, or someone else at [TW&Co.] to cover until 6:30pm each night, really is no big deal. And you know it. Remember, the more money we make, the more fees you earn - 2% of a larger figure. Hence, it's in everyone's interests to ensure we get the later trading times.

I really EXPECT you guys to go out of your way to make sure I get late trading - you're earning double what everyone else takes home on this business - although it's unlikely that we'll need 6:30pm trading every night. . . .

I really want to be your biggest client. I want to be first to try your new products. And I want you to have the best facilities/trading. And that's why I am happy to pay you double what I pay any one [sic] else.

(SEC Ex. 4.)

At trial Chester characterized the email as "negotiating" and stated that he had no other late trading facility and that the 1% statement may or may not have been true. (Tr. 540-41.)

On April 11, 2001, Wilson replied to Chester stating, in part, as follows:

54

> [y]ou guys limit your funds choices and thus restrict
> the business. You do one type of business . . .
>
> we are the only place to trade late past 530- in the
> [U.S.] with any brokers.- fact. ;^)
>
> thus you have to pay more . . .

(SEC Ex. 5.)


On May 1, 2001, Chester sent an email to Wilson and
Christian, stating as follows:

> We're sending you some leverage money - hopefully
> [CIBC] and your lawyer will get off their backside and
> complete the bloody leverage documentation! - for
> domestic funds. Trevor will call you later to discuss.
>
> Hopefully this should stop your endless, pathetic,
> pittiful [sic] moaning that I've been subjected to for
> years.
>
> It does mean you might have to work a little harder .
> . . poor souls, working past cookie and milk time . .
> . for once in your lives, you can work like real men
> and do a proper day's work. (You really are a bunch of
> women of the first order).
>
> Trevor will run through the procedures of how the
> trading is going to work.
>
> In essence, most of it will be done by you within
> certain parameters that we will give you each day. In
> the majority of cases, your decision point will be
> 5:30 pm NY time. In a few cases, your decision point
> will be 6:30 pm - I know, slave labor . . . whatever
> will you do working that late!
>
> When there are close decisions, you'll have a list of
> home / cell numbers for me, Trevor, Jafar [PCM's Chief

Operating Officer] and Anthony [another PCM employee]
(priority in that order) . . . and we'll make the
call. If you can't get through to us, then on a close
decision, you'll need to act like men and make the
call. (Not too difficult really, as it's not your
money!)

(SEC Ex. 6.)

On May 3, 2001, Chester sent an email to Wilson,
Christian, and Rose, which stated in part as follows:

I think Scott [Christian] will need to amend the fee
letter to 2.25%, so that Anne [Harrington] at Olympia
[Olympia Capital, PSPF's administrator] can accrue
properly for the fees. Can you arrange for this to
happen.

(Tr. 297-98, SEC Ex. 868.)

These exchanges establish the importance of the late
trading facility to PCM.

On May 9, 2001, Profit sent an email to Christian at
TW&Co. attaching a document entitled "Notes on Trading Domestic
Technology Funds" that provided more detailed instructions on
how PCM wanted TW&Co. to execute late trades on behalf of PSPF.
Specifically, the document indicated that PCM's trading model

56

"outputs a couple of lines of text at about 16:10 (New York time)," that is, 4:10 p.m. ET.  (SEC Ex. 8.)  The document then provided the following trading instructions for trading U.S. mutual funds holding technology companies' securities:

> [T]he procedure for trading these funds is as follows (all times are New York):
>
> 1. At or around 16:10 [4:10 p.m. ET], the dealing team at Pentagon phone Trautman Wasserman to tell them the output of the model.
> 2. At 17:30 [5:30 p.m. ET], if the condition on the futures is met and the futures are outside the "warning" band, Trautman Wasserman execute the trades - no need to phone Pentagon.
> 3. At 17:30, if the condition on the futures is not met and the futures are outside the "warning" band, no trades executed - TW can go home!
> 4. At 17:30, the futures are in the warning band, Trautman phones Lewis [Chester] at Pentagon, or the list of phone numbers that Trevor [Rose] will supply for further instructions, which might include waiting for another hour.

(SEC Ex. 8.)

On June 8, 2001, Rose sent an email to Christian attaching a "revised list of instructions for TW."  The new instructions modified the prior "Notes on Trading Domestic Technology Fund" as follows:

> If Pentagon is unreachable and the futures are in the warning band at 18:30 [6:30 p.m. ET], then Trautman should take a half position. So if we're going in to

the market, put half the funds in. If we're coming
out, take half out.

(SEC Ex. 9).

Sometime in late 2001, likely after August (Tr. 337-
39), Sassano left a voicemail for Chester stating the following:[3]

Hey Louis, it's Sassano. Uhm, Listen, here's the
scenario. Uhm. I don't care what Trevor or what
Jimmy's touting you as his time for cut off or
whatever it is, Bank of America is closing off their
deal with the guy. Alright? You wanna tell him that I
said so, go right ahead, but I would prefer you not.

You know, we'll take care of your trades the way you
want. If you guys don't want to trade with us, that's
okay too.   But uhm, you know, I don't need those, your
guys busting my guys balls. Alright? So uhm, come on
down here.   Let me explain to you the way this thing
works these days.   I'll, I'll make it nice n' cheap
for you. I mean there's no big deal, and there's no
rush, and there's no hurry and there's no problem.
But uhm, trust me, this 8:30 trading crap that he's
got going on .  .  . He's, I'll explain the scenario
later.  Just stand clear and don't try to pressure
anybody to do something stupid, cause pressuring us is
the wrong move.

(SEC Ex. 19.)  Chester received this voicemail (Tr. 558-63)

and Christian testified that Chester played it for him (Tr.

338-39, 428-32).

---

[3]    There is some conflict over whether any part of the tape containing the
voicemail was deleted.  (Tr. 2169-73.)

Between May 14, 2001 and June 16, 2002, Tran at PCM typically sent one-sentence emails to Christian at TW&CO., usually shortly after 4:00 p.m. ET, describing what the parameters for PCM's late trades that evening would be. (SEC Ex. 12 (compiling such emails).)

Prior to receipt of these emails, Christian would time-stamp potential trade sheets based on PCM's existing position. PCM's trades were either from an equity mutual fund to a predetermined bond or cash fund (in the case of sells), or from a bond or cash fund to a predetermined equity fund (in the case of a buy). Thus, Christian was able to create trade sheets reflecting PCM's potential trades before 4:00 p.m. ET. (Tr. 231.)

Both SEC and Defense witnesses explained that one of the advantages to late trading is that PCM could see what various companies' post-4:00 p.m. ET corporate announcements were released and the resulting movements in the futures markets. (Tr. 97, 247, 1336, 1680; SEC Ex. 60.)

59

Chester's calendar contains a March 11, 2002 entry with the following: "Gigi re: getting Haidar's Prospectuses." (SEC Ex. 39.) Chester's calendar contains an April 2, 2002 entry with the following: "Haidar Conference Call." (SEC Ex. 40.) Haidar refers to Said N. Haidar, the principal of two investment adviser entities, Haidar Capital Advisors, LLC (collectively, "Haidar"). A PowerPoint presentation sent by Haidar to PCM provided examples of Haidar's trading strategy, noting that trades in U.S. mutual funds must be made by 4:00 p.m. ET. (SEC Ex. 41 at 7-8.)

Chester and other PCM employees, acting through a fund-of-funds investment vehicle named "Talisman," directed investments into three Haidar hedge funds, including the Haidar Jupiter Shorty Equity Fund. The prospectus for the Haidar Jupiter Short Equity Fund contained in Defendants' files contains the following concerning late trading:

> Mis-pricings arise for a variety of reasons. For example, open-ended mutual funds, which allow purchase by 4PM Eastern Time for same-day Net Asset Value, value their portfolios at the last traded price on a major stock exchange.

(SEC Ex. 44 at 4-5.)

PCM, via Talisman, invested in another hedge fund, NetFund Offshore Fund, managed by NetFund, Inc., which stated in its offering memorandum contained in Defendants' files that trades in U.S. mutual funds had to be made by 4:00 p.m. ET to receive that day's NAV. (SEC Ex. 45.). On July 12, 2002, Omid sent an email to Chester forwarding that offering memorandum. (SEC Ex. 45.)

On March 21, 2002, Chester sent an email to a number of PCM personnel, analyzing an academic article entitled "The Wildcard Option in Transaction Mutual Fund Shares," Draft 00-03, published by the Wharton School at the University of Pennsylvania, by Professor Roger M. Edelen of the Wharton School, Professor John M.R. Chalmers of the Lundquist College of Business at the University of Oregon, and Professor Gregory B. Kedlec of the Pamplin College of Business at the University of Virginia Tech (the "Wharton Article") which stated that most funds accept trade up to the 4 p.m. close of the market. (SEC Ex. 31.)

On April 10, 2002, Chester received an email from Professor Andre Perold, a former professor of his at Harvard Business School, attaching an academic article by three

61

professors at the Yale School of Management, William Goetzmann, Zoran Ivkovich, and K. Geert Rouwenhorst, entitled "Day Trading International Mutual Funds: Evidence and Policy Solutions." (SEC Ex. 38.)   The article states, in part, as follows:

> [T]ime-zone differences create a special dilemma for U.S. mutual funds that invest in foreign securities. Consider a U.S. mutual fund invests in Japanese equities, most of which are not cross-listed in the U.S. Suppose the fund wants to determine the NAV in dollars (U.S.D.) of its shares as of 4PM Eastern Standard Time (EST) to settle the buy and sell orders it receives during the day. [FN1]
>
> > FN1. Among other reasons, 4PM EST is desirable because it allows fund companies to transfer investor wealth among its funds on the same day.
>
> Which prices should the fund use to compute the value of its Japanese holdings? One option is to take the Yen closing prices from the Tokyo Stock Exchange (TSE) and use the Yen/U.S.D. exchange rate that prevails at 4PM EST to compute the dollar value of the portfolio. The TSE closes at 1 AM EST, about nine hours before the opening New York Stock Exchange (NYSE). Therefore, this pricing rule effectively allows U.S. investors to purchase or sell shares in the fund during NYSE trading hours at prices determined at least fifteen hours earlier.

