UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

3|28|12

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,                    08 Civ. 3324(RWS)

     -against-                                    OPINION

PENTAGON CAPITAL MANAGEMENT PLC and
LEWIS CHESTER,

                    Defendants,

     -and-

PENTAGON SPECIAL PURPOSE FUND, LTD.,

                    Relief Defendant.

------------------------------------------X

A P P E A R A N C E S :

          Attorneys for Plaintiff

          SECURITIES AND EXCHANGE COMMISSION
          New York Regional Office
          3 World Financial Center, Suite 400
          New York, NY 10281
          By:  Paul G. Gizzi, Esq.
               Christopher J. Dunnigan, Esq.
               John C. Lehmann Jr., Esq.

          Attorneys for Defendants

          PEPPER HAMILTON LLP
          Hamilton Square
          600 Fourteenth Street, N.W.
          Washington, DC 20005-20004
          By:  Frank C. Razzano, Esq.
               Ivan B. Knauer, Esq.
               Matthew D. Foster, Esq.

**Sweet, D.J.**

On April 3, 2008, the Securities and Exchange Commission ("Plaintiff" or "SEC") commenced the instant enforcement action against defendants Pentagon Capital Management PLC ("PCM"), Lewis Chester ("Chester") (collectively, the "Defendants"), alleging that Defendants had orchestrated a scheme to defraud mutual funds in the United States through late trading and deceptive market timing in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder. In the alternative, the SEC asserted that Defendants aided and abetted violations of Section 10(b) and Rule 10b-5.

Following a seventeen-day bench trial, by opinion of February 14, 2012 (Dkt. No. 205) (the "Merits Opinion"), the Court granted in part and denied in part the relief sought by the SEC. The Court determined that Defendants engaged in a broad ranging fraudulent scheme of late trading U.S. mutual funds but that the rules surrounding market timing of mutual funds during the period in question were not sufficiently clear to permit liability as to Defendants' market timing activities.

1

Due to the level of scienter, the extensive nature of the fraud, and the likelihood of future violations, the Court determined that injunctive relief was appropriate as to PCM and Chester. (Op. 114-16).   In addition, the Court found that Defendants engaged in over 10,000 fraudulent late trades executed through formerly registered broker-dealer Trautman, Wasserman & Company ("TW&Co.") and that the profits and losses avoided due to the late trading scheme through TW&Co. was approximately $38,416,500.   (Id. at 124.)   The Court found Defendants and Relief Defendant Pentagon Special Purpose Fund, Ltd. ("PSPF") joint and severally liable for disgorgement in that sum plus pre-judgment interest. (Id.)   The Court further held that civil penalties of an equal sum, $38,416,500, would be imposed, without stating under which of the two prongs of the relevant statutory provisions, 15 U.S.C. § 77t(d) and 15 U.S.C. § 78u(d)(3), authority to do so existed or explicitly stating whether such penalty was to be imposed on each Defendant or joint and severally.   The Court instructed the parties to submit proposed forms of final judgment on notice in conformity with the Merits Opinion.

On February 17, 2012, the SEC submitted a proposed final judgment to be entered pursuant to the Merits Opinion. The SEC's proposed final judgment reflected separate $38,416,500 civil penalties as to each of PCM and Chester, for a total of $76,833,000.   On February 21, 2012, Defendants requested, and the SEC consented to, an extension until March 2, 2012 to submit a counter-proposed final judgment to permit Defendants to retain additional counsel. (Dkt. No. 206.)   On February 29, 2012, Defendants wrote to the Court to contest the imposition of roughly $38 million in civil penalties on the Defendants on the grounds that Relief Defendant "PSPF directly received all proceeds from the trading at Trautman Wasserman" and requesting the civil penalty issue be further briefed.

Following briefing on the scope of the final judgment and submission of a proposed final judgment by Defendants, argument was heard on March 21, 2012.

In short, the parties disagree as to the maximum civil penalty permissible by statute and the appropriate penalty to be assessed thereunder.   The SEC contends that pursuant to the Merits Opinion, civil penalties of $38,416,500 should be imposed individually on both PCM and Chester and that the statutory

3

maximum is far greater. Defendants assert that the maximum penalty permissible by statute is $1.62 million for PCM and $372,000 for Chester.

## I. CIVIL PENALITES

### A. Legal Standard

Under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), courts must determine the civil penalty to be imposed "in light of the facts and circumstances" of the case. Civil penalties are designed to punish wrongdoers and deter future violations of the securities laws. SEC v. Haligiannis, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007).

In weighing the appropriate civil penalty, courts consider a number of factors including:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

4

Id.