(SEC Ex. 38.)   Chester wrote an eight point, two-page email analyzing this article and forwarded it to Profit.   (Defs. Ex. 32.)   Chester's analysis of this article did not address the fact that the article states that investors can purchase or sell shares during NYSE trading hours.

62

On April 30, 2002, an entry in Chester's personal calendar from Profit reflects an entry entitled "Zitzewitz Discussion." (SEC Ex. 34). "Zitzewitz" refers to Prof. Eric Zitzewitz, a professor at the Stanford Graduate School of Business, who wrote multiple articles between 1999-2004 regarding market timing of U.S. mutual funds. (See SEC Exs. 36 & 37.)

On May 10, 2002, Profit created a 10-page analysis memorandum entitled "Mid-Cap models" that specifically attempts to replicate the results from the Zitzewitz 2000 and 2002 Articles for the purpose, among others, of back testing actual models and investigating hedging strategies. (SEC Ex. 35.) The references to Zitzewitz 2000 and 2002 Articles refer to articles entitled "Daily Mutual Fund New Asset Value Predictability and the Associated Trading Profit Opportunity" (Zitzewitz, February 2000) and "Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds" (Zitzewitz, March 2002). (SEC Ex. 36, 37.)

The March 2002 Zitzewitz Article states:

Almost all U.S.-based mutual funds calculate daily net asset values (NAVs) using the most recent price data

63

as of 4 PM Eastern Time (ET) and allow investors to
make trades at the current day's NAV up until 4 PM.

(SEC Ex. 37 at 1.)   The February 2000 Zitzewitz Article states:

A trading strategy designed to take advantage of the
predictability of fund returns would involve buying
when expected future returns are high and selling when
they are low. In practice this would involve checking
the market at 3:55PM each day and switching between
the fund and cash depending on whether expected next-
day returns are high or low. [FN 18]

FN.18 Almost all fund families allow transactions
up to 4:00 p.m. ET; a few even allow one to
cancel transactions after 4:00 p.m. ET but before
NAVs are reported at 5:30 PM.

(SEC Ex. 36 at 12 & n.18.)

On June 19, 2002, Ember memorialized a conversation he
had with Tran about how late trading through TW&Co. worked.   The
email, entitled "Notes on conversion[sic] with QT concerning
evening models etc.," states, in part:

TWC allow late switches until around 23:30 [6:30 p.m.
ET], priced at the close – these domestic and
international trades are useful for catching news
releases just after the close. (Historically, we have
found returns from these to be volatile.)   The
thresholds to go in are emailed to Scott & Jimmy
(brokers at TWCo) although JO [Jafar Omid]/LC [Lewis
Chester] makes the final decision around 23:00 [6:00
p.m. ET].

64

(SEC Ex. 14.)

On July 18, 2002 at 4:27 p.m., Christian sent an email to Tran with the subject line "Earnings Tonight" that listed companies that would be reporting earnings after the time of Christian's email (Allstate, Delta Air, International Paper, Eli Lilly, Philip Morris, Microsoft, Nokia, Nortel, Sprint PCS, Sun Microsystems) because of the effect on the futures markets and PCM's trading decisions. (SEC Ex. 60; Tr. 307-09.)

On April 17, 2002, Chester and Profit participated in a conference call with personnel from The RAM Group, including a former broker from WSDC who had started a market timing fund. PCM's notes of the conference call include the following:

After-hours trading

- There is an SEC letter that "legally allows us to trade until the time that the NAV is actually calculated"
- They've come to direct agreements with fund families to secure late trading.
- Using after-hours trading moves his proportion of profitable trades from 55% to 68%.
- They pulled 3 trades in Jan 2002, saving in the region of 6%.

(SEC Ex. 57.)

At his deposition, Chester testified about this subject matter as follows:

Q:  Did you ever look for an SEC "no action" letter or other SEC publication regarding late trading?
A:  No.

                              ***

Q:  Did Pentagon ever seek a legal opinion regarding the legality of late trading?
A:  No.
Q:  Did Pentagon ever make any attempts to find an SEC "no action" letter - - -
A:  No.
Q:  - regarding late trading?
A:  No, but we - I relayed the information to Jimmy Wilson, because I was in the habit of giving Jimmy information that I learnt in the marketplace and what Eddy [Stern] was doing seemed very much akin to what Jimmy was doing, which was acting as an introducing broker or someone who was inputting trades through a banking system, so I thought it was relevant information for Jimmy. It wasn't necessarily relevant information for Pentagon, because we weren't carrying out what Eddy Stern purported to tell me he was doing.
Q:  What did Jimmy Wilson say when you told him what Eddy Stern had told you?
A:  Umm . . . I don't recall if he said anything in particular but I do recall that Scott Christian called me some time shortly thereafter and had said that a friend of his had found the legal opinion and thanking me for bringing it to his attention. Sorry, not the legal opinion, the SEC "no action" letter.
Q:  Did he send you the SEC "no action" letter?
A:  No.

(Chester Dep. Tr. 211-13.)    At trial, Chester testified that
that PCM never sought legal counsel regarding late trading or
talked to TW&CO.'s compliance department, and never looked for a
no-action letter, nor contacted a mutual fund regarding late
trading.   (Tr. 513, 637, 646.)

At   trial,   Christian   recalled   a   conversation   with
Chester in which Chester recounted a conversation with Stern,
who managed Canary Capital, a U.S. market timing hedge fund.
According to Christian, Chester was told that there was a legal
opinion from a white shoe law firm and that in addition there
was a SEC no-action letter that supported late trading that
PCM's own attorney had.    (Tr. 345, 463-64.)    Chester testified
that Stern had informed him of a legal opinion and an SEC no-
action letter that justified late trading.   (Tr. 651.)

Following this conversation, on or about February 24,
2003, Christian asked a friend who was an attorney to do a
Lexis-Nexis search for the no-action letter and the letter was
sent to Christian.    According to Christian, he by himself or
with Wilson came up with the search terms to find the no-action
letter after speaking with Chester.    Christian provided copies
of the letter to Wilson, and Wilson gave copies to Trautman and,

67

TW&Co. principal, Sam Wasserman. (Tr. 345-48, 352-53; SEC Ex. 784.)

Stern testified that he sought legal advice about late trading between 2000 and 2001 from Rosenman & Colin and that he never waived the privilege as to the advice. (Tr. 1851.) He testified that he did not recall discussing the advice with Chester or that he discussed late trading with anyone outside of Canary Capital, including Chester. (Tr. 1854.)

The totality of the evidence establishes that Stern and Chester did have a conversation relating to late trading and the advice of counsel. Based on the timing of Chester's relationship with Stern, PCM had commenced late trading prior to this conversation. (See Tr. 648-52.)

PCM traded U.S. mutual funds through thirteen U.S. broker-dealers. (SEC Ex. 75.) Of these, eleven required that PCM place their trades by 4:00 p.m. ET in order to receive that day's NAV. (SEC Ex. 20, 909.) PCM discussed late trading with at least five of these broker-dealers (Paine Webber (SEC Exs. 15, 18); CIBC (SEC Exs. 19, 20, 909); Wall Street Discount (SEC Exs. 20, 27, 909, Quang Tran Dep. Tr. 200); Investex (SEC Exs.

68

20, 21, 22, 909); Millennium (SEC Exs. 153, 154) but was not granted it. Others (Prudential (SEC Ex. 17), Solomon Smith Barney/Citigroup (SEC Ex. 20, 909; Quang Tran Dep. Tr. 98), Brown Brothers Harriman (SEC Ex. 20, 28, 909)) told PCM that orders had to be placed prior to 4:00 p.m. ET.

Chester requested late trading from Justin Ficken ("Ficken"), a Prudential broker-dealer, who testified that Chester told him that PCM was late trading with TW&Co. and CIBC/Oppenheimer and that he would give Prudential more assets to manage if Prudential would give PCM late trading. (Tr. 1239-43, 1288.) Ficken additionally discussed these issues with Tran. (Tr. 1243, 1245.)

On August 22, 2002, Chester instructed Tran via email as follows:

> Do you want to phone around First Union and see if you can - discreetly - find out who's dealing with Najjy's account there. Then see if you can set up with them too. They might have late trading?

(SEC Ex. 55.) "Najjy" refers the Najy N. Nasser, the head of another U.K.-based hedge fund known as Headstart

Advisers Ltd. ("Headstart"), which engaged in late trading and market timing of U.S. mutual funds according to an enforcement action against Nasser and Headstart on April 10, 2008, brought shortly after the filing of this action. See Complaint (Dkt. No. 1), SEC v. Headstart Advisers Ltd., 08 Civ. 05484 (S.D.N.Y.) available at http://www.sec.gov/litigation/complaints/2008/comp20524.pd; see also Gabelli, 653 F.3d 49 at 54.

Tran responded to Chester's August 22, 2002 email the same day as follows:

> I've been in touch with First Union aka Wachovia, I spoke to a mutual funds broker there, it seems they are an outfit like pru [Prudential], solly [Salomon Smith Barney] where you have more than 1 broker at that place.
>
> However this guy does have other timers (I didn't use that word with him) and he is keen on wanting to further discuss. He is on holiday and will get back next week to continue this discussion.

(SEC Ex. 56.)

On August 23, 2002, Chester responded as follows:

> good . . . see if you can find out who Headstart are using. Obviously late trading is key . . . don't know

70

how you find out about this without actually saying
it.  No doubt you'll work it out!

(SEC Ex. 56.)


On August 27, 2002, Dr. Christian Koehl ("Koehl"), an
employee in PCM's Research & Development Department, wrote an
email analyzing an article dated July/August 2002 by four
professors at the Stern School of Business at New York
University entitled "Stale Prices and Strategies for Trading
Mutual Funds" (the "Boudoukh Article").  The Boudoukh Article
states the following:

> The buying or selling of mutual funds in the United
> States occurs at the close of trade (i.e., 4:00 p.m.),
> but the reported prices of the underlying assets in
> the fund reflect their last traded priced.