The statutes provide that "the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation." 15 U.S.C. §§ 77t(d)(1), 78u(d)(3)(A). The statutes provide that the maximum penalty is the greater of the figure reached under either the statutes' per-violation or gross pecuniary gain prongs. Under the per-violation prong, the penalty is calculated by multiplying the number of violations by a dollar amount provided by statute; under the other, second prong, the figure is the gross amount of pecuniary gain. See, id.; SEC v. Credit Bancorp, No. 99 Civ. 11395, 2002 WL 31422602, at *2 (S.D.N.Y. Oct. 29, 2002).

The statutory maximum for the per-violation approach is determined by a three-tiered system. Tier one, for which no showing of scienter is required; tier two, for violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; tier three, for violations involving such factors plus direct or indirect substantial loss or significant risk of loss to other persons. 15 U.S.C. §§ 77t(d), 78U(d)(3).

As previously found, third tier penalties are appropriate in this case because the Defendants' violations involved "fraud, deceit, manipulation or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d), 78u(d)(3); see Op. 124-25.

With regard to third tier penalties, the statutes provide that:

> the amount of penalty for each such violation shall not exceed the greater of
>
> (i) $100,000 for a natural person or $500,000 for any other person, or
>
> (ii) the gross amount of pecuniary gain to such defendant as a result of the violation, if—
>
> (I) the violation described in paragraph (1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and
>
> (II) such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

15 U.S.C. §§ 77t(d), 78u(d)(3). Pursuant to the Debt Collection Improvement Act of 1996, the SEC has adopted rules that adjust the maximum penalty pursuant to these provisions for inflation.

6

See 17 C.F.R. § 201.1002.  For 2001 through 2003, the relevant time period, the maximum civil penalty under prong one is $120,000 for natural persons and $600,000 for any other persons per violation.  Id.

### B. Civil Penalties of $38,416,500 Are Assessed Jointly and Severally on PCM and Chester

As applicable here, Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), authorize a maximum civil penalty of $120,000 for natural persons and $600,000 for all other persons per fraudulent late trade, as each late trade violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 by fraudulently representing to the mutual funds that such trades were made prior to the 4 p.m. closing of the markets when, in fact, the operative trading decisions occurred after 4 p.m.  (Op. 98-112.)  As this Court previously found, Defendants engaged in 10,052 late trades through TW&Co. (Op. 123-24.)[1]  Accordingly, the maximum civil penalty that may be imposed on each Defendant under the per-violation prong of the statutes, 15 U.S.C. §§ 77t(d)(2)(C)(i) & 78u(d)(3)(B)(iii)(I),

---

[1]     Defendants additionally executed a limited number of late trades through broker-dealer Concord.  (Op. 73.)

are $1.206 billion for Chester (10,052 late trades x $120,000) and $6.03 billion for PCM (10,052 late trades x $600,000).

Numerous other courts have interpreted the statutes to permit a maximum penalty under the per-violation prong in this way, based upon the number of acts taken that violate the securities laws. See, e.g., SEC v. Pattison, No. C-08-4238, 2011 WL 723600, at *5 (N.D. Cal. Feb. 23, 2011) (holding that "[t]he Court may assess a penalty for each distinct violation, e.g., each time Defendant falsified a record" (citations omitted) but exercising discretion to impose a lesser penalty); SEC v. Amerifirst Funding, Inc., No. 07-CV-1188, 2008 WL 1959843, at *9 (N.D. Tex. May 5, 2008) (determining that each investment defendants received from defrauded investors constituted a violation of the securities laws, and assessing a $2,000 penalty for each of 589 investments for a total civil penalty of $1.178 million); SEC v. Johnson, No. 03 Civ. 177, 2006 WL 2053379, at *10 (S.D.N.Y. July 24, 2006) (assessing separate penalties against a research analyst for each fraudulent report); SEC v. Coates, 137 F. Supp. 2d 413, 428-30 (S.D.N.Y. 2001) (assessing a $10,000 penalty for each of four separate, misleading statements to investors); SEC v. Kenton Capital Ltd., 69 F. Supp. 2d 1, 17 & n.15 (D.D.C. 1998)

8

(assessing a $1.2 million penalty calculated by "multiplying the maximum third tier penalty for natural persons ($100,000) by the number of investors who actually sent money to [defendant] (12)"); cf. SEC v. Invest Better 2001, No. 01 Civ. 11427, 2005 WL 2385452, at *5 (S.D.N.Y. May 4, 2005) (noting that defendant "violated Sections 5(a) and 5(c) of the Securities Act, through IB2001 offerings which were purchased by at least 5,000 investors" and "committed numerous violations of the antifraud provisions of Section 17(a) of the Securities Act and Rule 10(b) of the Exchange Act" and imposing a penalty in the gross amount of pecuniary gain as a result of the total violations because "[t]he exact number of violations committed by the Defendants is nearly impossible to determine.")   While imposition of civil penalties on the basis of the number of statutory provisions violated may be appropriate in some cases, the plain language of the statute does not call for such a result.   To limit the maximum penalty authorized under the per-violation prong other than by the number of violative acts would also produce the result that a defendant who engaged in thousands of repeated violations could be penalized under this provision no more than one who committed a handful of violations.