(SEC Ex. 33.)  The Boudoukh Article goes on to state:


> In general, three implementation methods are possible.
> First and foremost, an investor can trade directly
> through the mutual fund complex online (if available)
> or via automated telephone service. The speed of this
> transaction can be as quick as 30 seconds; thus, it
> can be implemented close to the 4:00 p.m. ET
> transaction deadline. Second, an investor can put in a
> trade through a broker. Brokers can also trade close
> to the 4:00 p.m. deadline, but this mechanism has the
> disadvantage of introducing an intermediary into the
> process. Third, a number of online trading firms
> (e.g., Charles Schwab & Company, E*TRADE Group, and
> Ameritrade) allow mutual fund trading. Transactions

71

through these firms are relatively quick and allow
trading across mutual fund families (i.e., the monies
invested are through the online account); however, the
transactions usually involve a fee (between $9.95 and
$29.95) and execution times are sometimes limited. For
example, a number of online trading firms require
notice by 3:00 p.m.

(SEC Ex. 33.)   Koehl's August 27, 2002 email analyzing the

Boudoukh Article made nine points, including the following:

(Tragically) Interesting paper, reads like what could
be a blue print to what we are doing, coming from the
public domain . . . .

The authors state that all trading has to be done by
4pm US time latest. I suppose it is a little
consolation that they haven't heard about late trading
. . . yet!

(SEC Ex. 33.)


On October 3, 2002 Tran sent an email to an Australian

broker-dealer. In the email, Tran stated the following:

Thank you for your email, I'm getting my R&D team to
look at the fund list. In the mean time can you
confirm the cut off time for the funds on the platform
and do I get the same day NAV or the next day NAV.
Typically with a UK Fund Platform we invest at 12 GMT,
with European platforms this varies throughout the day
and the US we have to place orders just before the US
Close at 4pm EST. On all platforms we receive same day
NAV. I assume for Australia we have to place orders
before Market Close.

(SEC Ex. 50.)

At the end of 2002, Coppola left Paine Webber and joined a small broker-dealer in New Jersey, Concord Equity. (Tr. 1328.)  Shortly after Coppola joined Concord, Pentagon opened accounts and began trading U.S. mutual funds through Concord. Defendants engaged in a limited number of late trades through Concord. (Tr. 1332-33.)  On April 30, 2003 Tran emailed Chester, Omid, and Bristow regarding a lunch he had with Coppola.  That email states "Dino informs me we are the only people that have late trading and they only stay late for us ( I think you mentioned this to me before Lewis)".  (SEC Ex. 543; see also SEC Ex. 92.)  Evidence presented demonstrated that Coppola permitted PCM to trade up to 4:20 p.m. ET. (SEC Exs. 20, 909.)

On May 14, 2003, Chester sent an email to Ron Basu, at Lehmann Brothers.  In discussing non-U.S. mutual funds, Chester wrote the following:

> Ron, these work just like the US funds, except dealing time is 3pm London time. If we were able to convince them to allow us to trade at 9pm London time, they would be exactly the same as any US mutual fund.

(SEC Ex. 51.)

73

At his September 23, 2010 deposition, when questioned about academic articles reviewed by PCM, Chester testified as follows:

> Q:   So an academic who is publishing a paper on the market timing of United States mutual funds states that all trades have to be placed by 4 p.m. Eastern Time and doesn't appear to know or even understand the concept of late trading, did that raise any red flags to you?
>
> A:   I understand the concept is not what . . .
>
> Q:   OK. Did point number five raise any red flags for you?
>
> A:   No.
>
> Q:   Why not?
>
> A:   I wouldn't expect an academic to necessarily know every feature of a particular marketplace.
>
> Q:   Would you expect an academic to know the structure of the marketplace?
>
> Mr. Razzano: Objection.
>
> A:   I would expect an academic to be able to analyse statistical numbers and return streams and come up with a view as to the predictability of those return streams and whether they have alpha or not.

(Chester Dep. Tr. 248-49.)  At trial, Chester testified that "I do not expect professors to know the ins and out of a particular marketplace."  (Tr. 588.)

74

Chester and PCM were aware of the 4 p.m. closing time of the NYSE and its significance to the mutual funds and the assignment of NAVs.

Following the announcement of the Canary enforcement action in September of 2003, Chester received a request for a letter stating that "Pentagon has not engaged in late trading or any other illegal activity." (SEC Ex. 63.) Chester responded "not a problem." (SEC Ex. 63.) That same day, September 18, 2003, Chester provided the requested letter, which states that all arrangements PCM has entered into "are in accordance with the relevant rules, regulations, investment prospectus, and/or any other such relevant documentation relating to the investment(s) concerned" and that PCM has "never entered into arrangements with any US onshore Mutual Fund in order to trade post-4:00pm EST for same-day NAV." (SEC Ex. 65.) When prompted by the United Kingdom Financial Services Authority (the "FSA") to produce certain documents and other materials, Defendants did not produce the Sassano voicemail or SEC Ex. 2 (the "smoking gun" email) (SEC Ex. 637; Tr. 2142-43, 2164-66, 2174-77.)

75

Between February 15, 2001, and September 3, 2003, PCM placed approximately 10,052 purchases of open-end U.S. mutual funds through TW&Co., totaling a principal investment of over $3.1 billion. (SEC Ex. 420.) PCM had an average holding period of two days on the purchases. (Id.) PCM realized profits of approximately $38,416,500.00 (approximately $38.4 million) from the U.S. mutual fund trades executed through TW&Co. (SEC Dem. Ex. 31.)

## III.  CONCLUSIONS OF LAW

### A. The Applicable Standard

This action is brought pursuant to Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. Those sections are among the federal securities laws' antifraud provisions that "prohibit the use of fraudulently misleading representations in the purchase or sale of securities." SEC v. Parklane Hosiery Co. Inc., 558 F.2d 1083, 1085 n.1 (2d Cir. 1977).

Section 17(a) of the Securities Act makes it unlawful in the offer or sale of any security, using the mails or an instrumentality of interstate commerce, directly or indirectly

> (1) to employ any device, scheme or artifice to defraud, or

> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

Section 10(b) of the Exchange Act prohibits any person, using the mails or any instrumentality of interstate commerce or the facility of a national securities exchange, from employing, in connection with the purchase or sale of any security, "any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations." 15 U.S.C. § 78j(b). Rule 10b-5 thereunder makes it unlawful for any person, directly or indirectly, by the use of any means or

instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange:

    (a)  To employ any device, scheme, or artifice to defraud,

    (b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (c)  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

> To establish a violation of Section 10(b) and Rule 10b-5, the SEC must "prove that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device."

VanCook v. SEC, 653 F.3d 130, 138 (2d Cir. 2011) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996)); see also SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999); Pentagon Capital Mgmt., 612 F. Supp. 2d. at 258; In re Alstom S.A. Sec. Litig., 406 F. Supp. 2d 433, 474 (S.D.N.Y. 2005); In re Global Crossing, Ltd., Sec. Litig., 322 F. Supp. 2d

319, 336-37 (S.D.N.Y. 2004). Thus, "'[c]onduct itself can be
deceptive, and so liability under § 10(b) or Rule 10b-5 does not
require a specific oral or written statement. Broad as the
concept of deception may be, it irreducibly entails some act
that gives the victim false impression.'" Pentagon Capital
Mgmt., 612 F. Supp. 2d at 261 (quoting United States v.
Finnerty, 533 F.3d 143, 148 (2d Cir. 2008)).


      In the context of the securities fraud statutes,
scienter means the "'intent to deceive, manipulate, or defraud;
or at least knowing misconduct.'" VanCook, 653 F.3d at 138
(quoting First Jersey Sec., 101 F.3d at 1467); see also Ernst &
Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). Scienter
may also be "established through a showing of reckless disregard
for the truth, that is, conduct which is highly unreasonable and
which represents an extreme departure from the standards of
ordinary care." SEC v. McNulty, 137 F.3d 732, 741 (2d Cir.
1998) (citations and internal quotation marks omitted); see also
SEC v. Stanard, 06 Civ. 7736, 2009 WL 196023, at *27 (S.D.N.Y.
Jan. 27, 2009) ("An egregious refusal to see the obvious, or to
investigate the doubtful, may also give rise to an inference of
recklessness. Accordingly, a defendant cannot plead ignorance
of facts where there are warning signs or information that

should have put him on notice of either misrepresented or undisclosed facts." (citations omitted)).   Whether or not such intent existed is a question of fact.   First Jersey Sec., 101 F.3d at 1467 (citation omitted).

"Essentially the same elements are required under Section 17(a)(1)-(3) in connection with the offer or sale of a security, though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)." Monarch Funding Corp., 192 F.3d at 308; see also Aaron v. SEC, 446 U.S. 680, 701-02 (1980) (SEC need not establish scienter as an element of an action to enjoin violations of Section 17(a)(2), 15 U.S.C. § 77q(a)(2), or Section 17(a)(3), 15 U.S.C. § 77q(a)(3), of the Securities Act).   Thus, Section 17(a) applies only to "offers and sales" and only one of Section 17(a)'s three subsections, prohibiting individuals from "employ[ing] any device, scheme or artifice to defraud," 15 U.S.C. § 77q(a)(1), requires proof of scienter.   Id.

The Supreme Court has directed lower courts to interpret the Exchange Act "flexibly" and broadly, rather than "technically [or] restrictively." SEC v. Zandford, 535 U.S. 813, 819 (2002) (internal quotation marks and citation omitted).

80

"Section 10(b) was designed as a catch-all clause to prevent fraudulent practices," Chiarella v. United States, 445 U.S. 222, 226 (1980) (citation omitted), including not just "garden type variet[ies] of fraud" but also "unique form[s] of deception" involving "[n]ovel or atypical methods," Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 11 n.7 (1971) (internal quotation marks omitted).