9

Defendants argue that to calculate the maximum authorized penalty based upon the Court's finding that Defendants executed 10,052 illegal late trades would violate due process because Defendants were only on notice that the SEC had charged them with two violations of the securities laws (Defs. Mem. 10).[2]  This argument is unpersuasive.  The amended complaint alleges in detail that Defendants engaged in an extensive, multi-year late trading scheme involving "thousands of trades through TW&Co."  (Am. Compl. 19; see also id. at 2-3, 6-10, 14-22, 31-35 (Dkt. No. 15)).  As found in the Merits Opinion, Defendants understood that late trading was illegal and acted with marked scienter, going to great lengths to seek out, structure, and maintain the ability to deceive the funds into accepting their late trades (Op. 45-76, 98-112) and attempting to cover up their late trading after the fact (Op. 104-0).  As such, calculation of the maximum statutory penalty based upon the number of Defendants' late trades poses no such due process concern.

---

[2]     The Court notes that the amended complaint alleges that Defendants violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder or in the alternative aided and abetted violations of Sections 10(b) and Rule 10b-5.  (Am. Compl. 33-35.)  Defendants were found to have violated three securities fraud provisions, Section 17(a), Section 10b, and Rule 10b-5.

Defendants further argue that calculating the maximum civil penalty by this approach is not permissible because it would permit civil penalties of $1.206 billion as to Chester and $6.03 billion as to PCM. That the statute might permit such large fines does not render the imposition of a fine many times below such maximum unjust or impermissible. Moreover, that the statutes might permit severe penalties does not mean that such a fine, in this case or any other, would be appropriate or constitutionally permissible. The statutory maximum is not the only limiting factor on the imposition of civil penalties.

Within those limits, the Court must determine, "in light of the facts and circumstances," 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i), the precise amount of civil penalty warranted to be paid by the persons who committed such violations. See, e.g., SEC v. Universal Express, Inc., 646 F. Supp. 2d 552, 567 (S.D.N.Y. 2009) (assessing third tier civil penalties of $1 million and $500,000 and noting that "[a]lthough each tier established a maximum penalty per violation, the amount of any civil penalty rests squarely in the discretion of the court").

11

For the reasons set forth below, a sum equivalent to the amount of profits gained and loss avoided due to Defendants' thousands of violations of the securities laws is imposed, which is below the maximum authorized by statute and is proportionate to the pecuniary gain from Defendants' repeated violations as well as the harm caused by them.

*(1) The egregiousness of the defendant's conduct*

As found in the Merits Opinion:

> the Defendants intentionally, and egregiously, violated the federal securities laws through a scheme of late trading. This scheme was broad ranging over the course of several years and in no sense isolated. Following the filing of the action by the [New York Attorney General] against Edward Stern and Canary Capital, as found above, Defendants attempted to cover up their conduct. While Defendants have since admitted to late trading, as on this evidence they must, neither Chester nor PCM have accepted blame for their conduct.

(Op. 115-16 (citations omitted).)

*(2) The degree of the defendant's scienter*

12

As found in the Merits Opinion, Defendants acted with extreme scienter in carrying out what was an egregious scheme to defraud.  Describing this, the Court found in part:

> The evidence establishes that Defendants knew that late trading was impermissible and that they were obtaining an advantage over other investors contrary to the mutual funds' rules and SEC regulation. Defendants were repeatedly made aware, and acknowledged, that the cut-off for trading in U.S. mutual funds in order to receive the same-day NAV was 4:00 p.m. ET.

> Late trading capacity was valuable to Defendants. Indeed, Defendants paid more for late trading capacity through TW&Co.  As found above, Defendants sought late trading through other broker-dealers but were repeatedly denied.  PCM discussed late trading with at least four of these broker-dealers who refused to them that capacity, while at least three others informed Defendants that their orders had to be placed by 4:00 p.m. ET.