To sustain a claim of aiding and abetting liability pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), the Commission must prove "(1) the existence of a securities law violation by the primary wrongdoer; (2) knowledge of the violation by the aider and abettor; and (3) proof that the aider and abettor substantially assisted in the primary violation." PIMCO Advisors Fund Mgmt., 341 F. Supp. 2d at 467-68 (internal quotation marks and citation omitted).  The Commission need only prove extreme recklessness to establish aiding and abetting liability. See Graham v. SEC, 222 F.3d 994, 1004-05 (D.C. Cir. 2000).

**B. The SEC Has Not Established Liability for Defendants' Market Timing**

81

Market timing alone is neither illegal nor necessarily fraudulent.  The SEC to date has not prohibited market timing, and timing a mutual fund may be executed in a myriad of different forms.  At core, market timing is the attempt to more effectively predict a fund's NAV than the fund's managers themselves, and as a result reap returns against the fund's long term investors.  This is not to say, however, that market timing strategies may not be carried out though the use of unlawful fraudulent devices, and/or material misstatements, and thus violate the securities laws.  See Gabelli, 653 F.3d 49.

Certain mutual funds under certain circumstances seek, and sought during the period in question, to prevent timing.  In civil enforcement actions such as these, as the Fifth Circuit has described:

> The SEC is essentially enforcing corporate regulations on behalf of the various mutual funds.  Because market timing itself is not illegal, the SEC had to prove an intent to deceive to fit [the defendant's] behavior within Section 10(b) and Rule 10b-5.  This creates a dilemma for the courts, which are asked to determine whether the defendant's legal acts are made illegal by his compliance or non-compliance with corporate regulations that companies sometimes suspend or ignore, either tacitly or expressly, depending on the circumstances of that particular trade.

82

SEC v. Gann, 565 F.3d 932, 939 (5th Cir. 2009). (emphasis in original).   Thus, the inquiry here must be whether the Defendants, in their efforts to market time, engaged in actions or misstatements or omissions that defrauded the mutual funds or aided and abetted their defrauding.   Squarely presented, then, is the often blurry line between outwitting another in the marketplace and defrauding him.

This inquiry is further complicated by the fact that while it is the funds that a market timer might seek to and in fact deceive, it is the long term investors of that fund who bear the brunt of the losses caused by market timing through dilution.   At the same time, the funds' long term investors may have different and conflicting interests than the funds' advisors, who are incentivized to seek large investors such as market timing hedge funds and the fees and cash flow they bring. (See Tr. 1925-26 (Professor Ciccotello stating "there weren't too few timing police, but the timing police were insufficiently independent of the advisor.   So the timing police would see the trades . . . and would be unable to stop it because of the business plan of the advisor.").)

In addressing this dilemma, the courts have identified a number of actions as fraudulent when taken in deliberate attempts to avoid the funds' efforts to prevent market timing.

The Fifth Circuit has recognized that both breaking up trades to remain under a fund's radar, continuing to trade a mutual fund after receiving block notices, and the use of multiple registered representative numbers and account numbers demonstrates the intent to mislead mutual funds as to the source of the trades. Gann, 565 F.3d 932 at 937-38. In Gann the court of appeals affirmed the district court's finding that a stockbroker had committed securities fraud in violation of Section 10(b) and Rule 10b-5 by using multiple registered representative and client account numbers so as to hide his market timing from the funds. Specifically, after receiving block notices, Gann, the broker, would switch the representative or account numbers he was using so as to enable his ability to keep trading. As here, there was no question that the defendant engaged in market timing, just a question as to whether the means employed by the broker violated the securities laws. As the Defendants here do, Gann argued that market timing is legal and, as such, his practices were not deceptive. The Fifth Circuit found that while market timing is not necessarily

84

illegal, a broker's switching of registered representative numbers in order to fly under the funds' radar constitutes a "material misstatement" for purposes of Section 10(b) and Rule 10b-5.

In SEC v. Ficken, 546 F.3d 45 (1st Cir. 2008), the First Circuit affirmed a similar finding. In that case, involving several brokers, the district court found that Ficken's use of various registered representative and client numbers in order to facilitate his market timing was a material misrepresentation and that there was sufficient evidence of scienter, based on the use of multiple numbers and breaking down trades to fly under the fund's radar, in order to grant summary judgment in favor of the SEC. See SEC v. Druffner, 517 F. Supp. 2d 502, 509-10 (D. Mass. 2007).

At the motion to dismiss stage, the court in In re Mut. Funds Inv. Litig., 384 F. Supp. 2d 845 (D. Md. 2005), a multidistrict proceeding involving private class investor and derivative actions brought against (1) investment advisors of several mutual funds, (2) traders, including Canary Capital, a market timing hedge fund, and (3) broker dealers who facilitated those transactions, found that the private plaintiffs stated a

85

claim against the hedge fund trader defendants because they alleged that the trader defendants were involved in the fraudulent scheme from the outset and were at least one of its architects. Id. at 852 n.3, 857-58.

Likewise, in SEC v. O'Meally, No. 06 Civ. 6483, 2008 WL 4090461 (S.D.N.Y. Sept. 3, 2008), on a motion to dismiss, Judge Swain found that the SEC had adequately pled an action for securities fraud against several former Prudential brokers in connection with the market timing of mutual funds, where the SEC had alleged that the brokers concealed their identities and those of their clients after the mutual funds had directed them to cease and desist from engaging in market timing practices.

Likewise, in SEC v. JB Oxford Holdings, Inc., No. CV 04-7084, 2004 U.S. Dist. LEXIS 29494, at *20 (C.D. Calif. Nov. 9, 2004), the court found that a clearing firm and its principals' cloning of account numbers "to circumvent the mutual funds' efforts to prevent market timing sufficiently allege[d] a deceptive device, scheme, artifice, or practice in violation of Rule 10b-5(a) or (c)."

The D.C. Circuit denied a defendants' petition for review of an SEC decision, In re Thomas C. Bridge, 411 Fed. Appx. 337 (D.C. Cir. 2010), which held that registered representatives establishing of multiple accounts with different customer names and numbers, transferring assets between accounts, and transferring accounts between branch offices, in an effort to mislead mutual fund companies as to the identity of their market timing clients constituted fraud. See In re Thomas C. Bridge No. 3-12626, 2009 WL 3100582 at *11 (Commission Opinion Sept. 29, 2009).

These cases stand for the principle that while market timing itself is not illegal, the execution of certain practices to effectuate a market timing plan, such as breaking down trades, cloning accounts, and using multiple accounts and registered representative numbers with the intent to deceive a fund into accepting a trade it would otherwise reject may constitute fraud. However, In re Mut. Funds Inv. Litig., 384 F. Supp. 2d 845, Oxford Holdings, 2004 U.S. Dist. LEXIS 29494, and O'Meally, 2008 WL 4090461, were decided on motions to dismiss, and Gann, 565 F.3d 932, and Ficken, 546 F.3d 45, involved brokers, not hedge fund traders, as here. In so far as Gann, 565 F.3d 932, or Ficken, 546 F.3d 45, are read broadly to hold

87

that market timing prior to September, 2003 when the Canary
Capital settlement was announced or 2004 when the SEC issued its
final market timing rule, was _per se_ fraudulent at least with
regard to non-broker defendants, the Court declines to follow
these decisions.

As found above, Defendants here engaged in similar
practices including reentering funds after kick outs and cloning
accounts, as well as utilizing numerous and changing accounts
and brokers and registered representative numbers in order to
ensure their trades were under the funds' radars.  In addition,
the evidence presented at trial demonstrates that Defendants
were aware that if they were determined to be market timing by
the market timing police at certain funds they might be kicked
out or their trades rejected; they engaged in practices that
they knew produced kick outs; and they anticipated certain kick
out rates. (SEC Exs. 226, 407; Tr. 1708-14.)  Moreover, the
evidence established that Defendants acted with the intent to
deceive any fund that might have rejected their market timed
trades into accepting those trades by "staying below the radar"
through the aforementioned practices, thus avoiding kick outs
and hard rejected trades.

However, the SEC has not established that market timing rules prior to September, 2003 were sufficiently clear as to permit liability. As Chief Judge Preska has recognized, prior to October 2003, there was "no clear law governing market timing" and "the definition of market timing was still evolving." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Savino, No. 06 Civ. 868, 2007 WL 895767, at *14. (S.D.N.Y. March 23, 2007). The SEC did not establish that the funds that PCM traded prohibited market timing (however defined), or that Defendants violated an articulated fund rule with any specific trade, such as against the use of a certain number of multiple accounts or brokers, surpassing a number of trades in and out of a fund (termed in the industry as "roundtrips") within a given period, or engaging in multiple small trades that would aggregate to a certain sum. Likewise, the SEC itself did not and has not expressly prohibited the market timing of mutual funds. This is perhaps not surprising given the difficulty presented by regulating the amount and timing of investments in a free market.

Defense expert Professor Macey established that during the relevant time period market timing was pervasive (Tr. 1466), and it appears that many funds had capacity agreements

89

permitting certain, but not most, investors to time the funds, a
fact that has been extensively litigated. PIMCO Advisors Fund
Mgmt., 341 F. Supp. 2d at 460-61 ("According to the SEC
investigations, press reports, allegations in complaints, and
expert commentary, many mutual fund companies engaged in huge
volumes of undisclosed transactions with Canary and other market
timers during the period at issue.") (See also Tr. 1869-72
(Professor Ciccotello noting that many of the largest mutual
fund families had entered into capacity agreements as well as
the potentially divergent interests of the mutual funds'
advisors and long term investors); Cutler Testimony, 108th Cong.
11-12 (stating that more than 50% of the largest mutual fund
groups entered into one or more market timing capacity
agreements).)