> Defendants further received and reviewed multiple academic articles that stated that U.S. mutual fund trades must be submitted prior to 4:00 p.m. ET in order to receive the same day NAV. The Sassano voicemail in 2001 telling Chester that late trading through TW&Co. was "crap" and that Chester should not "pressure anybody to do something stupid" was an additional red flag that late trading was illegal, and Chester's testimony that he "couldn't really understand what [Sassano] was referring to" was not credible.  That Chester cautioned Tran to be discreet when inquiring regarding late trading capacity and advised him that "[o]bviously late trading is key . . . don't know how you find out about this without actually saying it" further establishes Chester's knowledge that late trading was impermissible.

> Chester was also aware that TW&Co. falsely stamped timesheets as if orders were placed before 4 p.m. and

13

recognized that this gave Defendants "the ability to place a buy order after the bell, even if we haven't done so before the bell." Given Chester's intelligence, training, and experience both as a hedge fund manager whose business model was premised on the timing of trades and as an attorney, the evidence establishes he knew that false stamps were fraudulent and misleading.

Following the announcement of the Canary enforcement action, Chester responded to a request for a letter stating that "Pentagon has not engaged in late trading or any other illegal activity," to which he responded "not a problem." That same day, Chester provided a letter stating that PCM has "never entered into arrangements with any US onshore Mutual Fund in order to trade post-4:00pm EST for same-day NAV." At that time, Chester knew that he could not confirm that Pentagon had not late traded and that the comfort letter was deliberately misleading or false. Those statements and the fact that Defendants did not turn over the Sassano voicemail or SEC Ex. 2 (the "smoking gun" email) to the [Financial Services Authority of the United Kingdom] when prompted by document requests that should have produced them further establish that Defendants knew that their late trading was illegal.

(Op. 101-04 (citations omitted).)


*(3) Whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons*

SEC expert Professor Harris demonstrated that Defendants' fraudulent late trading created losses and the risk of substantial losses to other investors in the mutual funds traded at least in the tens of millions of dollars through dilution to their shares. (Op. 121-22; SEC Ex. 420.)

14

*(4) Whether the defendant's conduct was isolated or recurrent*

Far from isolated, Defendant's late trading scheme persisted over approximately two and a half years, through thousands of repeated and knowing violations.

*(5) Whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition*

Defendants seek to raise an issue regarding their ability to pay the civil penalties anticipated by the Merits Opinion.  As an initial matter, such a claim should have been raised at trial, not post-judgment.  The evidence does not contain documentation or estimates of their current or future financial condition, nor do they contend that they are in fact unable to pay the civil penalty imposed.  Defendants argue that a civil penalty of $38 million should not be imposed because Relief Defendant PSPF received much of this gain.  However, this does not demonstrate that the penalty should be reduced due to Defendants' financial condition.  Further, to the degree that Defendants' argument relies on Defendants' decision to wind down PCM, PCM's status is self-inflicted, and Defendants have long

15

been aware of this action, their late trading, and their
potential liability.

Moreover, in imposing monetary sanctions, the Court is
not required to assess Defendants' current ability to pay or the
collectability of any judgment. As Judge Lynch has aptly
observed:

> [Defendant's] claims of poverty cannot defeat the
> imposition of a disgorgement order or civil penalty.
> Perhaps, if [the defendant] is indeed impecunious, the
> SEC will eventually prove unable to collect on any
> judgment. But to withhold the remedy of disgorgement
> or penalty simply because a swindler claims that she
> has already spent all the loot and cannot pay would
> not serve the purposes of the securities laws. An
> order of disgorgement and civil penalty are both
> proper remedies in this case; the future will tell
> whether the SEC can find assets to levy upon.

SEC v. Inorganic Recycling Corp., No. 99 Civ. 10159, 2002 WL
1968341, at *4 (S.D.N.Y. Aug. 23, 2002); see also SEC v. Kane,
No. 97 Civ. 2931, 2003 WL 1741293, at *4 (S.D.N.Y. Apr. 1, 2003)
("[A] defendant's claims of poverty cannot defeat the imposition
of a civil penalty by a court. If the defendant is indeed
impecunious, the SEC will ultimately not be able to collect on
the judgment. . . . In addition, the court agrees with the
Commission that it should not ignore the possibility that a

16

defendant's fortunes will improve, and that one day the SEC will be able to collect on even a severe judgment.").