Defendants' actions thus took place in an atmosphere
of uncertainty.  There were no definitions or prohibitions from
the responsible agency with respect to market timing, and the
funds' enforcement of their provisions relating to timing was
discretionary, inconsistent, and occasionally conflicted with
capacity agreements.  The SEC issued no guidelines as to which
fund provisions it might seek to enforce and, of course, prior
to the Canary enforcement action by the NYAG in September 2003,

the SEC had not initiated any proceedings to obtain the relief sought here.

In addition, the SEC failed to establish the particular rubrics utilized by the funds and their market timing police or that those rubrics were either publicly available, known by the Defendants, or should have been known by the Defendants.[4]  It appears, for instance, that the transactional limits varied by fund and over time and proved to be moving and unpublished targets.  It is accordingly uncertain if the funds would have rejected Defendants' trades had they not engaged in the aforementioned practices.  In the absence of regulation, the failure to establish the funds' specific rules or practices is fatal to the SEC's market timing case, which is, and must be grounded, upon a theory that the agency is enforcing the

---

[4]    The SEC established that Defendants were aware of what they believed to be the standards of the timing police of certain funds at certain points. (See, e.g., SEC Ex. 248 (email from broker at Wall Street Discount recommending that PCM break up purchases into $500,000 blocks "to try to get avoid detection"); SEC Ex. 244 (email from Tran to Ficken stating:  "On Alliance are you getting a lot of kickouts?  I've just heard on the street Alliance are not monitoring any trades over $200k.  May be we need to keep them below $200k for a longer stay."); SEC Ex. 703 (Tran email to Donegan to "play around with the name" on the accounts as this "confuses the Fund Company and they are unable to detect who we are for a good few months"); SEC Ex. 866 (email from Rick Marino at Bank of America to Christian informing him that the Van Kampen Funds have a limit of eight exchanges per account per year and will hard reject any exchanges beyond that limit.)  In addition, on some occasions certain funds informed Defendants of their limits.  (SEC Exs. 839, 840, 842 (AIM Fund letters stating a limit of 10 exchanges per year).)

specific rules of given funds.  In the absence of regulation, the SEC's case must rise or fall on the funds' rules and practices, as it is those rules the SEC seeks to enforce.  See Gann, 565 F.3d at 939 (discussing difficulty presented by SEC enforcement of mutual fund rules).  Accordingly, in order to establish securities fraud in connection with market timing, the SEC must forge a link between a given market timed transaction and a given prospectus or standard utilized by the market timing police of a specific fund.  While the evidence presented at trial supports the SEC's general contention that the funds forbade timing and sought to deter it to a point, even during the period between 2001 and 2003 and with respect to certain transactions that prompted certain funds to kick out Defendants or hard reject certain of their trades, the lack of clarity by either the funds' prospectuses or their enforcement policies undermines the SEC's case here.

To be sure, PCM and Chester generally sought to outwit the funds and knew that the funds at least in some instances did not permit market timing.  However, the SEC did not demonstrate that in any given instant Defendants knew or should have known a given fund's limits and acted such as to fly below that limit in order to defraud a fund into accepting a trade that that fund

92

would not in fact had accepted, had Defendants not engaged in the various practices they did in order to stay "under the radar." Without the clarity of what the funds' rules were, despite Defendants' general intent to deceive, the SEC has failed to establish the requisite scienter required by Section 10(b), Rule 10b-5, and Section 17(a)(1).

Defendants are likewise not liable under Section 17(a)(2) or (3) of the Exchange Act with regard to their market timed redemptions or exchanges of mutual fund shares. Section 17(a)(2) prohibits, in the context of the offer or sale of any security, "obtain[ing] money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77q(a)(2). Section 17(a)(3) makes it unlawful to "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser" in the offer or sale of a security. 15 U.S.C. § 77q(a)(3). Neither Section 17(a)(2) nor Section 17(a)(3) requires a showing of scienter. Aaron, 446 U.S. at 695-702.

93

Here, because the SEC did not establish the funds'
particular market timing rules, as embodied in their
prospectuses, enforcement practices regarding redemptions or
otherwise, or that Defendants in fact took actions that would
have operated a fraud with respect to those rules in
effectuating redemptions or exchanges, there is insufficient
proof that Defendants engaged in any transaction, practice, or
course of business which operated or would operate a fraud upon
the funds under Section 17(a)(3).

With regard to market timing, the SEC did not prove
any untrue statement of material fact or omission with respect
to Defendants' redemptions or exchanges.  The Honorable Laura T.
Swain appropriately noted that a duty to disclose the identity
of a broker or trader may arise following a kick out letter from
a fund, O'Meally, 2008 WL 4090461, at *2-*3, at least where such
fund articulates a clear rule or reason as the basis of the kick
out.  However, under Section 17(a)(2) such a duty could only
attach to the redemption of fund shares, not the purchase.
While the SEC has proven that certain funds did not approve of
short term round trip transactions in some instances, the SEC
has not established any untrue statement or material omission
with respect to Defendants' redemptions or that any statements

94

or omissions were material to the funds with regards to their market timing policies, given the uncertain market context.

Moreover, Section 22(e) of the Investment Company Act, 15 U.S.C. § 80a-22(e), specifically prohibits mutual funds from suspending the right of redemption or postponing the date of payment for a redeemable security made "in accordance with its terms" for more than seven days except in certain enumerated circumstances.  Those exceptions include "as the Commission may by order permit for the protection of security holders of the company." Id.  The SEC did not establish any rule or regulation under this provision with respect to market timing applicable during the relevant period.  Thus, without a clear statement regarding the funds' terms or SEC regulation, the funds operated under an obligation to permit redemptions.  Defendants are accordingly not liable under Section 17(a)(2) or (3).

This is not to say that all acts to effectuate market timing are permissible or that they cannot be fraudulent.  The market landscape with regard to market timing is now different than prior to September, 2003.  The SEC's discovery of the mutual fund industry's systemic failure to deter market timing led the agency in 2004 to require that the funds to describe in

95

their prospectuses the risks, if any, that frequent purchases and redemptions may present to other shareholders; state whether or not the fund's board has adopted policies and procedures with respect to frequent purchases and redemptions, and, if not, to provide a statement of the specific basis for the view of the board that it is appropriate not to have such policies and procedures. See Final Market Timing Rule, 69 Fed.Reg. at 22,300. In addition, under the 2004 rule, U.S. mutual funds must describe their market timing policies with particularity in order to register under the Securities Act of 1933, including:

> (i) Whether or not the Fund discourages frequent purchases and redemptions of Fund shares by Fund shareholders;
> (ii) Whether or not the Fund accommodates frequent purchases and redemptions of Fund shares by Fund shareholders; and
> (iii) Any policies and procedures of the Fund for deterring frequent purchases and redemptions of Fund shares by Fund shareholders, including any restrictions imposed by the Fund to prevent or minimize frequent purchases and redemptions. Describe each of these policies, procedures, and restrictions with specificity. Indicate whether each of these restrictions applies uniformly in all cases or whether the restriction will not be imposed under certain circumstances, including whether each of these restrictions applies to trades that occur through omnibus accounts at intermediaries, such as investment advisers, broker-dealers, transfer agents, third party administrators, and insurance companies. Describe with specificity the circumstances under which any restriction will not be imposed. Include a description of the following restrictions, if applicable:

(A)   Any restrictions on the volume or number of purchases, redemptions, or exchanges that a shareholder may make within a given time period;

(B)   Any exchange fee or redemption fee;

(C)   Any costs or administrative or other fees or charges that are imposed on shareholders deemed to be engaged in frequent purchases and redemptions of Fund shares, together with a description of the circumstances under which such costs, fees, or charges will be imposed;

(D)   Any minimum holding period that is imposed before an investor may make exchanges into another Fund;

(E)   Any restrictions imposed on exchange or purchase requests submitted by overnight delivery, electronically, or via facsimile or telephone; and

(F)   Any right of the Fund to reject, limit, delay, or impose other conditions on exchanges or purchases or to close or otherwise limit accounts based on a history of frequent purchases and redemptions of Fund shares, including the circumstances under which such right will be exercised.

SEC Form N-1A, available at http://www.sec.gov/about/forms/formn-1a.pdf.

These requirements may affect under the radar trading in the future. Perhaps sufficient clarity has been achieved so as to establish that market timing of a fund, in contravention of its now published rules and practices, may violate the federal securities laws. However, the lack of regulation or clear rules or practices regarding market timing during the period in question cannot be remedied by a finding of liability here. Litigation in the absence of clear standards may further

97

raise due process concerns, upsetting the basic notion that individuals have fair notice of the standards under which they may be held liable.  See generally Skilling v. United States, -- U.S. --, 130 S. Ct. 2896 (2010).  Prospective regulation by the SEC and clear rules by the funds are preferable to post hoc litigation.

Clear rules for trading in U.S. mutual funds benefit not only long-term fund investors who would benefit though a reduction — potentially in many millions of dollars annually (Tr. 1896-97, 1935-36; SEC Ex. 37) — in the dilution of their shares, but also sophisticated market actors such as Defendants, who may seek gain and avoid liability in a less grey market regulatory environment.

## C. Defendants Engaged in Fraudulent Late Trading

SEC enforcement actions against those who late traded during the period in question seek to deter the fraud against funds perpetrated in attempts to circumvent not only the funds' rules and practices, as with market timing, but also SEC regulation.  See Rule 22c-1, 17 C.F.R. § 270.22c-1.  Due to both SEC regulation and the uniform industry practice, well known to

98

Defendants here, that mutual fund trades must be placed by the close of the markets at 4 p.m. ET in order to receive the same day's NAV, the line with regard to late trading is and was startlingly bright.