Defendants argue that the civil penalties sought by the SEC and those anticipated by the Merits Opinion are unjust because they are significantly larger than those imposed on TW&Co. and Gregory Trautman ("Trautman") in the SEC proceedings against them. The Commission ordered TW&Co. to disgorge $9,040,000 and assessed a $500,000 civil penalty on TW&Co., In re Trautman Wasserman & Co., SEC Release No. 340, 92 SEC Docket 1156, 2008 WL 149120 (Jan. 14 2008), and the $500,000 civil penalty initially imposed on Trautman was later reduced by administrative appeal to $120,000, In re Gregory O. Trautman, Admin. Proc. File No. 3-12559 (Commission Opinion Dec. 15, 2009) available at http://sec.gov/litigation/opinions/2009/33-9088a.pdf.

First, Defendants argue that imposition of significantly greater penalties here would be unjust because TW&Co. was "the primary malfeasor in the present case." (Defs. Mem. 12.) This contention is directly contrary to the Court's finding that "as the facts establish, Defendants did not act merely in reliance on their broker-dealers, as they have

17

asserted.  Defendants directed, indeed micromanaged, the late trading that TW&Co. performed on their behalf."  (Op. 105.) "Defendants sought out late trading through TW&Co., directed TW&Co.'s personnel to place late trades on their behalf in awareness of TW&Co.'s false time stamps, and indeed provided TW&Co. with detailed instructions for how and when to do so, according to Defendants' precise specifications, metrics, and authorization . . . . Defendants[ had] ultimate authority over both the content of and the decision to make late trades as if they had been placed before 4 p. m. ET . . . As detailed above, the evidence as a whole demonstrates that Defendants were the creators, directors, and chief beneficiaries of the fraudulent scheme. . . ."  (Op. 111-12 (citations omitted).)


In addition, Defendants argue that the Commission concluded on review of Trautman's case that through, among other things, his extensive late trading, Trautman had committed but a single "violation" for purposes of the calculation of civil penalties and that such a determination is entitled to deference.  (Defs. Mem. 13; Defs. Reply 2.)  However, the Commission did not address the issue, analogous to that here, of what the maximum civil penalty was that could be imposed on Trautman, only the appropriate penalty to impose.  In re Gregory

O. Trautman, Admin. Proc. File No. 3-12559, at 41-42.[3]   The
Commission held in relevant part:  "We have decided to impose
civil penalties based on the totality of Trautman's fraudulent
misconduct. . . . We consider a total penalty of $120,000, along
with the other sanctions imposed, to be sufficient to deter
future violations of the securities laws."  Id. at 42.
Additionally, the Commission had before it, and considered,
Trautman's financial information supporting his request for
reduced penalties.  Id. at 42-45 ("Trautman argues that he is
'destitute' and cannot pay disgorgement, interest, or civil
penalties. . . . We have reviewed the financial statements
submitted by Trautman.  Even accepting those statements at face
value, we find that the egregiousness of Trautman's conduct
outweighs discretionary waiver of disgorgement, prejudgment
interest, and/or penalties.  Ordering Trautman to pay
disgorgement of $608,886, plus prejudgment interest, and a

---

[3]   The ALJ conducted a similar inquiry, though recognizing the authority
to impose a greater penalty:

> The Division recommends third-tier penalties against TWCO in the
> amount of $500,000, against Trautman in the amount of $1,373,799,
> and against Wasserman in the amount of $511,000. The Division
> notes that a per-occurrence calculation would result in an
> astronomical result, and that TWCO "is defunct and has negligible
> assets." The conduct of TWCO and Trautman merits a third-tier
> penalty, however, given their financial condition I find it
> appropriate to assess a $500,000 civil penalty against TWCO and
> the same amount against Trautman.

In re Trautman Wasserman & Co., 2008 WL 149120, at *25-*26.

19

single third-tier penalty of $120,000 is necessary to deter others from defrauding mutual funds and their shareholders through illegal and deceptive trading practices." (citations omitted)).  As the Commission faced a different question, with different defendants, and upon a different record than that before this Court, the deference Defendants seek is inappropriate.  This is particularly the case in light of the record here, which establishes Defendant's leadership and indeed "micromanage[ment]" of the late trading scheme.  (Op. 105.)

    Defendants additionally argue that civil penalties of $38 million are inconsistent with those recently imposed in this District.  Defendants contend that in the majority of cases in which courts in this District have awarded a third tier civil penalty, the penalty assessed was less than the disgorgement amount.  (Defs. Mem. 12.)  The caselaw demonstrates that far from uncommon, courts routinely impose civil penalties equal to disgorgement.  See, e.g., SEC v. Becker, No. 09 Civ. 5707, 2010 U.S. Dist. LEXIS 52623 (S.D.N.Y. May 28, 2010) (imposing third tier penalty equal to defendants' pecuniary gain and disgorgement ordered); SEC v. Great Am. Techs., Inc., No. 07 Civ. 10694, 2010 U.S. Dist. LEXIS 34830 (S.D.N.Y. Apr. 8, 2010) (same); SEC v. Aimsi Technologies, Inc., 650 F. Supp. 2d 296