Every court to have considered the issue of late trading has concluded that it constitutes a violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.   See VanCook, 653 F.3d 130; Simpson Capital Mgmt., 586 F. Supp. 2d at 205 ("Thus, the 'false impression' communicated by the defendants' acts was that the trades were submitted before 4 p.m., when they actually were submitted with the benefit of market moving information after 4 p.m. The mutual funds were misled into thinking that the trades were made before 4 p.m."); In re Mut. Funds Inv. Litig., 384 F. Supp. 2d at 856 ("Late trading is itself illegal, and therefore, as alleged by plaintiffs, a scheme, practice, or course of business effectuating late trading is inherently fraudulent"); SEC v. Treadway, 04 Civ. 3464, 2005 WL 713826, at *1 (S.D.N.Y. Mar. 30, 2005) ("In contrast to market timing, late trading is illegal irrespective of whatever representations may have been made to investors."); see also In re Joseph VanCook, Exchange Act Release No. 61039, 97 SEC Docket 761, 2009 WL 4005083, at *2

99

(Nov. 20, 2009) ("'Late trading' refers to the unlawful practice of permitting mutual fund orders received after the 4:00 p.m. pricing time to receive the NAV calculated at or as of 4:00 p.m. that day, instead of 4:00 p.m. the following trading day."). This conclusion reflects the clear and consistent industry practice of calculating NAV's as of the close of the markets at 4:00 p.m. ET.

The Second Circuit has recently recognized that late trading, and actions taken and statements made in order to accomplish it, may constitute fraud in violation of Rule 10b-5(a), (b), & (c).  VanCook, 653 F.3d 130.  Specifically, the Court of Appeals stated:

> We have no trouble concluding that VanCook's late-trading scheme constituted a 'device, scheme, or artifice to defraud,' in violation of subsection (a) of Rule 10b-5; that, by designing and operating his late-trading scheme, and by taking numerous steps to hide it, VanCook made material, untrue statements and omissions, in violation of subsection (b); and that his actions "operate[d] . . . as a fraud or deceit upon any person, in connection with the purchase or sale of any security," in violation of subsection (c).

VanCook, 653 F.3d at 138 (citing 17 C.F.R. § 240.10b-5).

100

Here, Defendants' submission of late-trade orders constituted a fraudulent device and an implied misrepresentation in violation of Rule 10b-5(b) because it suggested that final orders were received before the funds' 4:00 p.m. pricing time, as reflected in the applicable prospectus language, when, in fact, the trading decisions were made after 4:00 p.m. Defendants were aware that TW&Co. took steps to make it appear to any outside observer that their buy and sell orders had been finalized by 4:00 p.m., when the critical decisions were not made until well after the close of market.   The mutual funds were thus deceived into believing that the trades were made before 4:00 p.m. and thus into giving the trades that day's NAV. This is because late trading is by definition a form of backwards pricing that misleads the recipient fund into believing that the trade was made prior to the close of the markets.   As such, unlike market timing, late trading is per se fraudulent.

The evidence establishes that Defendants knew that late trading was impermissible and that they were obtaining an advantage over other investors contrary to the mutual funds' rules and SEC regulation.    Defendants were repeatedly made aware, and acknowledged, that the cut-off for trading in U.S.

mutual funds in order to receive the same-day NAV was 4:00 p.m. ET. (SEC Ex. 50 (email from Tran stating that in order to get the same day's NAV, in "the US we have to place orders just before the US Close at 4pm EST."); SEC Ex. 51 (email from Chester stating "these work just like the US funds, except dealing time is 3pm London time. If we were able to convince them to allow us to trade at 9pm London time,[5] they would be exactly the same as any US mutual fund.") The funds Defendants late traded specifically required in their prospectuses that trades be placed by 4:00 p.m. ET in order to receive that day's NAV (SEC Exs. 419A, 420A, 421-499) and eight mutual fund witnesses, three at trial, testified that this was the case.

Late trading capacity was valuable to Defendants. (SEC Ex. 2 (Chester stating that "[t]his facility is VERY VALUABLE and we should utilize it accordingly") (emphasis in original).) Indeed, Defendants paid more for late trading capacity through TW&Co. (See, e.g., SEC Ex. 4 (email from Chester to Wilson, stating "[r]emember, the more money we make, the more fees you earn – 2% of a larger figure. Hence, it's in everyone's interests to ensure we get the later trading times. I really EXPECT you guys to go out of your way to make sure I get

---

[5]     9 p.m. London time is 4 p.m. ET.

late trading - you're earning double what everyone else takes home on this business - although it's unlikely that we'll need 6:30pm trading every night. . . . And that's why I am happy to pay you double what I pay any one [sic] else."); SEC Exs. 5, 6, 837, 868; Tr. 270, 297-98, 540-41.)   As found above, Defendants sought late trading through other broker-dealers but were repeatedly denied.   PCM discussed late trading with at least four of these broker-dealers who refused to give them that capacity, while at least three others informed Defendants that their orders had to be placed by 4:00 p.m. ET.

Defendants further received and reviewed multiple academic articles that stated that U.S. mutual fund trades must be submitted prior to 4:00 p.m. ET in order to receive the same-day NAV.   The Sassano voicemail in 2001 telling Chester that late trading through TW&Co. was "crap" and that Chester should not "pressure anybody to do something stupid" (SEC Ex. 19) was an additional red flag that late trading was illegal, and Chester's testimony that he "couldn't really understand what [Sassano] was referring to" (Tr. 563) was not credible.   That Chester cautioned Tran to be discreet when inquiring regarding late trading capacity (SEC Ex. 55) and advised him that "[o]bviously late trading is key . . . don't know how you find

103

out about this without actually saying it" (SEC Ex. 56) further establishes Chester's knowledge that late trading was impermissible.

Chester was also aware that TW&Co. falsely stamped timesheets as if orders were placed before 4 p.m. and recognized that this gave Defendants "the ability to place a buy order after the bell, even if we haven't done so before the bell." (SEC Ex. 2.)  Given Chester's intelligence, training, and experience both as a hedge fund manager whose business model was premised on the timing of trades and as an attorney, the evidence establishes he knew that false stamps were fraudulent and misleading.

Following the announcement of the Canary enforcement action, Chester responded to a request for a letter stating that "Pentagon has not engaged in late trading or any other illegal activity," to which he responded "not a problem."  (SEC Ex. 63.) That same day, Chester provided a letter stating that PCM has "never entered into arrangements with any US onshore Mutual Fund in order to trade post-4:00pm EST for same-day NAV."  (SEC Ex. 65.)  At that time, Chester knew that he could not confirm that Pentagon had not late traded and that the comfort letter was

104

deliberately misleading or false.  Those statements and the fact
that Defendants did not turn over the Sassano voicemail or SEC
Ex. 2 (the "smoking gun" email) to the FSA when prompted by
document requests that should have produced them (SEC Ex. 637;
Tr.  2142-43,  2164-66,  2174-77),  further  establish  that
Defendants knew that their late trading was illegal.

        Given  the  implied  misrepresentation  that  Defendants
made by engaging in late trading as well the evidence that they
knew their actions were impermissible, Defendants violated Rule
10b-5, Section 10(b), and Section 17(a).  See VanCook, 653 F.3d
at  138  ("We  have  no  trouble  concluding  that  VanCook's  late-
trading  scheme  constituted  a  'device,  scheme,  or  artifice  to
defraud,' in violation of subsection (a) of Rule 10b-5 . . . and
that his actions 'operate[d] . . . as a fraud or deceit upon any
person,  in  connection  with  the  purchase  or  sale  of  any
security,' in violation of subsection (c)." (citation omitted)).

        In  addition,  as  the  facts  establish,  Defendants  did
not act merely in reliance on their broker-dealers, as they have
asserted.   Defendants directed, indeed micromanaged, the late
trading that TW&Co. performed on their behalf.   (See, e.g., SEC
Ex.  6  (in  an  email  from  Chester  to  Wilson  and  Christian  at

TW&Co.:  "Trevor [head of PCM's Trading & Dealing Desk] will run through the procedures of how the trading is going to work.  In essence, most of it will be done by you within certain parameters that we will give you each day.  In the majority of cases, your decision point will be 5:30 pm NY time.  In a few cases, your decision point will be 6:30 pm - I know, slave labor . . . whatever will you do working that late!  When there are close decisions, you'll have a list of home / cell numbers for me, Trevor, Jafar [PCM's Chief Operating Officer] and Anthony [Profit] (priority in that order) . . . and we'll make the call."); SEC Ex. 8 (email from Profit, PCM's head of Research & Development, to Christian, stating: "the procedure for trading these funds is as follows (all times are New York): 1. At or around 16:10 [4:10 p.m. ET], the dealing team at Pentagon phone Trautman Wasserman to tell them the output of the model. 2. At 17:30 [5:30 p.m. ET], if the condition on the futures is met and the futures are outside the 'warning' band, Trautman Wasserman execute the trades - no need to phone Pentagon. 3. At 17:30, if the condition on the futures is not met and the futures are outside the 'warning' band, no trades executed - TW can go home! 4. At 17:30, the futures are in the warning band, Trautman phones Lewis [Chester] at Pentagon, or the list of phone numbers that Trevor will supply for further instructions, which might include waiting for another hour.")

106

Defendants argue that regardless they are not primarily liable under Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act because they personally made no false or misleading statement or omitted no material fact in violation of a duty to disclose. As in Simpson, Defendants argue that they are not primary violators and that any liability should be solely that of their brokers. See Simpson Capital Mgmt., 586 F. Supp. 2d at 205-06. For this proposition, Defendants rely on Janus Capital Group, 131 S. Ct. 2296, in which the Supreme Court limited the scope of liability for the making of false statements under Section 10(b) and Rule 10b-5(b). In Janus, the Court held that liability under Rule 10b-5(b) attaches to those who have ultimate authority over such a false statement, but not to others who do not. The Court concluded that for "purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." Id. at 2302.

In Defendants' view, their brokers were the makers of any false statements, and so under Janus the SEC's claims of

107

primary violations under Section 10(b) and Rule 10b-5 must fail.[6] Defendants further argue that Janus' rationale applies with equal force to Section 17(a) and so, for the same reasons, the SEC's Section 17(a) claim must fail as well.