20

(S.D.N.Y. 2009) (same); SEC v. World Info. Tech., Inc., 590 F. Supp. 2d 574 (S.D.N.Y. 2008) (same); SEC v. Solow, 554 F. Supp. 2d 1356, 1368 (S.D. Fla. 2008) (same); SEC v. Haligiannis, 470 F. Supp. 2d 373 (same); SEC v. Invest Better 2001, 2005 WL 2385452 (same); SEC v. Bocchino, No. 98 Civ. 7525, 2002 U.S. Dist. LEXIS 22047 (S.D.N.Y. Nov. 8, 2002) (same); SEC v. Rosenfeld, No. 97 Civ. 1467, 2001 WL 118612 (S.D.N.Y. Jan 9, 2001) (same); cf. SEC v. Koenig, 557 F.3d 736, 744-45 (7th Cir. 2009) (affirming imposition of penalty equal to disgorgement plus prejudgment interest, holding "the district court was entitled to treat the disgorged bonuses, plus prejudgment interest, as [defendant's] 'pecuniary gain' and to impose an equal penalty in 2009 dollars"); SEC v. Razmilovic, -- F. Supp. 2d --, No. 04 Civ. 2276, 2011 WL 4629022, at *35 (E.D.N.Y. Sept. 30, 2011) (finding defendant liable for disgorgement of more than $41 million and imposing a civil penalty of approximately $20.8 million equal to one-half of the gross pecuniary gain). Defendants' actions here were extensive, as evidenced by the fact that the amount of illegal gains in this case is larger than those involved in nearly all the cases Defendants cite, some by many orders of magnitude.

Defendants contend that $38 million in civil penalties should not be imposed because "the bulk of the $38 million in gain went to PSPF, and not to Chester or PCM." (Defs. Mem. 14) Defendants argue that they should only be penalized to the extent of their individual gain as currently established by the record.    With regard to Chester, Defendants urge that "the evidence in the record indicates that Chester's gains did not exceed the amount of his salary of approximately £150,000 per annum, plus car allowance."    (Id. (citing Chester Dep. 222-24 (Jan. 17, 2011)).)  Defendants argue that, based on this salary, the amount of Chester's gain attributable to late trades through TW&Co. during the period in question is $372,000.  Defendants do not contend that such a contextually small sum was in fact Chester's pecuniary gain for his illegal conduct, simply that the evidence in the record does not demonstrate that Chester received more than this figure. (Id.)    The record does not establish that Chester's gain due to the late trading scheme was limited to $372,000, only that he received at least as much as the salary to which he testified by deposition.    SEC expert Professor Harris did not estimate the amount of Chester's individual gain (SEC Ex. 420).    The record does not establish the pecuniary gain Chester received from the scheme. As to PCM, while Professor Harris estimated the fees PCM received from both

22

late trading and market timing at approximately $14 million, this figure was based not on knowledge of PCM's fee rates, as they were not established, but instead assumed rates of a 2% management fee and a 20% performance fee. (Id.)  The evidence is silent as to whether PCM's fees were higher or lower than these estimates during the period in question.  Defendants point to the testimony of Jafar Omid for the proposition that PCM earned only $4.2 in fees from 1999 to 2003. (Tr. 2031-34.)  However, Omid testified as to net, not gross, fees (id.), while the statutes specifically call for "gross pecuniary gain." 15 U.S.C. §§ 77t(d), 78u(d)(3).  Omid's estimates are therefore not sufficient to establish PCM's pecuniary gain for civil penalty purposes.  Additionally, Omid's testimony does not address PCM's gain specifically due to Defendants' late trades.  Defendants have not sought to provide any additional financial information to establish Chester's individual gain or that of PCM nor have they agreed to open their finances to determine such figures.

Thus, the record does not establish with sufficient reliability either Defendant's individual pecuniary gain.  What is established, however, is the amount gained, and losses avoided, due to the over 10,000 fraudulent late trades Defendants executed through TW&Co. -- $38,416,500 -- and the

23

resulting loss and risk of loss of tens of millions of dollars thereby imposed upon other investors. Cf. SEC v. Invest Better 2001, 2005 WL 2385452, at *5 (assessing a penalty equal to the gross amount of the pecuniary gain because "[t]he exact number of violations committed by the Defendants is nearly impossible to determine.")