Defendants' argument is unpersuasive for several reasons. First, Janus was a private suit, not an enforcement action brought by the SEC. The Court emphasized this difference, noting that its holding was limited to "accord[] with the narrow scope that we must give the implied private right of action" under Rule 10b-5 to private plaintiffs in contrast to the Commission. Janus, 131 S. Ct. at 2303 (citation omitted); id. at 2302 ("[I]in analyzing whether JCM 'made' the statements for purposes of Rule 10b-5, we are mindful that we must give 'narrow dimensions . . . to a [private] right of action Congress did not authorize when it first enacted the statute and did not expand when it revisited the law.'" (quoting Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 167 (2008)). There is no indication that the

---

[6]     TWC and its principals Wasserman and Trautman were found liable for violating the securities laws through late trading and acts to effectuate market timing. See In re Trautman Wasserman & Co., Inc., SEC Release No. 340, 92 SEC Docket 1156, 2008 WL 149120 (Jan. 14, 2008).

Court or Congress intended for actions brought by the SEC to be so limited.

In addition, the private litigant in Janus alleged simple false statements claims under Rule 10b-5(b), which prohibits the "mak[ing]" of an untrue statement of material fact in connection with the purchase or sale of a security. The Court's opinion therefore focused on the construction of the operative term "make." In contrast, this enforcement action was brought pursuant to the liability for schemes to defraud, under Rule 10b-5(a) & (c), which utilizes different and broader operative language.[7] See SEC v. Lee, 720 F. Supp. 2d 305, 344 (S.D.N.Y. 2010); see also In re Parmalat Securities Litigation, 376 F. Supp. 2d 472, 502 (S.D.N.Y. 2005); In re Salomon Analyst AT&T Litig., 350 F. Supp. 2d 455, 472-74 (S.D.N.Y. 2004). That is, the SEC contends that Defendants engaged in wrongdoing by carrying out a scheme to defraud mutual funds through deceptive

---

[7]     Rule 10b-5(a) provides that it is unlawful "[t]o employ any device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b-5(a) (emphasis added). Rule 10b-5(c) makes it unlawful "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" 17 C.F.R. § 240.10b-5(c) (emphasis added). Section 10(b) of the Exchange Act, under which Rule 10b-5 was promulgated, provides that, in connection with the purchase or sale of securities, it is unlawful for any person, directly or indirectly "[t]o use or employ . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b) (emphasis added).

conduct.   Accordingly, while Defendants were certainly aware of

the misstatements made at their direction and behest by TW&Co.

personnel, the allegations here hinge on Defendants' deceptive

conduct.

       In sum, Defendants have put forth no persuasive reason

why Janus should be read to reach enforcement actions brought by

the SEC or to claims alleging scheme liability pursuant to Rule

10b-5(a) & (c), and the Court can identify none.

       Nor does Janus apply to SEC enforcement actions

brought pursuant to Section 17(a) of the Securities Act.   See

SEC v. Daifotis, No. C 11-00137, 2011 WL 3295139 at *5-*6 (N.D.

Cal. Aug. 1, 2011), (holding that Janus does not apply to SEC

claims brought pursuant to Section 17(a) of the Securities Act,

stating that "[i]mportantly, the word 'make,' which was the very

thing the Supreme court was interpreting in Janus, is absent

from the operative language of Section 17(a). Rather, Section

17(a) makes it unlawful (1) 'to employ any device, scheme, or

artifice to defraud,' (2) 'to obtain money or property by means

of any untrue statement' or omission of a material fact, or (3)

'to engage in' certain types of transactions.") (emphasis in

original).

110

Notwithstanding, Defendants indisputably had "authority over the content of . . . and whether and how to communicate," Janus, 131 S. Ct. at 2303, the late trades here. Defendants sought out late trading through TW&Co., directed TW&Co.'s personnel to place late trades on their behalf in awareness of TW&Co.'s false time stamps,[8] and indeed provided TW&Co. with detailed instructions for how and when to do so, according to Defendants' precise specifications, metrics, and authorization. (SEC Ex. 6, 8.) While this conduct is best described as a fraudulent scheme, the use of a fraudulent device, or an act, practice, or course of business that operates a fraud, Defendants' ultimate authority over both the content of and the decision to make late trades as if they had been placed before 4 p.m. ET is undoubtedly sufficient under even the more stringent standard articulated in Janus.

As detailed above, the evidence as a whole demonstrates that Defendants were the creators, directors, and chief beneficiaries of the fraudulent scheme, and as such they

---

[8]    As previously found, the SEC established that Chester visited the offices of TW&Co. and, according to an email Chester sent on April 5, 2001, was aware that "[e]very day" TW&Co. time-stamped Defendants' trade sheets before 4 p.m. ET but did not process them until after 4 p.m., giving Defendants "the ability to place a buy order after the bell, even if we haven't done so before the bell." (SEC Ex. 2.)

111

are primarily liable.   See SEC v. U.S. Envtl., Inc., 155 F.3d
107, 111-12 (2d Cir. 1998) (defendant can be primarily liable
for securities fraud by knowingly or recklessly participating in
and furthering a market manipulation scheme regardless of
defendant's personal motivation for manipulating the market); In
re Mut. Funds Inv. Litig., 384 F. Supp. 2d at 856 ("Late trading
is itself illegal, and therefore as alleged by plaintiffs, a
scheme, practice, or course of business effectuating late
trading is inherently fraudulent.")


## D. Aiding and Abetting Liability


        As to late trading, having found the Defendants
primarily liable for violations of the anti-fraud provisions of
the federal securities laws, the Court does not reach the SEC's
alternative contention that they aided and abetted the primary
anti-fraud violations of their broker-dealers with regard to
late trading.


        As to the market timing claims, for the same reasons
primary liability fails, so too must aiding and abetting
liability.  To sustain a claim of aiding and abetting liability
the SEC must prove (1) the existence of a securities law

violation by the primary wrongdoer; (2) knowledge of the violation by the aider and abettor; and (3) that the aider and abettor substantially assisted in the primary violation. See SEC v. DiBella, 587 F.3d 553, 566 (2d Cir. 2009) (quotation marks and citation omitted); PIMCO Advisors Fund Mgmt., 341 F. Supp. 2d at 467-68.

Here, prior to September, 2003, the SEC failed to clearly or adequately define, let alone prohibit, market timing and the funds' market timing rules and practices were frequently uncertain. Given this market context, despite the intentional and coordinated attempts of Defendants and their brokers to outwit the funds, Defendants are not liable under an aiding-and-abetting theory because the SEC did not establish that Defendants knew or acted with extreme recklessness with regard to securities violations by their brokers.

## IV. Damages and Injunctive Relief

### A.  The Claims for Relief Are Not Time Barred

At the threshold, Defendants argue that the SEC's claims are time-barred by the five-year statute of limitations

113

in 28 U.S.C. § 2462 to the degree they are based on transactions or conduct that occurred prior to April 3, 2003. In Defendants' view, because the SEC did not file the original complaint until April 3, 2008, all claims for civil penalties based on transactions or conduct that occurred more than five years earlier (April 3, 2003) are time-barred.

There is no merit to this contention. The Second Circuit recently rejected this argument in Gabelli, 653 F.3d at 58-61. In Gabelli, in the context of an SEC enforcement action bringing market timing allegations, the Court of Appeals held that "since fraud claims by their very nature involve self-concealing conduct, it has been long established that the discovery rule applies where, as here, a claim sounds in fraud." Id. at 59. Specifically, the Circuit found that the Commission's claims against Defendants regarding statements made in association with the market timing of mutual funds did not accrue until September, 2003, when the SEC discovered the fraud. Id. at 58-61. As Defendants concede, the Commission filed this action within five years of discovery. (Def. Mem. 55.) Accordingly, the claims for relief are not time-barred.

**B. Injunctive Relief**

114

In determining whether injunctive relief is
appropriate, "[t]he critical question . . . is whether there is
a reasonable likelihood that the wrong will be repeated." SEC
v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1100 (2d Cir. 1972)
(citation omitted).  Injunctive relief is appropriate where the
Commission demonstrates a substantial likelihood of future
violations of the securities laws. SEC v. Cavanagh, 155 F.3d
129, 135 (2d Cir. 1998); SEC v. Power, 525 F. Supp. 2d at 427.
In this regard, courts consider (1) the fact that the defendant
has been found liable for illegal conduct; (2) the degree of
scienter; (3) whether the violations were isolated or repeated;
(4) whether defendant has accepted blame for his conduct; and
(5) whether, due to the defendant's professional occupation, he
might be in a position where future violations could be
anticipated.  Cavanaugh, 155 F.3d at 135 (citations omitted).
In addition, "fraudulent past conduct gives rise to an inference
of a reasonable expectation of continued violations." Manor
Nursing Ctrs., 458 F.2d at 1100.

Defendants have made no meaningful attempt to rebut
this inference.  As found above, the Defendants intentionally,
and egregiously, violated the federal securities laws through a

scheme of late trading.  This scheme was broad ranging over the course of several years and in no sense isolated.  Following the filing of the action by the NYAG against Edward Stern and Canary Capital, as found above, Defendants attempted to cover up their conduct.  While Defendants have since admitted to late trading (see, e.g., Tr. 512-13; Defs. FOF 7-8), as on this evidence they must, neither Chester nor PCM have accepted blame for their conduct.  Defendants will continue to have the opportunity to engage in similarly illegal conduct in the future.  There is plainly a reasonable likelihood of future violations.  See First Jersey Sec., 101 F.3d at 1477-78; see also Power, 525 F. Supp. 2d at 427.

The SEC's request for the entry of injunctions against future violations of the antifraud provisions of the securities laws as to PCM and Chester is therefore granted.

## C. Defendants and Relief Defendant are Joint and Severally Liable

"It is a well settled principle that joint and several liability is appropriate in securities laws cases where two or more individuals or entities have close relationships in engaging in illegal conduct." SEC v. Calvo, 378 F.3d 1211, 1215

(11th Cir. 2004) (citations omitted). Here, Defendants and Relief Defendant PSPF collaborated on the mutual fund trading scheme, and Defendants exercised complete control over PSPF's trading. (See, e.g., SEC Ex. 554 (PCM promotional material stating that "[a]ll investments, including hedging transactions are made at a Master Fund level, Pentagon Special Purpose Fund Ltd. (PSPF). . . . . PCM is the investment advisor to the Master Fund, and is responsible for all asset allocation decisions . . . PCM's mandate is limited to computer model signal generation and placement of trades on behalf of the Master Fund.").)