Defendants cannot wash their hands of this fact on the grounds that "the bulk of the $38 million in gain went to PSPF, and not to Chester or PCM." (Defs. Mem. 14.)  As hedge fund advisors, Defendants are directly responsible for the fund's illegal gains, which were acquired through Defendants' fraudulent acts, as well as for the significant harm thereby caused to other investors.  Defendants cannot isolate themselves from the ill-gotten gains they created on the grounds that they took illegal acts not only for their own benefit but also for the fund's.  Civil penalties in securities fraud cases are intended not only to punish the individual violator for past violations but also deter future violations of the securities laws.  See, e.g., SEC v. Razmilovic, 2011 WL 4629022, at *34; SEC v. Universal Express, Inc., 646 F. Supp. at 561. By deterring future violations, civil penalties further the goals of "encouraging investor confidence, increasing the efficiency

24

of financial markets, and promoting the stability of the securities industry." SEC v. Palmisano, 135 F.3d 860, 866 (2d Cir. 1998). Congress enacted the civil penalties because disgorgement alone did not provide an adequate "financial disincentives to securities law violations." H.R.Rep. No. 101-616 (1990), reprinted in, 1990 U.S.C.C.A.N. 1379, 1384 (the "authority to seek or impose substantial money penalties, in addition to the disgorgement of profits, is necessary for the deterrence of securities law violations") Were disgorgement alone imposed jointly and severally on Defendants and the Relief Defendant fund, and the advisors to bear no penalty in relation to the illegal gains their acts produced, little incentive would exist for advisors like Defendants not to violate the securities laws. This is particularly the case for sophisticated securities traders such Defendants, who are highly skilled in statistical analysis of risk and gain, as no doubt all violators are not caught and the potential gains to illegal trading, as this case amply demonstrates, are staggeringly large. On the record established, a penalty of $372,000 for Chester and $1.62 million for PCM is plainly insufficient to deter or punish Defendants or deter those similarly situated. As fund advisors, Defendants are responsible for the gains achieved through their illegal conduct, and their penalty should reflect this fact.

For the reasons set forth above, and pursuant to the findings of fact and conclusions of law reached in the Merits Opinion, a civil penalty of $38,416,500 joint and several as to PCM and Chester is warranted.

Finally, joint and several liability is appropriate here.  The SEC argues that the $38 million penalty should be imposed separately on each Defendant in order to ensure the punishment and deterrent purposes of the penalties are accomplished.  For support, the SEC points to two cases in which courts assessed civil penalties individually.  (SEC Mem. 6 (citing SEC v. Forest Res. Mgmt. Corp., 09 Civ. 903, 2010 WL 2077202, at *2 (S.D.N.Y. May 18, 2010); SEC v. One Wall Street, Inc., No. 06 Civ. 4217, 2008 WL 5082294, at *9-10 (E.D.N.Y. Nov. 26, 2008).)  Defendants argue that joint and several liability for civil penalties is impermissible on the ground that the SEC has argued that civil penalties cannot be assessed joint and severally.  (Defs. Mem. 3-4.)  However, neither party cites any authority for the proposition that joint and several liability for civil penalties is impermissible, particularly where, as here, the penalty is imposed pursuant to the per violation prong, and the Court is aware of none.

26

As detailed in the Merits Opinion, and evidenced in particular through the record of extensive email communications, PCM and Chester jointly created, led, and executed the late trading scheme. (Op. 45-76, 98-112.) PCM and Chester intimately collaborated in leading and carrying out the late trades, to the finest details of their metrics, timing, and procedures, thereby jointly violating the securities laws. Joint and several liability is therefore appropriate. See SEC v. Haligiannis, 470 F. Supp. 2d 373, 386 n.13 (imposing $15 million in civil penalties jointly and severally, a sum roughly equivalent to that disgorged, holding "[a]s with disgorgement and prejudgment interest, the Court holds all four defendants to be joint and severally liable for civil penalties, as there is no meaningful difference in their culpability."); see also SEC v. Elliot, No. 09 Civ. 7594, 2011 WL 3586454, at *19-*20 (S.D.N.Y. Aug. 11, 2011) (holding two sets of defendants jointly and severally liable for civil penalties in sums equal to disgorgement).

In light of the seriousness of Defendants' repeated and knowing violations of the securities laws and the substantial losses those violations created for the funds' shareholders, pursuant to 15 U.S.C. § 77t(d) and 15 U.S.C. §

27

78u(d)(3), civil penalties in the amount equal to the pecuniary gain for late trades through TW&Co., a sum of $38,416,500, are imposed jointly and severally on Defendants PCM and Chester.