As previously found, PSPF opened accounts at PCM's direction, Defendants were responsible for making PSPF's trading decisions, and Defendants late traded on PSPF's behalf, and to its gain, through TW&Co. PSPF received ill-gotten funds and does not have a legitimate claim to those funds. See, e.g., Cavanagh, 155 F.3d at 136. The evidence presented renders joint and several liability appropriate. See, e.g., SEC v. AbsoluteFuture.com, 393 F.3d 94, 97 (2d Cir. 2004) (trial court retains discretion to impose "joint and several liability for combined profits on collaborating or closely related parties").

117

**D.  Disgorgement**

1. The Standard for Disgorgement

"The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." First Jersey Sec., 101 F.3d at 1474 (citations omitted).  "'[E]ffective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable.  The deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits.'"  Id. (quoting Manor Nursing Ctrs., 458 F.2d at 1104; citing SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1308 (2d Cir. 1971 ("It would severely defeat the purposes of the Act if a violator of Rule 10b-5 were allowed to retain the profits from his violation.")).

The amount of disgorgement "should include all gains flowing from illegal activities, plus prejudgment interest, and 'need only be a reasonable approximation of profits causally connected to the violation.'" SEC v. Credit Bancorp, Ltd., No. 99 Civ. 11395, 2011 WL 666158, at *2 (S.D.N.Y. Feb. 14, 2011)

118

(quoting First Jersey Sec., 101 F.3d at 1475).  When calculating disgorgement, however, "separating legal from illegal profits exactly may at times be a near-impossible task." SEC v. First City Fin. Corp. Ltd., 890 F.2d 1215, 1231 (D.C. Cir. 1989) (citation omitted).   Therefore, disgorgement "need only be a reasonable approximation of profits causally connected to the violation." Id.; see also First Jersey Sec., 101 F.3d at 1475; SEC v. Drexel Burnham Lambert Inc., 837 F. Supp. 587, 612 (S.D.N.Y. 1993).  Further, "'any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.'"   SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 1998) (quoting SEC v. Patel, 61 F.3d 137, 140 (2d Cir. 1995)).

Finally, Defendants object to including losses avoided in the disgorgement calculation. (Defs. Br. at 57.)   However, the Second Circuit has long recognized that losses avoided are a proper measure of disgorgement. See, e.g., Patel, 61 F.3d at 140.

### 2. Disgorgement of $38,416,500 is Ordered

Based in part upon the report (Defs. Ex. 132) and testimony of their expert, Professor Ciccotello, Defendants argue that the SEC has not established that the Defendants

caused any dilution to the long-term investors in the mutual funds in which they traded and accordingly no damages are appropriate in this case.    Professor Ciccotello initially calculated that Defendants' trades caused $50.7 million in dilution.   However, he reached his ultimate damages figure of zero by calculating dilution after excluding several classes of trades, encompassing the vast majority of Defendants' trades, including most significantly all trades that Defendants engaged in with a mutual fund or broker that had entered a settlement agreement with the SEC – including TW&Co.   Such trades, by Professor Ciccotello's calculation, amounted to roughly 60% of Defendants' transactions.   This method is rejected.   The fact that a broker or fund has settled with the SEC does not either as a matter of law or for purposes of calculating damages render lawful or not subject to damages any trades Defendants conducted through that broker or with that fund.    Moreover, that, according to their expert, 60% of Defendants' trades were in funds or with brokers that have since settled with the SEC supports the conclusion that, as confirmed by the evidence at trial, Defendants sought out brokers who would market time and funds that were susceptible to market timing.   Accordingly, the Court places no weight on Professor Chiccotello's dilution estimate.

The SEC seeks $64,139,678 in disgorgement. This figure springs from the testimony and report of SEC expert Professor Harris, who reached this figure by calculating the dilution Defendants' caused long term investors though both their late and market timed trades. (SEC Ex. 420.) Professor Harris reached this figure and identified additional evidence of both market timing and late trading by reverse engineering Defendants' trading data. (Id.)

Professor Harris calculated that Defendants' combined first-day net profits from purchases and net losses-avoided from sales at $64,139,678. Professor Harris reasonably used first-day profits as an estimator of the dilution that existing shareholders experienced from Defendants' market timing and late trading, finding that the total first-day net profits earned by Defendants on purchases was $40,248,732 (with 67% of purchases being profitable on the first day) and $23,890,945 net losses avoided for sales (with 56% of sales avoiding losses). Defendants' expert Professor Ciccotello recognized repeatedly that profits from stale price trading strategies, that is market timing strategies, "come at the expense of the non-trading mutual fund shareholders" in the form of dilution. (Tr. 1896-

121

1901.)   Defendants offer no serious objection to Professor
Harris' calculations.   Indeed, Defendants' expert, Professor
Ciccotello recognized that he would "not feel comfortable nor do
I have the expertise to analyze Professor Harris' model."  (Tr.
1911-12.)   In sum, were damages to be calculated based upon
dilution to mutual fund shareholders due to both Defendants'
late and market timed trades, Professor Harris' calculation
would be an accurate estimate of damages.

However, Professor Harris' calculation is overly broad
based upon the conclusions of liability reached by the Court.
First, Defendants are liable only for their late, not market
timed, trading.   Second, Professor Harris' model accurately
calculates dilution to mutual fund shareholders, that is, the
additional profits that Defendants' made at the expense of long-
term investors, due to stale NAVs.   However, it is well
established that "[d]isgorgement wrests ill-gotten gains from
the hands of the wrongdoer" and "does not seek to compensate the
victims of the wrongful acts, as restitution does." SEC v.
Hughes Capital Corp., 917 F. Supp. 1080, 1085 (quoting SEC v.
Huffman, 996 F.2d 800, 802 (5th Cir. 1993)).     "'Thus, a
disgorgement order might be for an amount more or less than that
required to make the victims whole.'"   Id.  The illegal profits

122

Defendants reaped are those they earned from late trading, regardless of whether this figure is the same as that accrued though the dilution to other investors caused by the fact that those late trades were also market timed trades.

        In recognition that disgorgement is proper as to the smaller set of Defendants' late trades, not the larger set of Defendants' market-timed trades, $38,416,500, plus pre-judgment interest, is required as disgorgement.  As previously found, Defendants late traded through TW&Co. from February 15, 2001 to September 3, 2003.  Defendants possessed late trading capacity through TW&Co. from the beginning of their trading there.  Thus, PCM made final trading decisions, whether to stick with a previously made trading decision (through inaction or confirmation) or to cancel or actively trade following the 4 p.m. cut-off, for all trades placed through TW&Co.  As such, disgorgement of the sum of all profits Defendants accrued through TW&Co. is the appropriate measure of Defendants' illegal profits.

        Between February 15, 2001, and September 3, 2003, PCM placed approximately 10,052 purchases of open-end U.S. mutual funds through TW&Co., totaling a principal investment of over

$3.1 billion.   (SEC Ex. 420.)   Defendants realized profits of approximately $38,416,500 from the U.S. mutual fund trades they executed through TW&Co. (SEC Dem. Ex. 31.)

Defendants and Relief Defendant are therefore found joint and severally liable for disgorgement in the sum of $38,416,500 plus pre-judgment interest.   This figure is a "reasonable approximation of profits causally connected to the violation." Patel, 61 F.3d 139 (citations and quotation marks omitted), with "any risk of uncertainty . . . fall[ing] on the wrongdoer whose illegal conduct created that uncertainty." Id. at 140 (citation and internal quotation marks omitted).

## E.  Civil Penalties of $38,416,500 are Imposed

The SEC seeks maximum third tier civil penalties. Under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), the Court determines the civil penalty "in light of the facts and circumstances" of the case.  Civil penalties are designed to punish wrongdoers and deter future violations of the securities laws.  SEC v. Haligiannis, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007).   Third tier civil penalties are appropriate for

violations that involved "fraud, deceit, manipulation or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."   15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3); see also SEC v. Credit Bancorp, Ltd., No 99 Civ. 11395, 2002 WL 31422602, at *2 (S.D.N.Y. Oct. 29, 2002).

In light of Defendants' wrongdoing and, as established by SEC expert Professor Harris, the substantial losses those violations created to the funds' long term investors, pursuant to 15 U.S.C. § 77t(d) and 15 U.S.C. § 78u(d)(3), third-tier penalties against PCM and Chester are imposed.   The maximum third tier penalty that may be imposed is the greater of the gross amount of the pecuniary gain or, for violations occurring after February 2, 2001, $120,000 for natural persons and $600,000 for any other persons, per violation, pursuant to 17 C.F.R. § 201.1002.

Accordingly, civil penalties in the amount equal to Defendants' pecuniary gain for late trades through TW&Co., a sum of $38,416,500, are imposed.

125

## V.  CONCLUSION

The evidence presented at trial established that Defendants engaged in a broad ranging fraudulent late trading scheme through TW&Co.  While the SEC established that Defendants intended and took a variety of actions in order to ensure that their market timed trades were accepted by the funds, due to the failure of either the SEC or U.S. mutual funds to issue or enforce clear standards with respect to market timing or actions to carry out market timing strategies during the period in question, the SEC failed to establish that Defendants engaged in securities fraud with respect to their market timing. Defendants and Relief Defendant, PSPF, shall disgorge the total of their pecuniary gain on trades through TW&Co., a sum of $38,416,500 plus pre-judgment interest.  Civil penalties of $38,416,500 are additionally imposed and injunctive relief is granted.  Submit judgment upon notice.

It is so ordered.

New York, NY
February / 4, 2012

ROBERT W. SWEET
U.S.D.J.

126