### C. The Civil Penalties Imposed Do Not Violate the Excessive Fines Clause

Defendants contend that a civil penalty of $38 million as to either or both Defendants would violate the Eighth Amendment's prohibition on excessive fines under the Supreme Court's decision in United States v. Bajakajian, 524 U.S. 321 (1998).  The Eighth Amendment provides:  "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."   U.S. Const., Amdt. 8.   In Bajakajian, the Court determined that forfeiture of $357,144, with which Bajakajian attempted to leave the United States without reporting, as required by 31 U.S.C. § 5316(a)(1)(A), that he was transporting more than $10,000 in currency, violated the Excessive Fines Clause.  Bajakajian does not stand for the proposition that Defendants assert, that "civil fines be strictly proportional to any gain realized by unlawful conduct." (Defs. Mem. 14.)   Instead, Baljakajian held that "[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality:  The amount of

28

the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." 524 U.S. at 334. Thus, the inquiry under Bajakajian is thus not whether a fine is "strictly proportional to any gain realized" but instead whether it is disproportionate to the "gravity of a defendant's offense." Id. at 335. Second, the Court rejected a requirement of "strict proportionality between the amount of a punitive forfeiture and the gravity of a criminal offense," instead "adopt[ing] the standard of gross disproportionality." Id. at 336. In assessing whether the forfeiture in Bajakajian was grossly disproportionate, the Court noted that the Bajakajian's violation was unrelated to any other illegal activities, that he was "not a money launderer, a drug trafficker, or a tax evader," the class of persons for whom the statute was principally designed, but instead deemed him to have "a minimal level of culpability." Id. at 337-39; see also id. at 339 n.13 ("Respondent owed no customs duties to the Government, and it was perfectly legal for him to possess the $357,144 in cash and remove it from the United States. His crime was simply failing to report the wholly legal act of transporting his currency.") As the Court found, "[t]he harm that respondent caused was also minimal." Id. at 339. The Court reasoned:

29

Failure to report his currency affected only one party, the Government, and in a relatively minor way. There was no fraud on the United States, and respondent caused no loss to the public fist. Had his crime gone undetected the Government would have been deprived only of the information that $357,144 had left the country. The Government and the dissent contend that there is a correlation between the amount forfeited and the harm that the Government would have suffered had the crime gone undetected. We disagree. There is no inherent proportionality in such a forfeiture. It is impossible to conclude, for example, that the harm responded caused is anywhere near 30 times greater than that caused by a hypothetical drug dealer who willfully fails to report taking $12,000 out of the country in order to purchase drugs.

Id.; see also Cooper Ind., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 434-35 ("We have recognized that the relevant constitutional line is 'inherently imprecise,' rather than one 'marked by a simple mathematical formula.' But in deciding whether that line has been crossed, we have focused on the same general criteria: the degree of the defendant's reprehensibility or culpability; the relationship between the penalty and the harm to the victim caused by the defendant's actions; and the sanctions imposed in other cases for comparable misconduct." (citations omitted)).

Here, by contrast to Bajakajian, Defendants' fraudulent conduct was far from minimal or harmless. The record establishes the extensive nature of the fraud on the mutual

funds, Defendants' high degree of scienter, and the substantial loss and risk of loss of tens of millions of dollars that Defendants' illegal trades imposed on the funds' many investors. Defendants quite clearly fall into the class of persons for whom the securities fraud statutes were principally designed, and civil penalties equivalent to the disgorgement ordered are routinely imposed.    The civil penalty assessed here is proportionate to the harm Defendants caused, and, as key to the constitutional inquiry, not grossly disproportionate to the gravity of their offenses.

Moreover, as the Second Circuit has recently held, "because the factors for 'proportionality' under the Eighth Amendment are substantially similar to those that" courts must consider when imposing civil penalties pursuant to the federal securities fraud statutes, where a court properly considers such factors, "no constitutional violation" exists.    SEC v. Rosenthal, 426 Fed. Appx. 1, 4-5 (2d Cir. 2011) (citing United States v. Sabhnani, 599 F.3d 215, 262 (2d Cir. 2010), and affirming award of two times the illegal profits generated from the violations).

For the reasons set forth above, and pursuant to the findings of fact and conclusions of law reached in the Merits Opinion, a civil penalty of $38,416,500 is well-supported by the evidence of record and constitutionally permissible.

## II.  CONCLUSION

The evidence presented at trial established that Defendants engaged in an intentional and egregious fraudulent late trading scheme over the course of several years, involving thousands of transactions violative of the federal securities laws.  In light of the facts and circumstances of this case, civil penalties of $38,416,500 are assessed jointly and severally on Defendants PCM and Chester.

It is so ordered.

New York, NY
March 28, 2012

ROBERT W. SWEET
U.S.D.J.

32